# Exhibit 2

*Execution Version*

Dated as of January 20, 2017

# Note Agreement

among

**Petróleos de Venezuela, S.A.,**
as Issuer,

**PDVSA Petróleo, S.A.,**
as Guarantor,

**Dresser-Rand Company,**
as Initial Noteholder,

and

**Dresser-Rand Company,**
as Administrative Agent

**$119,645,069.70 6.50% Senior Guaranteed Note, Series 2017B**

## Table of Contents

Page

Article I Definitions .................................................................................................................... 1
Section 1.01    Defined Terms ............................................................................................... 1
Section 1.02    Terms Generally .......................................................................................... 11

Article II The Notes ................................................................................................................... 12
Section 2.01    Issuance of Initial Note ................................................................................ 12
Section 2.02    Repayment of Notes ..................................................................................... 12
Section 2.03    Interest on Notes ........................................................................................... 12
Section 2.04    Default Interest ............................................................................................. 12
Section 2.05    Repayment of Notes ..................................................................................... 13
Section 2.06    Pro-Rata Treatment ...................................................................................... 13
Section 2.07    Sharing of Setoffs ......................................................................................... 13
Section 2.08    Payments ....................................................................................................... 14
Section 2.09    Taxes ............................................................................................................. 14
Section 2.10    Registration of Notes ..................................................................................... 15
Section 2.11    Transfer and Exchange of Notes ................................................................... 15
Section 2.12    Replacement of Notes ................................................................................... 15
Section 2.13    Senior Indebtedness ...................................................................................... 16

Article III Representations and Warranties ................................................................................ 16
Section 3.01    Issuer's and Guarantor's Representations and Warranties ............................. 16
Section 3.02    Initial Noteholder's Representations and Warranties ..................................... 21

Article IV Conditions of Initial Note Issuance .......................................................................... 24
Section 4.01    Conditions to the Initial Note Issuance ......................................................... 24

Article V Covenants .................................................................................................................. 25
Section 5.01    Maintenance of Corporate Existence ............................................................. 25
Section 5.02    Insurance ....................................................................................................... 25
Section 5.03    Maintenance of Governmental Approvals ...................................................... 26
Section 5.04    Financial Statements, Reports, etc. ................................................................ 26
Section 5.05    Maintaining Records ..................................................................................... 26
Section 5.06    Compliance with Laws .................................................................................. 26
Section 5.07    Liens ............................................................................................................. 27
Section 5.08    Mergers, Consolidations, Sales of Assets and Acquisitions ........................... 27
Section 5.09    ERISA ........................................................................................................... 28

Article VI Guarantee ................................................................................................................. 29
Section 6.01    Guarantee ...................................................................................................... 29
Section 6.02    Guarantee of Payment .................................................................................... 29
Section 6.03    No Discharge or Diminishment of Note Guarantee ........................................ 29
Section 6.04    Defenses Waived ........................................................................................... 30
Section 6.05    Rights of Subrogation .................................................................................... 30
Section 6.06    Reinstatement ............................................................................................... 30
Section 6.07    Release .......................................................................................................... 30

Article VII Events of Default .................................................................................................... 31

Article VIII Administrative Agent ............................................................................................. 33

(i)

                                                                                                  **Page**

Section 8.01    Appointment and Authority...................................................................................33
Section 8.02    Rights as a Noteholder .....................................................................................33
Section 8.03    Exculpatory Provisions.....................................................................................33
Section 8.04    Reliance by Administrative Agent ....................................................................34
Section 8.05    Delegation of Duties.........................................................................................34
Section 8.06    Resignation of Administrative Agent................................................................34
Section 8.07    Non-Reliance on Administrative Agent and Other Noteholders.......................34

Article IX Miscellaneous ..........................................................................................................35
Section 9.01    Notices; Electronic Communications ...............................................................35
Section 9.02    Survival of Agreement .....................................................................................35
Section 9.03    Binding Effect ..................................................................................................36
Section 9.04    Successors and Assigns .....................................................................................36
Section 9.05    Expenses; Payments .........................................................................................38
Section 9.06    Right of Setoff..................................................................................................38
Section 9.07    Applicable Law ................................................................................................38
Section 9.08    Waivers; Amendment........................................................................................39
Section 9.09    Interest Rate Limitation....................................................................................39
Section 9.10    Entire Agreement .............................................................................................39
Section 9.11    WAIVER OF JURY TRIAL .............................................................................39
Section 9.12    Severability.......................................................................................................40
Section 9.13    Counterparts .....................................................................................................40
Section 9.14    Headings...........................................................................................................40
Section 9.15    Jurisdiction; Consent to Service of Process.......................................................40
Section 9.16    Confidentiality..................................................................................................41
Section 9.17    Noteholder Action ............................................................................................42
Section 9.18    USA PATRIOT Act Notice...............................................................................42
Section 9.19    Payment Suspension or Cessation .....................................................................42

EXHIBITS

| Exhibit A | -- | Form of Notes |
| Exhibit B | -- | Form of Assignment and Acceptance |

SCHEDULES

| Schedule 2.08 | -- | Accounts of Administrative Agent and the Initial Noteholder |
| Schedule 3.01(h) | -- | Subsidiaries |
| Schedule 3.01(i) | -- | Litigation |
| Schedule 3.01(p) | | Environmental Matters |

ANNEXES

| Annex I | -- | Description of Released Affiliates and of Novated Receivables |



## NOTE AGREEMENT

**NOTE AGREEMENT**, dated as of January 20, 2017 (the "**Effective Date**"), among **PETRÓLEOS DE VENEZUELA, S.A.**, a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela (the "**Issuer**"), **PDVSA PETRÓLEO, S.A.**, a corporation (*sociedad anónima*) organized and existing under the laws of the Bolivarian Republic of Venezuela (the "**Guarantor**"), **Dresser-Rand Company**, a company organized and existing under the laws of the State of Texas, United States of America, as Initial Noteholder (in such capacity, the "**Initial Noteholder**"), the other Noteholders (such term and each other capitalized term used but not defined in this introductory statement having the meaning given to it in Section 1.01) party hereto from time to time, and **Dresser-Rand Company**, a company organized and existing under the laws of the State of Texas, United States of America, as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") for the Noteholders.

### W I T N E S S E T H:

WHEREAS, the Issuer, certain Affiliates of the Issuer described on Annex I hereto (the "**Released Affiliates**") and the Initial Noteholder are parties to a Debt Assumption and Novation Agreement, dated as of the Effective Date (the "**Novation Agreement**");

WHEREAS, pursuant to the Novation Agreement (i) the Initial Noteholder agreed to release the Released Affiliates from their obligations to pay, and the Issuer agreed to release all and any actions, claims, rights, demands and set-offs that it ever had, may have or hereafter can, shall or may have against the Initial Noteholder arising out of or in connection with, the accounts receivable due to the Initial Noteholder as described on Annex I hereto, (ii) in consideration of such release by the Initial Noteholder, the Issuer agreed to assume and pay in full the obligations of the Released Affiliates in respect of the novated accounts receivable described on Annex I hereto (collectively, the "**Novated Receivables**"), and (iii) the Initial Noteholder agreed to release the Issuer from the Novated Receivables in consideration of the concurrent issuance of the Initial Note (as defined below) by the Issuer pursuant to this Agreement to the Initial Noteholder in a principal amount equal to the aggregate unpaid balance of the Novated Receivables held by the Initial Noteholder as of the Effective Date; and

WHEREAS, the Issuer, the Guarantor, the Initial Noteholder and the Administrative Agent are entering into this Agreement pursuant to which the Issuer will issue and pay the Note (as defined below) and the Guarantor will guarantee the payment of the Note by the Issuer, all in accordance with, and subject to, the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

**Section 1.01    Defined Terms**. As used in this Agreement, the following terms shall have the meanings specified below:

"**Accredited Investor**" shall have the meaning set forth in Rule 501 of the Securities Act.

"**Administrative Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided, however*, that the term "Affiliate" shall also include any Person that directly or indirectly owns five percent (5%) or more of any class of Equity Interests of the Person specified or that is an officer or director of the Person specified. None of the Administrative Agent, any Noteholder or any Affiliate thereof shall be deemed to be an "Affiliate" of any Finance Party for purposes of this Agreement.

"**Agreement**" shall mean this Note Agreement.

"**Anti-Bribery and Anti-Corruption Laws**" means the U.S. Foreign Corrupt Practices Act, 1977, 15 U.S.C. §§ 78m, 78dd-1 through 78dd-3 and 78ff, *et seq.*, as amended from time to time, and other reasonably applicable laws and regulations addressing prohibitions against the receipt or acceptance of improper payments and bribes involving officers, directors, employees, agents and affiliates of Governmental Authorities.

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Noteholder and an assignee substantially in the form of Exhibit B.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Business Day**" shall mean each day that is both (a) a Caracas Business Day and (b) a New York Business Day; *provided* that, in the event that there are more than three (3) consecutive days that are Unscheduled Holidays, the day immediately following the third Unscheduled Holiday that would have been a Business Day but for such Unscheduled Holiday, and each consecutive Unscheduled Holiday thereafter (if any), shall, notwithstanding such Unscheduled Holidays, constitute a Business Day hereunder.

"**Caracas Business Day**" shall mean any day other than a Saturday, Sunday or day on which banks are authorized or required by law to close in Caracas, Venezuela.

"**Change of Control**" shall mean any of the following: (a) the failure at any time of Venezuela to (i) legally and beneficially own and control, directly or indirectly, at least one hundred percent (100%) of the issued and outstanding Equity Interests of the Issuer, or (ii) have the ability to elect (and to have actually elected) and control all of the board of directors (or equivalent) of the Issuer, or (b) the failure at any time of the Issuer to (i) legally and beneficially own and control, directly or indirectly, at least one hundred percent (100%) of the issued and outstanding Equity Interests of the Guarantor, or (ii) have the ability to elect (and to have actually elected) and control all of the board of directors (or equivalent) of the Guarantor.

"**Charges**" shall have the meaning assigned to such term in Section 9.09.

"**Citgo Group**" shall mean CITGO Petroleum Corporation and its subsidiaries.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Communications**" shall have the meaning assigned to such term in Section 9.01.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.



"**Default**" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"**Designated Person**" shall mean a Person:

(a)     listed in the annex to, or otherwise targeted by the provisions of, the Executive Order;

(b)     named as a "Specially Designated National and Blocked Person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list;

(c)     to the best of any Finance Party's knowledge, with which any Finance Party is prohibited from dealing or otherwise engaging in any transaction by any Economic Sanctions Laws; or

(d)     owned (meaning fifty percent (50%) or greater ownership interest) or otherwise (directly or indirectly) controlled by a Person identified in (a) to (c) above.

"**Dollars**" or "**$**" shall mean the lawful money of the United States.

"**Economic Sanctions Laws**" shall mean the Executive Order, the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.), the Trading with the Enemy Act (50 U.S.C. App. §§ 1 et seq.), any other law or regulation promulgated thereunder from time to time and administered by OFAC, the U.S. State Department, the U.S. Department of Commerce or the U.S. Department of the Treasury, and any similar law enacted in the United States after the Effective Date, in each case as the same may be amended from time to time.

"**Effective Date**" shall have the meaning assigned to such term in the introductory statement of this Agreement.

"**Eligible Institution**" shall mean (a) any financial institution or any branch thereof (i) eligible for the then current lowest statutory rate of Venezuelan income Tax withholding from time to time generally applicable to non-Venezuelan financial institutions, or (ii) in the event a statutory rate described in (a) does not generally apply, organized under the laws of a country subject to a double-taxation treaty with Venezuela; or (b) the Initial Noteholder.

"**Environmental Laws**" shall mean all former, current and future Venezuelan national, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"**Environmental Liability**" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

3

"**Equity Interests**" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with the Issuer, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**Events of Default**" shall have the meaning assigned to such term in Article VII.

"**Excluded Taxes**" shall mean, (a) with respect to the Administrative Agent, any Noteholder or any other recipient of any payment to be made by or on account of any obligation of the Issuer hereunder, (i) income or franchise Taxes imposed on (or measured by) its net income by the United States, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Noteholder, in which its applicable lending office is located, and (ii) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction described in (i) above, and (b) with respect to any Noteholder that is not an Eligible Institution, any portion of withholding Tax, if any, that exceeds five percent (5%) (or the then current lowest rate of Venezuelan income Tax withholding from time to time generally applicable to an Eligible Institution) of the amount subject to the withholding Tax.

"**Executive Order**" shall mean U.S. Executive Order No. 13224 on Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism.

"**Finance Documents**" shall mean this Agreement, the Notes and any other document executed in connection with the foregoing.

"**Finance Parties**" shall mean the Issuer and the Guarantor.

"**Governmental Authority**" shall mean any federal, national, state or local court or governmental agency, authority, instrumentality or regulatory body of any jurisdiction or territory.

"**Guarantee**" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided*, *however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 6.01.

4



"**Guarantor**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Hazardous Materials**" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**Hedging Agreement**" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement, credit default swap agreement or other interest or currency exchange rate or commodity price or credit risk hedging arrangement.

"**IFRS**" shall mean the International Financial Reporting Standards promulgated from time to time by the International Accounting Standards Board or any successor institution ("**IASB**") (which includes standards and interpretations approved by the IASB and International Accounting Standards issued under its previous constitutions), together with its pronouncements thereon from time to time, applied on a basis consistent with the financial statements delivered pursuant to Section 4.01(c).

"**Indebtedness**" shall mean any obligation (whether present or future, actual or contingent and including any Guarantee) for the payment or repayment of money which has been borrowed or raised, excluding, for the avoidance of doubt, the issuance of Equity Interests constituting common stock or ordinary shares.

"**Indemnified Taxes**" shall mean Taxes other than Excluded Taxes.

"**Ineligible Transferee**" shall mean any Person that is (a) a Venezuelan Person, (b) a Venezuelan financial institution, (c) a Venezuelan branch of a non-Venezuelan financial institution, (d) a state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including the central bank) thereof (a "**Sovereign**"), (e) established by treaty or other arrangement between two or more Sovereigns and includes the International Monetary Fund, European Central Bank, International Bank for Reconstruction and Development, European Bank for Reconstruction and Development and International Finance Corporation, or (f) not a Qualified Institutional Buyer or a buyer purchasing pursuant to a registration statement registered under the Securities Act.

"**Information**" shall have the meaning assigned to such term in Section 9.16.

"**Initial Note**" shall mean the "6.50% Senior Guaranteed Note, Series 2017B" to be issued by the Issuer to the Initial Noteholder pursuant to this Agreement, substantially in the form of Exhibit A hereto with the legend thereon.

"**Initial Noteholder**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Initial Repayment Date**" shall mean April 20, 2017; *provided*, that if the Initial Repayment Date would occur on a day that is not a New York Business Day, the Initial Repayment Date shall be on the immediately succeeding New York Business Day.

"**Issuer**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under

any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a materially adverse effect on the business, assets, liabilities, operations or condition (financial or otherwise) of the Issuer, the Guarantor and their respective subsidiaries, taken as a whole, which has resulted, or could reasonably be expected to result, without the occurrence of any other event or effect, in an event described in clause (b) or (c) of this definition, (b) a material impairment of the ability of any Finance Party to perform any of its obligations under any Finance Document or (c) a material impairment of the rights and remedies of or benefits available to the Administrative Agent or the Noteholders under any Finance Document.

"**Maturity Date**" shall mean January 20, 2020; *provided*, that if the Maturity Date would occur on a day that is not a New York Business Day, the Maturity Date shall be on the immediately succeeding New York Business Day.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 9.09.

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**New York Business Day**" shall mean each day other than a Saturday, Sunday or a day on which banks in New York, New York, United States are authorized or required by law to close.

"**Noteholders**" shall mean (a) the Initial Noteholder (to the extent it has not ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any Person that has become a party hereto pursuant to an Assignment and Acceptance.

"**Notes**" shall mean the Initial Note and any promissory note or notes issued in exchange or replacement thereof in accordance with Section 2.11 and Section 2.12, respectively.

"**Novated Receivables**" shall have the meaning assigned to such term in the recitals hereto.

"**Novation Agreement**" shall have the meaning assigned to such term in the recitals hereto.

"**Obligated Party**" shall have the meaning assigned to such term in Section 6.02.

"**Obligations**" shall mean all obligations of every nature of each Finance Party from time to time owed to the Administrative Agent and/or the Noteholders or any of them, under any Finance Document, whether for principal, interest, fees, expenses, indemnification or otherwise.

"**OFAC**" shall mean the Office of Foreign Assets Control of the U.S. Department of the Treasury (or any successor thereto).

"**Other Taxes**" shall mean any and all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made under any Finance Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Finance Document, other than Excluded Taxes.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation.

"**Permitted Liens**" shall mean the following types of Liens:

6



(a)      Liens for Taxes, assessments or governmental charges or claims either (i) not delinquent (taking into account all available extensions) or (ii) contested in good faith by appropriate proceedings and as to which the Issuer or any of the Subsidiaries shall have set aside on its books such reserves to the extent required pursuant to IFRS;

(b)      statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law or pursuant to customary reservations or retentions of title incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, to the extent required by IFRS shall have been made in respect thereof;

(c)      Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure public or statutory obligations, the performance of tenders, statutory obligations, surety and/or appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), including any Lien securing letters of credit issued in the ordinary course of business in connection therewith;

(d)      any judgment Lien not giving rise to an Event of Default;

(e)      easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Issuer or any of the Subsidiaries;

(f)      any interest or title of a lessor under any capitalized lease obligation; *provided* that such Liens do not extend to any property or assets which are not leased property subject to such capitalized lease obligation;

(g)      Liens granted upon or with respect to any assets hereafter acquired by the Issuer or any of the Subsidiaries to secure the acquisition costs of such assets or to secure Indebtedness incurred solely for the purpose of financing the acquisition of such assets, including any Lien existing at the time of the acquisition of such assets as long as the maximum amount so secured shall not exceed the aggregate acquisition costs of all such assets or the aggregate Indebtedness incurred solely for the acquisition of such assets, as the case may be;

(h)      Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(i)      Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(j)      Liens arising in the ordinary course of business in connection with Indebtedness maturing not more than one (1) year after the date on which such Indebtedness was originally incurred and which are related to the financing of export, import or other trade transactions;

(k)      Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer or any of the Subsidiaries, including rights of offset and set-off;

7



(l)     Liens securing Hedging Agreements otherwise permitted under this Agreement;

(m)    Liens existing on any asset or on any stock of any Subsidiary prior to the acquisition thereof by the Issuer or any of the Subsidiaries as long as such Lien is not created in anticipation of such acquisition;

(n)    Liens existing as of the Effective Date;

(o)    Liens securing any senior indebtedness of the Issuer or any of its Subsidiaries;

(p)    Liens in favor of the Issuer or any of the Subsidiaries;

(q)    Liens on property of a Person existing at the time such Person is merged with or into or consolidated with the Issuer or any of the Subsidiaries or becomes a subsidiary thereof; *provided* that such Liens were in existence prior to the contemplation of such merger or consolidation and do not extend to any other assets owned by the Issuer or such subsidiary;

(r)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods or other Liens on inventory and goods to facilitate the purchase, shipment, or storage of such inventory or goods;

(s)    Liens on assets that are the subject of a direct or indirect arrangement relating to property now owned or hereafter acquired whereby the Issuer or any of the Subsidiaries transfers such property to another Person and the Issuer or such Subsidiary leases it from such Person;

(t)    Liens arising by operation of law;

(u)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depositary institution;

(v)    Liens on the receivables or inventory of the Issuer or any of the Subsidiaries securing obligations under or in connection with any lines of credit or working capital facilities;

(w)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not interfere in any material respect with the business of the Issuer and the Subsidiaries;

(x)    Liens in favor of the Venezuelan government or any agency or instrumentality thereof to secure payments under any agreement entered into between such entity and the Issuer or any of the Subsidiaries;

(y)    Liens to secure obligations of the Issuer or any of the Subsidiaries under agreements that provide for indemnification, adjustment of purchase price or similar obligations, in each case, incurred in connection with the disposition of any business, assets or subsidiary; *provided* that the maximum aggregate liability in respect of all such Liens will at no time exceed the gross proceeds actually received by the Issuer and the Subsidiaries in connection with such disposition;

(z)    Lien over any Qualifying Asset relating to a project financed by, and securing Indebtedness incurred in connection with, the Project Financing of such project by the Issuer, any of the Subsidiaries or any consortium or other venture in which the Issuer has any ownership or similar interest; and



(aa)    Liens in respect of Indebtedness the principal amount of which in the aggregate, together with all Liens not otherwise qualifying as the Issuer's Permitted Liens pursuant to this definition, does not exceed fifteen percent (15%) of the Issuer's consolidated total assets (as determined in accordance with IFRS) at any date as at which the Issuer's balance sheet is prepared and published pursuant to any indenture, agreement or other instrument to which it is a party.

"**Person**" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 307 of ERISA, and in respect of which the Issuer or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Process Agent**" shall mean Corporation Service Company, having its offices on the Effective Date at 1180 Avenue of the Americas, Suite 210, New York, NY 10036.

"**Project Financing**" of any project shall mean the incurrence of Indebtedness relating to the exploration, development, expansion, renovation, upgrade or other modification or construction of such project pursuant to which the providers of such Indebtedness or any trustee or other intermediary on their behalf or beneficiaries designated by any such provider, trustee or other intermediary are granted security over one or more Qualifying Assets relating to such project for repayment of principal, premium and interest or any other amount in respect of such Indebtedness.

"**Qualified Institutional Buyer**" shall have the meaning set forth in Rule 144A of the Securities Act.

"**Qualifying Asset**" in relation to any Project Financing shall mean:

(a)    any concession, authorization or other legal right granted by any Governmental Authority to the Issuer or any of the Subsidiaries, or any consortium or other venture in which the Issuer or any of the Subsidiaries has any ownership or other similar interest;

(b)    any drilling or other rig, any drilling or production platform, pipeline, marine vessel, vehicle or other equipment or any refinery, oil or gas field, processing plant, real property (whether leased or owned), right of way or plant or other fixtures or equipment;

(c)    any revenues or claims that arise from the operation, failure to meet specifications, failure to complete, exploitation, sale, loss or damage to, such concession, authorization or other legal right or such drilling or other rig, drilling or production platform, pipeline, marine vessel, vehicle or other equipment or refinery, oil or gas field, processing plant, real property, right of way, plant or other fixtures or equipment or any contract or agreement relating to any of the foregoing or the project financing of any of the foregoing (including insurance policies, credit support arrangements and other similar contracts) or any rights under any performance bond, letter of credit or similar instrument issued in connection therewith;

(d)    any oil, gas, petrochemical or other hydrocarbon-based products produced or processed by such project, including any receivables or contract rights arising therefrom or relating thereto and any such product (and such receivables or contract rights) produced or processed by other projects, fields or assets to which the lenders providing the project financing required, as a condition therefore, recourse as security in addition to that produced or processed by such project; and

9

(e)      shares, rights or other ownership interest in, and any subordinated debt rights owing to the Issuer by, a special purpose company or vehicle formed solely for the development of a project, and whose principal assets and business are constituted by such project and whose liabilities solely relate to such project.

