UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DRESSER-RAND COMPANY,

Plaintiff,

-against-

PETRÓLEOS DE VENEZUELA, S.A. and
PDVSA PETRÓLEO, S.A.,

Defendants.

Case No.: 1:19-cv-002689-LLS

## DEFENDANT PETRÓLEOS DE VENEZUELA, S.A'S TRIAL BRIEF

HOGAN LOVELLS US LLP
Dennis H. Tracey, III
Matthew Ducharme
390 Madison Avenue
New York, NY 10017
Tel: (212) 918-3000
Fax: (212) 918-3100
dennis.tracey@hoganlovells.com
matthew.ducharme@hoganlovells.com

Richard C. Lorenzo (pro hac vice)
600 Brickell Avenue, Suite 2700
Miami, FL 33131
Tel: (305) 459-6500
Fax: (305) 459-6550
richard.lorenzo@hoganlovells.com

*Counsel for Defendants Petróleos de
Venezuela, S.A. and PDVSA Petróleo,
S.A.*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................1

STATEMENT OF THE CASE.............................................................................3

I.      FACTUAL BACKGROUND ......................................................................3

II.     PROCEDURAL HISTORY.........................................................................8

ARGUMENT ....................................................................................................10

I.      PDVSA'S DUTY TO MAKE PAYMENTS UNDER THE NOTE WAS DISCHARGED BECAUSE ITS PERFORMANCE OF ITS PAYMENT OBLIGATION WAS RENDERED IMPOSSIBLE OR OBJECTIVELY IMPRACTICABLE. .........................10

      A.     Policies Adopted by Banks to Ensure Compliance with U.S. Sanctions Made PDVSA's Performance of its Payment Obligations Objectively Impracticable....11

           1.     Citibank – the Bank Designated by Dresser-Rand for Receipt of Payments – Had a Policy Against Processing Payments from PDVSA....................12

           2.     PDVSA Attempted to Make the Required Payments, But Those Payments Were Rejected Due to Banks' Internal Policies.........................................12

           3.     PDVSA Took Virtually Every Action Within Its Power to Perform Its Obligations.....................................................................................14

           4.     The Purpose of the Note Was Destroyed By PDVSA's Inability to Make Payments in the Manner Required by the Note Agreement. ....................16

           5.     The Bank Policies Causing PDVSA's Impossibility Were Unanticipated. .................................................................................17

      B.     Sanctions Imposed by the U.S. Government Made PDVSA's Performance of its Payment Obligations Impossible. ..........................................................17

           1.     The Note is "New Debt" Prohibited by Executive Order 13808. ..............17

           2.     Payments from PDVSA Are Blocked By Executive Order 13850............18

           3.     General License 9 is Inapplicable. ............................................................19

           4.     Executive Orders 13808 and 13850 Are Proper Grounds for PDVSA's Impossibility Defense. ............................................................................19

           5.     The Sanctions Causing PDVSA's Impossibility Were Unanticipated. .....20

II.    CERTAIN TESTIMONY OF PLAINTIFF'S EXPERT, STEPHANIE RICE, MUST BE
       EXCLUDED AS HEARSAY AND IMPROPER EXPERT OPINION UNDER
       FRE 702. ..........................................................................................................21

              1.    Ms. Rice's Testimony Concerning Undocumented Oral Communications
                    with OFAC is Inadmissible Hearsay.........................................................21

              2.    The Court Should Exclude Ms. Rice's Testimony Concerning Her Actions
                    While Employed by Bank of Tokyo Mitsubishi on the Ground that Ms.
                    Rice Failed to Provide Discovery on Such Actions...................................22

              3.    Ms. Rice's Opinion Concerning the Compliance Policies of JP Morgan
                    Should Be Excluded as Rank Speculation and Improper Expert Opinion
                    Under FRE 702. .......................................................................................23

III.   THE PROPOSED EXPERT TESTIMONY OF JOHN BARKER IS ADMISSIBLE
       UNDER RULE 702 OF THE FEDERAL RULES OF EVIDENCE................................24

CONCLUSION.............................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cai Rail, Inc. v. Badger Mining Corp.*,
   No. 20 CIV. 4644 (JPC), 2021 WL 705880 (S.D.N.Y. Feb. 22, 2021) ............................10, 16

*El Ansari v. Graham*,
   No. 17-CV-3963 (VEC), 2019 WL 3526714 (S.D.N.Y. Aug. 2, 2019) .................................26

*Int'l Cards Co. v. MasterCard Int'l*,
   No. 13 Civ. 2576 (LGS), 2016 WL 7009016 (S.D.N.Y. Nov. 29, 2016) ..............................26

*Kel Kim Corp. v. Cent. Markets, Inc.*,
   70 N.Y.2d 900, 519 N.E.2d 295 (N.Y. 1987) ........................................................10, 16, 17, 21

*Knowledge Based Techs. v. Int'l Bus. Machines*,
   No. 96 Civ. 9461 (JSR), 1998 WL 164791 (S.D.N.Y. Apr. 8, 1998)....................................26

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004)................................26

*Loc. 338, RWDSU v. Farmland Dairies, Inc.*,
   No. 02CIV.2705(LTS)(HBP), 2003 WL 1213422 (S.D.N.Y. Mar. 14, 2003),
   *aff'd*, 89 F. App'x 748 (2d Cir. 2003) ....................................................................................10

*Lowenschuss v. Kane*,
   520 F.2d 255 (2d Cir. 1975)....................................................................................................20

*MG Ref. & Mktg., Inc. v. Knight Enterprises, Inc.*,
   25 F. Supp. 2d 175 (S.D.N.Y. 1998) .......................................................................................20

*Nimely v. City of N.Y.*,
   414 F.3d 381 (2d Cir. 2005)........................................................................................21, 24, 25

*Organizacion JD Ltda. v. U.S. Dep't. of Justice*,
   18 F.3d 91 (2d Cir. 1994).................................................................................................11, 19

*In re Regency Holdings (Cayman), Inc.*,
   No. 00 CV 8115 (HB), 2001 WL 1033429, (S.D.N.Y. Sept. 7, 2001) ...................................11

*Transfield ER Cape Ltd. v. STX Pan Ocean Co.*,
   No. 09 CIV. 1250 (JGK), 2009 WL 691273 (S.D.N.Y. Mar. 17, 2009) ..........................14, 15

*United States v. Gen. Douglas MacArthur Senior Vill., Inc.*,
   508 F.2d 377 (2d Cir. 1974)....................................................................................................10

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)......................................................................................21

**Other Authorities**

Federal Rules of Civil Procedure 56 ..............................................................................8, 9

Federal Rules of Evidence 702 ................................................................................ *passim*

Federal Rules of Evidence 801 ........................................................................................22

Restatement (Second) of Contracts § 261 (1981) ......................................................1, 10

Pursuant to Rule 4 of Judge Louis Stanton's Individual Rules of Practice, defendant Petróleos de Venezuela, S.A. ("PDVSA") submits this trial brief on the following contested issues of law and anticipated evidentiary issues:  (I) whether PDVSA's duty to make payments under the Note was discharged because its performance of its payment obligation was rendered impossible or objectively impracticable; (II) whether portions of the proposed expert testimony of Plaintiff's expert, Stephanie Rice, should be excluded as improper expert testimony under Federal Rule of Evidence 702; and (III) whether the proposed expert testimony of John Barker is admissible under Federal Rule of Evidence 702.

