**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Case No. 19-cv-02689 (LLS)**

DRESSER-RAND COMPANY,

*Plaintiff,*

v.

PETRÓLEOS DE VENEZUELA, S.A. *et al.*,

*Defendants.*

## PLAINTIFF'S TRIAL BRIEF

REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
(212) 521-5400

*Attorneys for Plaintiff*
*Dresser-Rand Company*

# **TABLE OF CONTENTS**

**Page**

I.     STATEMENT OF THE CASE ..................................................................... 1

II.    PDVSA CANNOT SATISFY ITS HEAVY BURDEN OF
       DEMONSTRATING THAT IT WAS OBJECTIVELY IMPOSSIBLE TO
       PAY D-R UNDER THE NOTE AND NOTE AGREEMENT ......................... 3

III.   E.O. 13808 AND PDVSA'S SDN DESIGNATION DID NOT PROHIBIT
       PDVSA FROM MAKING PAYMENTS TO D-R UNDER THE NOTE AND
       NOTE AGREEMENT ............................................................................ 4

       A.     The Plain Language of E.O. 13808 and Related OFAC Guidance
              Authorized the Receipt of a Late Payment from PDVSA ..................... 4

       B.     The Waiver Is Distinct From a Formal Modification or Amendment
              Contemplated by OFAC and New York  Law ....................................... 6

       C.     FAQ 514 Does Not Offer PDVSA Any Additional Defenses ............... 9

       D.     General License 9 Authorized PDVSA's Repayment Obligations
              Concurrent to its SDN Designation on January 28, 2019 ................... 10

IV.    SANCTIONS DID NOT MAKE IT OBJECTIVELY IMPOSSIBLE FOR
       PDVSA TO MAKE PAYMENTS TO D-R UNDER THE NOTE
       AGREEMENT ..................................................................................... 11

V.     Evidentiary Disputes .......................................................................... 15

       A.     Mr. Barker's Expert Report and Anticipated Expert Testimony Are
              Unreliable and Should Be Precluded Under Federal Rule of Evidence
              702 ............................................................................................. 15

       B.     PDVSA's Submission of an Amended Expert Report Three Months
              After the Expert Discovery Deadline is Highly Prejudicial and an
              Improper Attempt to Take a Second Bite at the Apple ....................... 18

       C.     PDVSA's Attempt to Subpoena Trial Testimony From D-R's General
              Counsel is Procedurally and Substantively Improper ......................... 19

       D.     Additional Evidentiary Objections ................................................. 21

VI.    CONCLUSION ................................................................................... 22

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Broumand v. Joseph*,
    2021 WL 771387 (S.D.N.Y. 2021)......................................................................20

*Cacciola v. Selco Balers, Inc.*,
    127 F. Supp. 2d 175 (E.D.N.Y. 2001) ...........................................................16, 18

*CAI Rail, Inc. v. Badger Mining Corp.*,
    No. 20-cv-4644, 2021 WL 705880 (S.D.N.Y. Feb. 22, 2021) ................................4

*Clarex Ltd. v. Natixis Sec. Ams., LLC*,
    No. 1:12-cv-7908-GHW, 2014 WL 4276481 (S.D.N.Y. Aug. 29, 2014)................3

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..............................................................................................15

*Drummond Coal Sales Inc. v. Kinder Morgan Operating LP "C"*,
    No. 19-14260, 2021 WL 613748 (11th Cir. 2021) ...............................................15

*Ebert v. Holiday Inn*,
    No. 11-cv-4102, 2014 WL 349640 (S.D.N.Y. Jan. 31, 2014) .................................4

*Edge Group Waiccs LLC v. Sapir Group LLC*,
    705 F. Supp. 2d 304 (S.D.N.Y. 2010).................................................................10

*Ello v. Singh*,
    No. 05-cv-9625 (KMK), 2006 WL 2270871 (S.D.N.Y. Aug. 7, 2006).................21

*Feitshans v. Kahn*,
    2008 U.S. Dist. LEXIS 11330 (S.D.N.Y. 2008)....................................................21

*Gould v. Bantam Books, Inc.*,
    No. 83-CV-5121, 1984 WL 684 (S.D.N.Y. 1984)....................................................8

*Havens v. Maritime Commc'ns/ Land Mobile, LLC*,
    No. 11-993, 2014 WL 2094035 (D.N.J. May 20, 2014)........................................20

*Health–Chem Corp. v. Baker*,
    915 F.2d 805 (2d Cir. 1990)................................................................................14

*Hidden Brook Air, Inc. v. Thabet Aviation Intern. Inc.*,
    241 F.Supp.2d 246 (S.D.N.Y. 2002)......................................................................8

*Kel Kim Corp. v Central Mkts.*,
   70 N.Y.2d 900 (1987) ...........................................................................................4

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)...........................................................................................16

*Lagarenne v. Ingber*,
   273 A.D.2d 735 (3d Dep't 2000) .......................................................................4

*Lantino v. Clay LLC*,
   No. 1:18-cv-12247, 2020 WL 2239957 (S.D.N.Y. May 8, 2020) ...........................3

*Lattanzio v. Deloitte & Touche L.L.P.*,
   476 F.3d 147 (2d Cir. 2007)...............................................................................6

*Lidle v. Cirrus Design Corp.*,
   No. 08-cv-1253, 2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009) ...........................19

*Lippe v. Bairnco Corp.*,
   288 B.R. 678 (S.D.N.Y. 2003)....................................................................16, 17

*In re Med Diversified, Inc.*,
   346 B.R. 621 (Bankr. E.D.N.Y. 2006).................................................................16

*O'Connor v. Curcio*,
   281 A.D.2d 100 (N.Y. App. Div. 2001) ..............................................................8

*Pearlstein v. Blackberry Ltd.*,
   No. 13-cv-07060, 2019 WL 1259382 (S.D.N.Y. Mar. 19, 2019).........................21

*Perez v. Progenics Pharmaceuticals, Inc.*,
   No. 10–CV–08278, 2015 WL 4111551 (S.D.N.Y. June 24, 2015).......................20

*Ping-Kuo lin v. Horan Capital Mgmt. LLC*, No. 14-cv-5202, 2014 WL 3974585
   (S.D.N.Y. Aug. 13, 2014) ...................................................................................20

*Public Patent Found., Inc. v. GlaxoSmithKline Consumer Healthcare L.P.*,
   801 F. Supp. 2d 249 (S.D.N.Y. 2011)................................................................17

*Richman v. Respironics, Inc.*,
   2012 U.S. Dist. LEXIS 206345 (S.D.N.Y. Mar. 13, 2012) ..................................19

