UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DRESSER-RAND COMPANY, | |
| Plaintiff, | |
| -against- | Case No.: 1:19-cv-002689-LLS |
| PETRÓLEOS DE VENEZUELA, S.A. and PDVSA PETRÓLEO, S.A., | |
| Defendants. | |

**DEFENDANT PETRÓLEOS DE VENEZUELA, S.A'S POST-TRIAL BRIEF**

Date: October 15, 2021

HOGAN LOVELLS US LLP
Dennis H. Tracey, III
Matthew Ducharme
390 Madison Avenue
New York, NY 10017
Tel: (212) 918-3000
Fax:(212) 918-3100
dennis.tracey@hoganlovells.com
matthew.ducharme@hoganlovells.com

Richard C. Lorenzo (pro hac vice)
600 Brickell Avenue, Suite 2700
Miami, FL 33131
Tel: (305) 459-6500
Fax:(305) 459-6550
richard.lorenzo@hoganlovells.com

*Counsel for Defendants Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A.*

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................3

    I.    Payment In Accordance with the Terms of the Note Was Objectively
        Impossible ...................................................................................................6

    II.    PDVSA Took All Reasonable Steps To Pay D-R ....................................................9

        A.    PDVSA Attempted to Pay D-R on Three Separate Occasions ...................9

        B.    PDVSA Proposed Alternative Means of Payment, But None Were
               Successful ................................................................................................10

    III.    Alternative Methods of Payment Would Have Failed Because the
         Modification of the Third Interest Payment Date Rendered the Note
         Prohibited New Debt...............................................................................................13

        A.    U.S. Sanctions Made Payment under the Note Impossible ......................14

              i.    Payment Under the Note is Prohibited Under E.O. 13808
                  after the Parties Agreed to Modify the Terms of the Note ............14

              ii.    Rice's Testimony that OFAC Would Not View the  Note as
                  Prohibited New Debt Lacks Credibility........................................18

              iii.    Payment Under the Note is Also Prohibited by E.O. 13850..........21

        B.    Payment Under The Note Was Also Impossible Because No Bank
            Was Willing To Process Payments From PDVSA Under The
            Circumstances Here ................................................................................22

        C.    D-R Did Not Present Any Credible Evidence that Any Bank
            Would Have Processed a Payment from PDVSA Under the Note............25

CONCLUSION....................................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chevron Phillips Chem. Co. v. Kingwood Crossroads, L.P.*,
   346 S.W.3d 37 (Tex. App. 2011) ................................................................4

*Hammond v. Toy Indus. Ass'n, Inc.*,
   8 F. Supp. 3d 484 (S.D.N.Y. 2014) ...........................................................8

*Harriscom Svenska, A.B. v. Harris Corp.*,
   3 F.3d 576 (2d Cir.1993)...........................................................................4, 9

*Kel Kim Corp. v. Cent. Mkts., Inc.*,
   70 N.Y.2d 900 (1987) ................................................................................3

*Levy v. Young Adult Inst., Inc.*,
   No. 13-CV-2861 (JPO)(SN), 2016 WL 6092705 (S.D.N.Y. Oct. 18, 2016).......................3, 4

*Loc. 338, RWDSU v. Farmland Dairies, Inc.*,
   No. 02CIV.2705(LTS)(HBP), 2003 WL 1213422 (S.D.N.Y. Mar. 14, 2003) ....................3, 4

*N.Y. Soc'y for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for
   Special Surgery v. Wright Med. Tech., Inc.*,
   No. 15-CV-2871 KBF, 2015 WL 4508358 (S.D.N.Y. July 24, 2015) ....................................3

*Organizacion JD Ltda. v. U.S. Dep't of Just.*,
   18 F.3d 91 (2d Cir. 1994)...........................................................................4

*RW Holdings, LLC v. Mayer*,
   131 A.D.3d 1228 (2d Dep't 2015) .............................................................4

*United States v. Bedford Assocs.*,
   548 F. Supp. 732 (S.D.N.Y. 1982) ...........................................................9

**Other Authorities**

Restatement (Second) of Contracts § 261 (1981) ..................................................3, 4, 9

## **INTRODUCTION**

At its core, this case boils down to one question:  Was payment under the Note Agreement entered into by Dresser Rand Company ("D-R") and Petróleos de Venezuela, S.A. ("PDVSA") rendered impossible after the imposition of U.S. sanctions against PDVSA?  As the evidence presented at trial demonstrated, the answer to this question is unequivocally "Yes" for two independent reasons.  First, payment was impossible because the parties agreed in writing to modify the due date for the third interest payment, which rendered the Note prohibited "new debt" under U.S. sanctions.  Second, the evidence showed that following the imposition of sanctions, financial institutions were unwilling to process even permitted payments from PDVSA for internal risk tolerance reasons.

To support its impossibility defense, PDVSA is required to prove that it took all reasonable steps to make payment, and that payment was nevertheless impossible.  PDVSA clearly met its burden.  PDVSA presented evidence that its first two payments (prior to sanctions) were paid without difficulty; that it attempted on at least three occasions to make the third payment; that each of the attempts was unsuccessful; and that efforts to avoid sanctions provided fruitless.  No bank, not even D-R's bank Citibank—the only bank designated to receive payment under the Note— was willing to process the payments based on their internal risk appetites.  PDVSA presented the testimony and policies of two banks that vividly illustrated the unwillingness of banks to risk a sanctions penalty by participating in transfers of funds from a sanctioned party.

In stark contrast to PDVSA's extensive evidence of financial institutions' unwillingness to transfer PDVSA funds, D-R *did not call a single witness or present any credible evidence* that would support a finding that *any bank* was willing to process PDVSA funds.  Instead, D-R offered the testimony of an expert witness, Stephanie Rice ("Rice"), to make all of the arguments for which

D-R lacked any evidence.  For example, instead of presenting any documents or testimony from JPMorgan Chase ("JPMorgan") concerning whether JPMorgan would have processed payments from PDVSA under the Note, D-R introduced the wholly speculative testimony of Rice that JPMorgan would have processed the payments.  Instead of actual evidence of Office of Foreign Asset Control ("OFAC") guidance, D-R introduced hearsay testimony from Rice concerning generalized, undocumented telephone conversations several years earlier relating to unspecified transfers.

Indeed, D-R could have sought written guidance from OFAC on whether the payments on the Note were permitted under existing sanctions regulations, but apparently never did.  In response to PDVSA's trial subpoena seeking such communications, D-R tried to conceal its failure to contact OFAC by refusing to turn over its communications with OFAC on the grounds that doing so would be "unduly burdensome," but then, in a complete about face, D-R admitted on the first day of trial that no such communications with OFAC existed.