"**Regulation S**" shall mean Regulation S promulgated by the United States Securities and Exchange Commission as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"**Released Affiliates**" shall have the meaning assigned to such term in the recitals hereto.

"**Repayment Date**" shall mean (a) the Initial Repayment Date and (b) for each successive Repayment Date, each day in January, April, July and October described on Exhibit A to the form of Note attached hereto occurring after the Initial Repayment Date and on or prior to the Maturity Date (including the Maturity Date); *provided* that, in each case, whenever any Repayment Date would occur on a day that is not a New York Business Day, such Repayment Date shall be on the immediately succeeding New York Business Day.

"**Reportable Event**" shall mean any of the events set forth in Section 4043(c) of ERISA or the regulations thereunder, with respect to a Plan as to which the PBGC has not by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of that event. However, with respect to any Plan, a failure to meet the minimum funding standard of Section 412 of the Code or Section 302 of ERISA shall be a reportable event for the purposes of this definition regardless of the issuance of any waiver.

"**Required Noteholders**" shall mean, at any time, Noteholders having Notes having an aggregate outstanding principal balance more than 66.66% of the aggregate outstanding principal balance of all Notes outstanding at such time.

"**Reserved Payments**" shall have the meaning assigned to such term in Section 9.19.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Significant Subsidiary**" shall mean any Subsidiary that would be a "Significant Subsidiary" of the Issuer within the meaning of Rule 1-02 under Regulation S-X promulgated by the United States Securities and Exchange Commission.

"**Similar Law**" shall have the meaning assigned to such term in Section 3.02(k).

"**Subsidiary**" shall mean any subsidiary of the Issuer.



"**subsidiary**" shall mean, with respect to any Person (herein referred to as the "**parent**"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than fifty percent (50%) of the equity or more than fifty percent (50%) of the ordinary voting power or more than fifty percent (50%) of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**successor company**" shall have the meaning assigned to such term in Section 5.08.

"**Taxes**" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"**Threshold Amount**" shall mean, in respect of any Event of Default, the lesser of (a) one hundred million Dollars ($100,000,000) or (b) any lower threshold amount set out in any Indebtedness of the Issuer, the Guarantor or any of the Significant Subsidiaries in respect of an analogous event.

"**Transactions**" shall mean, collectively, (a) the execution, delivery and performance by the Issuer, the Released Affiliates, and the Initial Noteholder of the Novation Agreement, (b) the execution, delivery and performance by the Finance Parties of the Finance Documents to which they are a party and the making and borrowing of the Notes hereunder, and (c) the payment of related fees and expenses.

"**Transaction Documents**" shall mean the Novation Agreement and the Finance Documents.

"**Unfunded Vested Liability**" shall mean, relative to any Plan, including any Multiemployer Plan, at any time, the excess (if any) of (a) the present value of all vested nonforfeitable benefits under such Plan or such Multiemployer Plan, as the case may be, over (b) the fair market value of all Plan assets or Multiemployer Plan assets, as the case may be, allocable to such benefits, all determined as of the then most recent valuation date for such Plan or such Multiemployer Plan, as the case may be, but only to the extent that such excess represents a potential liability of the Issuer to the PBGC, such Plan or such Multiemployer Plan under Title IV of ERISA.

"**United States**" and "**U.S.**" shall mean the United States of America.

"**Unscheduled Holiday**" shall mean a day that is not a Caracas Business Day and with respect to which the market was not made aware of such fact (by means of a public announcement or other publicly available information) until a time later than 9:00 a.m. local time in Caracas five (5) Caracas Business Days prior to such Unscheduled Holiday.

"**USA PATRIOT Act**" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001, as amended)).

"**Venezuela**" shall mean the Bolivarian Republic of Venezuela.

"**Venezuelan Governmental Authority**" shall mean any Governmental Authority of Venezuela.

"**Welfare Plan**" means a "welfare plan" as such term is defined in Section 3(1) of ERISA.

**Section 1.02**    **Terms Generally**. The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property"

11

shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. All references herein to Articles, Sections, Exhibits, Schedules and Annexes shall be deemed references to Articles and Sections of, and Exhibits, Schedules and Annexes to, this Agreement unless the context shall otherwise require and all references herein to this Agreement shall be deemed to include the Exhibits, Schedules and Annexes hereto. Except as otherwise expressly provided herein, (a) any reference in this Agreement to any agreements (including the Transaction Documents), other contractual instruments and publications shall mean such agreement, instrument or publication as amended, restated, supplemented or otherwise modified from time to time, (b) any reference made in any Finance Document to any Person shall mean such Person and its permitted successors and assigns, and (c) all terms of an accounting or financial nature shall be construed in accordance with IFRS, as in effect on the Effective Date and consistent with financial statements delivered pursuant to Section 3.01(e).

## ARTICLE II

## THE NOTES

**Section 2.01    Issuance of Initial Note**.

(a)    The execution and delivery of this Agreement and the other Transaction Documents shall occur at a location in New York, New York that is mutually agreed upon by the parties, at 9:00 a.m., New York time (or at such other place or time or in such other manner as may be mutually agreed upon by the parties hereto), at a closing on the Effective Date.

(b)    On the Effective Date and upon the satisfaction or waiver of the conditions precedent specified in Section 4.01, the outstanding Novated Receivables held by the Initial Noteholder shall be released pursuant to the Novation Agreement and converted into the Initial Note issued by the Issuer pursuant to this Agreement to the Initial Noteholder in an principal amount equal to the aggregate outstanding amount of such Novated Receivables held by the Initial Noteholder as of the Effective Date as set forth on Annex I hereto. At the closing, the Issuer will deliver to the Initial Noteholder the Initial Note in the principal amount of the Novated Receivables of the Initial Noteholder that are released by the Initial Noteholder pursuant to the Novation Agreement substantially in the form of Exhibit A hereto with the legend thereon, dated the Effective Date and registered in the name of the Initial Noteholder.

**Section 2.02    Repayment of Notes**. (a) The Issuer hereby unconditionally promises to pay to each Noteholder the principal amount of the Note of such Noteholder as provided in Section 2.05.

(b)    Each Noteholder shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Issuer to such Noteholder resulting from each Note issued hereunder, including the amounts of principal and interest payable and paid to such Noteholder from time to time under this Agreement in respect of each such Note.

**Section 2.03    Interest on Notes**. (a) Subject to the provisions of Section 2.04, the Notes shall bear interest on the unpaid principal balance thereof from and after the Effective Date but excluding the date of repayment thereof, based on and computed on the basis of actual number of days elapsed on a year of 365 days, at a rate per annum equal to six and one-half percent (6.50%).

(b)    Interest on the Notes shall be payable  on the Repayment Dates (including the Maturity Date), or at maturity by acceleration, and, after such maturity, on demand.

**Section 2.04    Default Interest**. If (a) the Issuer shall default in the payment of any principal of or interest on any Note or any other amount due hereunder or under any other Finance Document, by



acceleration or otherwise (including automatic acceleration), or (b) if any Event of Default under Article VII (other than clause (a), (b) or (f) of Article VII) has occurred and is continuing and the Required Noteholders accelerate the Notes or direct the Administrative Agent to accelerate the Notes, then, in the case of clause (a) above, until such defaulted amount shall have been paid in full or, in the case of clause (b) above, from the date the applicable action has been taken by the Required Noteholders and for so long as such Event of Default is continuing or until the date the Required Noteholders agree otherwise, to the extent permitted by law, all amounts outstanding under this Agreement and the other Finance Documents shall bear interest (after as well as before judgment), payable on demand, based on and computed on the basis of actual number of days elapsed on a year of three hundred sixty five (365) days, at a rate per annum equal to eight and one-half percent (8.50%).

Section 2.05    **Repayment of Notes**. (a) The Issuer shall pay to the Administrative Agent, for the account of the Noteholders, on each Repayment Date, a principal amount of the Notes equal to the original principal amounts of the Note for the corresponding Repayment Dates set forth on Exhibit A to the form of Note attached hereto; *provided* that, if any Note or any portion thereof is transferred or exchanged to one or more Noteholders pursuant to Section 2.11 or replaced or exchanged pursuant to Section 2.12, Exhibit A of such Note or Notes issued pursuant to Section 2.11 or Section 2.12, as the case may be, shall be modified to reflect the installments of principal due to be paid with respect to all Repayment Dates occurring after the date of the Note or Notes that is or are issued in exchange pursuant to Section 2.11 or replacement pursuant to Section 2.12.

(b)    To the extent not previously paid, all Notes shall be due and payable on the Maturity Date together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(c)    The Issuer shall have the right to prepay the Notes in whole or in part at any time after not less than five (5) Business Days' notice by the Issuer to the Administrative Agent . All such prepayments shall be applied in the inverse order of the maturity of the installments of principal due under the Notes.

(e)    All repayments or prepayments permitted pursuant to this Section 2.05 shall be without premium or penalty.

Section 2.06    **Pro-Rata Treatment**. Each payment or prepayment of principal of any Note and each payment of interest on the Notes shall be allocated *pro rata* among the Notes in accordance with their respective principal amounts outstanding and unpaid thereon.

Section 2.07    **Sharing of Setoffs**. Each Noteholder agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Issuer or any other Finance Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Noteholder under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of the Notes as a result of which the unpaid principal portion of its Notes shall be proportionately less than the unpaid principal portion of the Notes of any other Noteholder, it shall be deemed simultaneously to have purchased from such other Noteholder at face value, and shall promptly pay to such other Noteholder the purchase price for, a participation in the Notes of such other Noteholder, so that the aggregate unpaid principal amount of the Notes and participation in the Notes held by each Noteholder shall be in the same proportion to the aggregate unpaid principal amount of all Notes then outstanding as the principal amount of its Notes prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Notes outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided, however*, that (a) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.07 and the payment giving rise thereto

shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (b) the provisions of this Section 2.07 shall not be construed to apply to any payment made by the Issuer pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Noteholder as consideration for the assignment of or sale of a participation in any of its Notes to any assignee or participant, other than to the Guarantor or any of its Affiliates (as to which the provisions of this Section 2.07 shall apply).   The Issuer and the Guarantor expressly consent to the foregoing arrangements.

**Section 2.08    Payments**.  (a) The Issuer shall make each payment (including principal of or interest on any Note, fees or other amounts) hereunder and under any other Finance Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, solely and exclusively in Dollars as currency of payment, and without setoff, defense or counterclaim (other than as specifically provided for in any such Finance Document solely with respect to amounts due under such Finance Document, including as provided in Section 2.09(d)). Each such payment shall be made to the Administrative Agent (at its offices at West8 Tower, Suite 1000, 10205 Westheimer Road, Houston, TX 77042, Attention: Erik Scherzer and Martha Vance, or to its account set forth on Schedule 2.08) who shall promptly distribute to each Noteholder any payments received by the Administrative Agent on behalf of such Noteholder, in each case to the account of such Noteholder set forth on Schedule 2.08 or as designated by the applicable Noteholder in its Assignment and Acceptance, or at such other address as shall be designated by such Noteholder from time to time to the Issuer and the Administrative Agent.

(b)      Except as otherwise expressly provided herein, whenever any payment (including interest on any Note, fees or other amounts) hereunder or under any other Finance Document shall become due, or otherwise would occur, on a day that is not a New York Business Day, such payment may be made on the immediately succeeding New York Business Day, and such extension of time shall in such case be included in the computation of interest or fees, if applicable.

**Section 2.09    Taxes**.  (a) Any and all payments by or on account of any obligation of the Issuer or any other Finance Party hereunder or under any other Finance Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided* that, if the Issuer or any other Finance Party shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.09) the Administrative Agent and each Noteholder (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Issuer or such Finance Party shall make such deductions and (iii) the Issuer or such Finance Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)      In addition, the Issuer shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      The Issuer shall indemnify the Administrative Agent and each Noteholder within twenty (20) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Noteholder, as the case may be, on or with respect to any payment by or on account of any obligation of the Issuer or any other Finance Party hereunder or under any other Finance Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.09) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.

14



(d)      As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Issuer or any other Finance Party to a Governmental Authority, the Issuer shall deliver to the applicable Noteholder and, if applicable, the Administrative Agent, the original or a copy of either a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Noteholder and/or the Administrative Agent. If a Noteholder is not an Eligible Institution, notwithstanding any other provision of the Finance Documents, each Finance Party shall be entitled to deduct and setoff from the payments due to such Noteholder under the Finance Documents all amounts that are paid by either of such Finance Parties to a Governmental Authority for Excluded Taxes of the type that are described in clause (b) of the definition of Excluded Taxes set forth in Section 1.01.

**Section 2.10      Registration of Notes**. The Issuer shall keep at its principal executive office a register for the registration and transfer of the Initial Note or, if applicable after a transfer and exchange of the Initial Note for more than one Note pursuant to Section 2.11, the Notes. The name and address of each Noteholder, each transfer thereof and the name and address of each transferee of the Notes shall be registered in such register. The Person in whose name any Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Issuer shall not be affected by any notice or knowledge to the contrary except for an assignee of the Note in respect of which the Issuer has received an executed Assignment and Acceptance as provided in Section 9.04.

**Section 2.11      Transfer and Exchange of Notes**.

(a)      Upon surrender of any Note or part thereof at the principal executive office of the Issuer for transfer or exchange (and in the case of a surrender for transfer, duly endorsed and accompanied by an Assignment and Acceptance duly executed by the registered holder of such Note or his attorney duly authorized in writing and the transferee and accompanied by the address for notices of each transferee of such Note or part thereof), the Issuer shall execute and deliver, at the Issuer's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note; *provided*, that Notes issued in exchange for a surrendered Note must be issued in a minimum denomination of one hundred thousand Dollars ($100,000) each and in integral multiples of one thousand Dollars ($1,000) in excess thereof. The Initial Note, and any subsequent Note issued as a result of a transfer or exchange in accordance with the terms of this Section 2.11, may be transferred or exchanged in part. Each new Note shall be payable to the transferee and shall be substantially in the form of Exhibit A with the legend thereon, which shall not be modified under any circumstances. Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest stall have been paid thereon. The Issuer may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes.

(b)      The Noteholder shall pay the cost of delivering to or from such Noteholder's home office or custodian bank from or to the Issuer, insured to the reasonable satisfaction of such holder, the surrendered Note and any Note issued in substitution for the surrendered Note.

**Section 2.12      Replacement of Notes**.

(a)      Upon receipt by the Issuer of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note, and

(i)      in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or



(ii)      in the case of mutilation, upon surrender and cancellation thereof,

the Issuer at its own expense shall execute and deliver, in lieu thereof, a new Note, which shall be substantially in the form of Exhibit A with the legend thereon and dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon.

(b)      The Noteholder shall pay the cost of delivering to or from such Noteholder's home office or custodian bank from or to the Issuer, insured to the reasonable satisfaction of such holder, a mutilated Note and any Note issued in replacement for the mutilated Note.

**Section 2.13      Senior Indebtedness.** The Notes constitute senior, unsecured, unsubordinated indebtedness of the Issuer that rank *pari passu* in priority of payment and in all other respects with all existing and future senior, unsecured, unsubordinated indebtedness of the Issuer, except for obligations mandatorily preferred by the laws of Venezuela and applying to companies generally.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

**Section 3.01      Issuer's and Guarantor's Representations and Warranties**.  The Issuer and the Guarantor represent and warrant to the Administrative Agent and the Initial Noteholder on the Effective Date that:

(a)      Organization; Powers.  The Issuer, the Guarantor and each of the Subsidiaries (except with respect to the Subsidiaries (other than the Guarantor), only to the extent that failure to do so could result in a Material Adverse Effect) (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, (iii) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a Material Adverse Effect, and (iv) has the power and authority to execute, deliver and perform its obligations under each of the Transaction Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Issuer, to issue the Initial Note hereunder.

(b)      Authorization.  The Transactions (i) have been duly authorized by all requisite corporate and, if required, stockholder action and (ii) will not (A) violate (1) any provision of law, statute, rule or regulation, or of the certificate or articles of organization or other constitutive documents or by-laws of the Issuer, the Guarantor or any Subsidiary, (2) any order of any Governmental Authority or (3) any provision of any indenture, agreement or other instrument to which the Issuer, the Guarantor or any Subsidiary is a party or by which any of them or any of their property is or may be bound, (B) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (C) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Issuer, the Guarantor or any Subsidiary.

(c)      Enforceability.  This Agreement has been duly executed and delivered by the Issuer and the Guarantor, and constitutes, and each other Transaction Document when executed and delivered by the Issuer, the Guarantor and each Subsidiary party thereto will constitute, a legal, valid and binding obligation of the Issuer, the Guarantor and each such Subsidiary, enforceable against the Issuer, the Guarantor and any such Subsidiary in accordance with its terms (except, in any case, as such

16

enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

(d)  Governmental Approvals.  No action, consent or approval (including any exchange control approval) of, registration or filing with or any other action by any Governmental Authority having jurisdiction over any Finance Party is or will be required in connection with the Transactions, except for such as have been made or obtained and are in full force and effect.

(e)  Financial Statements.  The Issuer has heretofore furnished to the Initial Noteholder its annual consolidated financial statements (including the notes thereof) as of and for the fiscal year ended December 31, 2015, prepared in accordance with IFRS and presented in the English language, together with a report thereon by the Issuer's certified independent accountants. Such financial statements and all other financial statements delivered in accordance with Section 5.04 hereof present fairly the financial condition of the Issuer and its consolidated Subsidiaries as of such date and for such period, and, to the extent required by IFRS, disclose all material liabilities, direct or contingent, of the Issuer and its consolidated Subsidiaries as of the date thereof.

(f)  No Material Adverse Effect.  No Material Adverse Effect has occurred since December 31, 2015.

(g)  Title to Properties; Possession Under Leases.

(i)  Each of the Issuer and the Guarantor has good and marketable title to, or valid leasehold interests in, all its material properties and assets, and each of the Subsidiaries has good and marketable title to, or valid leasehold interests in, all its material properties and assets, except to the extent such failure of a Subsidiary (other than the Guarantor) to have good and marketable title or a valid leasehold interest could not reasonably be expected to result in a Material Adverse Effect.  All such material properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 5.07 and Permitted Liens.

(ii)  Each of the Issuer and the Guarantor has complied with all obligations under all material leases to which it is a party and all such leases are in full force and effect, and each of the Subsidiaries has complied with all obligations under all material leases to which it is a party and all such leases are in full force and effect, except to the extent such failure of a Subsidiary (other than the Guarantor) to comply could not reasonably be expected to result in a Material Adverse Effect. Each of the Issuer and the Guarantor enjoys peaceful and undisturbed possession under all such material leases, and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases, except to the extent such possession by a Subsidiary (other than the Guarantor) could not reasonably be expected to result in a Material Adverse Effect.

(h)  Subsidiaries.  Schedule 3.01(h) sets forth as of the Effective Date a list of all Subsidiaries and the respective percentage ownership interest of the Issuer and/or the Guarantor therein. The shares of capital stock or other ownership interests so indicated on Schedule 3.01(h) are fully paid and non-assessable and are owned by the Issuer or the Guarantor, directly or indirectly, free and clear of all Liens.

(i)  Litigation; Compliance with Laws.

(i)  Except as set forth on Schedule 3.01(i), there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending

17



or, to the knowledge of the Issuer or the Guarantor, threatened against or affecting the Issuer, the Guarantor or any Subsidiary or any business, property or rights of any such Person (i) that involve any Transaction Document or the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(ii)     None of the Issuer, the Guarantor or any of the Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted or the entry into or performance of its obligations under any Transaction Document violate, any law, rule or regulation (including any tax law, disclosure or reporting requirement, securities laws and regulations, zoning, building, Environmental Law, ordinance, code or approval or any building permits), or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.

(j)      Agreements.

(i)     None of the Issuer, the Guarantor or any of the Subsidiaries is a party to any agreement or instrument or subject to any corporate restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(ii)     None of the Issuer, the Guarantor or any of the Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect.

(k)      Federal Reserve Regulations.

(i)     None of the Issuer, the Guarantor or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(ii)     None of the Issuer, the Guarantor or any of the Subsidiaries is a "public utility" within the meaning of, or subject to regulation under, the United States Federal Power Act of 1920 (16 U.S.C. §§791 et seq.).

(l)      Investment Company Act.  None of the Issuer, the Guarantor or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

(m)      Tax Returns.  Each of the Issuer, the Guarantor and the Subsidiaries has filed or caused to be filed all foreign and Venezuelan federal, national, state and local tax returns or materials required to have been filed by it, except any for which failure to file could not reasonably be expected to result in a Material Adverse Effect, and has paid or caused to be paid all Taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which the Issuer, the Guarantor or such Subsidiary, as applicable, shall have set aside on its books adequate reserves.

(n)      No Material Misstatements.  No information, report, financial statement, exhibit or schedule furnished by or on behalf of the Issuer or the Guarantor to the Administrative Agent or any

18

Noteholder in connection with the negotiation of any Transaction Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Issuer represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with the historical audited financial statements of the Issuer and the Guarantor, as applicable) and due care in the preparation of such information, report, financial statement, exhibit or schedule.

    (o)    <u>Employee Benefit Plans</u>.

    (i)    None of the Issuer, the Guarantor or any ERISA Affiliate (other than any member of the Citgo Group) has during the past five years maintained, contributed to or had an obligation to contribute to any Plan, Multiemployer Plan or has any present intention to do so.

    (ii)    In respect of the Citgo Group:

    (A)    each Plan complies in all material respects with all requirements of law except to the extent that noncompliance could not reasonably be expected to have a Material Adverse Effect;

    (B)    no Reportable Event has occurred, or is reasonably likely to occur, with respect to any Plan which could result in any member of the Citgo Group incurring a liability or obligation in excess of fifty million Dollars ($50,000,000);

    (C)    no steps have been taken to terminate any Plan which could result in any member of the Citgo Group making a contribution, or incurring a liability or obligation, to such Plan in excess of fifty million Dollars ($50,000,000), and no steps have been taken to appoint a receiver or trustee to administer any such Plan;

    (D)    there is no Unfunded Vested Liability with respect to any Plan that would reasonably be expected to have, in the event of termination of such Plan, a Material Adverse Effect;

    (E)    no Plan is determined to be, or is expected to be, in at-risk status (within the meaning of Title IV of ERISA);

    (F)    no contribution failure has occurred with respect to any Plan sufficient to give rise to a Lien under ERISA or the Code;

    (G)    no condition exists or event or transaction has occurred with respect to any Plan which would reasonably be expected to have a Material Adverse Effect;

    (H)    no member of the Citgo Group has any contingent liability with respect to any post-retirement benefit under a Welfare Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA, that would reasonably be expected to have a Material Adverse Effect; and



(I)      no member of the Citgo Group has during the past five years maintained, contributed to or had an obligation to contribute to any Multiemployer Plan or has any present intention to do so.