## INTRODUCTION

In this action, Dresser-Rand seeks to recover amounts allegedly due under a Note issued by PDVSA, pursuant to a Note Agreement.  The Note Agreement required PDVSA to make quarterly payments in U.S. Dollars to Dresser-Rand, as "Administrative Agent," to its office in Houston, Texas, or to its designated account with Citibank, N.A.  Dresser-Rand alleges that PDVSA failed to make the third interest payment under the Note and all payments due thereafter.

At trial, PDVSA will establish that PDVSA's duty to make payments under the Note was discharged because its performance, as mandated by the Note Agreement, was rendered impossible. It is well-settled that a party's duty to perform its contractual obligations will be discharged and excused if, after the contract is made, the party's performance is made impossible or objectively impracticable, "without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made . . . unless the language or the circumstances indicate the contrary."  Restatement (Second) of Contracts § 261 (1981).

To establish a defense of impossibility under New York law, a defendant must demonstrate: (1) the destruction of the subject matter of the contract or the means of performance makes

1

performance impossible or impracticable, and (2) the impossibility was produced by an unanticipated event that could not have been foreseen or guarded against in the contract.

Sanctions imposed by the U.S. government on PDVSA and other Venezuelan government-related entities and the sanctions policies adopted by banks (including the only bank mandated in the Note Agreement to receive payment to Dresser-Rand) made it impossible or objectively impracticable for PDVSA to make the requisite payments to Dresser-Rand. These sanctions and the policies implemented by banks to avoid triggering those sanctions destroyed PDVSA's ability to make payments under the Note – the very purpose of the Note.

The events causing the impossibility were unanticipated and could not have been guarded against in the Note Agreement. Indeed, the sanctions at issue were not imposed until nearly nine months after the parties entered into the Note.

PDVSA took virtually every action within its powers to perform its payment duties. Undisputed evidence shows that PDVSA attempted to make the third interest payment due under the Note to Dresser-Rand's designated Citibank account on at least three occasions, but, due to the banks' sanctions policies, those payments were rejected and the funds returned to PDVSA each time.

PDVSA was not at fault for the inability to make the payments. To the contrary, Dresser-Rand was directly responsible. Dresser-Rand learned in September 2017, before the third interest payment was due, of a new policy implemented by Citibank that would cause future payments to be automatically rejected unless Dresser-Rand took certain actions required by Citibank, which Dresser-Rand failed to do.

We anticipate that two evidentiary issues will arise at trial. First, Dresser-Rand has identified Stephanie Rice to testify as an expert witness relating to sanctions. However, certain of

Ms. Rice's opinions are inadmissible under FRE 702.  As will be discussed in more detail below, Ms. Rice is expected to testify to hearsay statements that were allegedly made by unnamed officials of the Office of Foreign Asset Control ("OFAC") in oral conversations with Ms. Rice.  Such evidence is pure hearsay, which is undocumented and cannot be confirmed, and thus cannot be admitted into evidence.  We will request that the Court exclude the proffered hearsay evidence and any opinion by Ms. Rice based on such evidence.

Second, PDVSA will offer expert testimony of John Barker relating to sanctions.  It is anticipated that Dresser-Rand will seek to exclude his testimony on the grounds of bias.   Mr. Barker, who is a practicing lawyer who devotes his entire professional practice to sanctions advice, has been consulted on sanctions issues by PDVSA, which is a client of Mr. Barker's law firm.  While Dresser-Rand is entitled to cross examine Mr. Barker on whether his relationship with PDVSA could bias his testimony, it is not a basis for exclusion of his testimony.  The fact that Mr. Barker has provided advice to PDVSA is, at most, a matter that goes to the weight of his opinions, not to their admissibility.  Mr. Barker's testimony should be accepted by the Court under Rule 702, and the Court may give it the proper weight.

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

This action concerns a note agreement dated January 21, 2017 (the "Note Agreement"), issued by PDVSA and guaranteed by Petróleo, pursuant to which PDVSA agreed to pay the amounts reflected in a corresponding note (the "Note").  Scherzer Aff.  Exs. A-B.  The Note Agreement required PDVSA to make the payments due under the Note in U.S. Dollars to the "Administrative Agent," Dresser-Rand, (1) at its offices at "West8Tower, Suite 1000, 10205 Westheimer Road, Houston TX 77042," or (2) to its designated bank account with Citibank, N.A. ("Citibank").  Note Agreement §§ 2.05, 2.08, Sch. 2.08.  On April 24, 2017, PDVSA made the

first interest payment of $1,917,599.06 to Dresser-Rand's Citibank account and, on July 10, 2017, made the second interest payment of $1,938,905.72 to Dresser-Rand's Citibank account. DRESSER_0061826-0061858.

On August 25, 2017, the U.S. government issued Executive Order 13808, which, in relevant part, prohibits "[a]ll transactions related to, provision of financing for, or other dealings in . . . new debt with a maturity of greater than 90 days of Petroleos de Venezuela, S.A. (PdVSA)" by a United States person or within the United States.  Exec. Order No. 13808, 82 Fed. Reg. 41155 (Aug. 24, 2017).

In September 2017, in light of Executive Order 13808, Citibank implemented a policy that significantly restricted activities involving PDVSA and other Venezuelan government-related entities.  Romano Dep. Tr. 41:6-13; 44:8-12.  All incoming/outgoing payments from/to PDVSA to/from Citibank clients would be automatically filtered and not processed, unless Citibank approved the client for manual processing of that transaction.  Romano Dep. Tr. 41:6-13, Ex. 6.

Based on its ongoing relationship with Dresser-Rand, on September 25, 2017, Citibank offered to manually process future incoming/outgoing payments from/to PDVSA if Dresser-Rand agreed to the terms outlined in Citibank's "Sanctions Compliance Certification," which, among other obligations, required Dresser-Rand to provide a list of anticipated transactions with PDVSA and to certify that the expected payments from PDVSA were compliant with relevant sanctions. Romano Dep. Tr. Exs. 6, 7, 9, 10.  Citibank explained to Dresser-Rand that unless Dresser-Rand returned the requisite documentation and was approved for Citibank's manual processing program, any attempted payment from PDVSA to Dresser-Rand's Citibank account would be rejected by Citibank and returned to PDVSA.  Romano Dep. Tr. Ex. 6.