*Ryan Int'l Airlines, Inc. v. Link Investments, LLC*,
   2007 WL 9797634 (D.N.J. 2007) .......................................................................8

*Saget v. Trump*,
   351 F.Supp.3d 251 (E.D.N.Y. 2019) ..................................................................20

*U.S. v. Int'l Bhd. of Teamsters*,
  816 F. Supp. 864 (S.D.N.Y. 1992) ........................................................................14

*Ziggity Sys., Inc. v. Val Watering Sys.*,
  769 F.Supp. 752 (E.D. Pa. 1990) .........................................................................18

**Rules**

Fed. R. Civ. P. 26 ..................................................................................................18

Fed. R. Civ. P. 45 ..................................................................................................19

Fed. R. Evid. 403 ..................................................................................................21

Fed R. Evid. 602 ...................................................................................................22

Fed. R. Evid. 701 ..................................................................................................22

Fed. R. Evid. 702 ..................................................................................................15

**Regulations**

Exec. Order No. 13808, 82 Fed. Reg. 41155 (Aug. 25, 2017) .......................................5

**Other Authorities**

General License 9, *Authorizing Transactions Related to Certain Dealings In Debt,*
  Department of the Treasu9 January 2018) ...........................................................11, 19

*Notes on Frequently Asked Questions*, OFAC, available at
  https://home.treasury.gov/policy-issues/financial-sanctions/frequently-asked-
  questions/note-on-frequently-asked-questions .........................................................5

Pursuant to Rule 4 of Judge Stanton's Individual Practices, Plaintiff Dresser-Rand Company ("D-R") respectfully submits this Trial Brief to address the key legal issues that D-R anticipates will arise at trial.[1]

## I.   STATEMENT OF THE CASE

This is a straightforward breach of contract case brought by D-R to collect over $119 million of debt indisputably owed by PDVSA to D-R under a Note Agreement dated January 20, 2017 ("Note Agreement") and corresponding Note of the same date ("Note").  On February 11, 2020, the Court entered an Opinion & Order, ECF No. 59 ("Order"), wherein it held that D-R had established each element of its breach of contract claim against PDVSA.[2]  Specifically, the Court held that (i) "[o]n January 20, 2017, the parties entered into the Note Agreement" (Order at 1); (ii) whereby "PDVSA agreed to pay [Dresser-Rand] the amount reflected in a corresponding Note . . . in the principal sum of $119,645,069.70 in scheduled payments, with an annual interest rate of 6.5% and a default interest rate of 8.5%" (*id.*); and (iii) "PDVSA made its first two payments without incident," but D-R "never received another payment from PDVSA."  (*Id.* at 2–3.)  The Court further ruled that the evidence submitted in support of D-R's motion for summary judgment in lieu of complaint made "a prima facie case for recovery on the Note."  (*Id.* at 5.)

The Court also ruled that material issues of fact existed with respect to PDVSA's lone

---

[1] D-R does not present an exhaustive list of the legal issues that may arise at trial, but rather focuses on the main contested issues of law remaining in this action.  D-R reserves its right to respond to any additional, belated legal arguments that might be raised by defendant Petróleos de Venezuela, S.A. ("PDVSA") in its briefing or at trial.

[2] In connection with the Order, the Court granted D-R's motion for summary judgment as to defendant PDVSA Petróleo, S.A. ("Petróleo") because, as the Court explained, Petróleo, as guarantor, "waived all defenses except for complete payment" and "[t]here is no question about [Petróleo's] liability; it is fully liable under the guarantee for the amount which remains unpaid."  (Order at 7–8.)  On May 29, 2020, the Clerk of Court entered final judgment against Petróleo in the amount of $149,517,709.96.  (ECF No. 79).   That judgment remains unpaid.

remaining defense:[3] that the enactment of Executive Order 13808 ("E.O. 13808") made it impossible, or impracticable, for PDVSA to pay D-R under the Note and Note Agreement.  (*Id*. at 6–7.)  Thus, the only issue left for the Court to rule upon is whether, as PDVSA contends, U.S. sanctions made it impossible, or impracticable, for PDVSA to satisfy its debt obligations to D-R.  Absent PDVSA satisfying its burden of proving this defense, this Court should enter judgment against PDVSA in D-R's favor.

The evidence will show that it was neither impossible nor impracticable for PDVSA to satisfy its obligations under the Note and Note Agreement following the issuance E.O. 13808 in August 2017.

*First*, under the plain language of E.O. 13808, transactions related to Venezuelan debt issued before August 25, 2017—like the Note and Note Agreement—continued to be legally permissible.  While PDVSA contends that D-R's thirty-day waiver of a single repayment deadline caused the Note and Note Agreement to become "new debt" prohibited under E.O. 13808, there is no evidentiary or legal support for this.  To the contrary, the evidence will show that this limited waiver did not result in the requisite formal modification or amendment contemplated by the Office of Foreign Assets Control ("OFAC") and New York law, and that, in any event, OFAC guidance permitted D-R to collect and accept payment under the Note and Note Agreement outside the agreed-upon payment period without converting it to "new debt."

*Second*, after being put on notice of its defaults under the Note and Note Agreement, PDVSA could have, but did not cure, its nonpayment.  The U.S. government issued General License 9 concurrent with its January 28, 2019 blocking sanctions, which permitted PDVSA to

---

[3] The only other substantive argument raised by PDVSA to date is that D-R's affiant, Erik Scherzer, lacked sufficient personal knowledge to render his affidavit acceptable.  This argument was rejected by the Court, which found D-R made "a substantial showing" that Mr. Scherzer "has personal knowledge of the default in payments."  (Order at 5.)

cure its default and repay D-R under the Note and Note Agreement after receiving D-R's Notice of Default, despite PDVSA, at the time, being designated as a Specially Designated National ("SDN").

*Third*, there is no credible evidence of an objective impossibility of PDVSA making payments to D-R when its remaining payment obligations became due under the Note. Rather, the evidence will show that at least two multinational financial institutions were still processing payments involving PDVSA after August 2017, including J.P. Morgan Chase & Co. ("JP Morgan"), which approved PDVSA's payment to D-R in February 2018 (although another financial institution did not forward the payment). The record will also show that D-R offered PDVSA several viable alternatives to facilitate payment under the Note and Note Agreement, but PDVSA failed to respond to D-R's communications and exhaust all avenues of performing. Under New York law, PDVSA's own inaction is fatal to its impossibility defense.

For these reasons and those expanded on below, PDVSA's impossibility defense fails as a matter of fact and law.