If it were true, as D-R's testifying expert claims, that OFAC would not have viewed the Note as prohibited under U.S. sanctions, and that there were multiple banks that would have processed a payment from PDVSA under the Note, D-R would have called those banks to testify at trial.  But they did not.  Indeed, it speaks volumes that D-R could not find even a single bank to testify at trial that it would have processed payment from PDVA under the Note.  D-R's failure to present any bank testimony (or even documents) can only mean one thing: payment under the Note was impossible, and D-R knew that any evidence it unearthed from third-parties or elsewhere would only lend support to PDVSA's defense.  Thus, the bank testimony presented by PDVSA is unrebutted, and demonstrates conclusively that payment under the Note was impossible after the imposition of U.S. sanctions.

## **ARGUMENT**

A party's duty to perform under a contract is discharged when, after the contract is made, performance is made impracticable by "the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made."  Restatement (Second) of Contracts § 261 (1981).  This rule provides relief in the event that unforeseeable circumstances beyond the control of the parties make it impossible to perform under the contract.  *See Kel Kim Corp. v. Cent. Mkts., Inc.,* 70 N.Y.2d 900, 902 (1987) ("[T]he impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract."); *see also Loc. 338, RWDSU v. Farmland Dairies, Inc.*, No. 02CIV.2705(LTS)(HBP), 2003 WL 1213422, at *4 (S.D.N.Y. Mar. 14, 2003) ("Generally, the excuse of impossibility of performance is limited to the destruction of the means of performance by an act of God, Vis major [a greater or superior force; an irresistible force], or by law.") (internal quotations and citations omitted).

A party seeking to establish the impossibility or impracticability defense must demonstrate that "(1) an event made the performance impracticable; (2) the non-occurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes." *N.Y. Soc'y for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery v. Wright Med. Tech., Inc.*, No. 15-CV-2871 KBF, 2015 WL 4508358, at *2 (S.D.N.Y. July 24, 2015) (citing the Restatement (Second) of Contracts § 261 (1981)).

The implementation of a domestic or foreign governmental regulation or order is an event which may destroy the means of performance and lead to impossibility or impracticability.  *See Levy v. Young Adult Inst., Inc*., No. 13-CV-2861 (JPO)(SN), 2016 WL 6092705, at *10 (S.D.N.Y. Oct. 18, 2016) (citing Restatement (Second) of Contracts § 264).  "The fact that it is still possible

3

for a party to perform if that party is willing to break the law and risk the consequences does not bar the party from claiming discharge." *Id.* (citing Restatement (Second) of Contracts § 264, cmt. a) (internal quotations removed).  In the case of intervening governmental activities causing impossibility, the party seeking to excuse its performance must show that the government action was unforeseeable, *see RW Holdings, LLC v. Mayer*, 131 A.D.3d 1228, 1230 (2d Dep't 2015) (collecting cases), and that it did not cause or fail to prevent the governmental action, *Organizacion JD Ltda. v. U.S. Dep't of Just.*, 18 F.3d 91, 95 (2d Cir. 1994).

Although this rule is often framed in terms of impossibility, "it has long been recognized that it may operate to discharge a party's duty even though the event has not made performance absolutely impossible."  Restatement (Second) of Contracts § 261, cmt. d.  Accordingly, in order to show that it took "virtually every action within its powers to perform its duties under the contract," *Local 338, RWDSU*, 2003 WL 1213422, at *4, a party need not show that it took every action that had only a remote chance of succeeding.  *See Harriscom Svenska, A.B. v. Harris Corp.*, 3 F.3d 576 (2d Cir.1993) (finding that failure of radio products exporter to use its Indian licensee to get around changes to the Arms Export Control Act that blocked sales to Iran or to apply for an export permit did not undermine the impracticability defense because to violate the government's rules "would have been unusually foolhardy and recalcitrant").  Highly uncertain actions and actions which depend on the agreement of third parties are not required to establish an impossibility defense.  *See Chevron Phillips Chem. Co. v. Kingwood Crossroads, L.P.*, 346 S.W.3d 37, 60 (Tex. App. 2011) (finding that party's failure to litigate and win against a third party or to enter into indemnity or settlement agreements with other third parties did not undermine its impossibility defense where it tried other methods for months to perform).

4

At trial, PDVSA showed how certain unforeseeable and undemocratic actions taken by the illegitimate regime of Nicolás Maduro led to U.S. sanctions that made it impossible for PDVSA to perform its payment obligations under the Note Agreement. Specifically, in March 2017, two months after the parties entered into the Note Agreement, the Maduro-controlled Supreme Court of Venezuela divested the democratically-elected National Assembly of legislative power, and then, in August 2017, Maduro established an illegitimate Constituent Assembly, which usurped the power of the democratically elected National Assembly. JX-41; Trial Transcript (Tr.") 335:15-25; 336:20-22 (Barker).[1] These events, combined with reports of atrocious human rights abuses, persecution of political opponents, and other antidemocratic actions, prompted President Trump to issue Executive Order 13808 ("E.O. 13808") on August 25, 2017. JX-41. The issuance of E.O. 13808, as well as the news of Maduro's power grab and human rights abuses, caused banks worldwide to develop sanctions compliance and risk tolerance policies that severely limited their abilities to process transactions involving entities related to the government of Venezuela, including PDVSA. *See, e.g.*, Tr. 149:15-21; 165:14-166:10 (Romano) (testifying about Citibank's policy changes in reaction to the events in Venezuela).

As shown at trial and as detailed below, these events made it impossible for PDVSA to make payments to D-R under the Note Agreement. The impossibility defense therefore excuses PDVSA's performance until such time as the sanctions orders are lifted and the bank policies are changed.

---

[1] References to "JX-__" are to the Joint Trial Exhibits.

I.   **PAYMENT IN ACCORDANCE WITH THE TERMS OF THE NOTE WAS OBJECTIVELY IMPOSSIBLE**

The evidence at trial indisputably showed that prior to the original due date of the third interest payment—October 20, 2017—Citibank implemented a risk appetite policy that rendered any further payment by PDVSA under the Note impossible.

Under the Note Agreement, PDVSA was required to make payments by wire transfer into D-R's Citibank account or to send a check to D-R's Houston office.  Agreed Findings of Fact, Dkt. No. 121 at 4, ¶ 17; JX-01 at 17, 57.  D-R's preferred method of receiving payment was by wire transfer, and D-R never designated another bank to receive payment under the Note.  Tr. 17:8-12; 62:14-17 (Scherzer).  Accordingly, PDVSA was, and still is, obligated by the Note to direct its payments to D-R's Citibank account.

Prior to August 2017, PDVSA had no problems paying into D-R's Citibank account. PDVSA promptly made the first two payments due under the Note in April and July 2017, and Citibank accepted both without issue.  Agreed Findings of Fact, Dkt. No. 121 at 1, ¶ 4; Tr. 49:7-50:23 (Scherzer).  But, in August of 2017, as noted above, the illegitimate Maduro government replaced the democratically-elected National Assembly with the Constituent Assembly, which prompted the imposition of U.S. sanctions and created a risk of financial and reputational harm for banks that continued to process transactions involving the Venezuelan government and entities under its control, like PDVSA.  Tr. 165:23-166:10 (Romano); Tr. 335:21-336:10 (Barker); JX-41.