(p)      Environmental Matters.  Except as set forth in Schedule 3.01(p) and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Issuer, the Guarantor or any of the Subsidiaries (i) has failed to comply with any Environmental Law applicable to it or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law applicable to it, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(q)      Insurance.  The Issuer and the Subsidiaries maintain insurance to such extent and against such risks required pursuant to Section 5.02.

(r)      Labor Matters.  As of the Effective Date, there are no strikes, lockouts or slowdowns against the Issuer, the Guarantor or any Subsidiary pending or, to the knowledge of the Issuer or the Guarantor, threatened which could reasonably be expected to result in a Material Adverse Effect. The hours worked by and payments made to employees of the Issuer, the Guarantor and the Subsidiaries have not been in violation of applicable Venezuelan national, state or local law dealing with such matters. All payments due from the Issuer, the Guarantor or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or, to the extent required by IFRS, accrued as a liability on the books of the Issuer, the Guarantor or such Subsidiary.  The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Issuer, the Guarantor or any Subsidiary is bound.

(s)      Solvency.  On the Effective Date and immediately following the issuance of the Initial Note and after giving effect to the cancellation of the Novated Receivables, (i) the assets of each Finance Party, at a fair valuation, are in excess of the total amount of its debts (including contingent liabilities); (ii) the present fair saleable value of each Finance Party's assets is greater than its probable liability on its existing debts as such debts become absolute and matured; (iii) each Finance Party is then able and expects to be able to pay its debts (including contingent liabilities and other commitments) as they mature; (iv) each Finance Party has capital sufficient to carry on its business as conducted and as proposed to be conducted; and (v) each Finance Party is in compliance with each applicable solvency standard under the laws of the jurisdiction where it is organized, domiciled, resident or otherwise located. For purposes of this clause (s), the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(t)      U.S. Anti-Terrorism Laws.  Each of the Issuer, the Guarantor and the Subsidiaries, and, to the best of the Issuer's and the Guarantor's knowledge, any Persons acting on any of their behalf with respect to activities performed under the Transaction Documents, (i) is not a Designated Person, and (ii) has not used any part of the assets or services acquired in connection with the creation of the Novated Receivables on behalf of any Designated Person or will otherwise use, directly by it or indirectly through any Subsidiary, such assets or services in connection with any investment in, or any transactions or dealings with, any Designated Person. Neither the Issuer nor any Released Affiliate has used any of the assets or services acquired in connection with the creation of the Novated Receivables for purposes other than for the use of such assets or services in the ordinary course of business of the Released Affiliates, or, directly or indirectly, used any of such assets or services for, or will repay any Note or Notes with the proceeds of, (A) business activities relating to Crimea, Cuba, Sudan, Iran, Syria or

20

North Korea, or (B) business activities that are or which become subject to sanctions, restrictions or embargoes imposed by the United Nations, the European Union, the State Secretariat for Economic Affairs of Switzerland or the Swiss Directorate of International Law, OFAC, the U.S. Department of State, the U.S. Department of Commerce, the U.S. Department of Treasury, HM Treasury of the United Kingdom, the Hong Kong Monetary Authority and/or the Monetary Authority of Singapore.  This includes, in particular (but without limitation) business activities involving Persons or entities subject to any such sanctions or named on any sanctions lists issued by any of the aforementioned bodies and entities owned or controlled by such listed Persons or entities.

(u)     Anti-Bribery and Anti-Corruption Laws.  Each of the Issuer, the Guarantor and the Subsidiaries, and, to the best of the Issuer's and the Guarantor´s knowledge, each of the Persons acting on any of their behalf with respect to activities performed under the Transaction Documents have not taken any action in connection with the acquisition of the assets or services acquired in connection with the creation of the Novated Receivables, or in connection with the negotiation, execution and delivery of the Transaction Documents, that is in violation of any Anti-Bribery and Anti-Corruption Law.

(v)     Senior Indebtedness.  The Obligations constitute the senior indebtedness of the Finance Parties that is entitled to the benefits of the subordination provisions, if any, relating to all other Indebtedness of the Issuer and the Guarantor.

(w)     Availability and Transfer of Foreign Currency.  Each of the Issuer and the Guarantor is subject to the Law on the Central Bank of Venezuela (*Ley del Banco Central de Venezuela*), published in Extraordinary Official Gazette No. 6,211 dated December 30, 2015, and Exchange Agreement No. 9 (*Convenio Cambiario No. 9*), published in Official Gazette No. 39,239 dated August 11, 2009, between the Central Bank of Venezuela and the Ministry of the People's Power for Economy and Finance (currently the Ministry of the People's Power for Banking and Finance), which grants the Issuer and the Guarantor the right to (i) maintain the proceeds received by the Issuer and the Guarantor derived from the export of hydrocarbons, in a foreign currency outside of Venezuela, and (ii) apply such proceeds in a foreign currency outside of Venezuela to the repayment of the Notes and comply with its obligations pursuant to the terms of this Agreement.  There are no other foreign exchange controls issued or, to the knowledge of the Issuer or the Guarantor, threatened to be issued by Venezuela or any Venezuelan Governmental Authority that would hinder the ability of the Issuer or the Guarantor to comply with its obligations under the Transaction Documents.

(x)     Commercial Activities; Absence of Immunity.  Each of the Issuer and the Guarantor is subject to civil and commercial law in Venezuela with respect to its obligations hereunder.  The execution, delivery and performance by the Issuer and the Guarantor of its obligations hereunder constitute private and commercial acts rather than public or governmental acts under the laws of Venezuela.  Neither the Issuer, nor the Guarantor, nor any of their properties, assets or revenues is entitled to any right of immunity in any jurisdiction from suit, court jurisdiction, judgment, attachment (whether before or after judgment), set-off or execution of a judgment or from any other legal process or remedy relating to the obligations of the Issuer except for the mandatory notice required pursuant to Article 111 of the Law of the Office of the Attorney General of Venezuela (*Ley Orgánica de la Procuraduría General de la República*).

**Section 3.02     Initial Noteholder's Representations and Warranties**.  The Initial Noteholder represents and warrants to the Issuer on the Effective Date that:

(a)     Organization; Powers.  The Initial Noteholder, only to the extent that failure to do so could result in a material impairment of the ability of the Initial Noteholder to perform any of its obligations under any Transaction Document (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to own its

21

property and assets and to carry on its business as now conducted and as proposed to be conducted, (iii) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a material impairment of the ability of the Initial Noteholder to perform any of its obligations under any Transaction Document, and (iv) has the power and authority to execute, deliver and perform its obligations under each of the Transaction Documents and each other agreement or instrument contemplated thereby to which it is or will be a party.

(b)     Authorization.  The Transactions (i) have been duly authorized by all requisite corporate and, if required, stockholder action and (ii) will not (A) violate (1) any provision of law, statute, rule or regulation, or of the certificate or articles of organization or other constitutive documents or by-laws of the Initial Noteholder, (2) any order of any Governmental Authority or (3) any provision of any indenture, agreement or other instrument to which the Initial Noteholder is a party or by which it or any of its property is or may be bound, (B) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (C) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Initial Noteholder.

(c)     Enforceability.  This Agreement has been duly executed and delivered by the Initial Noteholder and constitutes, and each other Transaction Document when executed and delivered by the Initial Noteholder to which it is a party will constitute, a legal, valid and binding obligation of the Initial Noteholder enforceable against the Initial Noteholder in accordance with its terms (except, in any case, as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

(d)     Governmental Approvals.   No action, consent or approval (including any exchange control approval) of, registration or filing with or any other action by any Governmental Authority having jurisdiction over the Initial Noteholder is or will be required in connection with the Transactions, except for such as have been made or obtained and are in full force and effect.

(e)     No Registration.  The Initial Noteholder understands that (i) the Initial Note has not been and will not be, and any Note issued pursuant to Section 2.11 or Section 2.12 will not be, registered under the Securities Act or any other applicable securities law,  (ii) the Initial Note is being acquired by the Initial Noteholder for investment and not with a view to public distribution, and (iii) unless consented to by the Issuer in accordance with the second sentence of Section 9.04(b), the Initial Note may be offered, sold or otherwise transferred only to qualified institutional buyers pursuant to Rule 144A of the Securities Act or to a buyer purchasing pursuant to a registration statement under the Securities Act. The Initial Noteholder understands that the Initial Note, and any Note issued pursuant to Section 2.11 or Section 2.12, will contain a legend as set forth on the form of Note attached hereto as Exhibit A.

(f)     Accredited Investor.  With respect to the Initial Note, the Initial Noteholder is an Accredited Investor.

(g)     Access to Prior Necessary Information.  Prior to the delivery of the Initial Note, to the extent that the Initial Noteholder regarded as necessary to evaluate the merits and risks of its investment therein, the Initial Noteholder was afforded the opportunity to ask questions of, and received sufficient answers from, representatives of the Issuer concerning: (i) the terms and conditions of the Initial Note and (ii) the operations, financial condition and future prospects of the Issuer and the Guarantor. The Initial Noteholder has, independently and based upon such documents and information as the Initial Noteholder has deemed appropriate, made its own appraisal of, and investigation into, the business,

operations, property, financial and other condition and creditworthiness of the Issuer and the Guarantor and made its own decision to acquire the Initial Note, and will, independently and based on such documents and information as the Initial Noteholder shall deem appropriate at the time, continue to make its own analysis, appraisals and decisions in taking or not taking action under the Transaction Documents, and to make such investigation as the Initial Noteholder deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Issuer.

 (h) Eligible Institution.  The Initial Noteholder is an Eligible Institution.

 (i) Distribution of Materials.  The Initial Noteholder has not distributed any materials relating to the Initial Note to anyone other than any counsel or other advisor to it, and no one other than such Persons has used its copies of such documents.

 (j) No Distribution.  The Initial Noteholder, its Affiliates (as such term is defined in Rule 501(b) under the Securities Act) or any Person acting on their behalf:

  (i) has not engaged, does not intend to engage, and will not engage, in connection with the issuance of any Note hereunder, in any form of public distribution that would require registration of any Note with the Securities and Exchange Commission under Section 5 of the Securities Act; and

  (ii) has not entered and will not enter into any contractual arrangement with any distributor (as the term is defined for purposes of Rule 902(d) of Regulation S) with respect to the distribution or delivery of any Note.

 (k) ERISA.  Either: (i) the Initial Noteholder is not (A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to the provisions of Part 4 of subtitle B of Title I of ERISA, (B) a "plan" to which Section 4975 of the Code applies, (C) a governmental, church or non-U.S. plan that is subject to any federal, state, local, non-U.S. or other laws or regulations that are substantially similar to the fiduciary responsibility or prohibited transaction provisions of ERISA or Section 4975 of the Code ("**Similar Law**") or (D) an entity whose underlying assets are deemed to include "plan assets" of any of the foregoing; or (ii) its acquisition or holding of such Initial Note does not and will not give rise to a non-exempt prohibited transaction under ERISA or Section 4975 of the Code or, with respect to investors described in clause (C) hereof, a non-exempt violation of any applicable Similar Law.

 (l) Independent Evaluation of Merits and Risks.  The Initial Noteholder has independently evaluated the merits and risks of its participation in the transactions contemplated hereby and, in so evaluating, has not relied upon any Person (other than the Issuer or the Guarantor) in connection with its decision to participate in such transactions.

 (m) Purchase for Investment.  With respect to the Initial Note issued in reliance on Section 4(a)(2) of the Securities Act, the Initial Noteholder is acquiring the Initial Note for its own account, *provided* that the disposition of the Initial Noteholder's property shall at all times be within the Initial Noteholder's control.  The Initial Noteholder understands that the Initial Note has not been registered under the Securities Act and may be sold, in whole or in part, only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Issuer is not required to register the Initial Note.



## ARTICLE IV

### CONDITIONS OF INITIAL NOTE ISSUANCE

The obligation of the Issuer to issue the Initial Note hereunder is subject to the satisfaction of the following conditions (it being acknowledged and agreed that, notwithstanding the failure to satisfy any of the conditions in this Article IV, if the Initial Noteholder chooses to waive any such conditions, the Issuer shall be obligated to issue the Initial Note in accordance with Section 2.01):

**Section 4.01    Conditions to the Initial Note Issuance**.  On the Effective Date:

(a)    The Administrative Agent and the Initial Noteholder shall have received: (i) a copy of the last amendment to the articles of incorporation and by-laws of the Issuer, the Guarantor and the Released Affiliates; (ii) a copy of a certificate of the secretary of each of the Issuer, the Guarantor and the Released Affiliates certifying as to the resolution of the board of directors of each of the Issuer, the Guarantor and the Released Affiliates (A) approving the terms of, and the transactions contemplated by, the Transaction Documents to which it is a party and resolving that it execute the Transaction Documents to which it is a party, (B) authorizing a specified Person or Persons to execute the Transaction Documents to which it is a party on its behalf, and (C) authorizing a specified Person or Persons, on its behalf, to sign all documents and notices to be signed by it under or in connection with the Transaction Documents to which it is a party; (iii) evidence of the payment capacity of the Issuer and the Guarantor, in the form of the publication of a certification of debt of the Issuer and the Guarantor, as required by Article 101 of the Organic Law on the Financial Administration of the Public Sector, published in Extraordinary Official Gazette No. 6.210 dated December 30, 2015; (iv) a copy of the most recent minutes of the meeting of the shareholders of each of the Issuer, the Guarantor, and the Released Affiliates appointing the members of its board of directors; (v) a copy of signature and incumbency certificates of each of the Issuer, the Guarantor, and the Released Affiliates, of the Person or Persons authorized to execute the Transaction Documents to which it is a party; and (vi) a certificate of an authorized signatory of each of the Issuer, the Guarantor, and the Released Affiliates, certifying that each copy of a document delivered pursuant to this Section 4.01(a) is true, correct, complete and in full force and effect as of the Effective Date.

(b)    Each of the Transaction Documents shall have been duly executed by the Finance Parties party thereto on or prior to the Effective Date and the Administrative Agent and the Initial Noteholder shall have received executed counterparts of each Transaction Document.

(c)    The Administrative Agent and the Initial Noteholder shall have received the financial statements and report referred to in Section 3.01(e), none of which shall demonstrate a change in the financial condition of the Issuer from (and shall not otherwise be materially inconsistent with) the financial statements previously provided to the Initial Noteholder, which has had or could reasonably be expected to result in a Material Adverse Effect.

(d)    All requisite Governmental Authorities and third parties shall have approved or consented to the Transactions and the other transactions contemplated hereby to the extent required, all applicable appeal periods shall have expired and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby.

(e)    The Administrative Agent and the Initial Noteholder shall have received evidence that the Issuer (for itself and the Guarantor) has obtained the prior favorable opinion of

24

the Central Bank to hold funds in foreign currency outside of Venezuela, pursuant to Exchange Agreement No. 9 and a certificate from the Issuer to the effect that such authorization remains in full force and effect as of the Effective Date.

(f)    In the reasonable judgment of the Administrative Agent and the Initial Noteholder, there shall have been no change or development since December 31, 2015 involving a prospective material adverse change in (i) the United States, Venezuelan or international financial, banking, political or economic conditions, (ii) the political, social, economic or financial condition of Venezuela, (iii) the currency exchange rates or controls imposed by any Governmental Authority in Venezuela applicable to Dollars which affects the Issuer's or the Guarantor's ability to perform their respective obligations under the Transaction Documents, (iv) any legislation, rules, regulations or other conditions affecting financial transactions of the same nature as the one reflected by the Transaction Documents or (v) the Initial Note syndication or capital markets with respect to Venezuelan and/or Latin American issuers, and neither the Administrative Agent nor the Initial Noteholder shall have received any notice from the Issuer that there has been any such material adverse change or development.  By having signed this Agreement, the Administrative Agent and the Initial Noteholder agree that this condition has been satisfied.

(g)    The Administrative Agent and the Initial Noteholder shall have received, to the extent requested, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

## ARTICLE V

## COVENANTS

The Issuer covenants and agrees with the Initial Noteholder and any subsequent Noteholder that from the Effective Date and until the principal of and interest on the Notes, all fees and all other expenses or amounts payable under any Finance Document shall have been paid in full, unless the Required Noteholders shall otherwise consent in writing:

**Section 5.01    Maintenance of Corporate Existence**.  Except as permitted pursuant to Section 5.08, the Issuer will, and will cause each of the Subsidiaries to, maintain in effect its and their corporate existence and all rights, privileges, titles to property, licenses, franchises and the like necessary in connection with the normal conduct of its and their business, activities or operations; *provided*, *however*, that the Issuer shall not be required to, and shall not be required to cause the Subsidiaries (other than the Guarantor) to maintain any such rights, privileges, titles to property, licenses or franchises if the Issuer determines in good faith that the maintenance thereof is no longer necessary in the conduct of the business of the Issuer and the Subsidiaries as a whole, and the failure to so maintain any such rights, privileges, titles to property, licenses or franchise is not disadvantageous in any material respect to the Noteholders.

**Section 5.02    Insurance**.  The Issuer will, and will cause each of the Subsidiaries to, maintain insurance with reputable insurance companies and in such amounts and covering such risks as are believed by the Issuer to be usually carried by companies engaged in similar businesses and owning and/or operating properties similar to those owned and/or operated by the Issuer or such Subsidiary, as the case may be, in the same general areas in which the Issuer or such Subsidiary owns and/or operates its properties.



**Section 5.03     Maintenance of Governmental Approvals**.  The Issuer will, and will cause each of the Subsidiaries to, maintain in full force and effect all approvals, consents, licenses and authorizations of any Governmental Authority which may be necessary or the Issuer may deem appropriate under any applicable law or regulation for the conduct of its business or for the performance of its obligations under the Finance Documents, as the case may be, except to the extent failure to do so would not be reasonably expected to have a Material Adverse Effect.

**Section 5.04     Financial Statements, Reports, etc.**     The Issuer will furnish to the Administrative Agent and the Noteholders:

(a)     within one hundred eighty (180) days following the end of each fiscal year of the Issuer after the Effective Date, (i) the annual consolidated financial statements (including the notes thereto) of the Issuer, prepared in accordance with IFRS and presented in the English language, (ii) a report thereon by the Issuer's certified independent accountants, and (iii) a "management discussion and analysis" or other report of management providing an overview in reasonable detail of the results of operations and financial condition of the Issuer and the Subsidiaries;

(b)     within one hundred eighty (180) days following the end of the second fiscal quarter in each fiscal year of the Issuer beginning with the second fiscal quarter ending after the Effective Date, (i) the semi-annual consolidated financial statements of the Issuer, prepared in accordance with IFRS and presented in the English language, and (ii) a "management discussion and analysis" or other report of management providing an overview in reasonable detail of the results of operations and financial condition of the Issuer and the Subsidiaries;

(c)     promptly upon obtaining knowledge thereof, written notice of the occurrence and continuance of any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(d)     promptly after the request by any Noteholder, all documentation and other information that such Noteholder reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(e)     promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Issuer, the Guarantor or any Subsidiary, or compliance with the terms of any Finance Document, as the Administrative Agent or any Noteholder may reasonably request; and

(f)     promptly after the request by any Noteholder, all documentation and other information that such Noteholder reasonably requests in order to assure itself that the Issuer and the Guarantor are in compliance with all applicable laws.

**Section 5.05     Maintaining Records**.  The Issuer will, and will cause each of the Subsidiaries to, maintain books, accounts and other records in accordance with IFRS in all material respects, and the Issuer will cause the Significant Subsidiaries organized under laws of any other jurisdiction to maintain their books and records in accordance with the generally accepted accounting principles of the applicable jurisdiction in all material respects.

**Section 5.06     Compliance with Laws**.  The Issuer will use its reasonable best efforts, and will cause each of the Subsidiaries to use its respective reasonable best efforts, to comply at all times with all laws applicable to the Issuer, the Subsidiaries, their respective business or the Transactions (including all

26

U.S. anti-terrorism laws, as set forth in Section 3.01(t), Anti-Bribery and Anti-Corruption Laws, tax laws, disclosure and reporting requirements and securities laws and regulations), except where (a) the Issuer determine in good faith that the failure by the Issuer or such Subsidiary to so comply would not have a Material Adverse Effect or (b) the necessity of compliance therewith is being contested by the Issuer, the Guarantor or any of the Subsidiaries in good faith by appropriate proceedings.

**Section 5.07    Liens**.  The Issuer will not, and will not cause or permit any of the Subsidiaries to incur, permit or suffer to exist, any Lien, other than Permitted Liens (which Permitted Liens shall not be considered Liens for purposes of the application of any of the provisions hereinafter set forth in this Section 5.07), of any kind against or upon any property or assets of the Issuer or any of the Subsidiaries whether owned on the Effective Date or acquired after the Effective Date, to secure any Indebtedness, unless it has made or will make effective provision whereby (a) the Administrative Agent and the Noteholders will be secured by such Lien equally and ratably with (or prior to, in the event such Indebtedness is subordinated in right of payment to the Obligations) all other Indebtedness of the Issuer or any of the Subsidiaries secured by such Lien and (b) if such Lien secures obligations subordinated to the Obligations in right of payment, such Lien shall be subordinated to a Lien securing the Obligations in the same property as that securing such Lien to the same extent as such subordinated obligations are subordinated to the Obligations.  Any Lien created for the benefit of the Administrative Agent and the Noteholders pursuant to the preceding sentence shall provide by its terms that such Lien will be automatically and unconditionally released and discharged upon release and discharge of the initial Lien.

**Section 5.08    Mergers, Consolidations, Sales of Assets and Acquisitions**.  The Issuer will not, in one or a series of transactions, consolidate or amalgamate with or merge into any corporation or convey, lease or transfer substantially all of its properties, assets or revenues to any Person or entity (other than a direct or indirect Subsidiary) or permit any Person (other than a direct or indirect Subsidiary) to merge with or into it unless:

(a)    either the Issuer is the continuing entity or the Person (the "**successor company**") formed by the consolidation or into which the Issuer is merged or that acquired or leased the property or assets of the Issuer will assume (jointly and severally with the Issuer unless the Issuer will have ceased to exist as a result of that merger, consolidation or amalgamation), by a supplemental agreement, all of the Issuer's obligations under this Agreement and the other Finance Documents;

(b)    the successor company (jointly and severally with the Issuer unless the Issuer will have ceased to exist as part of the merger, consolidation or amalgamation) agrees to indemnify the Administrative Agent and each Noteholder against any Tax, assessment or governmental charge thereafter imposed on the Administrative Agent and the Noteholders solely as a consequence of the consolidation, merger, conveyance, transfer or lease with respect to the payment of principal or interest of the Obligations;

(c)    immediately after giving effect to the transaction, no Default or Event of Default has occurred and is continuing; and

(d)    the Issuer has delivered to the Administrative Agent and the Noteholders a certificate of the secretary or assistant secretary of the Issuer and a favorable written opinion of counsel, each stating that the transaction complies with the terms of this Section 5.08 and that all conditions precedent provided for in this Section 5.08 and relating to the transaction have been complied with.