4

Despite this knowledge, Dresser-Rand failed to return the requisite documents to Citibank. Romano Dep. Tr. 45:3-10, 56:16-57:1.  There is no evidence that Dresser-Rand ever informed PDVSA that PDVSA's future payments to Dresser-Rand's Citibank account would be rejected by Citibank.

On November 21, 2017, PDVSA – unaware of Citibank's new policy – attempted to make the third interest payment of $1,960,212.37 to Dresser-Rand's designated Citibank account. DRESSER_0059847; DBCTA000003.  This attempted payment originated from China CITIC Bank ("China CITIC") and was transmitted through Deutsche Bank Trust Co Americas ("Deutsche Bank"), as intermediary to facilitate the transfer of the funds from China CITIC to Citibank. DBCTA000003.

This payment never even made it to Citibank because it was rejected by Deutsche Bank. Brogan Decl. Ex. 3.  Pursuant to Deutsche Bank's policies, PDVSA's payment was initially flagged and temporarily stopped for assessment under the Venezuela Decision Matrix, a policy document employed by Deutsche Bank for reviewing transactions involving a Venezuela-related entity to ensure compliance with relevant laws and regulations.  *Id.* ¶¶ 5, 7, 19.  In applying the assessment process outlined in the Venezuela Decision Matrix, Deutsche Bank concluded that the transaction involved a Venezuelan government-related entity because it was originated by PDVSA, which is a Venezuelan government-related entity.  *Id.* ¶ 19.  Deutsche Bank then concluded that the payment transaction had a nexus to the United States because the payment was made through Deutsche Bank's U.S. entity, in U.S. Dollars to a U.S. bank account held by a U.S. company.  *Id.* ¶ 19.  The purpose of the transaction was unclear from the payment order, and a Deutsche Bank client was not involved.  *Id.*  Based on the foregoing, under the Venezuela Decision Matrix, Deutsche Bank rejected the payment transaction.  *Id.* ¶ 19, Ex. 3.

On November 29, 2017, PDVSA asked Dresser-Rand to extend its time to make the third interest payment from October 29 to December 29, 2017 because, due to sanctions imposed on PDVSA by Executive Order 13808, financial institutions were "taking longer to process payment orders involving PDVSA." DRESSER_0059592. Dresser-Rand agreed to the requested extension. Scherzer Dep. Tr. 62:2-5.

On December 18, 2017, PDVSA asked Dresser-Rand if it had another bank account to which PDVSA could make the requisite payments. DRESSER_0059846-0059847. On December 27, 2017, Dresser-Rand provided PDVSA with account information for an account at Commerzbank AG ("Commerzbank") held by Siemens AG ("Siemens"). DRESSER_0059844-0059845. The Note Agreement, however, did not allow Siemens to act as the Administrative Agent or to make payments to Commerzbank, and no effort was made by Dresser-Rand to modify the Note Agreement to allow such changes.

On January 31, 2018, PDVSA again attempted to make a payment of $1,960,212.37 to Dresser-Rand's designated Citibank account. DRESSER_0061898. This attempted payment originated from Dinosaur Merchants Bank Limited ("DMBL"). *Id.* For unknown reasons, Citibank never received these funds, and instructed Dresser-Rand to have the "the originator of the payment" investigate from their side "in order to determine why the funds [were not] transmitted" to Citibank. DRESSER_0004256-0004258; Romano Dep. Tr. 27:11-20, 67:23-68:1, 69:24-70:1.

On February 12, 2018, PDVSA made a third attempt to pay the third interest payment from its account with DMBL to Dresser-Rand's U.S. account at Citibank. Romano Dep. Ex. 5. DMBL's correspondent bank, JP Morgan Chase Bank ("JP Morgan"), processed the payment from DMBL, and on February 12, 2018, transferred $1,960,187.37 to Citibank. Romano Dep. Tr. 36:3-10, Exs. 4-5. On February 14, 2018, Citibank rejected the transfer and returned the funds because

Dresser-Rand failed to agree to Citibank's procedures for manually processing funds originating from PDVSA.  Romano Dep. Exs. 4-5.  Had Dresser-Rand returned the requisite certification documents, "it's likely the transaction would have been processed [by Citibank]."  Romano Dep. Tr. 47:5-9.

On February 20, 2018, PDVSA – still unable to make the required Note payments to Dresser-Rand's Citibank account – asked Dresser-Rand if it was in a position to open a bank account at Novobank to receive payments from PDVSA under the Note in Euros. DRESSER_0004333-0004334.  PDVSA, at the time, had an existing banking relationship with Novobank.  DRESSER_0004339.

On March 2, 2018, Dresser-Rand informed PDVSA that Dresser-Rand was in a position to accept payment under the Note in Euros and would open an account at Novobank. DRESSER_0004333-0004334.  Dresser-Rand drafted an amendment to the Note Agreement to permit PDVSA to make payments under the Note in U.S. Dollars and/or Euros and, on March 2, 2018, e-mailed the proposed amendment to PDVSA.   DRESSER_0004337-0004339.   The proposed amendment did not include account information for a Euro account with Novobank and was never executed.  DRESSER_0062354.

Although Dresser-Rand had represented in March 2018 that it would open a Euro account with Novobank, Dresser-Rand failed to open a Euro account with Novobank until October 22, 2018.  DRESSER_0062283-0062300.  Importantly, Dresser-Rand never informed PDVSA that it had, in fact, opened a Euro account with Novobank, or provided PDVSA with the account information.  Scherzer Dep. Tr. 59:21-60:3.

On November 1, 2018, the U.S. government issued Executive Order 13850, which provides that "[a]ll property and interests in property [of certain Venezuelan persons designated by the

Secretary of Treasury] that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person . . . are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in . . . except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order.  Exec. Order No. 13850, 83 Fed. Reg. 55243 (Nov. 1, 2018).  On January 28, 2019, the Secretary of Treasury designated PDVSA as a Specially Designated National and Blocked Person ("SDN") subject to Executive Order 13850's blocking sanctions.  *See* U.S. Dep't of the Treasury, Press Releases, "Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A." (Jan. 28, 2019), available at https://home.treasury.gov/news/press-releases/sm594.

On February 14, 2019, Dresser-Rand sent Defendants a notice of default as a result of PDVSA's alleged failure to make the third interest payment due under the Note and all payments due thereafter.  Scherzer Aff. ¶¶ 10-11, Ex. C.  Dresser-Rand further alleges that on February 21, 2019, after Defendants failed to respond to the notice of default, Dresser-Rand sent Defendants a notice of acceleration, which declared the entire unpaid loan balance due and owing, pursuant to Article VIII(a) of the Note Agreement.  *Id.* ¶ 13, Ex. D.

## II.    PROCEDURAL HISTORY

Dresser-Rand commenced this action by motion for summary judgment in lieu of a complaint in the Supreme Court of the State of New York in February 2019.  In March 2019, Defendants removed the case to the U.S. District Court for the Southern District of New York.