## II. PDVSA CANNOT SATISFY ITS HEAVY BURDEN OF DEMONSTRATING THAT IT WAS OBJECTIVELY IMPOSSIBLE TO PAY D-R UNDER THE NOTE AND NOTE AGREEMENT

Under New York law, "impossibility . . . is treated synonymously with impracticability" as a defense to a breach of contract action. *Lantino v. Clay LLC*, No. 1:18-cv-12247, 2020 WL 2239957, at *3 (S.D.N.Y. May 8, 2020) (internal citations omitted); *see Clarex Ltd. v. Natixis Sec. Ams., LLC*, No. 1:12-cv-7908-GHW, 2014 WL 4276481, at *11 (S.D.N.Y. Aug. 29, 2014) ("New York courts do not appear to recognize commercial impracticability as a separate defense to the doctrine of impossibility; rather, impracticability is treated as a type of impossibility and construed in the same restricted manner.").

Impossibility excuses performance "only when . . . performance [is rendered] ***objectively***

*impossible* . . . by an unanticipated event that could not have been foreseen or guarded against in the contract." *Kel Kim Corp. v. Central Mkts.*, 70 N.Y.2d 900, 902 (N.Y. 1987) (emphasis added). Impossibility defenses are evaluated at the time of performance and "applied narrowly" by courts. *See id.* ("[P]erformance should be excused only in extreme circumstances"); *Ebert v. Holiday Inn*, No. 11-cv-4102, 2014 WL 349640, at *7 (S.D.N.Y. Jan. 31, 2014) ("Case law is clear that impossibility excuses a party's performance 'under very limited and narrowly defined circumstances.'"). PDVSA, as the party asserting the defense, bears the heavy burden of proving impossibility. *See CAI Rail, Inc. v. Badger Mining Corp.*, No. 20-cv-4644, 2021 WL 705880, at *10 (S.D.N.Y. Feb. 22, 2021) (finding defendant did not meet its burden of asserting an impossibility defense under New York law).

Thus, to demonstrate that sanctions imposed by the U.S. government made it impossible, or impracticable, for PDVSA to perform under the Note and Note Agreement, PDVSA must present evidence showing that it was "objectively impossible" to pay D-R in connection with the Note after June 2017. *Lagarenne v. Ingber*, 273 A.D.2d 735, 737 (3d Dep't 2000) ("The vitiation of a contract based on impossibility of performance is rarely imposed" and is applicable only when performance is "objectively impossible."). For reasons explained below, PDVSA will be unable to satisfy this onerous burden at trial.

## III.   E.O. 13808 AND PDVSA'S SDN DESIGNATION DID NOT PROHIBIT PDVSA FROM MAKING PAYMENTS TO D-R UNDER THE NOTE AND NOTE AGREEMENT

### A.   The Plain Language of E.O. 13808 and Related OFAC Guidance Authorized the Receipt of a Late Payment from PDVSA

E.O. 13808 prohibits "U.S. persons or persons subject to U.S. jurisdiction from engaging in transactions related to, providing financing for, or otherwise dealing in ***new debt***, with a maturity of longer than 90 days and issued by, on behalf of, or for the benefit of PDVSA, its property, or

4

its interests in property."  Exec. Order No. 13808, 82 Fed. Reg. 41,155 (Aug. 25, 2017) (emphasis

added).  Under E.O. 13808, the term "new debt" is any debt issued **on or after August 25, 2017**,

the effective date of E.O. 13808.  *Id.*  PDVSA does not dispute that the Note and Note Agreement,

entered into on January 20, 2017, are not considered "new debt" within the scope of E.O. 13808's

restrictions.  Barker Dep. Tr. at 43:1-19 (agreeing that at the time "E.O. 13808 came into being,

the Note Agreement and the debt at issue in this case already existed").  Instead, PDVSA contends

that D-R's agreement to PDVSA's request for a "waiver of 30 additional days counted from

[November 29, 2017]" to make the third quarterly interest payment (the "Waiver") (*see*

DRESSER_0059592) transformed the Note and Note Agreement into "new debt" prohibited by

E.O. 13808.

PDVSA's argument is premised on its partial and selective reading of guidance published

by OFAC in connection with E.O. 13808.[4]  Specifically, FAQ 553, which was published by OFAC

on February 12, 2018—*after* PDVSA had already missed its third and fourth quarterly interest

payments, and *after* it was given 30 additional days to make its third quarterly payment—aims to

provide additional context on what OFAC deems "new debt" for purposes of E.O. 13808.  It states:

> OFAC does not consider debt that was created prior to August 25, 2017 to be "new debt" for purposes of E.O. 13808 so long as the terms of the debt instrument (including, for example, the length of the repayment period or any interest rate applied) agreed to by the parties do not change on or after August 25, 2017.  Such preexisting debt does not need to conform to the 30- or 90-day tenors imposed under E.O. 13808, and U.S. persons may collect and accept payment for such debt regardless of whether the relevant segment of the Government of Venezuela, including PdVSA, pays during the agreed-upon payment period.

---

[4]  OFAC publishes frequently asked questions ("FAQs" or, individually, "FAQ") and answers to those FAQs relating to economic sanctions that "are intended only as general information to assist" persons to comply with legal requirements and "to facilitate an understanding of the scope and purposes of sanctions programs."  OFAC expressly cautions, however, that persons and entities must still "comply with the full legal requirements of OFAC's programs which are set forth in the applicable statutes, Executive Orders, and implementing regulations" and "that specific facts may alter an analysis and . . . a particular answer will not always be applicable to all programs or at all times."  *See Notes on Frequently Asked Questions*, OFAC, available at https://home.treasury.gov/policy-issues/financial-sanctions/frequently-asked-questions/note-on-frequently-asked-questions.

FAQ 553.  PDVSA contends that the Waiver modified "the length of the repayment period" under the Note Agreement and therefore caused the terms of the Note Agreement to be changed after August 25, 2017, making the Note Agreement "new debt."

PDVSA's argument, however, ignores the remainder of FAQ 553, which expressly permits U.S. persons, like D-R, to "collect and accept payment for [debt created prior to August 25, 2017] ***regardless*** of whether the relevant segment of the Government of Venezuela, including PdVSA, ***pays during the agreed-upon payment period***."  FAQ 553 (emphasis added).  Notably, D-R's sanctions expert, Stephanie Rice—who was employed at OFAC for five years and has experience interpreting E.O. 13808 in her former role as Director and Head of U.S. Sanctions Compliance of Bank of Tokyo Mitsubishi UFJ ("Bank of Tokyo")—testified that D-R's agreement to accept the third quarterly payment late is exactly what is contemplated by the last sentence of FAQ 553.  *See* Rice Dep. Tr. at 38:5–13 ("FAQ [553] tells us . . . that OFAC does not object to or does not see as prohibited the receipt or acceptance of late payment by a U.S. party from PDVSA in relation to preexisting debt.").  PDVSA's purported sanctions expert, John P. Barker, on the other hand, did not address this operative language in FAQ 553 at his deposition or in his expert report.[5]  PDVSA's selective reading of FAQ 553 would render the full provision meaningless and should therefore be rejected by the Court.  *Lattanzio v. Deloitte & Touche LLP*., 476 F.3d 147, 156 (2d Cir. 2007) (noting courts "generally avoid interpreting a regulation in a way that renders one of its provisions meaningless").