In reaction to these events, Citibank implemented a new policy with regard to payments involving PDVSA.  Tr. 165:14-18 (Romano).  Under that policy, Citibank would no longer process any transactions with PDVSA unless it understood the transactions and whether they met Citibank's requirements and expectations in advance.  Tr. 149:15-21 (Romano).  In order to gain the requisite understanding of upcoming transactions with PDVSA, Citibank offered its top clients

a process through which they could provide certain information on the transactions and have them preauthorized for manual processing.  *See* JX-16 at 12 (email offering Siemens preauthorization process); Tr. 57:16-19 (Scherzer) (agreeing that Siemens was offered the process for being a good client).  Citibank was unequivocal that, without this preauthorization, it would not accept a payment from PDVSA.  Tr. 150:10-13 (Romano).

Citibank informed D-R, through its parent company, Siemens, of this policy on September 25, 2017, and offered it the option of preauthorizing payments for manual processing by signing a "Sanctions Compliance Certification."  JX-16 at 12.  D-R was well aware of this policy—on multiple occasions, Citibank warned D-R in clear and unambiguous language that if it did not sign the Certification, transfers from PDVSA would be rejected.  JX-16 at 6, 8, 11-12.  Nevertheless, D-R dragged its feet, and did not even respond to Citibank's offer for nearly a month—after the October 20, 2017 deadline for PDVSA to make the third interest payment had passed.  JX-16 at 10-11.  D-R continued to ignore Citibank's entreaties, missing multiple deadlines set by Citibank for completing the requisite paperwork:  D-R did not sign the certification by the initial deadline of September 29, it missed an extended deadline of November 10, and it missed a final deadline of November 17, all despite several email reminders from Citibank.  JX-16 at 6-12.  D-R finally indicated its interest in preauthorization on November 18, and Citibank attempted to accommodate D-R despite the expiration of the multiple prior deadlines.  JX-16 at 4-5.  Citibank also accommodated D-R's requests for changes in the certification, although it had an internal policy, which it had previously communicated to Siemens, that the language in the agreement was not for negotiation.  JX-16 at 3-5.  Yet, after all of that negotiation and months of delay (during which PDVSA unsuccessfully attempted to make a payment on November 21), D-R never completed the paperwork.  Tr. 150:7-9 (Romano).

7

The reason, according to D-R, is that Citibank told D-R that "even if the documents were signed, the payments would not make it to the Siemens entities accounts [because] Citibank's compliance department would hold them up."  Tr. 83:20-24 (Petruzelli); *see also* Tr. 59:4-17 (Scherzer).  But even if D-R believed that Citibank would likely have rejected the payments from PDVSA, D-R's failure to even attempt to obtain pre-authorization is inexcusable.  As  Scherzer testified at trial, while it seemed unlikely, D-R cannot know for sure whether or not Citibank would have processed PDVSA payments because D-R never submitted the paperwork.  Tr. 40:25-41:6 ("Q:  Is it your understanding that the certification process that was proposed by Citi would have led to Citibank accepting the payments from PDVSA?  A:  I don't know. It is because we never finished it. However, at some point along the line we came to understand that Citibank was likely not going to accept payment from PDVSA, regardless of whether the certification was in place.") (Scherzer).   Under well-settled caselaw, a party that hinders performance under a contract discharges the other party from its obligation to perform.  *See, e.g.*, *Hammond v. Toy Indus. Ass'n, Inc.*, 8 F. Supp. 3d 484, 496 (S.D.N.Y. 2014) ("[A] promisee who prevents the promisor from being able to perform the promise can not maintain suit for nonperformance; he discharges the promisor from duty.") (internal citation omitted); *United States v. Bedford Assocs.*, 548 F. Supp. 732, 737 (S.D.N.Y. 1982) (holding that it is a "well-settled principle that where one of the parties to a contract makes performance by the other materially more difficult or expensive, the latter will be discharged").

In any event, the evidence is undisputable that Citibank's policy—and D-R's failure to complete the required compliance documents—made it impossible for PDVSA to make the payments as required under the Note Agreement.  Indeed, on February 14, 2018, Citibank rejected

PDVSA's attempted transfer of the third interest payment on the basis of its risk appetite policy. JX-31; Tr. 161:5-162:1 (Romano).

## II.     PDVSA TOOK ALL REASONABLE STEPS TO PAY D-R

PDVSA did everything reasonably within its power to make the required payments under the Note Agreement.  *See* Restatement (Second) of Contracts § 261, cmt. d (a party need not establish that performance was "absolutely impossible"); *see also Harriscom Svenska, A.B.,* 3 F.3d at 579-81 (recognizing that a party can still maintain an impossibility defense even without having pursued certain theoretically possible avenues of performance).  In fact, the evidence at trial demonstrated that PDVSA was significantly more proactive in trying to work with its banks to process the payments than was D-R, who failed to timely communicate with Citibank and complete necessary paperwork, and who failed to propose a single reasonable alternative to paying Citibank. PDVSA, on the other hand, attempted wire transfers on three separate occasions, and as those wire transfers were rejected under various banks' risk appetite policies, PDVSA reached out to D-R to propose alternative methods of payment, though none were ultimately feasible.

### A.     PDVSA Attempted to Pay D-R on Three Separate Occasions

PDVSA made at least three attempts to transfer the third interest payment to D-R.  Tr. 40:13-15 (Scherzer) ("It's my understanding that at least three times PDVSA tried to pay us at Citibank. And we, as the company, never received any of those payments.").

The first was on November 21, 2017 from PDVSA's China CITIC Bank ("China CITIC") account.  JX-10; JX-11.  China CITIC sent the funds to Deutsche Bank, the intermediary bank, but Deutsche Bank rejected the payment based on its internal risk appetite policy.  JX-10; JX-14 at 4; Tr. 307:13-23 (Brogan).  In making that determination, Deutsche Bank applied its Venezuela Decision Matrix.  JX-65.  That Matrix calls for the rejection of any transaction that (1) involves a government of Venezuela-related entity on either side, (2) has a U.S. nexus, (3) does not involve

a Deutsche Bank client, and (4) has an unclear purpose.  JX-65.  Deutsche Bank rejected PDVSA's first payment attempt because it met each of these criteria: (1) PDVSA is Venezuelan government-related entity; (2) D-R is a U.S. company and the payment was in U.S. dollars; (3) neither PDVSA nor D-R is a Deutsche Bank client; and (4) the purpose of the payment was unclear to Deutsche Bank.  Tr. 311:16-312:23 (Brogan).

PDVSA's second attempt was on January 31, 2018, this time from its Dinosaur Merchants Bank Limited/ZumaBank Corporation ("DMBL") account.  JX-25.  Again, Citibank never received the funds as the transfer was rejected by the intermediate bank.  Tr. 159:20-160:25 (Romano); JX-27; JX-28; JX-32 at 2.  But even if Citibank had received the funds, it would have rejected the payment based on its internal risk appetite and D-R's failure to complete the necessary certification.  *See* Section I, *supra*.