27



Notwithstanding anything herein to the contrary, so long as no Default or Event of Default under this Agreement or any other Finance Document will have occurred and be continuing at the time of the proposed transaction or would result from the transaction:

(i)     the Issuer may merge, amalgamate or consolidate with or into, or convey, transfer, lease or otherwise dispose of all or substantially all of its properties, assets or revenues to a direct or indirect Subsidiary in cases when the Issuer is the surviving entity in the transaction and the transaction would not have a Material Adverse Effect, it being understood that if the Issuer is not the surviving entity, the Issuer will be required to comply with the requirements set forth in clauses (a) through (d) above; or

(ii)    any direct or indirect Subsidiary may merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of assets to, any Person (other than the Issuer or any of its Subsidiaries or Affiliates) in cases when the transaction would not have a Material Adverse Effect; or

(iii)   any direct or indirect Subsidiary may merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of assets to, any other direct or indirect Subsidiary; or

(iv)    any direct or indirect Subsidiary may liquidate or dissolve if the Issuer determines in good faith that the liquidation or dissolution is in the best interests of the Issuer, and would not result in a Material Adverse Effect and if the liquidation or dissolution is part of a corporate reorganization of the Issuer; or

(v)     the Issuer may omit to comply with any term, provision or condition set forth in certain covenants or any term, provision or condition of this Agreement, if before the time for the compliance the Required Noteholders waive the compliance, but no waiver can operate except to the extent expressly waived, and, until a waiver becomes effective, the Issuer's obligations and the duties of the Administrative Agent as set forth in this Agreement in respect of any such term, provision or condition will remain in full force and effect.

**Section 5.09     ERISA**. In respect of the Citgo Group, for so long as the Citgo Group is treated as a single employer with the Issuer under Section 414 of the Code, or is within the same "controlled group" (as defined in ERISA) as the Issuer, the Citgo Group shall:

(a)     ensure any material liability imposed on it pursuant to Title IV of ERISA is paid and discharged when due;

(b)     ensure that no Plan is terminated under Section 4041 of ERISA, except as would not reasonably be expected to result in a Material Adverse Effect;

(c)     not adopt an amendment to a Plan requiring the provision of security under ERISA or the Code without the prior consent of the Required Noteholders, except as would not reasonably be expected to result in a Material Adverse Effect; and

(d)     ensure that no member of the Citgo Group engages in a complete or partial withdrawal, within the meaning of Sections 4203 and 4205 of ERISA, from any Multiemployer Plan without the prior consent of the Required Noteholders, except as would not reasonably be expected to result in a Material Adverse Effect.



28

## ARTICLE VI

## GUARANTEE.

**Section 6.01     Guarantee**. The Guarantor, as primary obligor and not merely as surety, hereby absolutely, irrevocably and unconditionally guarantees to the Administrative Agent and the Noteholders the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses including all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) (which obligation in respect of counsel shall be limited to one counsel for the Administrative Agent and one counsel for the Noteholders, as well as, in each case, other special and local counsel) and expenses paid or incurred by the Administrative Agent and the Noteholders in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Issuer or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the "**Guaranteed Obligations**"). The Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Guarantee apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of the Noteholders. The Guarantor shall not assign or transfer any part of its rights or obligations under this Guarantee without the prior written consent of the Administrative Agent and the Noteholders, and any attempted assignment without such consent shall be null and void. Each Noteholder shall be entitled to assign its rights under this Guarantee to any Person or Persons to whom it assigns all or a portion of its interests, rights and obligations under this Agreement and the other Finance Documents in compliance with the terms and conditions thereof, with notice to, but without the prior written consent of, the Issuer, the Guarantor and the Administrative Agent.  The Guarantor further agrees that it is jointly and severally liable for the Obligations.

**Section 6.02     Guarantee of Payment**. This Guarantee is a guarantee of payment and not of collection.  The Guarantor waives any right to require the Administrative Agent or the Noteholders to sue the Issuer, the Guarantor, any other guarantor or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "**Obligated Party**").

### Section 6.03     No Discharge or Diminishment of Note Guarantee.

(a)     Unconditional.  Except as otherwise provided herein, the obligations of the Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Issuer or any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which the Guarantor may have at any time against any Obligated Party, the Administrative Agent, the Noteholders or any other Person, whether in connection herewith or in any unrelated transactions.

(b)     No Setoff, Etc.  The obligations of the Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations or otherwise (other

29



than as provided in <u>Section 2.09(d)</u>), or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c) <u>No Diminishment</u>. Further, the obligations of the Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Administrative Agent or the Noteholders to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of the Issuer for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other Person liable for any of the Guaranteed Obligations; or (iv) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of the Guarantor or that would otherwise operate as a discharge of the Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

**Section 6.04** **Defenses Waived**. To the fullest extent permitted by applicable law, the Guarantor hereby waives any defense based on or arising out of any defense of the Issuer or the Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Issuer or the Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, the Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party or any other Person. The Administrative Agent may, at its election, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Guarantee except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash. To the fullest extent permitted by applicable law, the Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Guarantor against any Obligated Party or any security.

**Section 6.05** **Rights of Subrogation**. The Guarantor will not assert any right, claim or cause of action, including a claim of subrogation, contribution or indemnification that it has against any Obligated Party until the Issuer and the Guarantor have fully performed all their obligations to the Administrative Agent and the Noteholders.

**Section 6.06** **Reinstatement**. If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, the Guarantor's obligations under this Guarantee with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Administrative Agent and the Noteholders are in possession of this Guarantee. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantor forthwith on demand by the Administrative Agent.

**Section 6.07** **Release**. The Guarantor will be released from its obligations under this <u>Article VI</u> and the other Finance Documents to which it is a party upon the indefeasible payment in full of the Obligations. The Administrative Agent shall promptly execute any release documents giving effect to the

immediately preceding sentence upon the request of the Issuer, without the consent or further agreement of Administrative Agent or the Noteholders.

## ARTICLE VII

## EVENTS OF DEFAULT

In case of the happening of any of the following events ("**Events of Default**"):

(a)     the failure to pay the principal of, or interest on any of the Notes, when such principal becomes due and payable, including at any of the Repayment Dates, by acceleration or otherwise, and such failure continues for a period of five (5) days after written notice thereof has been given to the Issuer;

(b)     the failure by any Finance Party to pay any fee or any other amount under any Finance Document (other than the principal of, or interest on any of the Notes) when the same becomes due and payable and the default continues for a period of fifteen (15) days after written notice thereof has been given to the Issuer;

(c)     a default in the observance or performance of any other covenant or agreement contained in the Finance Documents which default continues for a period of thirty (30) days after the Issuer receives written notice specifying the default (and demanding that such default be remedied) from the Required Noteholders;

(d)     the failure to pay at final stated maturity (giving effect to any applicable grace periods and any extensions thereof) the principal amount of any Indebtedness of the Issuer, the Guarantor or any of the Significant Subsidiaries, or any Indebtedness of the Issuer, the Guarantor or any of the Significant Subsidiaries has become due and payable before it would otherwise have been due and payable as a result of, or on the basis of, the occurrence of a default, event of default or other similar condition or event (however described) (which acceleration is not rescinded, annulled or otherwise cured within thirty (30) days from the date of acceleration), if the aggregate principal amount of such Indebtedness, together with the principal or other amount of any other such Indebtedness in default for failure to pay principal at final stated maturity or which has been accelerated (in each case with respect to which the thirty (30) day period described above has elapsed), aggregates the Threshold Amount or more at any time;

(e)     one or more judgments in an aggregate amount in excess of the Threshold Amount shall have been rendered against the Issuer, the Guarantor or any of the Significant Subsidiaries and such judgments remain undischarged, unpaid, unstayed, unbonded or not suspended by agreement for a period of sixty (60) days after such judgment or judgments become final and nonappealable;

(f)     the Issuer, the Guarantor or any of the Significant Subsidiaries: (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts, or fails generally to pay its debts as they become due, or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes against it or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a final and non-appealable judgment of insolvency or bankruptcy (*declaración de quiebra*) or the entry of a final and non-appealable order for relief or the making of an order for its winding up or liquidation or (B) is not

31

dismissed, discharged, stayed or restrained in each case within sixty (60) days of the institution or presentation thereof; (v) passes a resolution for its winding up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, *conciliador*, trustee, *síndico*, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or such process is not dismissed, discharged, stayed or restrained, in each case within sixty (60) consecutive days thereafter; or (viii) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (i) to (vii) (inclusive) above (subject to the same time periods for such event to be dismissed, discharged, stayed or restrained);

(g)     an authorized officer of the Issuer or the Guarantor or a Governmental Authority (i) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of any of the Transaction Documents or any part thereof or (ii) unilaterally declares or imposes a moratorium, standstill, roll-over or deferral, whether de facto or de jure, with respect to any such Indebtedness in an aggregate amount of not less than the Threshold Amount, or takes any other action that has or would reasonably be expected to have an effect on the Repayment Dates hereunder, or the currency in which the Issuer shall pay the Obligations;

(h)     any event which causes a Material Adverse Effect;

(i)     any Finance Party becomes entitled to claim immunity from suit, judgment, execution, attachment or other legal process in any proceedings taken in its jurisdiction of organization or otherwise in any other jurisdiction in relation to any Transaction Document;

(j)     a Change of Control;

(k)     the failure at any time of the Obligations to constitute senior indebtedness that is entitled to the benefits of any subordination provisions relating to Indebtedness of the Issuer or the Subsidiaries; or

(l)     at any time prior to the last day of the month falling ten (10) months after the month in which the Effective Date occurs, the Issuer or the Guarantor reschedules or fails to pay when due, in whole or in part, any amount required to be paid by it under the terms of any written contract with respect to any investment (which for the avoidance of doubt shall not include contracts with respect to borrowed money obligations of the Issuer or the Guarantor) as such terms are in effect on the Effective Date,

then, and in every such event (other than an event with respect to the Issuer or the Guarantor described in clause (f) above), and at any time thereafter during the continuance of such event, the Required Noteholders may, or the Administrative Agent at the request of the Required Noteholders shall, by notice to the Issuer, declare the Notes then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Notes so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Issuer accrued hereunder and under any other Finance Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained herein or in any other Finance Document to the contrary notwithstanding; and in any event with respect to the Issuer or the Guarantor described in clause (f) above, the principal of the Notes then outstanding, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Issuer and the Guarantor accrued hereunder and under any other Finance Document, shall

32

automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer and the Guarantor, anything contained herein or in any other Finance Document to the contrary notwithstanding.

## ARTICLE VIII

## ADMINISTRATIVE AGENT

**Section 8.01    Appointment and Authority**.  Each Noteholder hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of the Finance Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to negotiate, enforce or settle any claim, action or proceeding affecting the Noteholders in their capacity as such, at the direction of the Required Noteholders, which negotiation, enforcement or settlement will be binding upon each Noteholder.

**Section 8.02    Rights as a Noteholder**.    In the event that the Person serving as the Administrative Agent hereunder is or becomes a Noteholder, the Administrative Agent shall have all rights and powers in its capacity as a Noteholder as any other Noteholder and the Administrative Agent may exercise the same as though it were not the Administrative Agent, and the Administrative Agent and its Affiliates may generally engage in any kind of business with the Issuer, the Guarantor or any Subsidiary or other Affiliate thereof as if it was not the Administrative Agent hereunder.

**Section 8.03    Exculpatory Provisions**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Finance Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and/or is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is instructed in writing to exercise by the Required Noteholders (or such other number or percentage of the Noteholders as shall be necessary under the circumstances provided in Section 9.08), and (c) except as expressly set forth in the Finance Documents, the Administrative Agent shall not have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Issuer, the Guarantor or any of the Subsidiaries that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Noteholders (or such other number or percentage of the Noteholders as shall be necessary under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Administrative Agent by the Issuer, the Guarantor or a Noteholder, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Finance Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Finance Document, (iv) the validity, enforceability, effectiveness or genuineness of any Finance Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Finance Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.



**Section 8.04    Reliance by Administrative Agent**. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Issuer), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**Section 8.05    Delegation of Duties**. The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions set forth in Sections 8.03 and 8.04 shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities as the Administrative Agent.

**Section 8.06    Resignation of Administrative Agent**. Subject to the appointment and acceptance of a successor Administrative Agent as provided below, the Administrative Agent may resign at any time upon thirty (30) days' written notice by notifying the Noteholders and the Issuer; *provided* that, the Required Noteholders may, by written notice to the Administrative Agent, the Noteholders and the Issuer, require the Administrative Agent to resign in accordance with this Section 8.06, which notice shall (without any further action) be deemed to be a notice of resignation delivered by the Administrative Agent to the Noteholders and the Issuer. Upon any such resignation, the Required Noteholders shall have the right to appoint a successor. If no successor shall have been so appointed by the Required Noteholders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, the Administrative Agent's resignation shall become effective and the Required Noteholders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Finance Document until such time, if any, as the Required Noteholders appoint a successor Administrative Agent. Notwithstanding the foregoing, if the Required Noteholders agree prior to the expiration of the thirty (30) day period that they will not appoint a successor Administrative Agent, the Administrative Agent's resignation shall become effective immediately thereon, and the Required Noteholders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Finance Document until such time, if any, as the Required Noteholders appoint a successor Administrative Agent. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Issuer to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Issuer and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article VIII and Section 9.05 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as the Administrative Agent.

**Section 8.07    Non-Reliance on Administrative Agent and Other Noteholders**. Each Noteholder acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Noteholder and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Noteholder also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Noteholder and based on such documents and information as it shall from time to time deem appropriate,



continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Finance Document, any related agreement or any document furnished hereunder or thereunder.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.01    Notices; Electronic Communications**.    Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, or sent by fax or electronic mail, as follows:

(a)    if to the Issuer or the Guarantor, to it at La Campiña, Av. Libertador, Calle El Empalme, Edificio Petróleos de Venezuela, Torre Este, Piso 8, Caracas, Venezuela, Attention of Ana María España (Director) and Renny Bolívar (Executive Director of Finance) (Fax No. +58 212 7081441, Email: espanaam@pdvsa.com and bolivarrs@pdvsa.com);

(b)    if to the Administrative Agent, to West8 Tower, Suite 1000, 10205 Westheimer Road, Houston, TX 77042, Attention: Erik Scherzer and Martha Vance, Fax No. 713-935-3880, Email: erik.scherzer@siemens.com/martha.vance@siemens.com;

(c)    if to the Initial Noteholder, to it at its address (or fax number or electronic mail address) set forth on Schedule 2.08; and

(d)    if to a Noteholder (other than the Initial Noteholder), to it at its address set forth in the Assignment and Acceptance pursuant to which such Noteholder shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or electronic mail, in each case delivered, or sent (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.

The Issuer hereby agrees, unless the electronic mail address referred to below has not been provided by the Administrative Agent or a Noteholder to the Issuer, that it will, or will cause the Subsidiaries to, provide to the Administrative Agent and the Noteholders all information, documents and other materials that it is obligated to furnish to the Administrative Agent and the Noteholders pursuant to the Finance Documents, including all financial statements, financial and other reports, certificates and other information materials (all such communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable **to the Administ**rative Agent and the Noteholders to an electronic mail address as directed by the Administrative Agent and each Noteholder.

**Section 9.02    Survival of Agreement**.    All covenants, agreements, representations and warranties made by the Issuer and the Guarantor herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Finance Document shall be considered to have been relied upon by the Noteholders and shall survive the issuance by the Issuer of the Notes, regardless of any investigation made by the Noteholders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on the Notes, any fee or any other amount payable under this Agreement or any other Finance Document is outstanding and unpaid.  The provisions of this Section 9.02 and, Sections 2.09, 9.05, and 9.16 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of



the transactions contemplated hereby, the repayment of any of the Notes, the invalidity or unenforceability of any term or provision of this Agreement or any other Finance Document, or any investigation made by or on behalf of the Administrative Agent or any Noteholder. Notwithstanding anything herein to the contrary, the provisions of Sections 2.09 and 9.05 shall expire upon the expiration of all applicable statutes of limitations, and the provisions of Section 9.16 shall expire on the second anniversary of the payment in full of all the Notes.

**Section 9.03    Binding Effect**. This Agreement shall become effective on the Effective Date.

**Section 9.04    Successors and Assigns**.

(a)    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Issuer, the Administrative Agent or the Noteholders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)    Each Noteholder may assign to any Person or Persons (other than an Ineligible Transferee) all or a portion of its interests, rights and obligations under this Agreement and the other Finance Documents, with notice to, but without the prior written consent of, the Issuer and the Administrative Agent. In addition, each Noteholder may assign to any Person or Persons all or a portion of its interests, rights and obligations under this Agreement and the other Finance Documents, with notice to and without the prior written consent of, the Administrative Agent, but with the prior written consent of the Issuer, to any Person or Persons who is or are Ineligible Transferee(s) solely as a result of such Person or Persons not meeting the requirements of clause (f) of the definition of Ineligible Transferee; *provided*, that the consent of the Issuer shall not be unreasonably withheld, conditioned or delayed if the Noteholder has delivered to Issuer at its own cost a legal opinion (in form and substance reasonably acceptable to the Issuer) opining that the transfer to such Person or Persons does not violate any United States federal or state securities laws or other applicable securities laws. Notwithstanding the foregoing sentences, upon the occurrence and continuance of an Event of Default, each Noteholder may effect any such assignment to any Person or Persons, with notice to, but without the prior written consent of, the Issuer and the Administrative Agent; *provided*, that the parties to each assignment shall execute and deliver to each of the Issuer and the Administrative Agent a copy of the Assignment and Acceptance. From and after the effective date specified in each Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Noteholder under this Agreement, (ii) the assigning Noteholder thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Noteholder's rights and obligations under this Agreement, such Noteholder shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.09 and 9.05 and be subject to the provisions of Section 9.16), and (iii) the assignee of a Note shall be entitled to exchange the assigned Note for a new Note as provided under Section 2.11.

(c)    By executing and delivering an Assignment and Acceptance, the assigning Noteholder thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Noteholder warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and the outstanding balances of its Note, in each case without giving effect to assignment thereof which have not become effective, are as set forth in such Assignment and Acceptance; (ii) except as set forth in (i) above, such assigning Noteholder makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or

36



the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Finance Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Issuer, the Guarantor or any Subsidiary or the performance or observance by the Issuer, the Guarantor or any Subsidiary of any of its obligations under this Agreement, any other Transaction Document or any other instrument or document furnished pursuant hereto; (iii) unless the assignment evidenced by such Assignment and Acceptance has been consented to by the Issuer in accordance with the second sentence of <u>Section 9.04(b)</u>, such assignee represents and warrants whether it is or is not an Eligible Institution and that it is a Person legally authorized to enter into such Assignment and Acceptance and that is not an Ineligible Transferee; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in <u>Section 3.01(e)</u> or delivered pursuant to <u>Section 5.04</u> and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, such assigning Noteholder or any other Noteholder and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as the Noteholder.

(d)     Each Noteholder may without the consent of the Issuer or the Administrative Agent sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this Agreement and the Note held by it; *provided, however*, that (i) such Noteholder's obligations under this Agreement shall remain unchanged, (ii) such Noteholder shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Issuer, the Administrative Agent and the Noteholders shall continue to deal solely and directly with such Noteholder in connection with such Noteholder's rights and obligations under this Agreement and the Note held by it, and such Noteholder shall retain the sole right to enforce the obligations of the Issuer relating to this Agreement and the Note held by it and to approve any amendment, modification or waiver of any provision of this Agreement. To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of <u>Section 9.06</u> as though it were a Noteholder, *provided* such participating bank or other Person agrees to be subject to <u>Section 9.06</u> as though it were a Noteholder and the Issuer has been notified of the identity of such participating bank or other Person prior to such participating bank or other Person exercising any setoff rights against the Issuer.

(e)     Any Noteholder or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this <u>Section 9.04</u>, disclose to the assignee or participant or proposed assignee or participant any information relating to the Issuer in respect of this Transaction furnished to such Noteholder by or on behalf of the Issuer; *provided* that, prior to any such disclosure of information designated by the Issuer as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement enforceable by the Issuer and the Guarantor whereby such assignee or participant shall agree to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Noteholders pursuant to <u>Section 9.16</u>.

(f)     Any Noteholder may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement and the other Obligations owed to such Noteholder to secure obligations owed by such Noteholder; *provided* that no such pledge or assignment shall release a Noteholder from any of its obligations hereunder or substitute any such assignee for such Noteholder as a party hereto.

37

(g)     The Issuer shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Noteholder, and any attempted assignment without such consent shall be null and void.

**Section 9.05     Expenses; Payments**. (a) Each party hereto shall be responsible for all out-of-pocket expenses incurred by it in connection with the preparation and administration of this Agreement. The Issuer agrees to pay all out-of-pocket expenses incurred by the Administrative Agent or any Noteholder in connection with the enforcement or protection of its rights in connection with this Agreement and the other Finance Documents or in connection with the Notes issued hereunder, and, in connection with any such enforcement or protection, the fees, charges and disbursements of any counsel for the Administrative Agent or any Noteholder.

(b)     All payments by the Issuer of principal, interest and other Obligations shall be made solely and exclusively in Dollars, as currency of payment, in same day funds, without setoff, counterclaim, deduction or other defense (other than as provided in Section 2.09(d)), free of any restriction or condition, and delivered to each Noteholder or the Administrative Agent, as applicable, not later than 12:00 (noon), New York City time, on the date due at the account of each such Noteholder or the Administrative Agent in accordance with Section 2.06. If it becomes necessary to convert into Dollars any amount in any other currency, then that conversion shall be made at the rate of exchange quoted in the interbroker market by the Administrative Agent for the spot purchase of such original currency at the close of business on the Business Day immediately preceding the day such payment was made. The Issuer agrees that its obligation to make payments in Dollars shall be enforceable as a separate cause of action if the amount received by the Noteholder or the Administrative Agent, as applicable, shall fall short of the full amount of Dollars payable hereunder, and shall not be affected by judgment being obtained for other sums due hereunder.

Subject to Section 9.02, the provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of the Notes, the invalidity or unenforceability of any term or provision of this Agreement or any other Finance Document, or any investigation made by or on behalf of the Administrative Agent or any Noteholder. All amounts due under this Section 9.05 shall be payable on written demand therefor.