In June 2019, Defendants moved for relief pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, asking this Court to deny or defer consideration of Dresser-Rand's summary judgment motion in light of Defendants' inability to access the documents and personnel relevant to Dresser-Rand's claims, and the unprecedented economic and humanitarian crisis in Venezuela.

In July 2019, the Court granted Defendants' motion and entered an order deferring consideration of Dresser-Rand's motion for summary judgment for 120 days.

In September 2019, the parties appeared before this Court for a conference to discuss Dresser-Rand's request for a briefing schedule on its motion for summary judgment and the discovery requests that Defendants served on Dresser-Rand.   Given that this action was commenced by motion for summary judgment in lieu of a complaint, the Court concluded that Defendants were not entitled to traditional discovery under Rule 26(f), only discovery under Rule 56(d).   And because of the highly unusual and unprecedented circumstances in Venezuela, where Defendants lack access to their own documents and records, the Court ordered Dresser-Rand to produce "copies of all correspondence and documents exchanged between the parties concerning the terms and performance of the loan agreement, including any payments."

After Dresser-Rand's production was complete, Defendants served and filed their opposition to Dresser-Rand's summary judgment motion.   Defendants argued that Dresser-Rand's motion for summary judgment should be denied because Dresser-Rand did not satisfy its initial threshold burden of establishing its *prima facie* entitlement to a judgment as a matter of law. Defendants further argued that a triable issue of fact exists with respect to Defendants' impossibility defense.

On February 11, 2020, this Court denied Dresser-Rand's motion for summary judgment against PDVSA but granted summary judgment against Petróleo.   The Court found that Dresser-Rand established its *prima facie* case against both Defendants, but that triable issues of material fact existed with respect to PDVSA's impossibility defense, which prevented summary judgment in favor of PDVSA.   In denying summary judgment against PDVSA, the Court reasoned that the blocking sanctions imposed by OFAC "make it legally impossible here for PDVSA to pay Dresser-

9

Rand," and thus, "there are material issues of impossibility of payment to prevent the entry of judgment as a matter of law against PDVSA."  In granting summary judgment against Petróleo, the Court reasoned that "Petróleo as Guarantor has waived all defenses except for complete payment" and thus, in contrast to PDVSA, was precluded from asserting impossibility as a defense.

## ARGUMENT

I.  **PDVSA'S DUTY TO MAKE PAYMENTS UNDER THE NOTE WAS DISCHARGED BECAUSE ITS PERFORMANCE OF ITS PAYMENT OBLIGATION WAS RENDERED IMPOSSIBLE OR OBJECTIVELY IMPRACTICABLE.**

"Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261 (1981).  "In general impossibility may be equated with an inability to perform as promised due to intervening events, such as an act of state or destruction of the subject matter of the contract."  *United States v. Gen. Douglas MacArthur Senior Vill., Inc*., 508 F.2d 377, 381 (2d Cir. 1974).  To establish a defense of impossibility in New York, a defendant must show:  (1) "the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible" and (2) the impossibility was "produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Kel Kim Corp. v. Cent. Markets, Inc.,* 70 N.Y.2d 900, 902, 519 N.E.2d 295, 296 (N.Y. 1987);  *see also Cai Rail, Inc. v. Badger Mining Corp.*, No. 20 CIV. 4644 (JPC), 2021 WL 705880, at *7 (S.D.N.Y. Feb. 22, 2021).

"[T]he party pleading impossibility as a defense must demonstrate that it took virtually every action within its powers to perform its duties under the contract." *Loc. 338, RWDSU v. Farmland Dairies, Inc.*, No. 02CIV.2705(LTS)(HBP), 2003 WL 1213422, at *4 (S.D.N.Y. Mar.

14, 2003), *aff'd*, 89 F. App'x 748 (2d Cir. 2003) (quoting *In re Regency Holdings (Cayman), Inc.*, No. 00 CV 8115 (HB), 2001 WL 1033429, at *4 (S.D.N.Y. Sept. 7, 2001) (additional citations omitted)).  When the impossibility is caused by a government order or judicial action prohibiting performance, the party asserting impossibility as a defense must not have caused or failed to prevent the underlying government order or judicial action.  *See Organizacion JD Ltda. v. U.S. Dep't. of Justice*, 18 F.3d 91, 95 (2d Cir. 1994).

PDVSA's impossibility defense is premised on two "events," (1) the risk-based screening and compliance policies adopted by banks to ensure compliance with U.S. sanctions that caused banks to reject PDVSA's payment attempts; and (2) Executive Orders 13808 and 13850 that prohibited PDVSA from making the requisite payments to Dresser-Rand.  As explained below, these events, which were unforeseen, made it impossible for PDVSA to perform its payment obligations, despite PDVSA's repeated efforts.

### A.   Policies Adopted by Banks to Ensure Compliance with U.S. Sanctions Made PDVSA's Performance of its Payment Obligations Objectively Impracticable.

PDVSA's performance of its payment obligations under the Note was rendered impossible because, as a result of U.S. sanctions, banks – including Citibank (the bank designated by Dresser-Rand for receipt of payments) – adopted policies for filtering, processing, and assessing transactions involving PDVSA and other Venezuelan government-related entities that caused PDVSA's payment attempts to be rejected.  Undisputed evidence shows that PDVSA attempted to make the third interest payment due under the Note to Dresser-Rand's designated Citibank account on at least three occasions, but, due to internal bank policies, PDVSA's payments were rejected and the funds returned to PDVSA.

1.    <u>Citibank – the Bank Designated by Dresser-Rand for Receipt of Payments – Had a Policy Against Processing Payments from PDVSA.</u>

In September 2017, Citibank – Dresser-Rand's own bank, and the only bank account designated in the Note Agreement for receipt of payments – adopted a policy that restricted activities involving PDVSA and other Venezuelan government-related entities.  Romano Dep. Tr. 41:6-13; 44:8-12, Ex. 6.  All incoming payments from PDVSA to a Citibank client would be automatically filtered and not processed, unless Citibank approved the client for manual processing of that transaction.  Romano Dep. Ex. 6.

Based on its ongoing relationship with Dresser-Rand, Citibank offered to manually process future incoming payments from PDVSA if Dresser-Rand provided Citibank with a list of anticipated transactions with PDVSA and certified that the expected payments from PDVSA were compliant with relevant sanctions.  Romano Dep. Exs. 6, 7, 9, 10.  Citibank made clear to Dresser-Rand that unless Dresser-Rand returned the requisite documentation and was approved by Citibank for manual processing, any attempted payment from PDVSA to Dresser-Rand's account would be rejected by Citibank and returned to PDVSA.  Romano Dep. Ex. 6.