### B.  The Waiver Is Distinct From a Formal Modification or Amendment Contemplated by OFAC and New York Law

PDVSA's strained argument also does not comport with what constitutes a modification

---

[5] Tellingly, Mr. Barker does not even discuss or cite to FAQ 553 anywhere in his original or amended expert reports.

or amendment by OFAC and under New York law.  The Waiver simply allowed D-R to accept payment of the third quarterly interest payment after the agreed-upon payment period, but did not change, alter, or otherwise affect PDVSA's remaining deadlines or obligations, or any other terms and conditions, under the Note and Note Agreement.  *See* DRESSER_0059592 (requesting the Waiver and re-affirming PDVSA's "intention and ability to comply with ***all of its commitments*** under the Note Agreement" and to "***remedy any delay*** in the payment of the unpaid interest as soon as possible") (emphasis added); DRESSER_0059630 (reminding PDVSA that the Waiver expired on December 29, 2017 and re-iterating the January 20, 2018 fourth quarterly interest payment deadline).

Ms. Rice confirmed that OFAC would not view the Waiver as a change in pre-existing debt, as PDVSA contends.  Following the issuance of E.O. 13808 in August 2017, Ms. Rice contacted OFAC to receive clarification on what changes to a pre-existing debt instrument would cause such debt to become "new debt" prohibited by E.O. 13808.  *See* Rice Dep. Tr. at 13:22–25.  OFAC advised Ms. Rice that pre-existing debt would become prohibited new debt "if the underlying contract or agreement of that debt was ***formally amended, formally renegotiated*** . . . in a way that changed the payment terms governing the debt."  *See id.* at 14:20–25 (emphasis added); 42:4–18 ("[I]f there was a formal amendment made to a pre-existing debt contract that altered the payment terms governing that debt, that would constitute a change to payment terms.").[6] Indeed, as Ms. Rice explained, the policy behind U.S. sanctions programs is not to prevent good-faith creditors, like D-R, from accepting late payments on a pre-existing debt obligation, but rather,

---

[6] In 2014, Ms. Rice, Vice President and Manager of Global Sanctions Compliance Advisory at JP Morgan at the time, similarly approached OFAC to receive clarification on what changes would cause pre-existing debt to become prohibited debt under the Russian sanctions program, which contains a parallel provision prohibiting activities relating to "new debt" issued on or after July 16, 2014.  Rice Dep. Tr. 13:14–21; s*ee* Directive 1 to Executive Order 13662. OFAC's offered the same guidance and explained that the agency contemplated a formal change to the parties' payment terms.

to prevent parties from creatively manipulating their existing debt instruments as an end-run around OFAC's restrictions on new debt.  *Id*. at 84:7–15.

OFAC's interpretation is consistent with New York law, which treats limited "waivers" of a contractual right as distinct from an amendment or modification to the underlying agreement. *See Hidden Brook Air, Inc. v. Thabet Aviation Int'l. Inc*., 241 F. Supp. 2d 246, 269 (S.D.N.Y. 2002) ("The legal implications of a waiver differ from those of an enforceable modification."). Specifically, under New York law, an amendment or modification requires a writing or consideration or the typical elements of a binding agreement.  *See Gould v. Bantam Books, Inc*., No. 83-CV-5121, 1984 WL 684, at *4 (S.D.N.Y. 1984); *see also O'Connor v. Curcio*, 281 A.D.2d 100, 102 (N.Y. App. Div. 2001) (There is a distinction between a modification agreement and a waiver."); *Ryan Int'l Airlines, Inc. v. Link Investments, LLC*, No. 04-0308, 2007 WL 9797634, at *4 (D.N.J. Oct. 31, 2007) (noting under New York law, "[a]s a binding agreement, modification requires all the elements of a contract, specifically mutual assent and consideration").  The evidence will show that the parties did not make any written modifications or agree to any amendments to the Note or Note Agreement, pursuant to Section 9.08 of the Note Agreement, which requires all modifications and amendments to be made by the parties pursuant to "an agreement . . . in writing."  Note Agreement § 9.08.

Tellingly, PDVSA has not, to date, come forward with any evidentiary or legal support for its strained interpretation of FAQ 553.  Indeed, PDVSA's sanctions expert, Mr. Barker, could not opine on whether the Waiver caused the Note and Note Agreement to become "new debt" prohibited under E.O. 13808.  *See* Barker Dep. Tr. at 109:10–25 ("I can't say right now whether [the Waiver] would be permitted or prohibited.").  Rather, Mr. Barker testified that he would simply adopt the same approach employed by Ms. Rice, and "look to the regulator, to OFAC to

determine" whether the Waiver caused the Note and Note Agreement to become "new debt." *Id.* at 17:8–11; 109:21–25; 110:22–25 ("I think you'd probably want to take [the issue] to the regulator"). But, Ms. Rice did receive guidance from OFAC on this issue in the context of other similar situations, and OFAC's response militates against a finding that PDVSA's debt constitutes new debt. Accordingly, PDVSA will be unable to demonstrate that its performance was legally impossible under E.O. 13808.[7]

### C.  FAQ 514 Does Not Offer PDVSA Any Additional Defenses

Perhaps recognizing the futility of the language of FAQ 553, PDVSA recently submitted a supplemental expert report relying on FAQ 514 for the first time in this litigation. Mr. Barker opines that FAQ 514 prohibits U.S. parties from dealing in drawdowns or disbursements with a repayment date of longer than ninety (90) days if the terms of the drawdown or disbursement were negotiated after August 25, 2017. Without forming an opinion one way or the other, Mr. Barker states that OFAC would need to determine whether the Waiver constitutes a "renegotiation of the payment terms" prohibited by FAQ 514.

Setting aside the procedural impropriety of Mr. Barker's amended expert report (discussed in Section V.B below), Mr. Barker's reliance on FAQ 514 is misplaced. FAQ 514, by its plain terms, addresses instances where a U.S. person entered into a "***revolving credit facility*** or ***long term-loan arrangement***" with PDVSA, and whether any future "***drawdown***[] and ***disbursement***[]" under the parent agreement is prohibited under E.O. 13808.[8] FAQ 514 (emphasis added). FAQ 514 provides clarity as to whether the 90- and 30-day repayment terms provided for in E.O. 13808

---

[7] As noted below, PDVSA's contention that the Waiver caused the Note Agreement to become "new debt" prohibited by E.O. 13808 is further undermined by J.P. Morgan's processing of PDVSA's payment to D-R *after* the Waiver.