PDVSA's third attempt was on February 12, 2018, again through DMBL, which transferred the payment through JPMorgan, the intermediary, to Citibank, which rejected the transfer under its internal compliance and risk appetite policy.  JX-30; JX-31; Tr. 161:5-162:1 (Romano). PDVSA thus made several efforts, including trying different originating banks over a period of several months, to perform exactly as required by the Note Agreement, but, through no fault of its own, was unsuccessful, because banks rejected the payments due to their own internal risk policies.

### B.    PDVSA Proposed Alternative Means of Payment, But None Were Successful

The evidence at trial showed clearly that PDVSA did not want to default on this debt, and that it tried to find alternative ways to make the payment.  In fact, after two different failed transfer attempts to Citibank, PDVSA reached out to D-R to find alternatives.  Tr. 31:18-20; 32:16-19 (Scherzer).  On December 18, 2017, after PDVSA finally learned that "Citibank rejects payments from PDVSA," PDVSA asked D-R for wire instructions for another bank account.  JX-15 at 2-3. In  response,  D-R  provided  the  information  for  an  account  at  Commerzbank  A.G.

("Commerzbank").  JX-15 at 1-2  However, that account was not a D-R account, but an account held by its parent company, Siemens AG ("Siemens").  JX-15 at 2; Tr. 63:7-13 (Scherzer). Payment to Siemens, however, was not a viable option.  First, PDVSA was not authorized under the Note Agreement to make payments to an entity other than the Administrative Agent designated by the Note Agreement.  JX-01 at 17; Agreed Findings of Fact, Dkt. No. 121 at 4, ¶ 17.  Second, PDVSA was not authorized to make payments to an account other than D-R's Citibank account. JX-01 at 17, 57; Agreed Findings of Fact, Dkt. No. 121 at 4, ¶ 17.  And, although Scherzer testified that D-R was willing to make an amendment to allow payment to Siemens's Commerzbank account under the Note Agreement, there is no documentary evidence that D-R took any steps toward such an amendment.  Tr. 63:14-64:3 (Scherzer).  And, in any event, as discussed in Section III.B *infra*, if the parties had executed such an amendment, the Note would be considered "new debt," and payments would be prohibited by E.O. 13808.  *See* Tr. 357:23-358:19 (Barker).

Even absent these complications, there is no evidence that Commerzbank would have processed the PDVSA payments.  Commerzbank, though based in Germany, is still subject to U.S. sanctions when processing transactions with a U.S. nexus.  Tr. 185:21-25 (Rice); Tr. 334:14-23 (Barker).  Commerzbank's internal "Business policy restrictions" for Venezuela prohibits processing of transfers to Venezuelan entities "if there are indications for a connection to the financial system or jurisdiction of the United States," and only allows the processing of transfers from Venezuelan entities if there are no links to the previously-mentioned transactions, which include payments with a connection to the jurisdiction of the United States.  JX-64 at 9.  This policy and Commerzbank's obligation to abide by U.S. sanctions support a strong inference that Commerzbank would not have processed a payment by PDVSA under the Note.  Against this, D-R offers only the speculative testimony of its expert, Rice.  Tr. 206:15-20 (Rice).  But, tellingly,

D-R did not, at the time, ask Commerzbank whether, in light of the sanctions, it would be willing to accept payments from PDVSA. Tr. 64:4-10 (Scherzer). Nor did D-R subpoena documents or call a Commerzbank witness at trial to testify that it would have been willing to accept payment from PDVSA. There is, therefore, no credible evidence in the record that Commerzbank would have accepted payments from PDVSA.

PDVSA also suggested, on February 20, 2018, after its third failed attempt to wire the payment to Citibank, that it could pay D-R in euros from its account with Novobank. JX-33 at 2-3; Tr. 32:7-19, 33:19-34:1 (Scherzer). This suggestion got some traction when D-R agreed to open an account with Novobank and accept payments in euros, JX-33 at 1, but ultimately, this proposal turned out not to be viable for at least three reasons.

First, D-R's legal department determined that "it will be necessary to amend [the Note Agreement] in order to proceed with payments in a currency other than US Dollars." JX-33 at 1; Tr. 72:9-11 (Scherzer). Executing this amendment, as discussed in Section III.B *infra*, would cause the debt to be considered "new debt," and so would guarantee that payments on the Note would be prohibited under E.O. 13808. *See* Tr. 358:20-359:15 (Barker).

Second, D-R never informed PDVSA when it finally opened an account at Novobank, seven months after PDVSA made the suggestion, and D-R never provided PDVSA with the account information necessary to initiate a payment to that account. Tr. 35:6-9 (Scherzer). PDVSA had no way of making a payment to an account it did not know about. Tr. 65:20-24 (Scherzer).

Third, and finally, making the payment in euros instead of dollars does not solve the problems created by the sanctions orders. Sanctions apply to payments with a U.S. nexus, no matter what currency they are in and no matter where the bank handling the payments is located.

*See* Tr. 185:21-25 (Rice); Tr. 334:14-23 (Barker). D-R is a U.S. company and is the ultimate beneficiary of the payments under the Note, and so there would be a U.S. nexus for any payment under the Note. And thus, regardless of the currency, there was a risk that sanctions would apply to any payment under the Note. Tellingly, Scherzer admitted at trial that he is not aware of anyone at D-R ever asking any of its euro-based banks if they would accept payment from PDVSA. Tr. 69:6-14 (Scherzer). At bottom, even if D-R had given PDVSA the information for its Novobank account or any other euro-based account, which it did not, Tr. 35:6-9 (Scherzer), payment under the Note would still have been impossible.

PDVSA exhausted all reasonable options to pay under the Note. It tried to transfer funds to the designated Citibank account on three separate occasions using two different originating banks, and it proposed two alternatives to payment to the Citibank account. None of these efforts panned out because, after the imposition of E.O. 13808, payment under the Note was impossible. At trial, D-R failed to present any credible evidence that there were any viable alternatives to payment that PDVSA could have pursued.

### III.   Alternative Methods of Payment Would Have Failed Because the Modification of the Third Interest Payment Date Rendered the Note Prohibited New Debt

On November 29, 2017, PDVSA wrote a letter asking D-R to change the date of the third interest payment from October 20, 2017 to December 29, 2017, and D-R agreed, as acknowledged in later emails and at trial. JX-13; JX-21 at 1; Tr. 69:22-24; 73:12-17 (Scherzer). Because of this modification to the Note's payment terms, payment under the Note became impossible for two independent reasons: (1) U.S. sanctions prohibited payment under the Note because the parties' agreement created new debt, and (2) regardless of whether or not payment under the Note was prohibited by sanctions, no bank was willing to risk being subject to millions of dollars in OFAC

fines for processing a potentially prohibited payment in exchange for extremely small wire processing fees.