**Section 9.06     Right of Setoff**.

(a)     The Issuer acknowledges that if an Event of Default shall have occurred and be continuing, each Noteholder is entitled to whatever statutory or common law provisions relating to banker's liens, rights of set off or similar rights and remedies as to deposit accounts or other funds maintained with depository institutions are available to such Noteholder.

(b)     The Issuer hereby confirms its agreement pursuant to the Novation Agreement that it has released all and any actions, claims, rights, demands and set-offs that it ever had, may have or hereafter can, shall or may have against the Initial Noteholder arising out of or in connection with the Novated Receivables and agrees that it will not assert or claim any such actions, claims, rights, demands or set-offs as a defense to, or as a set-off against, its obligation to pay the Obligations.

**Section 9.07     Applicable Law**.  THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS (EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN ANY SUCH OTHER FINANCE DOCUMENT), AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE

STATE OF NEW YORK, WHICH THE ISSUER, THE GUARANTOR, THE NOTEHOLDERS AND THE ADMINISTRATIVE AGENT EXPRESSLY INTEND TO APPLY), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

**Section 9.08    Waivers; Amendment.** (a) No failure or delay of the Administrative Agent or any Noteholder in exercising any power or right hereunder or under any other Finance Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.   The rights and remedies of the Administrative Agent and the Noteholders hereunder and under the other Finance Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.   No waiver of any provision of this Agreement or any other Finance Document or consent to any departure by the Issuer or any other Finance Party therefrom shall in any event be effective unless the same shall be permitted by clause (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.   No notice or demand on the Issuer or the Guarantor in any case shall entitle the Issuer or the Guarantor to any other or further notice or demand in similar or other circumstances.

(b)      Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Issuer and the Required Noteholders; *provided*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Finance Document without the prior written consent of the Administrative Agent.

**Section 9.09    Interest Rate Limitation.**  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Notes, together with all fees, charges and other amounts which are treated as interest on such Notes under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Noteholder holding such Note in accordance with applicable law, the rate of interest payable in respect of such Note, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Note but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Noteholder in respect of other periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Maximum Rate to the date of repayment, shall have been received by such Noteholder.

**Section 9.10    Entire Agreement.**   This Agreement and the other Finance Documents constitute the entire contract between the parties hereto relative to the subject matter hereof.   Any other previous agreement among the parties hereto with respect to the subject matter hereof is superseded by this Agreement and the other Finance Documents.   Nothing in this Agreement or in the other Finance Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Noteholders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Finance Documents.

**Section 9.11    WAIVER OF JURY TRIAL.**  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER FINANCE DOCUMENTS.   EACH PARTY HERETO (A) CERTIFIES THAT NO

REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.11</u>.

Section 9.12 **Severability**. In the event any one or more of the provisions contained in this Agreement or in any other Finance Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.13 **Counterparts**. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in <u>Section 9.03</u>. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 9.14 **Headings**. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.15 **Jurisdiction; Consent to Service of Process**. (a) The Issuer and the Guarantor each hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of competent jurisdiction sitting in the County of New York, State of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Finance Documents, or for recognition or enforcement of any judgment, and agrees that it will not take any action or proceeding relating to this Agreement or the other Finance Documents in the courts of any other jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto further agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Noteholder may otherwise have to bring any action or proceeding relating to this Agreement or the other Finance Documents against the Issuer, the Guarantor or their respective properties in the courts of any jurisdiction.

(b)     The Issuer and the Guarantor each hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Finance Documents in any New York State or federal court sitting in the County of New York, State of New York. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court, with the express intent that such provision shall apply.



(c)     To the extent that the Issuer or the Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process, the Issuer and the Guarantor each hereby waives such immunity and hereby agrees not to assert, by way of motion, as a defense or otherwise, in any suit, action or proceeding the defense of sovereign immunity or any claim that it is not personally subject to the jurisdiction of the courts referred to in clause (a) above by reason of sovereign immunity or otherwise, or that it is immune from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property or from attachment either prior to judgment or in aid of execution by reason of sovereign immunity, except for the mandatory notice required for Venezuelan state owned entities in accordance with Article 111 of the law of the Attorney General's Office  (*Ley Orgánica de la Procuraduría General de la República*).

(d)     The Issuer and the Guarantor each irrevocably appoints the Process Agent as its agent to receive and forward any writs, process and summonses in any suit, action or proceeding brought in connection with this Agreement or any other Finance Document against the Issuer in any court of the State of New York or any United States federal court sitting in the County of New York, State of New York and has agreed that such appointment shall be so long as the Obligations remain outstanding in accordance with the terms hereof or until the appointment by the Issuer of a successor agent in the County of New York, State of New York as its agent for such purpose and the acceptance of such appointment by such successor. If for any reason such agent shall cease to be available to act as such (including by reason of the failure of such agent to maintain an office in the County of New York, State of New York), the Issuer agrees promptly to designate a new agent in the County of New York, State of New York, on the terms and for the purposes of this Section 9.15. Nothing herein shall in any way be deemed to limit the ability of the Administrative Agent or the Noteholders to serve any such legal process in any other manner permitted by applicable law or to obtain jurisdiction over the Issuer or the Guarantor or bring actions, suits or proceedings against it in such other jurisdictions, and in such manner, as may be permitted by applicable law.

**Section 9.16     Confidentiality**. Each of the Administrative Agent and the Noteholders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being agreed that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and that the Administrative Agent or Noteholder disclosing Information to such Affiliates shall be responsible for a disclosure of Information by such Affiliates in contravention of this Section 9.16), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, *provided* that if legally permissible, such Noteholder or the Administrative Agent, as applicable, shall use commercially reasonable efforts to provide prompt notice to the Issuer prior to such disclosure and if not possible, promptly thereafter, (d) in connection with the exercise of any remedies hereunder or under the other Finance Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Finance Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Issuer, the Guarantor or any Subsidiary or any of their respective obligations, (f) with the consent of the Issuer or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. For the purposes of this Section 9.16, **"Information"** shall mean all information received from the Issuer or the Guarantor and related to the Issuer or the Guarantor or their business, other than any such information that was available to the

41

Administrative Agent or any Noteholder on a nonconfidential basis prior to its disclosure by the Issuer or the Guarantor.  Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

**Section 9.17    Noteholder Action**. Each Noteholder agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Finance Party or any other obligor under any of the Finance Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any property of any such Finance Party, unless expressly provided for herein or in any other Finance Document, without the prior written consent of the Administrative Agent.  The provisions of this Section 9.17 are for the sole benefit of the Administrative Agent and shall not afford any right to, or constitute a defense available to, any Finance Party.

**Section 9.18    USA PATRIOT Act Notice**. Each Noteholder and the Administrative Agent (for itself and not on behalf of any Noteholder) hereby notifies the Issuer and the Guarantor that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Issuer and the Guarantor, which information includes the name and address of the Issuer and the Guarantor and other information that will allow such Noteholder or the Administrative Agent, as applicable, to identify the Issuer and the Guarantor in accordance with the USA PATRIOT Act.

**Section 9.19    Payment Suspension or Cessation**. Any Noteholder shall have the right, but not obligation, and for its account only, to issue written instructions to the Issuer to suspend or cease payment of amounts due under Notes or this Agreement if the payment obligations of the Issuer to such Noteholder under the Notes or this Agreement violates applicable law.  Upon receipt of any such instructions, the Issuer shall comply therewith in respect of the Note of the Noteholder issuing such instruction and reserve any such payments that are so suspended or ceased (collectively, the "**Reserved Payments**").  Notwithstanding any provision of this Agreement or any Note to the contrary, failure to make such Reserved Payments in accordance with the written instruction of the Noteholder shall not be deemed a Default or an Event of Default or a breach or violation in any respect of such Note or this Agreement nor entitle the Noteholder or the Administrative Agent to exercise any remedies with respect to such Note or this Agreement.  Notwithstanding the foregoing, such suspension or cessation of the Reserved Payments shall not be construed as relieving, cancelling or otherwise forgiving the Reserved Payments so suspended or ceased or otherwise relieve the Issuer of its other obligations under this Agreement and to other Noteholders; *provided*, that, notwithstanding any provision of the Note or this Agreement to the contrary, for so long as such suspension or cessation continues, the rate at which interest under such Note and this Agreement shall accrue with respect to the amount of the Reserved Payments shall be adjusted to be equal to the lesser of (i) 6.50% or (ii) a variable rate per annum equal to the "Money market, annual yield" as may from time to time be published in the Wall Street Journal (currently published under "Bonds, Rates and Yields") or if such information is no longer published, another comparable rate as shall be mutually agreed upon by the Issuer and the applicable Noteholder, acting reasonably.

Such issuing Noteholder shall have the right at its sole discretion to revoke such instructions and require the Issuer to pay all amounts then due and owing, in which case, the Reserved Payments and interest thereon at the applicable rate set forth in the immediately preceding sentence shall be due to such Noteholder not later than ten (10) Business Days following the Issuer's receipt of a written notice of revocation of such instructions from such Noteholder.



*[remainder of page intentionally left blank]*



**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed by their respective authorized officers or directors as of the Effective Date.

**PETRÓLEOS DE VENEZUELA, S.A.,**
as Issuer

By: _____
Name: Waldemar Negrín
Title: Authorized Signatory

**PDVSA PETRÓLEO, S.A.,**
as Guarantor

By: _____
Name: Waldemar Negrín
Title: Authorized Signatory

*Signature page to Note Agreement*



**Dresser-Rand Company**
as Administrative Agent

By:
Name: Herbert Stegemann
Title: CEO of Siemens Venezuela

*Signature page to Note Agreement*



**Dresser-Rand Company**
as Initial Noteholder

By: _____

Name: Herbert Stegemann
Title: CEO of Siemens Venezuela

*Signature page to Note Agreement*



EXHIBIT A

**FORM OF NOTE**

## PETRÓLEOS DE VENEZUELA, S.A.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, AGREES TO OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE ONLY TO QUALIFIED INSTITUTIONAL BUYERS PURSUANT TO RULE 144A OF THE SECURITIES ACT, TO BUYERS PURCHASING PURSUANT TO A REGISTRATION STATEMENT REGISTERED UNDER THE SECURITIES ACT OR WITH THE ISSUER'S PRIOR WRITTEN CONSENT IN ACCORDANCE WITH SECTION 9.4(b) OF THE NOTE AGREEMENT (AS DEFINED BELOW). IN ADDITION, ANY SUCH OFFER, SALE, PLEDGE OR OTHER TRANSFER MUST OTHERWISE BE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR OTHER APPLICABLE JURISDICTION.

6.50% SENIOR GUARANTEED NOTE, SERIES 2017B

Date: January 20, 2017

No. R-1

FOR VALUE RECEIVED, the undersigned, **PETRÓLEOS DE VENEZUELA, S.A.** (herein called the "**Issuer**"), a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela, hereby promises to pay to DRESSER-RAND COMPANY, or registered assigns, the principal sum of ONE HUNDRED NINETEEN MILLION SIX HUNDRED FORTY-FIVE THOUSAND SIXTY-NINE AND 70/100 DOLLARS ($119,645,069.70 ), with interest (a) on the unpaid principal balance thereof based on and computed on the basis of the actual number of days elapsed on a year of three hundred sixty five (365) days, at a rate per annum equal to six and one-half percent (6.50%), payable quarterly, on April 20, 2017 (the "**Initial Repayment Date**") and on each day in January, April, July and October described on Exhibit A hereto occurring after the Initial Repayment Date on or prior to January 20, 2020 (the "**Maturity Date**" and, each such date on which payment of principal and interest is due, including the Maturity Date, a "**Repayment Date**") or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, and (b) on any overdue payment of principal, any overdue payment of interest, payable quarterly as aforesaid (or, at the option of the registered holder hereof, on demand), at a rate per annum of eight and one-half percent (8.50%) per annum, calculated as set forth above. The principal amount of this Note shall be due and payable on each Repayment Date or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, in installments, with each installment being equal to the amounts set forth on Exhibit A hereto, with any

A-1

unpaid principal and interest on this Note not previously paid being due and payable in full on the Maturity Date.

Payments of principal and interest on this Note are to be made in United States Dollars to the Administrative Agent (at its offices at West8 Tower, Suite 1000, 10205 Westheimer Road, Houston, TX 77042, Attention: Erik Scherzer and Martha Vance).

This Note is one of the Notes (herein called the "**Note**") issued pursuant to the Note Agreement, dated as of January 20, 2017 (as from time to time amended, the "**Note Agreement**"), among the Issuer, the Guarantor, the Administrative Agent and the Initial Noteholder named therein, and the Noteholders party thereto from time to time, and is entitled to the benefits and is otherwise subject to the provisions thereof. Capitalized terms used herein and not defined shall have the same meanings when used herein as in the Note Agreement.

This Note is a registered Note and, as provided in the Note Agreement, upon surrender of this Note for registration of transfer, duly endorsed, or accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note (or, subject to the provisions of Section 2.11 of the Note Agreement, new Notes with an aggregate principal amount equal to the principal amount of this Note) will be issued to, and registered in the name of, the transferor, the transferee or the transferees, as the case may be. Prior to due presentment for registration of transfer, the Issuer may treat the Person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Issuer will not be affected by any notice to the contrary.

This Note is subject to optional prepayment, in whole or from time to time in part.

If an Event of Default, as defined in the Note Agreement, occurs and is continuing, the principal of this Note, together with all accrued and unpaid interest hereon, may be declared or otherwise become due and payable in the manner, and with the effect provided in the Note Agreement.

THIS NOTE, AND THE RIGHTS AND OBLIGATIONS OF THE ISSUER AND THE HOLDER HEREOF UNDER THIS NOTE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WHICH THE ISSUER, THE HOLDER HEREOF AND THE ADMINISTRATIVE AGENT EXPRESSLY INTEND TO APPLY), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

**PETRÓLEOS DE VENEZUELA, S.A.**

By _____
    Name: Waldemar Negrín
    Title: Authorized Signatory

A-2

Exhibit A
To
6.50% SENIOR GUARANTEED NOTE, SERIES 2017B

| Repayment Date | Principal Amount Due | Interest Due |
|---|---|---|
| April 20, 2017 | $0 | $1,917,599.06 |
| July 20, 2017 | $0 | $1,938,905.72 |
| October 20, 2017 | $0 | $1,960,212.37 |
| January 20, 2018 | $0 | $1,960,212.37 |
| April 20, 2018 | $14,955,633.71 | $1,917,599.06 |
| July 20, 2018 | $14,955,633.71 | $1,696,542.50 |
| October 20, 2018 | $14,955,633.71 | $1,470,159.28 |
| January 20, 2019 | $14,955,633.71 | $1,225,132.73 |
| April 20, 2019 | $14,955,633.71 | $958,799.53 |
| July 20, 2019 | $14,955,633.71 | $727,089.64 |
| October 20, 2019 | $14,955,633.71 | $490,053.09 |
| January 20, 2020 | $14,955,633.73 | $245,026.55 |

A-1



EXHIBIT B

## FORM OF ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (this "Assignment") is dated as of the Effective Date set forth below and is entered into by and between [**Insert name of Assignor**] (the "Assignor") and [**Insert name of Assignee**] (the "Assignee"). All capitalized terms used but not otherwise defined herein have the meanings given to them in the Note Agreement identified below (the "Note Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Finance Documents, as of the Effective Date set forth below, the interest in and to all of the Assignor's rights and obligations under the Note Agreement (or, if a Note has been transferred to an Assignee in part, a portion thereof equivalent to the portion of such Note transferred to the Assignee), the other Transaction Documents and any other agreements, documents or instruments delivered pursuant thereto or for the benefit of the Noteholders relating thereto that represents the amount identified below of all of the Assignor's outstanding rights and obligations under the Note identified below (collectively, the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| (a) | Assignor: | _____ _____ |
| (b) | Assignee: | _____ _____ |
| (c) | Issuer: | Petróleos de Venezuela, S.A. |
| (d) | Administrative Agent: | Dresser-Rand Company, as administrative agent under the Note Agreement |
| (e) | Note Agreement: | The Note Agreement, dated as of January 20, 2017 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and Dresser-Rand Company, as Administrative Agent. |
| (f) | Assigned Interest: | Unpaid principal balance of $_____ on the Note dated _____, 20__ in the original principal amount of $_____ |
| (g) | Account for Payments: | _____ |

**Effective Date:** _____ ___, 20___

*[remainder of page intentionally left blank]*

C-2-1



The terms set forth in this Assignment are hereby agreed to:

**ASSIGNOR**
[**NAME OF ASSIGNOR**]


By: _____

Name:

Title:


**ASSIGNEE**
[**NAME OF ASSIGNEE**]


By: _____

Name:

Title:

C-2-2



ANNEX 1

NOTE AGREEMENT, DATED AS OF JANUARY 20, 2017, BY AND AMONG PETRÓLEOS DE
VENEZUELA, S.A., AS ISSUER, PDVSA PETRÓLEO, S.A., AS GUARANTOR, THE
NOTEHOLDERS THAT ARE A PARTY THERETO FROM TIME TO TIME AND DRESSER-RAND
COMPANY, AS ADMINISTRATIVE AGENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ACCEPTANCE

1.      **Representations and Warranties**

1.1     **Assignor**

The Assignor: (a) represents and warrants that (i) it is the legal and beneficial owner of the
Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other
adverse claim and (iii) it has full power and authority, and has taken all action necessary, to
execute and deliver this Assignment and to consummate the transactions contemplated hereby;
and (b) assumes no responsibility with respect to (i) any statements, warranties or representations
made in or in connection with the Note Agreement or any other agreement, instrument or
document delivered pursuant thereto or for the benefit of the Noteholders relating thereto, other
than this Assignment (collectively, the "Finance Documents"), (ii) the execution, legality, validity,
enforceability, genuineness, sufficiency or value of the Finance Documents, or any collateral
thereunder, (iii) the financial condition of the Issuer, the Guarantor, any of the Subsidiaries or any
of their respective Affiliates in respect of any Finance Document, or (iv) the performance or
observance by the Issuer, the Guarantor, any of the Subsidiaries or any of their respective
Affiliates of any of their respective obligations under any Finance Document.

1.2     **Assignee**

The Assignee: (a) represents and warrants that (i) it has full power and authority, and has taken all
action necessary, to execute and deliver this Assignment and to consummate the transactions
contemplated hereby and to become a Noteholder under the Note Agreement, (ii) it is [an Eligible
Institution / not an Eligible Institution][1] and, unless the assignment evidenced by this Assignment
has been consented to by the Issuer in accordance with the second sentence of Section 9.04(b) of
the Note Agreement, is not an Ineligible Transferee, (iii) from and after the Effective Date, it shall
be bound by the provisions of the Note Agreement and, to the extent of the Assigned Interest,
shall have the obligations of a Noteholder thereunder, and (iv) it has received a copy of the Note
Agreement, together with copies of the most recent financial statements delivered pursuant to
Section 5.04 thereof and such other documents and information as it has deemed appropriate to
make its own credit analysis and decision to enter into this Assignment and to purchase the
Assigned Interest on the basis of which it has made such analysis and decision; and (b) agrees
that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or
any other Noteholder, and based on such documents and information as it shall deem appropriate
at the time, continue to make its own credit decisions in taking or not taking action under the
Finance Documents, and (ii) it will perform in accordance with their terms all of the obligations
which by the terms of the Finance Documents are required to be performed by it as a Noteholder.

---

[1] Select one as applicable.

C-2-3



2.     **Payments**

From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest and other amounts) to the Assignor for amounts which have accrued up to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.     **General Provisions**

This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy and electronic mail shall be equally effective to the delivery of a manually executed counterpart of this Assignment. THIS ASSIGNMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

*[remainder of page intentionally left blank]*



Schedule 2.08

## ACCOUNTS OF ADMINISTRATIVE AGENT AND INITIAL NOTEHOLDER

Account of Administrative Agent:

| | |
|---|---|
| Legal Entity Name: | Citibank N.A. |
| ABA Routing: | 021000089 |
| SWIFT: | CITIUS33 |
| Currency: | USD |
| Country: | U.S.A. |
| National Account Number: | 30591016 |

Issuer is to provide, at the time of each cash transfer, all the related information for its proper identification, including, but not limited to bank account source of the funds, swift code and amount.

Account of Initial Noteholder:

| | |
|---|---|
| Legal Entity Name: | Citibank N.A. |
| ABA Routing: | 021000089 |
| SWIFT: | CITIUS33 |
| Currency: | USD |
| Country: | U.S.A. |
| National Account Number: | 30591016 |

Administrative Agent is to provide, at the time of each cash transfer, all the related information for its proper identification, including, but not limited to bank account source of the funds, swift code and amount.

Address for Notices to Initial Noteholder:

Address: West8 Tower, Suite 1000, 10205 Westheimer Road, Houston,TX 77042
Attention: Erik Scherzer and Martha Vance
Fax No.: 713-935-3880
Email: erik.scherzer@siemens.com/martha.vance@siemens.com

S2.08-1



Schedule 3.01(h)

## SUBSIDIARIES

### Corporate Structure

The following chart summarizes our corporate structure:





## LITIGATION

**Legal Proceedings**

*PDV Sweeny and ConocoPhillips Company*

On February 25, 2010, PDV Sweeny, Inc. ("PDV Sweeny") and PDV Texas, Inc. ("PDV Texas") filed a request for arbitration with the International Chamber of Commerce (the "ICC") against ConocoPhillips Company ("ConocoPhillips") and Sweeny Coker Investor Sub, Inc. ("Sweeny Sub"), in connection with the exercise of a call option by ConocoPhillips and Sweeny Sub to purchase the interests of PDV Sweeny and PDV Texas in the joint venture for no consideration (the "Call Option Arbitration"). PDV Sweeny and PDV Texas seek an award declaring, among other things, that the exercise of the call option was invalid and ineffective and that they are entitled to their interests in the joint venture. Thereafter, on August 16, 2010 (amended on September 29, 2010), ConocoPhillips filed a request for arbitration with the ICC against PDVSA and its wholly-owned subsidiary PDVSA Petróleo, S.A., alleging that PDVSA Petróleo, S.A., breached an obligation under a crude oil supply agreement to participate in a joint calculation of an adjustment to the price of crude oil for the second half of 2008, and all of 2009, and that as a result ConocoPhillips suffered damages in excess of U.S.$242 million, and further alleging that PDVSA, as guarantor, had an obligation to indemnify ConocoPhillips for such damages (the "Lookback Adjustment Arbitration"). On December 17, 2010, an arbitral tribunal granted the request of PDVSA and its affiliates to consolidate the Call Option Arbitration and the Lookback Adjustment Arbitration. On February 4, 2011, ConocoPhillips resubmitted its claim related to the Lookback Adjustment Arbitration as a counterclaim and submitted two additional counterclaims, alleging that PDVSA Petróleo, S.A., under a crude oil supply agreement and PDVSA as guarantor were liable for damages caused by their failure to supply crude oil during the months of January, March, April, June, July and August 2009, in excess of U.S.$16 million, as well as damages caused by demurrage, in excess of U.S.$3.3 million. On May 3, 2011, the tribunal and the parties signed the terms of reference, and on May 26, 2011, the tribunal issued a procedural order, establishing a schedule for the arbitration. In accordance with that procedural order, PDVSA and its affiliates submitted their Statement of Claim on August 3, 2011, and the Statement of Defense and Counterclaim was filed on December 20, 2011. A hearing was conducted in December 2012. A partial award was issued by the tribunal on April 14, 2014 and a final award on August 18, 2014. Under the partial award, the tribunal dismissed the claims by PDVSA and its affiliates, declaring that ConocoPhillips properly exercised the call option and thereby validly acquired the interests of PDV Sweeny and PDV Texas in the joint venture. With respect to the counterclaims by ConocoPhillips, under the partial award, the tribunal declared that PDVSA Petróleo and PDVSA are jointly and severally liable to ConocoPhillips for approximately U.S.$5 million in damages arising out of their failure to supply crude oil during the months of April, June and July 2009, and dismissed all other counterclaims except for claims for legal costs of the arbitration and pre- and post-award interest. Under the final award, the tribunal declared that PDVSA and its affiliates are jointly and severally liable for approximately U.S.$3.7 million in legal costs plus pre-award interest and post-award interest.