Despite this knowledge, Dresser-Rand failed to return the requisite documents to Citibank. Romano Dep. Tr. 56:16-57:1.  Nor did Dresser-Rand inform PDVSA that PDVSA's future payments to Dresser-Rand's Citibank account would be automatically rejected.  Citibank's policy, and Dresser-Rand's failure to provide the documents required for Citibank to make an exception to that policy, made it impossible for PDVSA to make payments to Dresser-Rand in the manner required by the Note Agreement.

2.    <u>PDVSA Attempted to Make the Required Payments, But Those Payments Were Rejected Due to Banks' Internal Policies.</u>

This impossibility is exemplified by PDVSA's repeated attempts to make the required payments to Dresser-Rand.  On November 21, 2017, PDVSA attempted to make a payment of

$1,960,212.37 from its account with China CITIC to Dresser-Rand's Citibank account. DRESSER_0059847. Dresser-Rand never received the funds because Deutsche Bank, acting as an intermediary to facilitate the transfer of the funds from China CITIC to Dresser-Rand's account with Citibank, rejected and refused to process the payment transaction, due to internal Deutsche Bank policies. Brogan Decl. Ex. 3. Under those policies, Deutsche Bank would reject any transaction involving a Venezuelan government-related entity, if the transaction had a nexus to the United States and the purpose of the transaction was unclear from the payment order, and no Deutsche Bank client was involved. *Id.* ¶ 19, Ex. 1. Accordingly, Deutsche Bank rejected PDVSA's payment order because it was originated by a Venezuelan government-related entity; the payment was in U.S. Dollars to a U.S. bank account held by a U.S. company and thus, had a nexus to the United States; the purpose of the transaction was unclear from the payment order; and no client of Deutsche Bank was involved. *Id.* ¶ 19.

On January 31, 2018, PDVSA again attempted to make a payment to Dresser-Rand's designated Citibank account, this time through PDVSA's account with DMBL. DRESSER_0061898. For unknown reasons, Citibank never received these funds and instructed Dresser-Rand to have the "the originator of the payment" investigate why the funds were not transmitted to Citibank. DRESSER_0004256-0004258; Romano Dep. Tr. 27:11-20, 67:23-68:1, 69:24-70:1. Even if Citibank had received these funds, based on Citibank's internal policies, Citibank would have rejected the transaction and returned the funds to PDVSA. Romano Dep. Ex. 6.

On February 12, 2018, PDVSA attempted to make another payment to Dresser-Rand's designated Citibank account through DMBL. Romano Dep. Ex. 5. This attempt, too, was unsuccessful. Romano Dep. Exs. 4-5. On February 14, 2018, Citibank rejected the transfer and

returned the funds because Dresser-Rand failed to agree to Citibank's procedures for processing payment transactions involving PDVSA.  Romano Dep. Tr. 41:6-13, Exs. 4-5.

       3.   <u>PDVSA Took Virtually Every Action Within Its Power to Perform Its Obligations</u>.

This evidence establishes that PDVSA did virtually everything within its power to satisfy its payment obligations in accordance with the Note Agreement.  *See Transfield ER Cape Ltd. v. STX Pan Ocean Co.*, No. 09 CIV. 1250 (JGK), 2009 WL 691273, at *3 (S.D.N.Y. Mar. 17, 2009) (noting that defendant may "prove that it exhausted its attempts to perform on the Agreement before failing to pay" to satisfy requirement of "demonstrate[ing] that it took virtually every action within its powers to perform its duties under the contract" (citations omitted)).  PDVSA attempted to make the third interest payment due under the Note to Dresser-Rand's designated Citibank account on at least three occasions.  After Deutsche Bank, acting as intermediary, refused to process its payment order in November 2017, PDVSA made two subsequent attempts from different accounts to Dresser-Rand's designated account with Citibank.  But those attempts failed because Citibank had a policy that required it to reject any payment order from PDVSA.

The policies of Citibank and Deutsche Bank are exemplary of the risk-based screening and compliance policies implemented by banks to ensure that transactions do not trigger sanctions. Barker Report pp. 13-14.  Because it is often difficult or impossible for a financial institution to determine whether a particular transaction is prohibited by sanctions, banks are generally reluctant to process transactions involving sanctioned parties even if such transactions could be legal because the processing of such transactions exceeds the risk appetite for the financial institutions. *Id*.  This often results in financial institutions rejecting transactions with sanctioned parties without even doing due diligence on the transaction to determine whether it is legal.  *Id*.

Dresser-Rand contends that PDVSA did not take every action within its powers to perform its payments duties because, although Dresser-Rand provided account information for a Commerzbank account held by Siemens, there is no evidence that PDVSA actually attempted to make a payment to that account. Contrary to Dresser-Rand's contention, PDVSA need only show "that it took virtually every action within its powers to perform its duties *under the contract*." The contract here, the Note Agreement, specifically required PDVSA to make the required Note payments to Dresser-Rand, as Administrative Agent, to its address in Texas or its designated Citibank account. Note Agreement § 2.08, Sched. 2.08. The Note Agreement was never amended to reflect Siemens as the Administrative Agent or to reflect its Commerzbank account as the designated account for payment. In any event, beginning on April 30, 2018, Commerzbank – like Deutsche Bank and Citibank – adopted policies that would have caused Commerzbank to reject any payment order from PDVSA. CBNY00241-00252; Yang Dep. Tr. 21:16-22:7, 34:4-6.

Dresser-Rand further contends that PDVSA did not take every action within its powers to perform its payments duties because Dresser-Rand proposed an amendment to the Note Agreement in March 2018 – to call for payments to be made in Euros to an account with Novobank, rather than in U.S. Dollars to Dresser-Rand's Citibank account – but PDVSA never responded to that proposal. As a preliminary matter, there is no known case law requiring a party to agree to change the terms of a contract to satisfy the requirement "that it took virtually every action within its powers to perform its duties under the contract."

In any event, Dresser-Rand's proposed amendment is a red herring. Although Dresser-Rand proposed the amendment to PDVSA in March 2018, Dresser-Rand did not actually open a Euro account with Novobank until October 22, 2018. DRESSER_0062354. And Dresser-Rand never provided PDVSA with the account information that would allow PDVSA to make payments

to that account or even inform PDVSA that the account had been opened.  Scherzer Dep. Tr. 59:21-60:3.

Further, there is no evidence that the proposed amendment would have enabled PDVSA to make the requisite payments to the Euro account that Dresser-Rand eventually opened with Novobank.  Although in April 2018, when asked if Novobank could accept payments from PDVSA, Novobank stated: "Currently, there is no embargo, or prohibitive situation, relating to commercial and financial transactions with Venezuela, so there are no reasons to justify refusing transactions to and from this country," DRESSER_0061909, Dresser-Rand finally opened an account with Novobank on October 22, 2018, DRESSER_0062354, just days before November 1, 2018, when Executive Order 13850's blocking sanctions were imposed.