[8] Ms. Rice will be prepared to address the inapplicability of FAQ 514 at trial. However, to the extent the Court permits PDVSA to submit Mr. Barker's amended expert report—which, for reasons discussed below, it should now—PDVSA respectfully requests that the Court also afford Ms. Rice a similar opportunity to supplement her expert report to respond to the new assertions made by Mr. Barker in his amended report, including as to FAQ 514.

apply to drawdowns and disbursements.  Mr. Barker correctly quotes FAQ 514, which states: "U.S. persons may not deal in a ***drawdown*** or ***disbursement*** initiated after August 25, 2017 with a repayment term of longer than 90 days (for PdVSA) . . . if the terms of the ***drawdown*** or ***disbursement*** were negotiated on or after August 25, 2017."  FAQ 514 (emphasis added).  But, Mr. Barker misses the mark in terms of the applicability of this provision.  Neither the Note nor the Note Agreement are revolving credit facilities or long-term loan arrangements and do not provide for periodic drawdowns or disbursements.  Instead, they are simply agreements that cover pre-existing, fully funded obligations.  Accordingly, PDVSA cannot rely on the factually inapposite FAQ 514 in support of its impossibility defense.

### D.  General License 9 Authorized PDVSA's Repayment Obligations Concurrent to its SDN Designation on January 28, 2019

PDVSA also contends that OFAC's January 28, 2019 designation of PDVSA as an SDN made it legally impossible from PDVSA to pay D-R additional amounts due from that day forward. The evidence will show, however, that PDVSA still had more than ***fourteen months*** to make payments under the Note and Note Agreement before receiving the SDN designation and, during that timeframe, missed ***five*** quarterly payments under the Note.  Put simply, PDVSA's SDN designation has no bearing on its material breaches of the Note and Note Agreement in 2017 and 2018.  *See Edge Group Waiccs LLC v. Sapir Group LLC*, 705 F. Supp. 2d 304, 318 (S.D.N.Y. 2010) ("[I]mpossibility (or even impracticability) of performance at the time that performance was due may excuse enforcement of a contract if the impossibility was brought about by a force majeure, or circumstances that were not caused by the party."); Order at 3 (finding D-R "never received another payment from PDVSA" after June 2017).

More fundamentally, concurrent with the January 28, 2019 blocking sanctions, the U.S. government issued General License 9 "Authorizing Transactions Related to Dealings in Certain

Debt" ("GL 9"), which made it permissible for the parties to continue engaging in transactions and activities related to the Note and Note Agreement.  *See* General License 9, *Authorizing Transactions Related to Certain Dealings In Debt*, Department of the Treasury (29 Jan. 2018). Section (a) of GL 9 authorizes, in relevant part:

> ***all transactions and activities*** prohibited by Section l(a)(iii) of Executive Order 13808 (E.O. 13808) or Executive Order 13850 that are ***ordinarily incident and necessary to dealings in any debt*** (including the bonds listed on the Annex to this general license, promissory notes, and other receivables) ***of Petroleos de Venezuela, S.A. (PdVSA)*** or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest (together, PdVSA-related debt), ***issued prior to August 25, 2017*** (the effective date of E.O. 13808) . . . provided that any divestment or transfer of, or facilitation of divestment or transfer of, any holdings in such debt must be to a non-U.S. person.

GL 9 at (a) (emphasis added).[9]  PDVSA's repayment obligations—activities "ordinarily incident and necessary" to PDVSA's performance under the January 20, 2017 Note and Note Agreement—are therefore permitted under the plain language of GL 9.  *See* Rice Dep. Tr. at 71:23–25–72:1 ("[I]t is my opinion that PDVSA's payment obligations under the note agreement would have been permitted by General License 9."); Barker Dep. Tr. at 73:25–74:1–4 (stating GL 9 "authoriz[es] payments to go forward for anything that was issued prior to August 25, 2017.").

Accordingly, PDVSA was legally permitted to make the requisite payments to D-R both before and after its SDN designation.

## IV.   SANCTIONS DID NOT MAKE IT OBJECTIVELY IMPOSSIBLE FOR PDVSA TO MAKE PAYMENTS TO D-R UNDER THE NOTE AGREEMENT

PDVSA will argue that even if its performance was legally permissible under E.O. 13808 (and it was), PDVSA was still unable to make payments in the form and manner required by the Note Agreement.  Specifically, PDVSA will rely on evidence relating to PDVSA's payment

---

[9] Seven superseding versions of GL 9, issued between February 1, 2019 and May 12, 2020, continued to authorize PDVSA's performance under the Note and Note Agreement.

attempts that were rejected by Deutsche Bank and Citibank N.A. ("Citi") on November 21, 2017 and February 12, 2018, respectively, as support for its contention that it was unable to effectuate payment to D-R.  The evidence, however, will show that, at or around the time the third and fourth quarterly interest payments became due, at least two financial institutions were processing payments made by PDVSA to U.S. counterparties.  Moreover, PDVSA could have sought to obtain a specific license through OFAC—as its expert's own law firm helped it attempt to do in other credit situations—that would have permitted PDVSA to satisfy its payment obligations, but there is no evidence in the record that it did so.

Most notably, on February 12, 2018, PDVSA, through its originating bank, Dinosaur Merchants Bank Limited ("DMBL"), attempted to pay $1,960,212.37 into D-R's account at Citi (the "February 12 Payment").  The uncontested evidence shows that DMBL's correspondent bank, JP Morgan, processed the February 12 Payment and transferred $1,960,187.37 to Citi.  *See* Romano Dep. Ex. 4.  The fact that JP Morgan, a highly sophisticated U.S. bank with an exemplary compliance program, processed the February 12 Payment—more than two months after the Waiver—is further evidence that the payment was legally permissible under E.O. 13808 and tolerable under the bank's internal risk appetite policy.  *See* Rice Expert Report at 18 ("[B]ased on my experience, it is unlikely that JP Morgan—with its relatively conservative approach on sanctions risk—would have processed a payment that was not E.O. 13808 compliant."); Barker Dep. Tr. at 85:21 (conceding JP Morgan is "a very reputable organization" that presumably has an adequate OFAC compliance group).

But JP Morgan was not the only bank that was approving payments from PDVSA at the time.  Ms. Rice explained that, in her role as Director and Head of U.S. Sanctions Compliance at Bank of Tokyo, she too "approved the processing of transactions involving PDVSA," during the

relevant time period.  Rice Expert Report at 18.