The imposition of U.S. sanctions and the implementation of banks' internal risk policies precluding PDVSA payments are both proper grounds for PDVSA's impossibility defense since they were unforeseen events not caused by PDVSA. The actions of the Maduro regime and the sanctions order that followed shortly afterward were neither foreseen nor guarded against at the time that D-R and PDVSA signed the Note Agreement. The parties signed the Note Agreement in January 2017, before the Maduro-controlled Supreme Court divested the National Assembly of legislative power, and more than seven months before Maduro replaced the National Assembly with the undemocratic Constituent Assembly, which is what prompted the imposition of E.O. 13808. JX-41; Tr. 335:17-336:22 (Barker). These undemocratic actions, which deepened the ongoing humanitarian crisis in Venezuela, could not have been predicted by the parties. JX-41. And PDVSA did not cause the imposition of the sanctions or banks' risk tolerance policies. The U.S. government imposed the sanctions in reaction to undemocratic actions taken by the illegitimate Maduro regime. JX-41; JX-42.

### A. U.S. Sanctions Made Payment under the Note Impossible

#### i. Payment Under the Note is Prohibited Under E.O. 13808 after the Parties Agreed to Modify the Terms of the Note

Section 1(a)(i) of E.O. 13808 prohibits dealings in "new debt with a maturity of greater than 90 days of [PDVSA]." JX-41. E.O. 13808 does not define "new debt," but OFAC published FAQ 553, which answers the question, "For purposes of E.O. 13808, what is 'new debt'?" JX-53. According to FAQ 553—the only written guidance published by OFAC on this topic— "new debt" is defined as follows:

> OFAC considers "new debt" to be debt created on or after August 25, 2017. See FAQ 511 for examples of "debt," which includes loans and extensions of credit.
>
> OFAC does not consider debt that was created prior to August 25, 2017 to be "new debt" for purposes of E.O. 13808 so long as the terms of the debt instrument (including, for example, the length of the repayment period or any interest rate applied) agreed to by the parties do not change on or after August 25, 2017. Such preexisting debt does not need to conform to the 30- or 90-day tenors imposed under E.O. 13808, and U.S. persons may collect and accept payment for such debt regardless of whether the relevant segment of the Government of Venezuela, including PdVSA, pays during the agreed-upon payment period.

*Id.*

Thus, according to the plain terms of FAQ 553, "new debt" is either (1) debt created on or after August 25, 2017, or (2) debt in which the terms of the debt instrument have changed on or after August 25, 2017.  FAQ 553 provides two examples of changes to a debt instrument that would create new debt—"the length of the repayment period or any interest rate applied."  *Id.* These two examples reflect a non-exhaustive list, and the parties agree that there are other changes that would create new debt even though they are not specifically referenced in FAQ 553.  Tr. 219:7-14 (Rice); Tr.338:15-18 (Barker).

Significantly, FAQ 553's prohibition on changes to the terms of debt is unqualified.  It does not indicate that there are any types of changes to a debt instrument that OFAC would view as insufficient to create new debt.  Accordingly, absent further authoritative guidance from OFAC, *any* change to the terms of pre-existing debt must be viewed as potentially sufficient to create new debt.  Tr. 338:12-15; Tr. 341:1-8 (Barker).  Such a standard makes a lot of sense here.  Not only does it have the benefit of creating an easy-to-follow black-and-white rule, but it is also entirely consistent with OFAC policy, which is to prevent creditors from "negotiating away or providing a discount on the debt without the U.S. Government['s] involvement in determining whether for foreign policy reasons it wished to permit [the payment] to go forward."  Tr. 339:19-340:4 (Barker).

15

Applying the FAQ 553 guidelines to this case, the Note initially constituted pre-existing debt because it was issued prior to August 25, 2017, and the parties had not agreed to change any terms.[2]  Tr. 341:18-24 (Barker).  The Note, however, became prohibited new debt on November 29, 2017, because on that date, the parties agreed, in writing, to extend the date of the third interest payment from October 20, 2017 to December 29, 2017.  *See* JX-13; JX-21 at 1; Tr. 69:22-24 (Scherzer).  As a result, the parties had agreed to change the terms of the Note in three respects: (1) the deadline for the third interest payment was extended; (2) PDVSA went from being in default to not being in default; and (3) the default interest rate no longer applied to the third interest payment.  Tr. 341:25-343:6 (Barker).

As  Mr. Scherzer confirmed at trial, D-R granted PDVSA an extension of 70 days to make the third interest payment.  Tr. 67:3-8 (Scherzer).  At the time PDVSA requested the extension, PDVSA was already in default because it had not made the third interest payment due on October 20, 2017.  Tr. 73:9-17 (Scherzer).  That being the case, the default interest rate of 8.5% automatically applied to that outstanding payment.  JX-1 at 15-16, Section 2.04.  But after D-R granted the 70-day extension, PDVSA was no longer in default.  *See* Tr. 73:9-17 (Scherzer) (explaining that Dresser-Rand granted the extension because they did not want to "say [to PDVSA], oh, yeah, you're in default.").  And as a result, the 8.5.% default interest rate that automatically applied to the late third interest payment, no longer applied, because the payment was no longer late.  Accordingly, the parties' agreement to extend the third interest payment debt modified the terms of the Note in several respects, and thus created new debt.  Significantly, the modifications

---

[2] Despite the fact that the Note did not become prohibited new debt until November 29, 2017, payment under the Note was still impossible starting from the day E.O. 13808 was issued because, as discussed in Section I *supra*, D-R's bank, Citibank, refused to accept payment from PDVSA starting even before the imposition of U.S. sanctions in August of 2017.

here mirror the very examples provided in FAQ 553—*i.e.,* a change in the length of the payment period and a change to the interest rate.  Tr. 342:3-9, 342:21-343:1 (Barker).

In a desperate attempt to muddy the waters of an otherwise straightforward application of FAQ 553, Rice testified at trial that the agreement to extend the third interest payment date was nothing more than an agreement to accept a late payment from PDVSA, which is expressly allowed under the last sentence of FAQ 553.  Tr. 125:13-17 (Rice).  While there is no dispute that the last sentence of FAQ 553 allows parties to accept late payment on pre-existing debt, that is not at all what occurred here.  D-R did not agree to accept PDVSA's third-interest payment late; rather, it agreed to change the payment date such that payment was no longer considered late at all, and altered the automatic application of default interest.  Tr. 344:8-345:9 (Barker).  The notion that D-R was only agreeing to accept the third interest payment late, and nothing more, fails the straight face test.  A late payment is, by definition, one received after the deadline for payment; here, the parties agreed to *change the terms of the Note* by extending the deadline for payment so that the payment *would not be late.*

Rice's testimony that D-R's agreement was nothing more than a late payment is unsupported by either evidence or logic.  Nowhere does either party refer to the agreement as an acceptance of a late payment.  *See* JX-13; JX-15; JX-21.  Instead,  LaTorre, speaking on behalf of D-R, refers to the agreement as an "extension" to make the third interest payment.  JX-21; Tr. 74:14-25 (Scherzer).[3]  Applying its ordinary meaning, the word "extension" here clearly indicates

---

[3] While the parties at times referred to the agreement to extend the third interest payment date as a "waiver," this has no bearing on the new debt analysis.  For purposes of determining whether a change to the terms of a debt instrument creates new debt, OFAC would not be particularly concerned with whether the change was technically considered a waiver instead of an amendment.  Instead, OFAC would analyze whether the effect of the agreement was that terms of the debt instrument changed.  Tr. 348:3-21 (Barker). If it were the case that a waiver could never be considered a change triggering new debt, this would create an obvious loophole whereby parties could evade sanctions and change the terms of pre-existing debt if they structured the change as a waiver opposed to an amendment.

that D-R was providing PDVSA with additional time to make the third interest payment, meaning that the payment due date had been changed such that PDVSA was no longer in default.  This is consistent with the testimony of  Mr. Scherzer, who stated that the purpose of the agreement was so that PDVSA would not be in default.  Tr. 73:9-17 (Scherzer).