On July 11, 2014, PDV Sweeny and PDV Texas filed a petition with the United States District Court for the Southern District of New York (the "District Court") against ConocoPhillips and Sweeny Sub, seeking to vacate the portion of the partial award that dismissed the call option claim and declared that ConocoPhillips had properly exercised the call option and validly acquired the joint venture interests of PDV Sweeny and PDV Texas (the "Petition to Vacate"). On August 29, 2014, ConocoPhillips and Sweeny Sub filed their opposition to the Petition to Vacate, as well as a cross petition to confirm the partial and final awards in their entirety (the "Cross Petition"). On September 29, 2014, PDV Sweeny and

PDV Texas filed their reply, and on October 6, 2014, ConocoPhillips and Sweeny Sub filed their reply. On September 1, 2015, the District Court issued a decision denying the Petition to Vacate and granting the Cross Petition and judgment was entered that same day.

On September 23, 2015, ConocoPhillips and Sweeny Sub filed a motion with the District Court seeking an order that the judgment be amended to include both the partial and final awards, reflecting all of the sums that were awarded in their favor under both of those awards, approximately U.S.$10.7 million. On October 2, 2015, PDV Sweeny and PDV Texas filed an opposition, and on October 7, 2015, respondents filed their reply. On December 21, 2015, the District Court issued a decision granting the motion of ConocoPhillips and Sweeny Sub to amend the judgment, but stated that the corrected judgment does not alter whatever liability the awards assigned to PDV Sweeny and PDV Texas. Accordingly, on December 22, 2015, a corrected judgment was entered, reflecting all of the sums that were awarded in favor of ConocoPhillips and Sweeny Sub under both of the awards and stating that the entitlement of ConocoPhillips and Sweeny Sub to those sums is subject to the conditions specified in the awards.

PDV Sweeny and PDV Texas have paid all of the sums they owe under the corrected judgment, a total of approximately U.S.$4 million. Accordingly, on February 16, 2016, ConocoPhillips and Sweeny Sub filed with the District Court a satisfaction of judgment reflecting that PDV Sweeny and PDV Texas had fully satisfied their payment obligations under the corrected judgment.

In the interim, on January 15, 2016, PDV Texas and PDV Sweeny appealed to the United States Court of Appeals for the Second Circuit (as used in this paragraph, the "Court of Appeals") the denial of the Petition to Vacate and the grant of the Cross Petition insofar as it confirmed the portion of the partial award that declared the exercise of the call option by ConocoPhillips to have been valid. In accordance with an order by the Court of Appeals, dated February 16, 2016, PDV Texas and PDV Sweeny filed their opening appellate brief on April 27, 2016. ConocoPhillips and Sweeny Sub filed their response on June 28, 2016, and PDV Texas and PDV Sweeny filed their reply on July 12, 2016. The Court of Appeals has yet to set a date for oral argument.

*Opic Arbitration*

On November 19, 2010, Opic Karimun **Corporation** ("Opic") filed a request for arbitration before the International Court of Arbitration of the International Chamber of Commerce in New York, against Corporación Venezolana del Petróleo, S.A. ("CVP") and PDVSA under the exploration at risk and profit sharing association agreements relating to the Gulf of Paria **East** and Gulf of Paria West (the "Gulf of Paria Agreements") and PDVSA's guaranties of CVP's obligations thereunder. Opic alleges that PDVSA and CVP are liable under a **variety** of **theories**, including breach of the **Gulf** of Paria Agreements and the guaranties, and seeks damages in the amount of approximately U.S.$200 million as a result of the migration process of 2007 in accordance with Decree-Law 5.200. On January 14, 2011, PDVSA and CVP filed their answer to the Request for Arbitration. Thereafter, following the constitution of the arbitral tribunal and the establishment of the terms of reference, the parties have submitted their initial briefs and have engaged in document production.

A pre-hearing briefing on the matter was completed on December 14, 2012 and a hearing on the merits was held on January 21, 2013 through January 28, 2013. The parties submitted their post-hearing briefs on March 15, 2013. Thereafter, the Secretariat of the ICC informed the parties that the ICC International Court of Arbitration has extended the time limit for rendering the award until November 29, 2013. An award was issued on November 11, 2013, pursuant to which PDVSA was ordered to pay U.S.$81 million. PDVSA has not made any payments on this award.

***Helmerich & Payne International Drilling Co. and Helmerich & Payne de Venezuela C.A.***

On September 23, 2011, Helmerich & Payne International Drilling Co. ("H&P-IDC") and Helmerich & Payne de Venezuela C.A. ("H&P-V", together with H&P-IDC, the "Plaintiffs"), filed a lawsuit against the Bolivarian Republic of Venezuela, PDVSA and PDVSA Petróleo (collectively, the "Defendants") before the United States District Court for the District of Columbia (the "District Court"), seeking recovery of damages for the alleged expropriation of H&P-V's assets in Venezuela (the "expropriation claim") and for breach of contract for the alleged failure to make payments under ten drilling contracts entered into between H&P-V and PDVSA Petróleo (the "contractual claims"). The complaint alleges that payments are due under the contracts in the amount of U.S.$32 million and seeks damages for an unspecified amount on all claims. On August 31, 2012, Defendants filed motions to dismiss the complaint; on February 22, 2013, Plaintiffs filed their opposition; and on April 15, 2013, Defendants filed their reply. On July 15, 2013, the District Court heard oral argument, and on September 20, 2013, it rendered its decision, dismissing H&P-V's expropriation claim but refusing to dismiss H&P-IDC's expropriation claim and H&P-V's contractual claims.

Both the Plaintiffs and the Defendants appealed to the United States Court of Appeals for the District of Columbia Circuit (as used in this paragraph, the "Court of Appeals"), and both appeals were subsequently consolidated. In accordance with an order by the Court of Appeals; on May 12, 2014, Defendants filed their opening brief; on July 11, 2014, Plaintiffs filed their opening brief; on August 25, 2014, Defendants filed their reply brief; and on September 24, 2014, Plaintiffs filed their reply brief. On January 26, 2015, the Court of Appeals held oral argument, and on May 1, 2015, it rendered its decision, reversing the dismissal of H&P-V's expropriation claim and affirming the refusal to dismiss H&P-IDC's expropriation claim but dismissing H&P-V's contractual claims. Subsequently, Defendants sought rehearing and rehearing en banc, and the Court of Appeals denied those petitions on July 30, 2015.

Thereafter, both the Plaintiffs and the Defendants filed petitions for certiorari with the Supreme Court of the United States (the "Supreme Court"). On February 29, 2016, the Supreme Court invited the Solicitor General of the United States (the "Solicitor General") to file briefs expressing the views of the United States as to whether the petitions for certiorari should be granted. On May 24, 2016, the Solicitor General filed amicus briefs recommending that the Supreme Court partially grant Defendants' petition for certiorari and deny Plaintiffs' petition for certiorari in its entirety.

In the interim, on October 19, 2015, the District Court issued an order, establishing a schedule for jurisdictional discovery and further briefing. In accordance with that schedule, from November 2015 until June 28, 2016, the parties engaged in jurisdictional discovery.

On June 28, 2016, the Supreme Court partially granted Defendants' petition for certiorari, but did not decide Plaintiffs' petition for certiorari, which petition remains pending. In light of the Supreme Court's grant of certiorari, on June 28, 2016, the District Court stayed all proceedings before it, including jurisdictional discovery, until after the Supreme Court renders a decision on the issues before it.

On August 19, 2016, Defendants filed their opening brief on the merits with the Supreme Court. Plaintiffs are to file their response on September 26, 2016, and Defendants are to file their reply on October 24, 2016. The Supreme Court has yet to set a date for oral argument.

***PDVSA Servicios, S.A. v. Petrosaudi Oil Services (Venezuela) LTD***

S3.01(i)-3



On August 28, 2015, PDVSA Servicios, S.A. ("PDV Servicios") filed a request for arbitration under the UNCITRAL Rules against Petrosaudi Oil Services (Venezuela) Ltd. ("Petrosaudi"), in relation to a drilling services agreement between the companies dated September 9, 2010. PDV Servicios claims relate to the payment of several invoices delivered by Petrosaudi under the services agreement, alleging that such invoices do not reflect the terms and conditions contained in the agreement.

On March 22, 2016, the arbitral tribunal held a first preliminary hearing. On March 24, 2016, the arbitral tribunal issued its first partial award, where it upheld several claims raised by PDV Servicios in its allegations. This award permitted PDV Servicios to no longer abide by the "pay now, argue later" provision contained in the services agreement.

On May 16, 2016, Petrosaudi submitted its statement of defense and counterclaim. Although Petrosaudi has yet to set a sum of damages in connection with its counterclaims, it is expected that damages may reach up to approximately U.S.$150,000,000.00. An additional preliminary hearing took place during July 2016, and a final hearing on the merits is set to take place in December 2016.

*Crystallex International Corp. v. Bolivarian Republic of Venezuela*

On February 16, 2011, Crystallex International Corp. ("Crystallex") commenced an arbitration against the Bolivarian Republic of Venezuela, before the International Centre for Settlement of Investment Disputes (ICSID), for the amount of U.S.$3,417 million, plus costs and interest, claiming an alleged infringement of the Bilateral Investment Treaty between Venezuela and Canada. On April 4, 2016, the arbitral tribunal issued an arbitral award granting Crystallex damages in the amount of U.S.$1,200 million (plus interest).

On April 7, 2016, Crystallex filed a request for confirmation of the arbitral award before the United States District Court for the District of Columbia, which was the seat of award. Venezuela has opposed confirmation of the award and filed a motion seeking to vacate the award pursuant to the Federal Arbitration Act. In this proceeding, Crystallex has also moved that Venezuela be ordered to provide a prejudgment bond in the amount of the award. Venezuela has opposed the motion.

Crystallex has asserted that it has filed requests for recognition and enforcement of the award in several other jurisdictions, including Canada. On July 20, 2016 the Superior Court of Justice of Ontario, Canada issued an order recognizing and permitting enforcement of the award.

On April 12, 2016, PDVSA's affiliate, PDVSA Services B.V. was notified by the Court of The Hague that PDVSA's ownership interests of the following European affiliates have been subject to attachment: Propernyn B.V., PDV Europa B.V. and PDVSA Services B.V. for an amount of U.S.$1,526 million, based on the allegation that PDVSA is jointly and severally liable for the debts of the Bolivarian Republic of Venezuela. PDVSA objected to such claim and will file before the court a brief during the first quarter of 2017. The embargo of these shares has not resulted in any expenditure or the suspension of activities of any of PDVSA's affiliates.

In addition, Crystallex has sued PDVSA, PDV Holding, and CITGO Holding in U.S. district court in Delaware claiming that a U.S.$2.2 billion dividend made by CITGO Holding in February 2015 was a fraudulent conveyance. Motions to dismiss have been filed and argued by the defendants. The trial court has not yet ruled on the motions.

Some creditors have, in recent years, used litigation tactics against several sovereign debtors, to attach assets of state-owned entities located outside the relevant jurisdiction or interrupt payments made



by these. While PDVSA and its subsidiaries are entities with a legal personality separate from the Bolivarian Republic of Venezuela, PDVSA cannot guarantee that a creditor of the Bolivarian Republic of Venezuela will not be able to interfere with the Exchange Offers, the Collateral or payments made under the New Notes, through an attachment of assets, injunction, temporary restraining order or otherwise.

### *Phillips 66 v. Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A.*

On March 24, 2015, Phillips 66 filed an arbitration request against PDVSA and PDVSA Petróleo before the Court of Arbitration of the International Chamber of Commerce in New York, in relation to the claim of the Look Back Adjustment under the Crude Oil Supply Modifying Agreement ("COSA") asserting that PDVSA and PDVSA Petróleo owed Phillips 66 U.S.$250 million, which must be deducted from the price of future purchases of crude oil delivered under the COSA. The Look Back Adjustment is a review of the look back competitiveness of the crude oil supplied under the COSA. The periods at issue are the last half of the year of 2008 and the entire year of 2009. The hearing took place from April 4 through April 6, 2016, in New York.

On August 26, 2016, the arbitral tribunal rendered its final award. In accordance with article 12.3 of the COSA, the tribunal accepted, without any further adjustment, the proposal by PDVSA and PDVSA Petróleo, which was to revise the total amount of the aggregated look back adjustment amounts to U.S.$66.8 million, corresponding to the periods at issue, which will be deducted from future invoices. The tribunal also ruled that Phillips 66 must reimburse PDVSA and PDVSA Petróleo the prepayment of U.S.$325,000, plus applicable costs and fees for an amount of U.S.$1,572,833.99.

### *Frescati Shipping, et al. v. CITGO et al.*

In November 2004, the Athos I, a merchant tanker, struck a submerged anchor in the public channel of the Delaware River near Paulsboro, New Jersey and released crude oil owned by CITGO Asphalt Refining Company ("CARCO"), a wholly-owned subsidiary of CITGO. Frescati Shipping Company Ltd. ("Frescati"), the owner of the Athos I, filed suit against CARCO in the U.S. District Court for the Eastern District of Pennsylvania for over U.S.$125 million in oil spill recovery and cleanup costs. In 2008, CITGO was also sued in the same court by the U.S. federal government, which was seeking to recover U.S.$87 million it paid out of the Oil Spill Liability Trust Fund to Frescati for its costs in responding to the oil spill. The cost of the entire cleanup and damages was approximately U.S.$268 million.

Although CITGO does not believe CARCO had any liability for the oil spill, it entered into an agreement with the U.S. federal government to cap CITGO's potential damages at U.S.$124 million if it were to lose the Frescati lawsuit, with interest the amount is approximately U.S.$210 million.

On April 12, 2011, the U.S. District Court found that neither CARCO nor CITGO was liable for any damages or cleanup **expenses**. On June 10, 2011, the plaintiffs filed an appeal of the verdict in CARCO's favor with the **U.S. Court of Appeals for the** Third Circuit. The U.S. Court of Appeals issued its decision on May 16, 2013 in which it reversed the trial court's decision and remanded the case for additional findings of fact. On July 1, 2013, CITGO filed a petition for rehearing with the U.S. Court of Appeals, which was denied on July 12, 2013. CITGO then filed an appeal of that decision with the U.S. Supreme Court, and on February 24, 2014, the U.S. Supreme Court denied CITGO's petition for a writ of certiorari.

The trial on remand was held in the U.S. District Court in 2015, and on July 25, 2016, the judge issued its opinion and preliminary order in favor of Frescati and the U.S. federal government for U.S.$100

million plus U.S.$20 million of prejudgment interest. CITGO intends to appeal the judgment to the Third Circuit. Legal proceedings over insurance coverage for these damages, which had been stayed pending this decision, will resume this year. CITGO does not believe that the resolution of this matter will have a material adverse effect on its financial condition or results of operations.

### *Other Claims; Allowances for Contingencies*

As of December 31, 2015, we were subject to other legal claims and procedures in the ordinary course of business having an aggregate amount of U.S.$3,159 million.

As of December 31, 2015 and December 31, 2014, we registered allowances for contingences having an aggregate amount of U.S.$1,244 million and U.S.$4,274 million, respectively.

S3.01(i)-6



## ENVIRONMENTAL MATTERS

**Environment and Occupational Health.** We and our subsidiaries are subject to a complex environmental and occupational health regulation framework. Under this framework, we and our subsidiaries may be required to make significant expenditures to modify our facilities and to prevent or remedy the effects of waste disposal, pollutant spills, and accidents on the environment and the population's health.

We are taking important steps to prevent risks to the environment, the population's health, and the integrity of our installations. During 2012 and 2013, we continued the implementation of our company-wide Integral Risk Management System (SIR-PDVSA®). The system is based on international practices and standards, such as ISO 14001 for Environmental Management, ISO 18000 and British Standard BUSINESS 8800 for health, and the Occupational Safety and Health Administration (OSHA)'s and American Petroleum Institute (API) for process safety.

We have invested $42 million to complete the implementation of SIR-PDVSA®. In addition, we are undertaking an investment plan to comply with Venezuelan environmental laws under which $88 million was invested during 2011, $115 million was invested during 2012 and $32 million during the six months ended June 30, 2013. In addition, CITGO plans to invest approximately $291 million for projects managing environmental risks between 2013 and 2017.

As part of our environmental responsibility initiative, we have also instituted a plan to recover oil pits that were left behind from oil exploration and production activities until 2004. Oil pits are excavations made on the soil surface to store oil sludge and drilling cuts. The plan includes the recovery, recycling and transformation of the disposed waste, including abandoned installations, in order to convert them into financial and environmental assets. The plan was first implemented in 2001 and has an expected duration of twelve years. Since 2005, a total of 3,223 oil pits have been closed and restored. In 2012, 565 oil pits were closed and restored. As of December 31, 2012, the total amount of restored oil pits are 5,081. In 2012, 2011 and 2010, we registered remediation and restoration expenses having an aggregate amount of $176 million, $217 million and $164 million, respectively.

Our subsidiary CITGO has received several notices of violation from the Environmental Protection Agency of the United States and other government authorities, which include notices of violation under the Federal Clean Air Act that may lead to CITGO being deemed liable, jointly with other companies, for remediation of contamination in respect of certain properties pursuant to the Comprehensive Environmental Response, Compensation and Liability Act. Such notices of violation are currently being analyzed by CITGO and, in certain cases, remediation actions are being performed. CITGO is committed to negotiate and settle with the governmental authorities in respect of such matters.

As of December 31, 2012, CITGO's non-current liabilities included an environmental accrual of $135 million compared with $127 million as of December 31, 2011. CITGO estimates a possible additional loss of $72 million as of December 31, 2012 in connection with environmental matters.

On February 4, 2012, two surface pipelines in the Venezuelan state of Monagas ruptured, resulting in a spill of light crude oil. The resulting oil spill spread over a distance of approximately 0.5 km to the Guarapiche River. A water treatment plant that treats water from the Guarapiche River and provides such water to residents of certain areas of the state of Monagas was temporarily shut down while Petróleos de Venezuela, S.A. ("PDVSA") contained and conducted a clean-up of the oil spill. During such shut down,

PDVSA distributed potable water to residents of the affected areas.  In consultation with experts, PDVSA deployed containment barriers and equipment for purposes of containing and removing the oil.  After containing the spill, PDVSA worked to remediate the affected water and soil.  The clean-up of the spill and the restoration of the water supply to affected residents was completed within forty days of the incident.

Since May 2012, the following changes to PDVSA's environmental safety initiatives have occurred: (i) PDVSA has increased the number of environmental indicators certified by KPMG; (ii) PDVSA has engaged in the development of the subsoil injection of waste, which has allowed PDVSA to safely dispose of approximately 650,000 barrels of mud and industrial water; (iii) PDVSA has designed and implemented new plans to address oil spills; (iv) PDVSA has commenced 174 environmental projects in different facilities throughout Venezuela; and (v) PDVSA has incorporated additional environmental policies to seven projects to be developed by PDVSA.

At the beginning of 2015 PDVSA initiated a process of certifying 12 environmental management progress indicators, which were included in the 2015 Memorandum of Balance of Environmental Management, with the support of the auditing firm KPMG.  The 12 indicators in process of certification are:  Authorization Procedures, Sanctioning Procedures, Environmental Conservation, Natural Resources Monitoring, Effluent Liquids Management, Production Waters, Atmospheric Emissions, Air Quality Monitoring, Waste Management, Hydrocarbon and other Contaminating Substances Spills, Social-Environmental Formation and Environmental Cure and Restoration.