Moreover, the proposed amendment would have impermissibly changed the terms of the debt, thus making it "new debt" prohibited by Executive Order 13808.  As explained below, Dresser-Rand, as a U.S. company, was prohibited from dealing in "new debt" with PDVSA.

        4.       <u>The Purpose of the Note Was Destroyed By PDVSA's Inability to Make Payments in the Manner Required by the Note Agreement</u>.

PDVSA's inability to make payments in the manner required by the Note Agreement, as a result of internal bank policies, clearly satisfies the "destruction of . . . the means of performance" element of a successful impossibility defense.  *See Kel Kim Corp.*, 70 N.Y.2d at 902, 519 N.E.2d at 296.  The payment of funds was the fundamental purpose of the Note, and the bank sanctions policies destroyed the means of performance by making it impossible for PDVSA to successfully make the payments.  *See Cai Rail, Inc.*, 2021 WL 705880, at *9.  It was demonstrably impossible for PDVSA to make payments to Dresser-Rand's designated account with Citibank, as required by the Note Agreement.

16

     5.     <u>The Bank Policies Causing PDVSA's Impossibility Were Unanticipated</u>.

The events causing PDVSA's impossibility – the policies adopted by banks to ensure compliance with U.S. sanctions – were unanticipated and were not foreseen or guarded against in the Note Agreement. *See Kel Kim Corp.*, 70 N.Y.2d at 902, 519 N.E.2d at 296. In fact, in the Note Agreement, Dresser-Rand, as "Administrative Agent," specifically designated its account with Citibank as the account to which PDVSA should direct its Note payments. Note Agreement § 2.08, Sched. 2.08. Clearly, neither party contemplated that Citibank would adopt policies that would prevent PDVSA from making payments to that account.

**B.**    **Sanctions Imposed by the U.S. Government Made PDVSA's Performance of its Payment Obligations Impossible.**

     1.     <u>The Note is "New Debt" Prohibited by Executive Order 13808.</u>

Wholly apart from the banks' sanctions policies, any payment on the Note after Executive Order 13808 was actually unlawful because the terms of the debt were changed, thus making it "new debt," which would render any payment illegal under Executive Order 13808. *See* Exec. Order No. 13808, 82 Fed. Reg. 41155.

Debt issued before August 25, 2017 may qualify as "new debt" under Executive Order 13808 if, after August 25, 2017, the parties change the terms of the debt. *See* U.S. Dep't of Treasury, Frequently Asked Questions, Venezuela Sanctions, No. 554 (Feb. 12, 2018), available at https://home.treasury.gov/policy-issues/financial-sanctions/faqs/554 ("debt created prior to August 25, 2017 – including extensions of credit related to goods or services provided to PdVSA or another segment of the Government of Venezuela – would not constitute 'new debt,' *provided that the parties do not change the terms of the debt*" (emphasis added)). For example, a change to "the length of the repayment period or any interest rate applied," after August 25, 2017, would give rise to "new debt." *See* U.S. Dep't of Treasury, Frequently Asked Questions, Venezuela

Sanctions, No. 553 (Feb. 12, 2018), available at https://home.treasury.gov/policy-issues/financial-sanctions/faqs/553 ("OFAC does not consider debt that was created prior to August 25, 2017 to be 'new debt' for purposes of EXECUTIVE ORDER 13808 so long as the terms of the debt instrument (including, for example, the length of the repayment period or any interest rate applied) agreed to by the parties do not change on or after August 25, 2017."); *see also id.* No. 514 (July 19, 2018), available at https://home.treasury.gov/policy-issues/financial-sanctions/faqs/514 ("Drawdowns and disbursements whose repayment terms exceed the applicable authorized tenor are also not prohibited if the terms of such drawdowns and disbursements (including the length of the repayment period, the interest rate applied to the drawdown, and the maximum drawdown amount) were contractually agreed to prior to August 25, 2017, and are not modified on or after August 25, 2017.").

Although the parties entered into the Note Agreement in January 2017, the Note qualifies as "new debt" under Executive Order 13808 because the parties agreed to change the payment terms after August 25, 2017. As previously explained, in December 2017, the parties agreed to extend Dresser-Rand's time to make the third interest payment to December 29, 2017. Scherzer Dep. Tr. 62:2-5. And, had the parties agreed to change the currency of the required payments to Euros, as proposed by Dresser-Rand in March 2018, that, too, would have impermissibly changed the terms of the debt, rendering it "new debt" under Executive Order 13808.

2.    Payments from PDVSA Are Blocked By Executive Order 13850.

Beginning on January 25, 2019, when OFAC designated PDVSA as an SDN, PDVSA's performance of its payment obligations became illegal under Executive Order 13850's blocking sanctions. As previously explained, under Executive Order 13850, "[a]ll property and interests in property [of certain Venezuelan persons designated by the Secretary of Treasury] that are in the United States, that hereafter come within the United States, or that are or hereafter come within

18

the possession or control of any United States person . . . are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in . . . except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order."  Exec. Order No. 13850, 83 Fed. Reg. 55243.  Accordingly, beginning on January 25, 2019, any payment by PDVSA, in any currency, to Dresser-Rand or to a U.S. bank would be blocked, absent a general or specific license from OFAC.

       3.      <u>General License 9 is Inapplicable</u>.

Contrary to Dresser-Rand's assertion, General License 9, issued on January 28, 2019, did not permit PDVSA to make the requisite Note payments to Dresser-Rand.  General License 9, in relevant part, permits "all transactions and activities . . . ordinarily incident and necessary to dealings in any debt" issued by PDVSA prior to August 25, 2017.  U.S. Dep't of Treasury, OFAC, General License No. 9 (Jan. 28, 2019).  As previously explained, because the parties agreed to change the terms of the debt, the Note is considered new debt issued after August 25, 2017.  For this reason, General License 9 is inapplicable.

       4.      <u>Executive Orders 13808 and 13850 Are Proper Grounds for PDVSA's Impossibility Defense</u>.

A government order or judicial action prohibiting performance may be grounds for an impossibility defense "so long as the party seeking to be excused has not caused or failed to prevent the judicial action."  *Organizacion JD Ltda.*, 18 F.3d at 95 ("[T]he private intermediary banks cannot be subject to a damage action because the intervening government actions in ordering the seizures of the EFTs rendered any enforceable contract impossible to perform." (citations omitted)).  "[T]he rule in New York is that although governmental orders barring an action are normally grounds for an impossibility defense, impossibilities caused by such orders 'will excuse a party's performance only if the fault of the party owing performance did not contribute to the order.'"  *MG*

*Ref. & Mktg., Inc. v. Knight Enterprises, Inc*., 25 F. Supp. 2d 175, 188 (S.D.N.Y. 1998) (quoting

*Lowenschuss v. Kane*, 520 F.2d 255, 265 (2d Cir. 1975)).   "Resolution of the defense of

impossibility requires an examination into the conduct of the party pleading the defense in order

to determine the presence or absence of such fault."  *Lowenschuss*, 520 F.2d at 265.