Throughout this litigation, PDVSA has pointed to Citi's rejection of PDVSA's payment attempt in February 2018 as evidence that it was impossible to perform under the Note Agreement. Specifically, in September 2017, Citi adopted a manual process to review all future incoming and outgoing payments involving PDVSA, and asked its clients to return certain documentation to seek approval for the bank's manual processing program.  *See* Romano Dep. Ex. 6.  Citi cautioned, however, that even with the requisite documentation in hand, Citi would still need to seek approval from a senior committee to determine whether its clients, like D-R, were eligible for an exception. Romano Dep. Ex. 10.  The evidence will show that between September 2017 and December 2017, Citi and D-R engaged in e-mail and verbal discussions regarding Citi's manual processing program.  *See* Romano Dep. Exs. 6, 7, 8, and 10.  Ultimately, the parties stopped those discussions after D-R learned that Citi's compliance department was unlikely to process payments from PDVSA, even if D-R returned the requisite documentation to the bank.  *See* Scherzer Dep. Tr. pp. 27–28.

There are additional reasons why the impossibility defense fails.  Indeed, the evidence will show that after discussions between D-R and Citi reached an impasse, D-R provided PDVSA with several viable alternatives to effectuate payment, but PDVSA simply ignored D-R's outreach.

*First*, on December 18, 2017, D-R provided PDVSA the information for a Commerzbank AG ("Commerzbank") account located in Munich, Germany capable of accepting payments in U.S. dollars (the "Commerzbank Account").  On January 19, 2018, D-R followed up with PDVSA and reiterated that the Commerzbank Account was "active for making transfers in [U.S. dollars]," but, as the evidence shows, PDVSA did not respond to D-R's outreach regarding the Commerzbank Account.  DRESSER_0059844-0059845.  While PDVSA never sought to make

13

payment through Commerzbank—which standing alone should defeat impossibility—it also bears noting that there is no testimony or documentary evidence to suggest that Commerzbank would have denied PDVSA's attempts to pay D-R into the Commerzbank Account.  To the contrary, the evidence shows that at the time D-R presented Commerzbank as an alternative, Commerzbank did not employ any policies that prohibited payments from PDVSA or even addressed the Venezuelan sanctions program generally.  Rice Expert Report at 23.  In fact, Commerzbank's first Venezuela-specific policy, effective April 30, 2018, did not restrict payments originating from "Venezuelan persons, organisations or institutions" provided that the beneficiary, like D-R, was not a Venezuelan person, organization or institution.  CBNY00249.

*Second*, on February 20, 2018, **PDVSA requested** that D-R open a bank account at Novobank to receive payments by PDVSA under the Note in Euros because PDVSA, at the time, had an existing banking relationship with Novobank.  DRESSER_0004337.  On March 2, 2018, D-R informed PDVSA that D-R was in a position to accept payment under the Note in Euros and would open an account at Novobank, and emailed PDVSA a proposed amendment to the Note Agreement to permit PDVSA to make payments under the Note in Dollars and/or Euros (as the Note permitted payment only in Dollars).  DRESSER_0004341-47.  As the evidence will show, D-R opened an account with Novobank, sent PDVSA multiple follow-up emails regarding the status of its overdue payments, and even tried to schedule a meeting with PDVSA to discuss the same, but never received a response to these inquiries.  DRESSER_0060240-42.  PDVSA's own, documented inaction is fatal to its impossibility defense.  *See U.S. v. Int'l Bhd. of Teamsters*, 816 F. Supp. 864, 874 (S.D.N.Y. 1992) ("[T]he defense of impossibility is not available to one who . . . did not take virtually every action within his or her power to perform.");  *Health–Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("[Appellant] makes no claim that it took virtually every

action within its power to perform its duties under the contract and therefore cannot assert the defense of impossibility."); *Drummond Coal Sales Inc. v. Kinder Morgan Operating LP "C"*, No. 19-14260, 2021 WL 613748, at *7 (11th Cir. Feb. 17, 2021) (applying New York law) (rejecting impossibility argument because party failed "to allege that [it] exhausted all avenues of performing its contractual duties").

*Third*, publically available evidence makes clear that the Bolivarian Republic of Venezuela, led by interim President Juan Guaidó, has sought to obtain specific licenses from OFAC to engage in certain conduct.  PDVSA, under the direction of the ad hoc board appointed by President Guaidó in early February 2019—and represented by Arnold & Porter Kaye Scholer LLP ("A&P"), the law firm where PDVSA's expert is an equity partner—could have similarly sought a license to pay D-R the monies that are due and owing.  But, there is no evidence in the record that PDVSA or its ad hoc board has sought such a license.  Instead, it is has elected to contest its ability to make the required payments in this litigation.

## V.    EVIDENTIARY DISPUTES

Consistent with Rule 4(A)(5) of the Court's Individual Practices, D-R identifies and addresses below the evidentiary issues that it anticipates raising at trial.[10]

### A.    Mr. Barker's Expert Report and Anticipated Expert Testimony Are Unreliable and Should Be Precluded Under Federal Rule of Evidence 702

To be admissible, expert testimony must be both relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  This bedrock principle is articulated in Federal Rule of Evidence 702 ("Rule 702" or "Fed. R. Evid. 702"), which permits expert testimony if the testimony is "the product of reliable principles and methods."  Fed. R. Evid. 702(c).  Because

---

[10] To the extent necessary, D-R can provide the Court with additional briefing on any of the evidentiary issues addressed herein.

experts assist the Court by providing unbiased information and opinions, an expert's opinions become inadmissible under Rule 702 where the expert's partiality is so apparent that the expert's opinions become "unreliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (District courts serve a required "gatekeeping" function to insure that all proposed expert testimony is reliable); *In re Med Diversified, Inc.*, 346 B.R. 621, 642 (Bankr. E.D.N.Y. 2006) ("[T]he deliberate, manifest, pervasive and systematic bias [of the expert] . . . warrants disqualifying him and his report on the principal ground of unreliability.").

Against this backdrop, federal courts routinely disallow expert testimony where the proposed expert also serves as a party's attorney. There is a basic and unavoidable tension between a lawyer's role as an advocate, whose ethical "duty [is] . . . to represent [his] client zealously within the bounds of the law," and the role of an expert, whose value depends on his "detachment and independence." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688–89 (S.D.N.Y. 2003); *see also Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 184 (E.D.N.Y. 2001) ("When expert witnesses become partisans, objectivity is sacrificed to the need to win.").