Moreover, if Ms. Rice were correct, any party seeking to extend the terms of repayment could easily evade E.O. 13808.  E.O. 13808 was intended to prevent parties from modifying the terms of existing debt, including specifically extending the payment terms.  If parties seeking to extend credit terms could avoid the "new debt" provisions of E.O. 13808 by simply calling any payments received on the new payment schedule "late payments," then any note's payment terms could be changed without creating new debt, rendering E.O. 13808 meaningless.  This clearly is not consistent with the letter or spirit of E.O. 13808.

### ii.    Rice's Testimony that OFAC Would Not View the Note as Prohibited New Debt Lacks Credibility

Confronted with the reality that FAQ 553 does not place any limitations on the types of changes to debt terms that can create new debt, D-R has tried to create such limitations—none of which are found in any written OFAC guidance—by introducing an ever-evolving array of "opinions" of Ms. Rice.  Rice claims that during telephone calls several years ago to OFAC's hotline, she was informed that only "formal" or "material" changes to a debt instrument would create new debt.  Tr. 133:11-334:11 (Rice).  But Rice's testimony as to what was said during these two phone calls is wholly unreliable.

As an initial matter, Rice's testimony as to what OFAC told her during these phone calls has been inconsistent, seemingly evolving over time to best suit the needs of D-R as it has revised its litigation positions in this case.  For instance, in its pre-trial brief, D-R argued that the Note did not become new debt because it was never "formally" amended.  ECF No. 122 at 12.  During her

deposition, Rice testified that OFAC told her on the hotline that a formal amendment was required in order for a change in terms to trigger new debt. *Id*. At trial, however, Rice changed her story. Rice appeared to abandon her prior position that OFAC told her that a formal amendment was required to create new debt, and instead testified that "it's best to not get hung up on the term 'formal' exclusively, because . . . when OFAC spoke of formal changes to the debt instrument, I believe it was speaking of material changes. I believe the conversation was, in essence, equating formal and material . . ." Tr. 231:6-15 (Rice). But Rice's trial testimony that OFAC informed her of a materiality requirement is directly contradicted by her deposition testimony, in which she specifically stated that she did not discuss any materiality requirement with OFAC during her calls. Tr. 229:3-25 (Rice). The only reasonable inference to be drawn from Rice's conflicting testimony is that her memory of her undocumented phone calls with OFAC has evolved to support D-R's litigation theories, regardless of whether or not OFAC actually provided that guidance on the hotline.

Moreover, Rice does not have any notes or written documentation reflecting the substance of the calls, meaning her testimony describing these calls, which occurred four and seven years ago, respectively, is based solely on memory. Tr. 135:11-16 (Rice). And even if her memory was completely accurate, Rice admitted that advice provided on the OFAC hotline may change over time. Tr. 259:20-260:7 (Rice). Rice does not recall the name of the persons she spoke with during either call. Tr. 134:19-24 (Rice). Rice made these calls in connection with different matters, and thus did not relay to OFAC any of the relevant facts of this case. *See* Tr. 347:1-6 (Barker) (explaining that OFAC needs to know the relevant facts of each case to render effective guidance). And she admitted that she does not recall verbatim what OFAC told her during these calls. Tr. 227:3-11 (Rice).

Given that Rice's phone calls with OFAC are entirely undocumented, and her memory of what was said during the calls is vague and ever-changing, the Court should disregard Rice's testimony as unreliable.  Instead, the Court should look to the written guidance published by OFAC in FAQ 553.  Rice testified at trial that the advice she received over the OFAC hotline was subsequently memorialized in FAQ 553.  Tr. 134:12-14; 259:23-260:7 (Rice).  And thus, by Rice's own admission, the advice she received on the OFAC hotline is duplicative of FAQ 553, meaning that the Court need not look beyond the text of FAQ 553 to determine the meaning of new debt.

Moreover, the text of FAQ 553 provides no support for Ms. Rice's interpretation of E.O. 13808.  Nowhere does it state that changes triggering new debt must be material or memorialized in a formal amendment.  JX-53; Tr. 347:14-348:2 (Barker).  In fact, the words "material" and "formal" are not used at all in FAQ 553.  *Id.*  And looking beyond FAQ 553, Rice admitted at trial that OFAC has never published anything in writing providing that a change in terms has to be either material or reflected in a formal amendment in order for it to create new debt.  Tr. 220:25-221:4; Tr. 230:14-20 (Rice).  If OFAC wanted to implement a materiality limitation as part of its guidance on E.O. 13808, it knows exactly how to do so, and indeed has imposed such limitations in connection with other sanction regimes.  Tr. 340:5-23 (Barker).  That OFAC has never published written guidance establishing a materiality or formal amendment requirement for changes to trigger new debt is clear evidence that no such requirements exist.  Tr. 343:15-344:1 (Barker) ("I believe that there are no qualifiers in [FAQ 553]. This guidance is put out for all parties. This information has to be replicated so everybody can follow the same guidance. There are no restrictions. There is no particularity qualifier in that guidance.").

### iii.    Payment Under the Note is Also Prohibited by E.O. 13850

In addition to being prohibited by E.O. 13808, payment under the Note also became prohibited by E.O. 13850 on January 28, 2019, when OFAC designated PDVSA as Specially Designated National and Blocked Person ("SDN").  Pursuant to E.O. 13850, "[a]ll property and interests in property [of certain Venezuelan persons designated by the Secretary of Treasury] that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person . . . are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in . . . except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order." JX-42.  Accordingly, beginning on January 28, 2019, any payment by PDVSA, in any currency, to Dresser-Rand or to a U.S. bank would be blocked, absent a general or specific license from OFAC.