S3.01(p)-2



**Description of Released Affiliates and of Novated Receivables**

Annex

| AMOUNT IN USD | -$116,905,369.86) |
| AMOUNT IN EUR | €-738,785.58 |
| AMOUNT IN GBP | -£854,011.11 |
| AMOUNT IN SEK | -8,124,627.30 kr |

| Siemens Entity | PDVSA Entity | Invoice number | Currency | Gross Amount | Net Amount | Date | PDVSA invoice number |
|---|---|---|---|---|---|---|---|
| DRESSER RAND DE VENEZUELA | PDVSA PETRÓLEO S.A. | 19465 | USD | -4,893.72 | -4,839.89 | 1/21/2014 | 4906712 |
| DRESSER RAND DE VENEZUELA | PDVSA PETRÓLEO S.A. | N/C 00282 | USD | 565.82 | 559.59 | 8/26/2014 | 4906712 |
| DRESSER RAND DE VENEZUELA | PDVSA PETRÓLEO S.A. | 19464 | USD | -4,779.00 | -4,630.85 | 1/21/2014 | 4906709 |
| DRESSER RAND DE VENEZUELA | PDVSA PETRÓLEO S.A. | N/C 00281 | USD | 704.40 | 682.57 | 8/26/2014 | 4906709 |
| DRESSER RAND DE VENEZUELA | PDVSA PETRÓLEO S.A. | 19502 | USD | -8,900.62 | -8,802.71 | 3/13/2014 | 4906712 |
| DRESSER RAND DE VENEZUELA | PDVSA PETRÓLEO S.A. | N/C 00244 | USD | 1,185.97 | 1,172.92 | 3/13/2014 | 4906712 |
| DRESSER RAND DE VENEZUELA | PDVSA PETRÓLEO S.A. | 19501 | USD | -3,929.40 | -3,886.18 | 3/13/2014 | 4906712 |
| DRESSER RAND DE VENEZUELA | PDVSA PETRÓLEO S.A. | N/C 00283 | USD | 525.42 | 519.64 | 8/26/2014 | 4906712 |
| DRESSER RAND DE VENEZUELA | PDVSA PETRÓLEO S.A. | 19543 | USD | -19,191.09 | -18,979.99 | 5/20/2014 | 4906712 |
| DRESSER RAND DE VENEZUELA | PDVSA PETRÓLEO S.A. | N/C 00263 | USD | 3,970.11 | 3,926.44 | 5/20/2014 | 4906712 |
| Siemens Energy, Inc. | BARIVEN | 90060302D | USD | 500,000.00 | 500,000.00 | 7/2/2013 | 1800008 |
| Siemens Energy, Inc. | BARIVEN | 90060302D | USD | -1,371,321.76 | -1,371,321.76 | 7/2/2013 | 4901465 |
| DRESSER RAND | BARIVEN | 35037-017246 | USD | -97,011.08 | -97,011.08 | 8/29/2012 | 4901333 |
| EthosEnergy TC, Inc | BARIVEN | 23004 | USD | -5,947,561.00 | -5,947,561.00 | 9/30/2012 | 4901349 |
| EthosEnergy TC, Inc | BARIVEN | 23002 | USD | -3,737,871.31 | -3,737,871.31 | 9/30/2012 | 4901349 |
| EthosEnergy TC, Inc | BARIVEN | 22998 | USD | -3,936,749.42 | -3,936,749.42 | 9/30/2012 | 4901359 |
| EthosEnergy TC, Inc | BARIVEN | 23959 | USD | -35,044.00 | -35,044.00 | 12/14/2012 | 4901373 |
| DRESSER RAND | BARIVEN | 35037-017572 | USD | -79,850.50 | -79,850.50 | 12/20/2012 | 4901375 |
| DRESSER RAND | BARIVEN | 35037-017574 | USD | -51,551.73 | -51,551.73 | 12/20/2012 | 4901375 |
| EthosEnergy TC, Inc | BARIVEN | 24132 | USD | -1,513,420.18 | -1,513,420.18 | 12/19/2012 | 4901385 |
| DRESSER RAND | BARIVEN | 340-70040270 | USD | -187,273.37 | -187,273.37 | 12/30/2012 | 4901375 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DRESSER RAND | BARIVEN | 340-70040272 | USD | -237,914.46 | -237,914.46 | 12/30/2012 | 4901375 |
| DRESSER RAND | BARIVEN | 340-70040008 | USD | -304,379.41 | -304,379.41 | 12/27/2012 | 4901375 |
| DRESSER RAND | BARIVEN | 513-31397 | USD | -23,250.00 | -23,250.00 | 12/31/2012 | 4901381 |
| DRESSER RAND | BARIVEN | 513-31389 | USD | -4,129.20 | -4,129.20 | 12/31/2012 | 4901381 |
| DRESSER RAND | BARIVEN | 513-31533 | USD | -165,540.20 | -165,540.20 | 1/15/2013 | 4901385 |
| DRESSER RAND | BARIVEN | 340-80001872 | USD | -104,437.14 | -104,437.14 | 1/23/2013 | 4901381 |
| EthosEnergy TC, Inc | BARIVEN | 24578 | USD | -16,681.00 | -16,681.00 | 1/24/2013 | 4901386 |
| EthosEnergy TC, Inc | BARIVEN | 24698 | USD | -9,039.00 | -9,039.00 | 2/5/2013 | 4901387 |
| EthosEnergy TC, Inc | BARIVEN | 25220 | USD | -64,830.00 | -64,830.00 | 3/8/2013 | 4901396 |
| DRESSER RAND | BARIVEN | 340-70046436 | USD | -48,684.66 | -48,684.66 | 3/22/2013 | 4901401 |
| DRESSER RAND | BARIVEN | 340-70046387 | USD | -288,686.88 | -288,686.88 | 3/22/2013 | 4901401 |
| DRESSER RAND | BARIVEN | 340-70046367 | USD | -269,403.30 | -269,403.30 | 3/22/2013 | 4901401 |
| DRESSER RAND | BARIVEN | 340-70046347 | USD | -25,644.84 | -25,644.84 | 3/22/2013 | 4901401 |
| DRESSER RAND | BARIVEN | 342-90136150 | USD | -154,342.02 | -154,342.02 | 3/28/2013 | 4901401 |
| DRESSER RAND | BARIVEN | 340-80002061 | USD | -634,533.42 | -634,533.42 | 3/31/2013 | 4901402 |
| DRESSER RAND | BARIVEN | 513-33125 | USD | -26,009.84 | -26,009.84 | 3/28/2013 | 4901406 |
| DRESSER RAND | BARIVEN | 513-33127 | USD | -54,134.96 | -54,134.96 | 3/28/2013 | 4901406 |
| DRESSER RAND | BARIVEN | 513-33128 | USD | -42,433.52 | -42,433.52 | 3/28/2013 | 4901406 |
| DRESSER RAND | BARIVEN | 513-33129 | USD | -30,475.64 | -30,475.64 | 3/28/2013 | 4901407 |
| DRESSER RAND | BARIVEN | 340-80002106 | USD | -2,667,246.10 | -2,667,246.10 | 4/25/2013 | 4901411 |
| Siemens, S.A. | BARIVEN | 1-265423 | EUR | -88,856.60 | -88,856.60 | 5/6/2013 | 4901414 |
| EthosEnergy TC, Inc | BARIVEN | 26223 | USD | -5,000.00 | -5,000.00 | 4/24/2013 | 4901416 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029555 | USD | -234,225.00 | -222,279.52 | 9/25/2014 | 4907051 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 57755610014961 | USD | -1,650,280.57 | -1,599,121.87 | 7/2/2013 | 4906158 |
| DRESSER RAND | BARIVEN | 340-70050760 | USD | -229,489.04 | -229,489.04 | 6/24/2013 | 4901427 |
| DRESSER RAND | BARIVEN | 340-70050749 | USD | -229,489.04 | -229,489.04 | 6/24/2013 | 4901427 |
| DRESSER RAND | BARIVEN | 340-70050762 | USD | -456,583.50 | -456,583.50 | 6/24/2013 | 4901427 |
| DRESSER RAND | BARIVEN | 340-70050748 | USD | -58,107.74 | -58,107.74 | 6/24/2013 | 4901427 |
| DRESSER RAND | BARIVEN | 340-70050772 | USD | -201,449.16 | -201,449.16 | 6/24/2013 | 4901427 |
| DRESSER RAND | BARIVEN | 340-70050773 | USD | -189,629.36 | -189,629.36 | 6/24/2013 | 4901427 |
| DRESSER RAND | BARIVEN | 340-70050782 | USD | -1,793,070.69 | -1,793,070.69 | 6/24/2013 | 4901427 |
| DRESSER RAND | BARIVEN | 340-70050784 | USD | -488,721.51 | -488,721.51 | 6/24/2013 | 4901427 |
| DRESSER RAND | BARIVEN | 340-70050790 | USD | -132,455.25 | -132,455.25 | 6/24/2013 | 4901427 |
| DRESSER RAND | BARIVEN | 340-70050791 | USD | -287,272.35 | -287,272.35 | 6/25/2013 | 4901428 |
| DRESSER RAND | BARIVEN | 340-70050796 | USD | -58,107.74 | -58,107.74 | 6/25/2013 | 4901428 |
| DRESSER RAND | BARIVEN | 340-70050802 | USD | -87,313.98 | -87,313.98 | 6/25/2013 | 4901428 |
| DRESSER RAND | BARIVEN | 340-70050886 | USD | -320,096.19 | -320,096.19 | 6/27/2013 | 4901429 |
| DRESSER RAND | BARIVEN | 342-90144038 | USD | -47,621.98 | -47,621.98 | 6/24/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 342-90144131 | USD | -32,463.01 | -32,463.01 | 6/25/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 342-90144028 | USD | -11,234.40 | -11,234.40 | 6/24/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 340-70050902 | USD | -200,205.91 | -200,205.91 | 6/27/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 340-70050895 | USD | -368,681.51 | -368,681.51 | 6/27/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 340-70050933 | USD | -49,864.25 | -49,864.25 | 6/28/2013 | 4901490 |
| DRESSER RAND | BARIVEN | 340-70050950 | USD | -282,867.51 | -282,867.51 | 6/27/2013 | 4901430 |

| DRESSER RAND | BARIVEN | 340-70050951 | USD | -304,379.41 | -304,379.41 | 6/29/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 35037-01806152PR | USD | -50,646.60 | -50,646.60 | 6/27/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 35037-01805952PR | USD | -87,783.94 | -87,783.94 | 6/26/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 35037-01805852PR | USD | -514,964.83 | -514,964.83 | 6/26/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 35037-01805751PR | USD | -224,704.49 | -224,704.49 | 6/26/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 35037-01805652PR | USD | -490.8 | -490.8 | 6/26/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 35037-01805252PR | USD | -24,316.31 | -24,316.31 | 6/26/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 340-80002316 | USD | -305,748.66 | -305,748.66 | 6/29/2013 | 4901430 |
| DRESSER RAND | BARIVEN | 124809-02 | USD | -11,152.69 | -11,152.69 | 7/10/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-08 | USD | -16,194.70 | -16,194.70 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-04 | USD | -80,420.90 | -80,420.90 | 7/10/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-16 | USD | -40,427.10 | -40,427.10 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 342-90144404 | USD | -584,639.48 | -584,639.48 | 7/8/2013 | 4901431 |
| DRESSER RAND | BARIVEN | 513-35927 | USD | -14,097.40 | -14,097.40 | 7/3/2013 | 4901432 |
| DRESSER RAND | BARIVEN | 513-35828 | USD | -5,650.56 | -5,650.56 | 7/3/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-35814 | USD | -78,250.72 | -78,250.72 | 7/3/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-35813 | USD | -86,651.92 | -86,651.92 | 7/3/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-35757 | USD | -54,302.54 | -54,302.54 | 7/3/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-35758 | USD | -43,344.93 | -43,344.93 | 7/3/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-53759 | USD | -14,520.88 | -14,520.88 | 7/3/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-35760 | USD | -15,063.00 | -15,063.00 | 7/3/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 124809-19 | USD | -42,979.95 | -42,979.95 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-20 | USD | -41,350.12 | -41,350.12 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-07 | USD | -10,773.37 | -10,773.37 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-03 | USD | -45,675.76 | -45,675.76 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-18 | USD | -40,162.98 | -40,162.98 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-17 | USD | -40,427.10 | -40,427.10 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 513-35896 | USD | -33,561.84 | -33,561.84 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-14 | USD | -41,350.12 | -41,350.12 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-13 | USD | -40,427.10 | -40,427.10 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-12 | USD | -42,979.95 | -42,979.95 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-11 | USD | -14,586.38 | -14,586.38 | 6/30/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 513-35890 | USD | -28,020.16 | -28,020.16 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 513-35926 | USD | -134,291.60 | -134,291.60 | 7/3/2013 | 4901451 |
| DRESSER RAND | BARIVEN | 513-35880 | USD | -145,319.28 | -145,319.28 | 7/3/2013 | 4901451 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610018659 | USD | -530,477.74 | -514,032.93 | 10/7/2013 | 4906185 |
| DRESSER RAND | BARIVEN | 342-90145225 | USD | -100,965.75 | -100,965.75 | 7/10/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-35829 | USD | -37,626.40 | -37,626.40 | 7/3/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 342-90146153 | USD | -27,476.60 | -27,476.60 | 7/24/2013 | 4901435 |
| DRESSER RAND | BARIVEN | 340-70051405 | USD | -245,666.28 | -245,666.28 | 7/30/2013 | 4901438 |
| DRESSER RAND | BARIVEN | 340-70051406 | USD | -245,666.28 | -245,666.28 | 7/31/2013 | 4901438 |
| DRESSER RAND | BARIVEN | 35037-01812252PR | USD | -126,690.86 | -126,690.86 | 7/30/2013 | 4901438 |
| DRESSER RAND | BARIVEN | 35037-01812052PR | USD | -8,360.29 | -8,360.29 | 7/30/2013 | 4901438 |
| DRESSER RAND | BARIVEN | 340-7803838 | USD | -32,865,020.00 | -32,865,020.00 | 8/1/2013 | 4901439 |

| | | | | 20,000,000.0 | | | |
|---|---|---|---|---|---|---|---|
| DRESSER RAND | BARIVEN | 340-7803838 | USD | 0 | 20,000,000.00 | 8/1/2013 | 4901499 |
| DRESSER RAND | BARIVEN | 342-90147649 | USD | -156,970.08 | -156,970.08 | 8/7/2013 | 4901441 |
| DRESSER RAND | BARIVEN | 340-70051570 | USD | -386,523.38 | -386,523.38 | 8/12/2013 | 4901441 |
| DRESSER RAND | BARIVEN | 696-35486 | USD | -405,982.20 | -405,982.20 | 6/26/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 696-35486 CD | USD | -12,180.00 | -12,180.00 | 6/26/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-06 | USD | -27,669.38 | -27,669.38 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 124809-05 | USD | -180,771.30 | -180,771.30 | 7/3/2013 | 4901442 |
| DRESSER RAND | BARIVEN | 35037-018177 | USD | -80,385.60 | -80,385.60 | 8/23/2013 | 4901448 |
| DRESSER RAND | BARIVEN | 35037-018181 | USD | -11,996.00 | -11,996.00 | 8/26/2013 | 4901448 |
| DRESSER RAND | BARIVEN | 340-70051888 | USD | -282,867.51 | -282,867.51 | 8/27/2013 | 4901448 |
| DRESSER RAND | BARIVEN | 35037-01820051PR | USD | -17,273.65 | -17,273.65 | 8/30/2013 | 4901449 |
| Siemens, S.A. | BARIVEN | 5.55016E+11 | USD | -246,448.12 | -246,448.12 | 4/1/2013 | 4901546 |
| Siemens, S.A. | BARIVEN | 555016012012A | USD | -175,506.07 | -175,506.07 | 4/1/2013 | 4901546 |
| Siemens, S.A. | BARIVEN | 555008022013-A | USD | -6,236.44 | -6,236.44 | 4/1/2013 | 4901547 |
| DRESSER RAND | BARIVEN | 340-70052048 | USD | -264,910.50 | -264,910.50 | 9/6/2013 | 4901450 |
| DRESSER RAND | BARIVEN | 340-70052473 | USD | -2,256.79 | -2,256.79 | 9/18/2013 | 4901453 |
| DRESSER RAND | BARIVEN | 340-70052556 | USD | -371,265.30 | -371,265.30 | 9/26/2013 | 4901454 |
| DRESSER RAND | BARIVEN | 124809-10 | USD | -8,245.20 | -8,245.20 | 6/30/2013 | 4901458 |
| EthosEnergy  TC, Inc | BARIVEN | 27958 | USD | -423,783.86 | -423,783.86 | 9/20/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 340-70052691 | USD | -1,113,795.90 | -1,113,795.90 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 340-80002526 | USD | -1,248,050.70 | -1,248,050.70 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 340-70052692 | USD | -329,361.36 | -329,361.36 | 9/30/2013 | 4901463 |
| DRESSER RAND | BARIVEN | 513-37986 | USD | -20,087.70 | -20,087.70 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37985 | USD | -20,087.70 | -20,087.70 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37984 | USD | -20,087.70 | -20,087.70 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37983 | USD | -21,429.75 | -21,429.75 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37982 | USD | -21,429.75 | -21,429.75 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37981 | USD | -21,429.75 | -21,429.75 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37979 | USD | -21,429.75 | -21,429.75 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37978 | USD | -37,919.84 | -37,919.84 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37977 | USD | -56,879.76 | -56,879.76 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37976 | USD | -56,879.76 | -56,879.76 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37975 | USD | -8,412.33 | -8,412.33 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37974 | USD | -1,474.80 | -1,474.80 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37969 | USD | -5,462.80 | -5,462.80 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37968 | USD | -5,462.80 | -5,462.80 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37967 | USD | -42,393.15 | -42,393.15 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37966 | USD | -79,078.27 | -79,078.27 | 9/30/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-36826 | USD | -134,291.60 | -134,291.60 | 8/28/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-36827 | USD | -92,509.75 | -92,509.75 | 8/24/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37132 | USD | -19,065.04 | -19,065.04 | 8/28/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37133 | USD | -30,428.08 | -30,428.08 | 8/28/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-37134 | USD | -30,428.08 | -30,428.08 | 8/28/2013 | 4901460 |
| DRESSER RAND | BARIVEN | 513-38016 | USD | -86,408.16 | -86,408.16 | 6/30/2013 | 4901463 |
| DRESSER RAND | BARIVEN | 513-35848 | USD | -21,866.87 | -21,866.87 | 8/20/2013 | 4901432 |
| DRESSER RAND | BARIVEN | 513-35841 | USD | -46,477.28 | -46,477.28 | 8/20/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-35789 | USD | -40,345.81 | -40,345.81 | 8/20/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-35785 | USD | -48,023.50 | -48,023.50 | 8/3/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-35784 | USD | -38,175.50 | -38,175.50 | 8/20/2013 | 4901433 |
| DRESSER RAND | BARIVEN | 513-35747 | USD | -72,394.70 | -72,394.70 | 8/20/2013 | 4901433 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DRESSER RAND | BARIVEN | 340-70052696 | USD | 1,000,000.00 | 1,000,000.00 | 9/30/2013 | 1800008 |
| DRESSER RAND | BARIVEN | 340-70052696 | USD | -2,164,502.46 | -2,164,502.46 | 9/30/2013 | 4901489 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610022076 | EUR | -180,054.22 | -167,450.43 | 1/29/2014 | 4906345 |
| DRESSER RAND | BARIVEN | 340-70054173 | USD | -149,394.37 | -149,394.37 | 12/30/2013 | 4901490 |
| DRESSER RAND | BARIVEN | 35037-01845951PR | USD | -52,252.98 | -52,252.98 | 12/26/2013 | 4901488 |
| DRESSER RAND | BARIVEN | 340-80002781 | USD | -3,475,325.37 | -3,475,325.37 | 12/31/2013 | 4901488 |
| DRESSER RAND | BARIVEN | 606885 | USD | -147,279.66 | -147,279.66 | 1/8/2014 | 4901490 |
| DRESSER RAND | BARIVEN | 513-40152 | USD | -2,474,072.70 | -2,474,072.70 | 12/17/2013 | 4901491 |
| DRESSER RAND | BARIVEN | 35037-01848851 | USD | -19,985.00 | -19,985.00 | 1/17/2014 | 4901493 |
| DRESSER RAND | BARIVEN | 35037-018518 | USD | -79,744.17 | -79,744.17 | 2/6/2014 | 4901498 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029565 | USD | -561,154.69 | -538,147.35 | 9/25/2014 | 4906676 |
| DRESSER RAND | BARIVEN | 35037-018428 | USD | -17,814.00 | -17,814.00 | 12/6/2013 | 4901499 |
| DRESSER RAND | BARIVEN | 340-70055559 | USD | -2,393,527.35 | -2,393,527.35 | 3/7/2014 | 4901505 |
| SIEMENS, S.A. | OPGS PDVSA PETRÓLEO S.A. | 55755610034009 | USD | -85,410.00 | -85,410.00 | 7/31/2015 | 4901611 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029527 | USD | -165,073.23 | -159,955.96 | 9/24/2014 | 4907481 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029525 | USD | -188,655.12 | -182,806.81 | 9/24/2014 | 4907481 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029516 | USD | -160,308.04 | -155,338.49 | 9/24/2014 | 4907481 |
| DRESSER RAND | BARIVEN | 516-42074 | USD | -925,500.00 | -925,500.00 | 2/18/2014 | 4901506 |
| DRESSER RAND | BARIVEN | 342-90165802 | USD | -3,204.52 | -3,204.52 | 3/18/2014 | 4901506 |
| DRESSER RAND | BARIVEN | 342-90165800 | USD | -5,085.64 | -5,085.64 | 3/18/2014 | 4901506 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610031162 | USD | -444,890.98 | -433,323.82 | 12/18/2014 | 4906792 |
| Siemens Energy, Inc. | BARIVEN | 90089416 | USD | -556,134.30 | -556,134.30 | 4/3/2014 | 4901567 |
| DRESSER RAND | BARIVEN | 340-70055526 | USD | -6,489,385.79 | -6,489,385.79 | 3/6/2014 | 4901505 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029566 | USD | -491,010.36 | -470,878.94 | 9/25/2014 | 4906679 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029538 | USD | -1,096,760.37 | -1,057,277.00 | 9/24/2014 | 4906971 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029523 | USD | -140,269.53 | -135,921.17 | 9/24/2014 | 4907481 |
| Siemens Energy, Inc. | BARIVEN | 90106652P4 | USD | -9,078,847.20 | -9,078,847.20 | 6/3/2014 | 4901528 |
| Siemens Energy, Inc. | BARIVEN | 90106652P4 | USD | 2,685,421.86 | 2,685,421.86 | 6/3/2014 | 9460001 |
| Siemens Energy, Inc. | BARIVEN | 90106652P4 | USD | 2,685,421.86 | 2,685,421.86 | 6/3/2014 | 9460000 |
| Siemens Energy, Inc. | BARIVEN | 90106652P4 | USD | 2,685,421.86 | 2,685,421.86 | 6/3/2014 | 9460000 |
| DRESSER RAND | BARIVEN | 513-39719 | USD | -291,880.00 | -291,880.00 | 11/22/2013 | 4901527 |
| DRESSER RAND | BARIVEN | 340-70034064 | USD | -99,831.78 | -99,831.78 | 9/28/2012 | 4901527 |
| SIEMENS, S.A. | OPGS PDVSA PETRÓLEO S.A. | 55755610035122 | USD | -111,080.10 | -111,080.10 | 11/12/2015 | 4901611 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610021411 | USD | -172,764.90 | -167,409.19 | 12/16/2013 | 4906937 |