PDVSA is not at fault for the underlying sanctions that made its performance impossible.

Rather, those sanctions were directed at the illegitimate Maduro regime.  The U.S. government

imposed the sanctions outlined in Executive Order 13808:

> [I]n light of recent actions and policies of the Government of Venezuela, including
> serious abuses of human rights and fundamental freedoms; responsibility for the
> deepening humanitarian crisis in Venezuela; establishment of an illegitimate
> Constituent Assembly, which has usurped the power of the democratically elected
> National Assembly and other branches of the Government of Venezuela; rampant
> public corruption; and ongoing repression and persecution of, and violence toward,
> the political opposition . . . .

Exec. Order No. 13808, 82 Fed. Reg. 41155.  Likewise, in designating PDVSA as an SDN subject

to the blocking sanctions of Executive Order 13850, the U.S. government explained:

> The United States is holding accountable those responsible for Venezuela's tragic
> decline, and will continue to use the full suite of its diplomatic and economic tools
> to support Interim President Juan Guaidó, the National Assembly, and the
> Venezuelan people's efforts to restore their democracy.  Today's designation of
> PdVSA will help prevent further diverting of Venezuela's assets by Maduro and
> preserve these assets for the people of Venezuela.  The path to sanctions relief for
> PdVSA is through the expeditious transfer of control to the Interim President or a
> subsequent, democratically elected government.

U.S. Dep't of Treasury, Press Releases, "Treasury Sanctions Venezuela's State-Owned Oil

Company   Petroleos   de   Venezuela,   S.A."   (Jan.   28,   2019),   available   at

https://home.treasury.gov/news/press-releases/sm594.

### 5.   The Sanctions Causing PDVSA's Impossibility Were Unanticipated.

The U.S. sanctions causing PDVSA's impossibility were unanticipated and were not

foreseen or guarded against in the Note Agreement.  *See Kel Kim Corp*., 70 N.Y.2d at 902, 519

N.E.2d at 296.  In fact, in the Note Agreement, PDVSA expressly represented that, at the time that it entered into the Note Agreement, PDVSA was not an SDN and not subject to any known sanctions.  Note Agreement § 3.01(t).

## II.   CERTAIN TESTIMONY OF PLAINTIFF'S EXPERT, STEPHANIE RICE, MUST BE EXCLUDED AS HEARSAY AND IMPROPER EXPERT OPINION UNDER FRE 702.

Rule 702 provides that a person  "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The district court acts as a gatekeeper against unreliable expert testimony.  *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  The proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact.  *See Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005).

PDVSA respectfully submits that certain expected testimony by Stephanie Rice, Dresser-Rand's expert witness, as more specifically described below, should be excluded.

1.     Ms. Rice's Testimony Concerning Undocumented Oral Communications with OFAC is Inadmissible Hearsay.

One of the issues to be tried is whether the Note issued by PDVSA was "new debt" as to which any transactions were prohibited under Executive Order 13808.  Debt issued before August 25, 2017 may qualify as "new debt" under Executive Order 13808 if, after August 25, 2017, the parties change the terms of the debt.  Here, PDVSA contends that the terms of the debt were

modified when PDVSA and Dresser-Rand agreed to extend the date for payment of the third interest payment from October 29 to December 29, 2017.

Ms. Rice is expected to testify at trial that the modification of the due date for the third payment did not render the Note "new debt."  The sole basis for this opinion is two alleged oral conversations with unidentified persons at OFAC.  Rice Dep. Tr. 13:2-14:10, 15:19-16:9.  Ms. Rice could not provide the date of the alleged conversations, the name of the person she spoke to or any further details concerning the conversation.  Rice Dep. Tr. 14:4-10, 15:24-16:2.  Although she claims she took notes of the conversation, the notes were subsequently destroyed and are no longer available.  Rice Dep. Tr. 14:11-16, 16:21-17:5.

Ms. Rice's testimony regarding what an unidentified person at OFAC stated to her in an oral conversation is an out of court statement that is impermissible hearsay and must be excluded. Fed. R. Evid. 801(c).  In addition, because Ms. Rice relies solely on such conversations to support her opinion whether the modification resulted in "new debt," her opinion on that subject must similarly be excluded because it is not based on sufficient facts or data as required by Rule 702(b).

      2.   <u>The Court Should Exclude Ms. Rice's Testimony Concerning Her Actions While Employed by Bank of Tokyo Mitsubishi on the Ground that Ms. Rice Failed to Provide Discovery on Such Actions.</u>

Ms. Rice is expected to testify at trial that despite the issuance of Executive Order 13808 banking institutions were approving the transfers of funds related to PDVSA.  The sole basis for this opinion is her observations of funds transfers while she was a compliance officer at Bank of Tokyo Mitsubishi from January 2017 to May of 2018.  Rice Report p. 18; Rice Dep. Tr. 46:9-48:5. However, when asked at her deposition to provide details of any such transfers and the circumstances surrounding them, Ms. Rice declined to provide a response on the ground that the information was confidential.  Rice Dep. Tr. 47:13-17.

The facts surrounding any such transfers are essential to any determination of their significance in this case.  The primary issue at trial will be whether banks were regularly rejecting payments from PDVSA even though such payments were technically lawful under the sanctions rules.  PDVSA will demonstrate at trial that banks regularly rejected transfers without performing due diligence on them in order to avoid taking the risk of violating sanctions rules, and as a result, transfers that were lawful would be rejected because the banks did not perform the due diligence required to determine whether they were lawful.  If Ms. Rice is going to testify that certain transfers were made to or from PDVSA, it is essential that PDVSA be given the opportunity to cross-examine Ms. Rice to establish the nature and purpose of the transfers, and the level of due diligence performed by the bank.  Without this basic information, PDVSA is unable adequately cross-examine Ms. Rice or establish the relevant facts relating to such transfers.

Accordingly, based on Ms. Rice's refusal to provide relevant and necessary discovery, any testimony relating to such transfers should be excluded.  Similarly, Ms. Rice's opinion that banks were approving transfers to or from PDVSA (Rice Report p. 18), which is based solely on her experience at Bank of Tokyo Mitsubishi, must be excluded.

3.   Ms. Rice's Opinion Concerning the Compliance Policies of JP Morgan Should Be Excluded as Rank Speculation and Improper Expert Opinion Under FRE 702.