While Mr. Barker is not counsel of record for PDVSA in this case, his role as PDVSA's counsel in other, related matters precludes any possibility of him offering objective and reliable opinions to the Court. In particular, Mr. Barker is an equity partner at the law firm A&P, where he advises "clients that seek to send and receive payments through financial institutions, on OFAC compliance obligations." Barker Report at 1–2. Critically, Mr. Barker admitted to having "provided OFAC compliance advice" for "PDVSA under the direction of the ad hoc board appointed by President Guaidó and the Central Bank of Venezuela under the direction of the ad hoc board appointed by President Guaidó" as well as other "entities owned and controlled by the

16

Bolivarian Republic of Venezuela."[11]   *Id.* (emphasis supplied); *see also* **Exhibits A-D** (each disclosing that A&P advised Venezuela's "Special Attorney General with respect to OFAC sanctions and preparing requests for specific licenses and other similar actions from OFAC").   Mr. Barker's expert report, and anticipated testimony, almost certainly covers topics and areas of inquiry that Mr. Barker analyzed and advised upon as PDVSA's lawyer-advocate.

As this Court held in *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004), "[i]t would be most inappropriate to permit [Mr. Barker] now to testify as an expert witness about the very matters he helped develop as a lawyer-advocate."   *Id.* at 688. Indeed, because of his role as an advocate of PDVSA, Mr. Barker cannot "now testify with the detachment and independence that one would expect from an expert witness offering views as a professional."   *Id.* at 688–89 (excluding expert testimony and holding that "plaintiffs have gone too far, for they seek to call as a witness someone who has acted as their attorney, with a 'duty . . . to represent [his] client[s] zealously within the bounds of the law.'").

The Court should therefore exercise its discretion and, pursuant to Rule 702, preclude PDVSA from introducing the Barker expert report (and for that matter the Amended Barker Report, as hereinafter defined) or calling Mr. Barker to testify as an expert witness at trial.   *See Public Patent Found., Inc. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 801 F. Supp. 2d 249, 253 (S.D.N.Y. 2011) (precluding proposed testimony of expert who had served as counsel for

---

[11] Mr. Barker also testified under oath that A&P has represented Venezuela and related entities since at least 2008, and likely "much earlier than that."  In fact, according to A&P's bi-annual Foreign Agents Registration Act (FARA) filings, dated July 2019 to January 2021, and attached hereto as **Exhibits A-D**, since July 2019, A&P has collected more than $6 million in fees from the Bolivarian Republic of Venezuela, PDVSA, and the Central Bank of Venezuela, in connection with contractual and legal matters, including advising such clients in multiple litigations and arbitration proceedings and with respect to OFAC sanctions. As an equity partner at A&P, and owner of the firm, Mr. Barker benefits from the firm's ongoing relationship with Venezuela, PDVSA, and related entities on three unique levels. *First*, all equity partners, like Mr. Barker, benefit when these entities retain or continue to employ the equity partner's firm and pay it to perform legal services. *Second*, these clients pay A&P for specific time billed by Mr. Barker on their matters.  *Third*, Mr. Barker's yearly compensation is based upon the number of hours that he works, which includes more than 31 hours spent on Venezuela-related matters.  *See* Barker Dep. Tr. at 30–39.

17

plaintiff on the grounds his "testimony could 'hardly be considered independent of his clients due to his role as attorney'"); *Ziggity Sys., Inc. v. Val Watering Sys.*, 769 F.Supp. 752, 807 (E.D. Pa. 1990) ("[An attorney with] a direct interest in the . . . case . . . lacks credibility from that deficiency only."); *Cacciola*, 127 F. Supp. 2d at 184 (precluding proposed testimony and holding "[w]hen expert witnesses become partisans, objectivity is sacrificed to the need to win.").

### B. PDVSA's Submission of an Amended Expert Report Three Months After the Expert Discovery Deadline is Highly Prejudicial and an Improper Attempt to Take a Second Bite at the Apple

On March 19, 2021—***three months*** after the close of expert discovery—PDVSA submitted an amended expert report from its expert, Mr. Barker, (the "Amended Barker Report"). PDVSA's counsel has represented that the purpose of the Amended Barker Report is to cover topics addressed by Mr. Barker during the course of his deposition, but that were not included in Mr. Barker's original expert report. The Amended Barker Report, however, is an improper attempt by PDVSA to take a second bite at the apple with the benefit of D-R's expert's opinions.

As a threshold matter, by way of the Amended Barker Report, PDVSA attempts to introduce new opinions on topics that Mr. Barker knew were relevant but omitted from his original report. Specifically, the Amended Barker Report analyzes FAQ 514 and GL 9—neither of which were addressed in the original Barker report, but which Mr. Barker admitted he had knowledge of. *See* Barker Dep. Tr. at 12:16–21 (conceding that Mr. Barker "was aware that the earlier GL 9 existed" at the time he signed his expert report, but did not did not make any reference to same); 15:10-12 ("I could have explained better why GL 9 did not apply . . . It would have been useful to explain better" in the expert report.).

Against this backdrop, neither the Federal Rules nor case law interpreting them allow the supplemental submission that PDVSA is now seeking to make. Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 26(e) "does not grant a license to supplement a previously filed expert report

because a party wants to" and "experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions." *Richman v. Respironics, Inc*., No. 08-cv-9407, 2012 U.S. Dist. LEXIS 206345, at *29–30 (S.D.N.Y. Mar. 13, 2012) (noting "[i]f that were the case, there would never be any closure to expert discovery, and parties would need to depose the same expert multiple times"). Similarly, New York federal courts continuously hold that if an expert, in supplementing his or her report, "does not rely [on] any information that was previously unknown or unavailable to him," it is not an appropriate supplemental report under Rule 26. *Lidle v. Cirrus Design Corp*., No. 08-cv-1253, 2009 WL 4907201, at *5–6 (S.D.N.Y. Dec. 18, 2009); *see* FAQ 514 (released July 19, 2018); GL 9 (dated January 28, 2019). Accordingly, PDVSA should not be permitted to submit a supplemental report that is not based on any new facts or occurrences and thus essentially amounts as a cure of the gap in Mr. Barker's original report.

### C. PDVSA's Attempt to Subpoena Trial Testimony From D-R's General Counsel is Procedurally and Substantively Improper

During the course of the parties' pre-trial meet-and-confers, PDVSA's counsel informed D-R that PDVSA intends to call D-R's general counsel, Denise Hansen, as a witness at trial. While PDVSA has yet to formally subpoena Ms. Hansen's testimony at trial, given that Your Honor's Individual Practices request that the parties brief any evidentiary issues likely to arise at trial, D-R thought it best to preview for the Court that it anticipates seeking to quash the subpoena on several grounds.