Contrary to Dresser-Rand's assertion, General License 9, issued on January 28, 2019, did not permit PDVSA to make the requisite Note payments to Dresser-Rand.  General License 9, in relevant part, permits "all transactions and activities . . . ordinarily incident and necessary to dealings in any debt" issued by PDVSA prior to August 25, 2017.  JX-44.  General License 9 did not permit payment under the Note for two reasons.  First, by its express terms, General License 9 does not apply to E.O. 13808, Section 1(a)(i), which is the section of E.O. 13808 that renders the Note prohibited new debt.  JX-44; *see also* Tr. 262:3-7 (Rice) (admitting that General License 9 does not apply to E.O. 13808, Section 1(a)(i)).  As such, payment under the Note continued to be prohibited under E.O. 13808(a)(i) even after the issuance of General License 9.  Second, just like under E.O. 13808, General License 9 authorizes payment of pre-existing debt, but it does not permit payment of new debt.  And so for the same reasons payment is prohibited by E.O. 13808—

*i.e.*, because the agreement to extend the third interest payment date created new debt—payment is also prohibited by E.O. 13850.  Tr. 361:11-16; Tr. 362:9-14 (Barker).

### B. Payment Under The Note Was Also Impossible Because No Bank Was Willing To Process Payments From PDVSA Under The Circumstances Here

As set forth in the preceding paragraphs, the evidence strongly supports the conclusion that the D-R Note was "new debt" and thus subject to OFAC sanctions.  However, the Court need not even reach that issue because—regardless of the actual legality of the payment—the evidence showed that no bank was willing to assume the risk of processing a payment from PDVSA under the circumstances here.  All banks include risk tolerance policies within their sanctions compliance program.  Tr. 172:5-12 (Rice).  Risk appetite policies define the amount of risk a bank is willing to take on in pursuit of business activities associated with any law, rule, or regulation.  Tr. 144:8-12 (Romano).  Under a risk appetite policy, a bank may decide to reject a transaction even if not prohibited by sanctions.  Tr. 172:5-173:3 (Rice).

In order to develop these risk appetite policies, banks balance the costs and benefits of processing certain transactions.  *See* Tr. 351:22-352:8 (Barker).  On one side of the balance, the benefit of processing a given wire transfer, especially as an intermediary, is very low because banks make almost no money from processing these transactions.  Tr. 352:2-3 (Barker).  On the other side of the balance, banks risk significant financial and reputational harm by processing transactions that may be later found to violate sanctions orders.  Tr. 143:16-18 (Romano); 334:24-335:14 (Barker).  Sanctions violations are strict liability—even a bank's good faith effort to comply will not prevent OFAC from imposing potentially millions of dollars in fines for processing sanctioned transactions.  Tr. 335:10-14 (Barker).  Given this high-risk, low-reward balance, most banks are extremely reluctant to process borderline transactions.  *See* Tr. 354:16-22 (Barker) ("I have worked with many financial institutions that have decided not to process

transactions because of their concerns in other sanctions programs about not simply wanting to take on the risk.  You know, for Cuba transactions, Cuba is allowed to have some transactions go forward, but there's practically no bank in the United States that will process that because of the risk appetite.")

The bank policies entered into evidence at trial reflect that banks are highly averse to sanctions risks, as well as other reputational risks associated with processing payments for sanctioned parties.  *See* Tr. 351:11-13; 353:23-354:5 (Barker).  As applicable to this case, banks were unwilling to process transfers involving PDVSA after the imposition of E.O. 13808 on August 25, 2017.  *Id*.  In fact, even before the imposition of E.O. 13808, Citibank decided that it was not going to process most transactions involving PDVSA because of reputational risks stemming from the negative media attention surrounding the actions of the Maduro regime that soon after gave rise to E.O. 13808.  Tr. 165:23-166:23 (Romano).  By the time E.O. 13808 went into effect, Citibank had already decided not to process any transactions from PDVSA without preauthorization from its clients certifying that the transaction complied with all OFAC and anti-money laundering requirements.  JX-16 at 12; Tr. 149:15-21; 150:3-13; 165:23-166:23 (Romano).  Deutsche Bank similarly implemented a decision making matrix that mandated rejection of all payments with a U.S. nexus, that did not involve a Deutsche Bank client, and that had an unclear purpose.  JX-65; Tr. 311:16-312:23 (Brogan).  Under Deutsche Bank's policy, if one of its clients is not involved in the transaction, Deutsche Bank will not even take the time to determine the purpose of the transaction and whether it is barred by the sanctions order; it will simply reject the transaction as too risky.  Tr. 191:13-21 (Rice).

If a bank were willing to consider processing a transaction that carries a risk of violating sanctions, it would have to conduct due diligence to determine whether the transaction was legal.

Tr. 352:12-18 (Barker); *see also* Tr. 201:16-17 (Rice) (testifying that approval of transactions was "based on performing due diligence on the transaction"). Here, that diligence would have included asking whether there had been any changes to the terms of the debt instrument such that the debt at issue would qualify as new debt, and thus be prohibited under E.O. 13808 and E.O. 13850. Tr. 352:15-18 (Barker). In the case of a payment on the Note, D-R and PDVSA would have been required to tell a bank conducting due diligence that the payment date for the third interest payment had been extended. That information would raise a serious red flag for the bank that OFAC might consider the debt at issue to be new debt. Tr. 355:19-356:3 (Barker). At that point, the only way the bank would go forward with the transaction would be to get authorization from OFAC. Tr. 356:2-5 (Barker).

Tellingly, no payment attempt from PDVSA to D-R even made it to the point where a bank conducted due diligence. PDVSA's first attempt to pay, which occurred before the parties modified the third payment date, was rejected by Deutsche Bank without any due diligence because the payment did not involve a Deutsche Bank client. Tr. 240:6-12 (Rice); Tr. 316:21-317:15 (Brogan). Similarly, there is no evidence that Citibank conducted any due diligence on PDVSA's payment attempts. Even though Romano testified that Citibank generally analyzed transactions for sanctions violations before analyzing them under its internal risk policies, Romano also testified that Citibank was never provided the details of the purpose of the transaction with PDVSA, and there is no documentary evidence that Citibank ever determined that the payment did not violate E.O. 13808. Tr. 150:23-151:2, 170:20-171:6 (Romano); Tr. 240:16-19 (Rice) ("Q. Have you seen any evidence that Citibank was aware that the parties had to agree to extend the third interest payment at the time that they reviewed the transaction? A. I'm not aware that Citibank was aware of that, no.").

In sum, the evidence presented a trial makes clear that a payment from PDVSA under the Note would either have been rejected out of hand without any due diligence, as was the case with Deutsche Bank and Citibank, or, it would have been rejected after a bank conducted due diligence and discovered that the parties had agreed to amend the third interest payment date, creating substantial risk that the note would be considered prohibited new debt.  In either scenario, the payment would have been rejected because no bank would have been willing to risk being subject to potentially millions of dollars in OFAC fines in order to make just a few dollars in wire transfer fees.  It simply was not worth the risk, not even for a bank's top client, as exemplified by Citibank's refusal to process PDVSA payments for the benefit of D-R.