| Company | Counterparty | Number | Currency | Amount 1 | Amount 2 | Date | Ref |
|---|---|---|---|---|---|---|---|
| SIEMENS, S.A. EthosEnergy TC, Inc | PDVSA PETRÓLEO S.A. | 55755610029419 | USD | -168,468.32 | -168,299.85 | 9/23/2014 | 4906971 |
| Siemens, S.A. | BARIVEN | 30929 | USD | -476,523.00 | -476,523.00 | 6/21/2014 | 4901531 |
| Siemens Energy, Inc. | BARIVEN | 1-287796 | USD | -306,400.00 | -306,400.00 | 6/24/2014 | 4901568 |
| | BARIVEN | 90093849 | USD | -1,538,673.68 | -1,538,673.68 | 7/14/2014 | 4901560 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029421 | USD | -303,242.98 | -302,939.74 | 9/23/2014 | 4906971 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029426 | USD | -100,797.56 | -97,168.85 | 9/23/2014 | 4906971 |
| DRESSER RAND | BARIVEN | 513-44726 | USD | -91,530.69 | -91,530.69 | 7/20/2014 | 4901586 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029558 | USD | -350,722.26 | -336,342.65 | 9/25/2014 | 4906853 |
| Siemens Industrial | BARIVEN | 429F/90078002 | SEK | -1,984,051.00 | -1,984,051.00 | 9/17/2014 | 4901550 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029524 | USD | -100,192.80 | -97,086.83 | 9/24/2014 | 4907481 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610029506 | USD | -206,140.26 | -198,719.21 | 9/24/2014 | 4906853 |
| SIEMENS AG | BARIVEN | 7724/90078931 | EUR | -1,339.70 | -1,339.70 | 9/24/2014 | 4901551 |
| SIEMENS AG | BARIVEN | 7724/90078873 | EUR | -906.89 | -906.89 | 9/24/2014 | 4901551 |
| DRESSER RAND | BARIVEN | 342-90181031 | USD | -669,972.64 | -669,972.64 | 9/26/2014 | 4901552 |
| DRESSER RAND | BARIVEN | 342-90181336 | USD | -87,174.86 | -87,174.86 | 9/29/2014 | 4901553 |
| DRESSER RAND | BARIVEN | 513-47460 | EUR | -234,850.00 | -234,850.00 | 9/17/2014 | 4901557 |
| DRESSER RAND | BARIVEN | 342-90180673 | USD | -210.88 | -210.88 | 9/24/2014 | 4901553 |
| DRESSER RAND | BARIVEN | 342-90180698 | USD | -15,598.32 | -15,598.32 | 9/24/2014 | 4901553 |
| SIEMENS AG EthosEnergy TC, Inc | BARIVEN | 7724/90079978 | EUR | -29,766.07 | -29,766.07 | 9/29/2014 | 4901553 |
| | BARIVEN | 31845 | USD | -1,920,487.00 | -1,920,487.00 | 9/25/2014 | 4901554 |
| DRESSER RAND | BARIVEN | 341-609357 | USD | -5,807.42 | -5,807.42 | 9/30/2014 | 4901553 |
| DRESSER RAND | BARIVEN | 604364 | USD | -2,600,363.70 | -2,600,363.70 | 9/30/2014 | 4901554 |
| DRESSER RAND | BARIVEN | 604365 | USD | -1,313,987.70 | -1,313,987.70 | 9/30/2014 | 4901554 |
| DRESSER RAND | BARIVEN | 604366 | USD | -240,684.00 | -240,684.00 | 9/30/2014 | 4901554 |
| DRESSER RAND | BARIVEN | 340-70058771 | USD | -135,831.15 | -135,831.15 | 9/22/2014 | 4901553 |
| DRESSER RAND | BARIVEN | 340-70058855 | USD | -7,197.00 | -7,197.00 | 9/23/2014 | 4901553 |
| DRESSER RAND | BARIVEN | 340-70058844 | USD | -2,268,115.62 | -2,268,115.62 | 9/25/2014 | 4901554 |
| DRESSER RAND | BARIVEN | 340-70058845 | USD | -4,433,420.01 | -4,433,420.01 | 9/25/2014 | 4901567 |
| DRESSER RAND | BARIVEN | 340-70058943 | USD | -160,620.88 | -160,620.88 | 9/29/2014 | 4901568 |
| DRESSER RAND | BARIVEN | 340-70058955 | USD | -203,096.08 | -203,096.08 | 9/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 341-609677 | USD | -29,611.41 | -29,611.41 | 10/9/2014 | 4901555 |
| Siemens, S.A. | BARIVEN | 555016012012E | USD | -153,629.17 | -153,629.17 | 4/1/2014 | 4901556 |
| Siemens, S.A. | BARIVEN | 555016012012C | USD | -130,718.91 | -130,718.91 | 4/1/2014 | 4901556 |
| Siemens, S.A. | BARIVEN | 55508022013-C | USD | -4,241.12 | -4,241.12 | 4/1/2014 | 4901556 |
| DRESSER RAND | BARIVEN | 341-609847 | USD | -24,421.65 | -24,421.65 | 10/14/2014 | 4901555 |
| DRESSER RAND | BARIVEN | 341-609729 | USD | -30,433.54 | -30,433.54 | 10/10/2014 | 490157 |
| DRESSER RAND | BARIVEN | 120313 | USD | -829,795.00 | -829,795.00 | 10/16/2014 | 4901555 |
| DRESSER RAND | BARIVEN | 342-90182350 | USD | -35,758.12 | -35,758.12 | 10/14/2014 | 4901556 |
| DRESSER RAND | BARIVEN | 513-47595 | USD | -934,517.20 | -934,517.20 | 9/17/2014 | 1900029 |
| DRESSER RAND | BARIVEN | 513-47670 | USD | -58,797.39 | -58,797.39 | 10/9/2014 | 4901556 |
| DRESSER RAND | BARIVEN | 513-47620 | USD | -23,345.85 | -23,345.85 | 9/17/2014 | 4901556 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DRESSER RAND | BARIVEN | 513-47504 | USD | -60,159.00 | -60,159.00 | 10/9/2014 | 4901556 |
| DRESSER RAND | BARIVEN | 341-609725 | USD | -26,590.65 | -26,590.65 | 10/10/2014 | 4901567 |
| DRESSER RAND | BARIVEN | 513-48622 | USD | -5,750.00 | -5,750.00 | 10/31/2014 | 4901560 |
| DRESSER RAND | BARIVEN | 513-47624 | USD | -26,192.59 | -26,192.59 | 10/30/2014 | 4901558 |
| DRESSER RAND | BARIVEN | 513-47631 | USD | -80,221.72 | -80,221.72 | 10/30/2014 | 4901560 |
| DRESSER RAND | BARIVEN | 513-47685 | USD | -4,644.85 | -4,644.85 | 9/30/2014 | 4901560 |
| DRESSER RAND | BARIVEN | 340-80003407 | USD | -978,412.00 | -978,412.00 | 9/29/2014 | 4901567 |
| DRESSER RAND | BARIVEN | 342-90181477 | USD | -23,660.74 | -23,660.74 | 9/30/2014 | 4901560 |
| DRESSER RAND | BARIVEN | 513-47495 | USD | -13,190.00 | -13,190.00 | 9/17/2014 | 4901562 |
| DRESSER RAND | BARIVEN | 513-47640 | USD | -1,030,234.26 | -1,030,234.26 | 9/17/2014 | 4901562 |
| DRESSER RAND | BARIVEN | 340-70059826 | USD | -242,370.05 | -242,370.05 | 11/19/2014 | 4901560 |
| DRESSER RAND | BARIVEN | 340-70059830 | USD | -4,500.12 | -4,500.12 | 11/19/2014 | 4901576 |
| DRESSER RAND | BARIVEN | 342-90185669 | USD | -461.28 | -461.28 | 11/18/2014 | 4901561 |
| DRESSER RAND | BARIVEN | 342-90185454 | USD | -286.96 | -286.96 | 11/17/2014 | 4901561 |
| DRESSER RAND | BARIVEN | 341-609092 | USD | -4,967.16 | -4,967.16 | 9/23/2014 | 4901554 |
| DRESSER RAND | BARIVEN | 341-609153 | USD | -67,342.16 | -67,342.16 | 9/25/2014 | 4901554 |
| DRESSER RAND | BARIVEN | 341-611208 | USD | -50,707.89 | -50,707.89 | 11/20/2014 | 4901571 |
| DRESSER RAND | BARIVEN | 341-610868 | USD | -3,317.00 | -3,317.00 | 11/12/2014 | 4901561 |
| Siemens Industrial | BARIVEN | 429F/90083234 | SEK | -1,712,532.30 | -1,712,532.30 | 11/25/2014 | 4901572 |
| Siemens Industrial | BARIVEN | 429F/90083247 | SEK | -4,428,044.00 | -4,428,044.00 | 11/25/2014 | 4901572 |
| DRESSER RAND | BARIVEN | 341-611192 | USD | -104,914.00 | -104,914.00 | 11/17/2014 | 4901572 |
| DRESSER RAND | BARIVEN | 341-611333 | USD | -38,487.55 | -38,487.55 | 11/25/2014 | 4901573 |
| DRESSER RAND | BARIVEN | 342-90186162 | USD | -1,282.76 | -1,282.76 | 11/24/2014 | 4901563 |
| DRESSER RAND | BARIVEN | 342-90186359 | USD | -109,772.20 | -109,772.20 | 11/26/2014 | 1900030 |
| DRESSER RAND | BARIVEN | 342-90186225 | USD | -181,269.74 | -181,269.74 | 11/25/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 341-611414 | USD | -42,333.62 | -42,333.62 | 11/26/2014 | 4901571 |
| DRESSER RAND | BARIVEN | 341-611602 | USD | -804.58 | -804.58 | 12/4/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 341-611429 | USD | -3,091.00 | -3,091.00 | 11/26/2014 | 4901570 |
| DRESSER RAND | BARIVEN | 513-49343 | USD | -57,607.80 | -57,607.80 | 11/30/2014 | 4901564 |
| DRESSER RAND | BARIVEN | 341-609363 | USD | -42,809.26 | -42,809.26 | 9/30/2014 | 4901563 |
| Siemens Industrial Turbomachinery L | BARIVEN | 426F0013001310 | USD | -172,115.50 | -172,115.50 | 11/28/2014 | 4901591 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610031182 | USD | -202,161.98 | -201,959.82 | 12/18/2014 | 4906971 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610031178 | USD | -453,589.03 | -437,259.82 | 12/18/2014 | 4906971 |
| SIEMENS AG | BARIVEN | 7724/90085262 | EUR | -15,386.14 | -15,386.14 | 12/17/2014 | 4901564 |
| SIEMENS AG | BARIVEN | 7724/90085258 | EUR | -53,965.00 | -53,965.00 | 12/17/2014 | 4901564 |
| SIEMENS AG | BARIVEN | 7724/90085245 | EUR | -97,092.41 | -97,092.41 | 12/17/2014 | 4901564 |
| DRESSER RAND | BARIVEN | 342-90187913 | USD | -13,709.76 | -13,709.76 | 12/18/2014 | 1900030 |
| DRESSER RAND | BARIVEN | 341-611396 | USD | -80,610.54 | -80,610.54 | 11/26/2014 | 4901566 |
| DRESSER RAND | BARIVEN | 341-612187 | USD | -266,189.74 | -266,189.74 | 12/18/2014 | 4901567 |
| DRESSER RAND | BARIVEN | 341-612157 | USD | -11,731.34 | -11,731.34 | 12/18/2014 | 4901567 |
| DRESSER RAND | BARIVEN | 341-611978 | USD | -4,435.73 | -4,435.73 | 12/15/2014 | 4901567 |
| DRESSER RAND | BARIVEN | 341-611977 | USD | -26,692.70 | -26,692.70 | 12/15/2014 | 4901567 |
| DRESSER RAND | BARIVEN | 341-612246 | USD | -502,132.34 | -502,132.34 | 12/19/2014 | 4901567 |
| DRESSER RAND | BARIVEN | 341-612445 | USD | -93,091.91 | -93,091.91 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 342-90188203 | USD | -8,704.67 | -8,704.67 | 12/22/2014 | 4901570 |
| DRESSER RAND | BARIVEN | 342-90188699 | USD | -28,713.89 | -28,713.89 | 12/30/2014 | 4901570 |
| DRESSER RAND | BARIVEN | 340-70060488 | USD | -100,955.67 | -100,955.67 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060490 | USD | -151,943.48 | -151,943.48 | 12/29/2014 | 4901569 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DRESSER RAND | BARIVEN | 340-70060493 | USD | -151,943.48 | -151,943.48 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060494 | USD | -151,943.48 | -151,943.48 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060500 | USD | -151,943.48 | -151,943.48 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060489 | USD | -151,943.48 | -151,943.48 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060533 | USD | -166,042.70 | -166,042.70 | 12/30/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060501 | USD | -30,793.79 | -30,793.79 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060499 | USD | -241,303.72 | -241,303.72 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060492 | USD | -268,371.27 | -268,371.27 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060505 | USD | -256,600.79 | -256,600.79 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060498 | USD | -291,657.90 | -291,657.90 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060496 | USD | -151,943.48 | -151,943.48 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060504 | USD | -151,943.48 | -151,943.48 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 340-70060491 | USD | -151,943.48 | -151,943.48 | 12/29/2014 | 4901569 |
| DRESSER RAND | BARIVEN | 346-612482 | USD | -13,706.43 | -13,706.43 | 12/30/2014 | 4901569 |
| SIEMENS AG | BARIVEN | 7724/90086088 | EUR | -2,775.38 | -2,775.38 | 1/7/2015 | 1900029 |
| SIEMENS AG | BARIVEN | 7724/90086065 | EUR | -15,430.26 | -15,430.26 | 1/6/2015 | 4901570 |
| DRESSER RAND | BARIVEN | 342-90181479 | USD | -31,225.51 | -31,225.51 | 9/30/2014 | 1900030 |
| DRESSER RAND | BARIVEN | 513-50109 | USD | -116,934.00 | -116,934.00 | 12/31/2014 | 4901570 |
| DRESSER RAND | BARIVEN | 513-47971 | USD | -420.24 | -420.24 | 10/9/2014 | 4901570 |
| DRESSER RAND | BARIVEN | 513-49594 | USD | -3,263.40 | -3,263.40 | 12/31/2014 | 1900029 |
| DRESSER RAND | BARIVEN | 513-49947 | USD | -54,261.35 | -54,261.35 | 12/31/2014 | 1900030 |
| DRESSER RAND | BARIVEN | 513-49507 | USD | -892.8 | -892.8 | 12/30/2014 | 4901572 |
| DRESSER RAND | BARIVEN | 513-49702 | USD | -68,032.71 | -68,032.71 | 12/31/2014 | 4901572 |
| DRESSER RAND | BARIVEN | 341-612289 | USD | -9,431.81 | -9,431.81 | 12/22/2014 | 4901573 |
| Siemens, S.A. | BARIVEN | 1-238591-5 | USD | -426,020.00 | -426,020.00 | 1/26/2015 | 4901581 |
| Siemens, S.A. | BARIVEN | 1-238591-9 | USD | -250,510.00 | -250,510.00 | 1/26/2015 | 4901581 |
| DRESSER RAND | BARIVEN | 513-50559 | USD | -374,528.18 | -374,528.18 | 1/31/2014 | 4901575 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610033114 | USD | -168,779.66 | -163,547.49 | 5/18/2015 | 4907258 |
| DRESSER RAND | BARIVEN | 342-90181071 | USD | -382,557.28 | -382,557.28 | 9/26/2014 | 4901576 |
| DRESSER RAND | BARIVEN | 341-609405 | USD | -12,129.40 | -12,129.40 | 9/30/2014 | 4901576 |
| Siemens Industrial Turbomachinery L | BARIVEN | 426F0015010082 | GBP | -100,699.50 | -100,699.50 | 3/6/2015 | 4901579 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610033082 | USD | -535,879.74 | -519,267.47 | 5/13/2015 | 4906997 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610032337 | USD | -308,215.12 | -307,906.90 | 3/24/2015 | 4907209 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610032335 | USD | -453,589.02 | -432,723.92 | 3/24/2015 | 4907019 |
| Siemens Energy, Inc. | BARIVEN | 90059671 | USD | -12,326.00 | -12,326.00 | 6/20/2012 | 4901582 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610034039 | USD | -87,229.30 | -87,142.07 | 8/4/2015 | 4907104 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610034646 | USD | -136,420.60 | -136,284.18 | 9/16/2015 | 4907263 |
| DRESSER RAND | BARIVEN | 513-50526 | USD | -1,715,583.83 | -1,715,583.83 | 12/16/2014 | 4901581 |
| Siemens Energy, Inc. | BARIVEN | 90059672 | USD | -7,108.00 | -7,108.00 | 6/20/2012 | 4901582 |
| DRESSER RAND | BARIVEN | 513-50112 | USD | -845,356.49 | -845,356.49 | 12/30/2014 | 4901582 |
| Siemens Industrial Turbomachinery L | BARIVEN | 426F0015010128 | GBP | -99,145.36 | -99,145.36 | 3/31/2015 | 4901583 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Siemens Industrial Turbomachinery L | BARIVEN | 426F0015010129 | GBP | -99,145.36 | -99,145.36 | 3/31/2015 | 4901583 |
| DRESSER RAND | BARIVEN | 513-50725 | EUR | -5,095.40 | -5,095.40 | 12/6/2014 | 1900030 |
| DRESSER RAND | BARIVEN | 513-50562 | EUR | -76.8 | -76.8 | 12/15/2014 | 1900030 |
| DRESSER RAND | BARIVEN | 513-45915 | USD | -2,251.24 | -2,251.24 | 7/21/2014 | 1900030 |
| DRESSER RAND | BARIVEN | 341-609404 | USD | -3,310.34 | -3,310.34 | 10/30/2014 | 1900030 |
| DRESSER RAND | BARIVEN | 341-609842 | USD | -19,197.15 | -19,197.15 | 10/14/2014 | 4901585 |
| Siemens Industrial Turbomachinery L | BARIVEN | 426F/90093972 | GBP | -136,842.78 | -136,842.78 | 5/5/2015 | 4901587 |
| Siemens Industrial Turbomachinery L | BARIVEN | 426F/H15010127 | GBP | -100,699.50 | -100,699.50 | 3/31/2015 | 4901587 |
| Siemens, S.A. | BARIVEN | 1-299074 | USD | -100,140.00 | -100,140.00 | 1/15/2015 | 4901587 |
| Siemens Industrial Turbomachinery L | BARIVEN | 426F/90094083 | GBP | -99,611.61 | -99,611.61 | 5/7/2015 | 4901587 |
| Siemens Industrial Turbomachinery L | BARIVEN | 426F/90094328 | GBP | -59,359.12 | -59,359.12 | 5/12/2015 | 4901586 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610034051 | USD | -625,193.03 | -605,812.05 | 8/5/2015 | 4907157 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610034043 | USD | -625,193.03 | -605,812.05 | 8/5/2015 | 4907157 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610034044 | USD | -625,193.03 | -605,812.05 | 8/5/2015 | 4907157 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610034041 | USD | -781,491.28 | -757,265.05 | 8/5/2015 | 4907157 |
| Siemens Industrial Turbomachinery L | BARIVEN | 426F0013001342 | USD | -47,619.00 | -47,619.00 | 2/16/2015 | 4901596 |
| SIEMENS AG | BARIVEN | 77724/90098378 | EUR | -12,109.50 | -12,109.50 | 6/29/2015 | 4901595 |
| SIEMENS AG | BARIVEN | 7724/90098379 | EUR | -13,685.00 | -13,685.00 | 6/29/2015 | 4901597 |
| DRESSER RAND | BARIVEN | 341-619154 | USD | -13,525.62 | -13,525.62 | 7/1/2015 | 1900031 |
| DRESSER RAND | BARIVEN | 523-100603 | USD | -1,931,762.50 | -1,931,762.50 | 6/30/2015 | 4901595 |
| DRESSER RAND | BARIVEN | 341-619151 | USD | -13,552.44 | -13,552.44 | 7/1/2015 | 4901595 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610034341 | USD | -253,169.04 | -245,320.80 | 8/27/2015 | 4907481 |
| DRESSER RAND | BARIVEN | 342-90203218 | USD | -37,722.84 | -37,722.84 | 6/30/2015 | 1900031 |
| DRESSER RAND | BARIVEN | 342-90203163 | USD | -436.63 | -436.63 | 6/30/2015 | 1900031 |
| DRESSER RAND | BARIVEN | 342-90203179 | USD | -13,098.62 | -13,098.62 | 6/30/2015 | 1900031 |
| DRESSER RAND | BARIVEN | 342-90203150 | USD | -3,122.36 | -3,122.36 | 6/30/2015 | 1900031 |
| DRESSER RAND | BARIVEN | 342-90203128 | USD | -751.4 | -751.4 | 6/30/2015 | 1900031 |
| DRESSER RAND | BARIVEN | 340-70064147 | USD | -48,620.00 | -48,620.00 | 7/1/2015 | 4901596 |
| DRESSER RAND | BARIVEN | 342-90203275 | USD | -104,009.40 | -104,009.40 | 7/1/2015 | 4901596 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610034537 | USD | -76,325.64 | -76,249.31 | 9/9/2015 | 4907263 |
| SIEMENS, S.A. | PDVSA PETRÓLEO S.A. | 55755610034647 | USD | -119,368.03 | -119,248.66 | 9/16/2015 | 4907263 |
| Siemens Industrial Turbomachinery L | BARIVEN | 426F/H12038623 | GBP | 369,851.72 | 369,851.72 | 3/10/2014 | 180001 |
| Siemens Industrial Turbomachinery L | BARIVEN | 426F/H12038623 | GBP | -528,359.60 | -528,359.60 | 3/10/2014 | 4901603 |
| DRESSER RAND | BARIVEN | 513-50558 | USD | -223,045.95 | -223,045.95 | 12/31/2014 | 190003 |
| Siemens Industrial Turbomachinery L | BARIVEN | ZIV2/12502282 | USD | -70,027.89 | -70,027.89 | 9/5/2012 | 4901600 |
| DRESSER RAND | BARIVEN | 523-100113 | USD | -331,143.60 | -331,143.60 | 6/25/2015 | 4901600 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Siemens Energy, Inc. | BARIVEN | 30031529 | USD | -36,161.18 | -36,161.18 | 10/9/2015 | 4901 |
| Siemens Nederland N.V | BARIVEN | M0037 | USD | -299,940.51 | -299,940.51 | 11/10/2015 | 4901 |
| Siemens Nederland N.V | BARIVEN | M0038 | USD | -299,940.51 | -299,940.51 | 11/10/2015 | 4901 |
| Siemens Nederland N.V | BARIVEN | M0039 | USD | -299,940.51 | -299,940.51 | 11/10/2015 | 4901 |
| Siemens Nederland N.V | BARIVEN | M0040 | USD | -299,940.51 | -299,940.51 | 11/10/2015 | 4901 |
| | **TOTAL USD** | | 337 | | -$116,905369 | | |
| | **TOTAL EUR** | | 15 | | €-738,785.58 | | |
| | **TOTAL GBP** | | 9 | | -£854,011.11 | | |
| | **TOTAL SEK** | | 3 | | -8,124,627.30 kr | | |

| | | | |
|---|---|---|---|
| **SUB TOTAL USD** | **TASA CAMBIARIA EURO / USD** | 1.0616 | ($784,294.77) |
| **SUB TOTAL USD** | **TASA CAMBIARIA GBP / USD** | 1.2318 | ($1,051,970.89) |
| **SUB TOTAL USD** | **TASA CAMBIARIA SEK / USD** | 0.111197 | ($903,434.18) |
| | | | |
| **TOTAL USD** | | | ($119,645,069.70) |