At trial, PDVSA will present evidence relating to the repeated rejections of its efforts to make payment under the Note, including the compliance policies of Citibank and Deutsche Bank that were the basis for the rejections.  In an effort to rebut PDVSA's evidence, Ms. Rice is expected to testify that JP Morgan had a "more lenient" policy than the other banks.  Rice Report pp. 17-18. However, that testimony is not based on any **facts**, but is mere speculation.  Ms. Rice did not review any JP Morgan compliance policy or review any other information that would provide any factual basis for her opinion.  The sole basis for her opinion is that JP Morgan did not reject a

single transfer from PDVSA on or about February 12.  Rice Report pp. 17-18.  However, absent any information concerning JP Morgan's policies, or the basis for its failure to reject a single PDVSA transfer, Ms. Rice is engaging in pure speculation in testifying that JP Morgan's policies were "more lenient" than Citibank's or Deutsche Bank's.  Even more speculative is Ms. Rice's testimony, based on that single transfer, that "U.S. banks took a wide range of differing positions with respect to transactions involving PDVSA."  Rice Report p. 18.  These opinions fail to meet the minimum requirements of *Daubert* and must be excluded.

### III.   THE PROPOSED EXPERT TESTIMONY OF JOHN BARKER IS ADMISSIBLE UNDER RULE 702 OF THE FEDERAL RULES OF EVIDENCE.

The proposed testimony of John Barker is admissible under Rule 702 of the Federal Rules of Evidence.  As previously explained, the proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact.  *See Nimely*, 414 F.3d at 397.

Mr. Barker is qualified to testify as an expert on sanctions imposed by OFAC and policies adopted by financial institutions to ensure compliance with those sanctions.  Mr. Barker is a partner of the law firm Arnold & Porter LLP, where he focuses his practice on U.S. trade sanctions and export controls.  Barker Report p. 2.  Mr. Barker advises financial institutions on OFAC compliance obligations as well as other entities seeking to send and receive payments through financial institutions.  *Id.*  Prior to his employment with Arnold & Porter, Mr. Barker served in the U.S. Department of State, where he acted as the Deputy Assistant Secretary for Nonproliferation Controls and Deputy Assistant Secretary for Export Controls.  *Id.*  His responsibilities at the State Department included the development and implementation of U.S. sanctions policy.  *Id.*

Mr. Barker's opinions on the impact of OFAC sanctions on PDVSA's ability to make the requisite payments to Dresser-Rand is based on reliable data and methodology.  In forming his opinions, Mr. Barker reviewed the document productions, including the specific policy documents produced by Citibank, Deutsche Bank, and Commerzbank, and deposition transcripts from this case, in addition to Executive Orders 13808 and 13850 and related regulations and relevant OFAC general licenses, FAQs, press releases, and published guidance and advisories.  Barker Report Supp. Sched. C.

Mr. Barker's proposed testimony would be helpful to the trier of fact on how the sanctions at issue made it objectively impracticable for PDVSA to make the requisite payments to Dresser-Rand.  Mr. Barker explains how and why U.S. banks implement risk-based screening and compliance policies to ensure that transactions do not trigger sanctions.  Barker Report pp. 13-18. He explains that it is often difficult or impossible for a financial institution to determine whether a particular transaction is prohibited by sanctions.  *Id.* pp. 13-14.  Because of this, banks are generally reluctant to process transactions involving sanctioned parties even if such transactions could be legal because the processing of such transactions exceeds the risk appetite for the financial institutions.  *Id.*  This testimony would be helpful to the trier of fact to understand why banks rejected PDVSA's payments, even if, as Dresser-Rand alleges, such payments were not legally prohibited.

Mr. Barker also explains why PDVSA could not simply make payments to a different bank (e.g. Siemens' account with Commerzbank) or in a different currency.  Even if the Note was not "new debt" prohibited by Executive Order 13808, those changes, if made after August 25, 2017, could cause the Note to be regarded by OFAC as "new debt."

Dresser-Rand is expected to object to the testimony of Mr. Barker – not because he is unqualified as an expert witness – but because the Republic of Venezuela is a client of the law firm of which Mr. Barker is a partner and he has provided sanctions advice to PDVSA.  These facts are not grounds for excluding Mr. Barker's expert testimony.  *See Int'l Cards Co. v. MasterCard Int'l*, No. 13 Civ. 2576 (LGS), 2016 WL 7009016, at *8 (S.D.N.Y. Nov. 29, 2016) ("[T]he mere fact that [the expert] is an employee of a party "does not automatically disqualify him from rendering expert testimony.").  Although expert testimony may be excluded if the expert "has a clear conflict of interest or bias of an extraordinary degree," the threshold for disqualifying an expert on such grounds is high because many expert witnesses have some level of discernible bias.  *El Ansari v. Graham*, No. 17-CV-3963 (VEC), 2019 WL 3526714, at *8 (S.D.N.Y. Aug. 2, 2019) (citing *Lippe v. Bairnco Corp*., 288 B.R. 678, 688 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004)).  "[A] a complete lack of bias is not required."  *Id.* (citation omitted).  Indeed, "courts routinely permit expert testimony by parties, employees, and others with financial and other plain interests in the outcome of the litigation."  *Knowledge Based Techs. v. Int'l Bus. Machines*, No. 96 Civ. 9461 (JSR), 1998 WL 164791, at *1 (S.D.N.Y. Apr. 8, 1998).

Dresser-Rand's anticipated claim of bias goes to the weight, rather than the admissibility, of Mr. Barker's opinions.  See Matter of Trusts Established under Pooling & Servicing Agreements relating to Wachovia Bank Commercial Mortg. Tr. Commercial Mortg. Pass-Through Certificates, Series 2007-C30, No. 17 CIV. 1998 (KPF), 2020 WL 1304400, at *53 (S.D.N.Y. Mar. 19, 2020) (collecting cases).  This case will not be tried by a jury, and the Court, as the trier of fact, will be able to account for any cross-examination on such issues when weighing the evidence.

## CONCLUSION

For all of the foregoing reasons, the Court should conclude:  (I) that PDVSA's duty to make payments under the Note was discharged because its performance of its payment obligation

was rendered impossible or objectively impracticable; (II) that portions of the proposed expert testimony of Plaintiff's expert, Stephanie Rice, should be excluded as improper expert testimony under Federal Rule of Evidence 702; and (III) that the proposed expert testimony of John Barker is admissible under Federal Rule of Evidence 702.

Dated:   New York, New York
         March 29, 2021

**HOGAN LOVELLS (US) LLP**

By:      _/s/ Dennis H. Tracey, III_
         Dennis H. Tracey, III
         Matthew Ducharme
         390 Madison Avenue
         New York, NY 10017
         Tel. (212) 918-3000
         Fax. (212) 918-3000
         dennis.tracey@hoganlovells.com
         matthew.ducharme@hoganlovells.com

         Richard C. Lorenzo (pro hac vice)
         600 Brickell Avenue, Suite 2700
         Miami, FL 33131
         Tel:  (305) 459-6500
         Fax:  (305) 459-6550
         richard.lorenzo@hoganlovells.com

         _Counsel for Defendants Petróleos de_
         _Venezuela, S.A. and PDVSA Petróleo, S.A_