*First*, Ms. Hansen is not within the geographical limits of Fed. R. Civ. P. 45. Pursuant to Fed. R. Civ. P. 45(c)(1)(A)-(B), a subpoena can only command a person to attend a trial within "100 miles of where the person resides" or, if that person is a party or party officer, where the person "resides, is employed, or regularly transacts business in person in the state." Fed. R. Civ.

P. 45(c) advisory committee's note to 2013 amendment; *Saget v. Trump*, 351 F. Supp. 3d 251, 253 (E.D.N.Y. 2019) (following the 2013 amendments to Fed. R. Civ. P. 45, "[t]he 100-mile and state radii now apply to party and non-party alike").  Ms. Hansen is a Texas resident, works at Siemens' corporate offices in Houston, and does not regularly transact business in person in New York.  PDVSA is therefore unable to command Ms. Hansen's testimony at trial.[12]  *See Perez v. Progenics Pharmaceuticals, Inc*., No. 10–CV–08278, 2015 WL 4111551, at *2 (S.D.N.Y. June 24, 2015) (denying plaintiff's request to call defendant's board member, who lived in Chicago, as a live witness at trial); *Havens v. Maritime Commc'ns/ Land Mobile, LLC*, No. 11-993, 2014 WL 2094035, at *2–3 (D.N.J. May 20, 2014) (granting motion to quash subpoenas that sought to require corporate officers to travel from California to New Jersey to provide trial testimony).

*Second*, PDVSA will have an opportunity at trial to examine other D-R witnesses about matters relevant to this action, including the topics that PDVSA seeks to inquire of Ms. Hansen.  During the course of discovery, D-R proffered Erik Scherzer, Head of Credit and Collections in the Americas for D-R, as the company's Fed. R. Civ. P. 30(b)(6) witness.  Mr. Scherzer has already testified, and will be prepared to testify at trial, about the same subject matter PDVSA offers as justification for Ms. Hansen's testimony—namely, what transpired between Citi and D-R with respect to Citi's manual processing program.  *See* Scherzer Dep. Tr. at 11:24–25 (affirming that Mr. Scherzer is "familiar" with Citi's alleged rejection and/or non-receipt of PDVSA's funds).

---

[12]  Indeed, the geographical limitations of Fed. R. Civ. P. 45 apply regardless of whether Ms. Hansen is commanded to attend the trial in person or via videoconference.  *See Broumand v. Joseph*, 2021 WL 771387, at *10 (S.D.N.Y. 2021) ("Rule 45(c) [] speaks, not of how far a person would have to travel, but simply the location of the proceeding at which a person would be required to attend.").  As this Court reasoned in *Ping-Kuo Lin v. Horan Capital Mgmt. LLC*, Fed. R. Civ. P. 43(a), which permits a district court in certain circumstances to allow "testimony in open court by contemporaneous transmission from a different location," "does not operate to extend the range or requirements of a subpoena." No. 14-cv-5202, 2014 WL 3974585, at *1 (S.D.N.Y. Aug. 13, 2014) (Stanton J.) (finding a respondent located more than 100 miles away from New York City could not be compelled to testify, even by videoconference, at an arbitration hearing in New York City).  Although *Lin* concerned an arbitral subpoena, the Court's analysis is still instructive because "[a]rbitral subpoenas for witness testimony are enforced in the same manner provided by law for securing the attendance of witnesses . . . in the courts of the United States." *Id*. at *2.

There is no indication that Ms. Hansen has evidence that may not be elicited through more appropriate means and in fact would only be cumulative of testimony obtained from Mr. Scherzer as well as Citi's corporate representative.  *See* Fed. R. Evid. 403; *Ello v. Singh*, No. 05-cv-9625 (KMK), 2006 WL 2270871, at *6 (S.D.N.Y. Aug. 7, 2006) ("A lawyer's testimony is 'necessary,' *only* if there are no other witnesses to the circumstances at issue.").

*Third*, PDVSA's counsel has indicated that it intends to examine Ms. Hansen about internal D-R communications between Ms. Hansen and other D-R employees.  As General Counsel for Siemens Energy Inc., D-R's parent corporation, Ms. Hansen's testimony regarding her internal communications at D-R risks disrupting the attorney-client privilege and work product doctrine. *Pearlstein v. Blackberry Ltd.*, No. 13-cv-07060, 2019 WL 1259382, at *4 (S.D.N.Y. Mar. 19, 2019) (Attorney-client privilege extends "to a company's communications with its external and in-house lawyers.").  Indeed, it will take significant time and judicial resources at trial to parse through D-R's privilege objections with respect to Ms. Hansen's testimony.  *See Feitshans v. Kahn*, No. 06-cv-2125, 2008 U.S. Dist. LEXIS 11330, at *18–20 (S.D.N.Y. Feb. 6, 2008) (holding that in-house counsel for the defendants could not be called as a trial witness by plaintiff because "such an exercise is both unnecessary and a waste of the Court's time and resources where [the] testimony is not essential, potentially duplicative, and largely protected under the attorney-client privilege").  In short, the probative value of Ms. Hansen's cumulative testimony is far outweighed by the risk of encroaching on privilege and time spent litigating potential privilege objections.  *See* Fed. R. Evid. 403 (relevant evidence may still be excluded if its probative value is substantially outweighed by risk of "undue delay" or "wasting time").

### D.  Additional Evidentiary Objections

As set forth in the Consent Pre-Trial Order, D-R will object to certain trial exhibits designated by PDVSA on the following grounds: (i) hearsay; (ii) authenticity; (iii) lack of

foundation; (iv) cumulative; (v) relevance; (vi) prejudice; and (vii) Fed R. Evid. 102.

D-R will also object to any attempt by Citi's representative, Raymond Romano, to testify as to whether Citi would have processed payments from PDVSA.  To the extent such testimony purports to be based on out-of-court statements, the testimony is inadmissible hearsay.  To the extent such testimony does not purport to be based on out-of-court statements, the testimony is "unfounded speculation about [another person]'s state of mind [that] . . . [is] not . . . admissible." *See* Fed. R. Evid. 701(a) (requiring such non-factual lay testimony to be "rationally based on the witness's perception," not unfounded speculation); Fed R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

## VI.   CONCLUSION

For all of the foregoing reasons, and based on the facts to be established at trial, judgment should be entered in favor of D-R on its claim for breach of contract against PDVSA.

Dated:   New York, New York
         March 29, 2021

REED SMITH LLP

By:   */s/ Jordan W. Siev*
      Jordan W. Siev
      Geoffrey G. Young
      Nicole Lech
      599 Lexington Avenue
      New York, NY  10022
      Tel. (212) 521-5400
      Fax. (212) 521-5450

      *Attorneys for Plaintiff*