> **C.      D-R Did Not Present Any Credible Evidence that Any Bank Would Have Processed a Payment from PDVSA Under the Note**

In the face of the evidence, outlined above, that, after August 25, 2017, no bank would have processed a payment from PDVSA to D-R under the Note, D-R offered only speculative testimony from D-R employees and its testifying expert that some banks would have processed the payments under the Note.  Specifically, D-R's witnesses testified that they believed that PDVSA could have paid D-R at a different bank once it became impossible for PDVSA to pay into Citibank.  Tr. 93:4-19 (Petruzelli); Tr. 70:10-20; 71:23-72:1 (Scherzer) (testifying that D-R could have deposited a check with one of the five to six banks that D-R had relationships with in 2017 and 2018).  Petruzelli said that D-R even had a replacement bank in mind.  Tr. 93:14-19 (Petruzelli).  But, despite claiming that there were at least a handful of banks that would have accepted payment, D-R did not call a single witness from any bank to testify at trial that it would have accepted a payment from PDVSA under the Note.  Presumably, PDVSA could not find a single bank that was willing to testify that it would have accepted payment from PDVSA under the Note.

And so instead, D-R asked its expert, Rice, to offer an opinion as to whether other banks would have processed the payment. Rice opined that both JPMorgan and DMBL had risk policies in place that would have allowed each bank to accept a payment from PDVSA to D-R under the Note. Tr. 188:15-19 (Rice). Her basis for this opinion was the fact that JPMorgan and DMBL each processed a single payment from PDVSA to D-R. Tr. 186:8-11; 187:19-21 (Rice). Rice did not, however, review any documentation from either JPMorgan or DMBL about the processing of these transactions—she did not know whether either bank conducted due diligence and discovered the agreement to extend the third interest payment, whether either transaction was flagged as a sanctions risk, or even whether any human reviewed and approved the transactions. Tr. 242:10-25 (Rice). She did not review any sanctions compliance or risk appetite policies in place at either bank. Tr. 242:5-9 (Rice). And she did not review the screening lists at either bank, and so she did not have any idea whether PDVSA was added to the banks' lists in a timely fashion, which, as she testified, does not always happen. Tr. 243:10-15; 244:7-10 (Rice). In other words, Rice's opinion that JPMorgan and/or DMBL would have processed additional payments from PDVSA under the Note is entirely speculative.

This is especially the case because, as both experts agreed, banks' sanctions compliance policies are not perfect, and errors can and do occur in the compliance screening process. *See* Tr. 266:10-24 (Rice) (describing problems with internal screening at JPMorgan that led to processing of 85 transactions involving individuals or entities on the SDN list from 2011 to 2014). In fact, errors occur with enough frequency that there is a formal process for voluntarily disclosing those mistakes to OFAC. Tr. 356:25-357:4 (Barker). Indeed, one of Rice's job responsibilities at JPMorgan was to review and approve voluntary self-disclosures when potential sanctions violations slipped through the bank's review procedures. Tr. 105:23-25 (Rice). Given D-R's

failure to subpoena any documentation from either JPMorgan or DMBL, it is impossible to know whether the transfer was the result of an affirmative decision by the bank (and if so, on what grounds) or a compliance error, and thus Ms. Rice's testimony is of little value.

In a final attempt to support her opinion that, after E.O. 13808, some other bank would have processed and accepted payment from PDVSA under the Note Agreement, Rice testified that, when she worked at Bank of Tokyo Mitsubishi, she was aware of transfers involving PDVSA that both came into and went out of the bank after E.O. 13808 became effective. Tr. 200:1-6; 201:1-5; 250:10-22 (Rice). Rice could not, however, provide any specific details about these transactions. Tr. 251:13-252:2 (Rice). She could not discuss the parties involved in any transactions and, though she vaguely referred to a transaction in which two foreign parties had attempted to change the amount of the debt instrument, which, by the way, she determined was prohibited by E.O. 13808, she could provide no additional details of that transaction. Tr. 251:20-253:4 (Rice). Rice also admitted that she would not know the internal policies of any other banks and so would not know what they were doing "holistically with regard to PDVSA payments," or how many PDVSA payments they were rejecting. Tr. 250:23-251:10 (Rice).

Rice's vague and unsupported testimony that some transactions that had some connection to PDVSA were still processed does nothing to help the Court decide the question at issue here, which is whether any bank would have processed a payment from PDVSA in these specific circumstances. Notably, Rice did not testify, even vaguely, that she witnessed a successful transaction where PDVSA made a payment on a long-term debt instrument that had been modified by an agreement, in writing, to extend one of the payment dates. It is undisputed that some payments involving PDVSA clearly fell outside the scope of the sanctions order and were still being processed by banks. *See* Tr. 175:3-8 (Rice) (noting that many types of transactions involving

27

PDVSA were permissible under E.O. 13808).  Rice even agreed that some of the transactions involving PDVSA that she witnessed at Bank of Tokyo Mitsubishi were outside the scope of E.O. 13808.  Tr. 254:4-19 (Rice).  It is therefore unsurprising, and of no evidentiary value, that some payments involving PDVSA were still occurring after E.O. 13808 took effect.

D-R's last, desperate attempt to prove that it was somehow possible for PDVSA to make payments under the Note is to claim that PDVSA that could have just sent D-R a check instead of a wire transfer.  Tr. 17:8-12; 70:5-20 (Scherzer).  This argument fails because a check is not an end-run around sanctions orders or risk appetite policies.  Tr. 75:16-17 (Scherzer).  If PDVSA had sent D-R a check, D-R would have attempted to deposit the check into its Citibank account.  Tr. 62:4-10 (Scherzer).  Citibank's risk appetite policy applied equally to checks, and so the payment would have been rejected.  Tr. 159:7-14 (Romano).  Had D-R attempted to deposit the check in another bank, those banks would have applied their own risk appetite policies to the check and rejected it.  D-R appears to have realized that a check was no different than a wire transfer, as it never told PDVSA that all the payment problems would be solved if it just wrote D-R a check, and it never asked any of the five to six banks with which it had a relationship if any of them would accept a check from PDVSA.  Tr. 75:1-9 (Scherzer).

D-R's speculation that PDVSA could have avoided bank appetite risk policies is unsupported by any evidence in the record, and must be rejected.

## CONCLUSION

For the foregoing reasons, the Court should find that (1) it has been impossible for PDVSA to make payments to D-R under the Note Agreement since August 25, 2017, (2) because it has been impossible to make payments, PDVSA has not defaulted under the Note Agreement, and (3)

PDVSA's payment obligations under the Note Agreement are discharged until performance is no longer impossible due to U.S. sanctions and banks' risk appetite policies.

Respectfully submitted,

HOGAN LOVELLS US LLP

/s/ Dennis H. Tracey, III
Dennis H. Tracey, III
Matthew Ducharme
390 Madison Avenue
New York, NY 10017
Tel: (212) 918-3000
Fax:(212) 918-3100
dennis.tracey@hoganlovells.com
matthew.ducharme@hoganlovells.com

Richard C. Lorenzo (pro hac vice)
600 Brickell Avenue, Suite 2700
Miami, FL 33131
Tel: (305) 459-6500
Fax:(305) 459-6550
richard.lorenzo@hoganlovells.com

*Counsel for Defendants Petróleos de
Venezuela, S.A. and PDVSA Petróleo, S.A.*