**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Case No. 19-cv-02689 (LLS)**

DRESSER-RAND COMPANY,

*Plaintiff,*

v.

PETRÓLEOS DE VENEZUELA, S.A. *et al.*,

*Defendants.*

**PLAINTIFF'S POST-TRIAL BRIEF**

REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
(212) 521-5400

*Attorneys for Plaintiff*
*Dresser-Rand Company*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................... 1

ARGUMENT ............................................................................................ 6

I.    THE COURT HAS DETERMINED, AND THE PARTIES HAVE
      STIPULATED TO FACTS, THAT ESTABLISH D-R'S CASE IN CHIEF ............... 6

II.   PDVSA HAS FAILED TO SATISFY ITS HEAVY BURDEN OF PROVING
      IMPOSSIBILITY ................................................................................. 8

III.  THE EVIDENCE ESTABLISHES THAT OFAC SANCTIONS DID NOT
      PROHIBIT PDVSA'S PAYMENTS UNDER THE NOTE AGREEMENT ............... 9

      A.    PDVSA Has Conceded That Until At Least November 29, 2017,
            Payment Under the Note Agreement Was *Not* Prohibited By OFAC
            Sanctions. .............................................................................. 9

      B.    D-R's Agreement to Accept the Third Quarterly Payment on a Date
            After it Was Due Did Not Convert the Note Agreement to "New Debt"
            That Would Be Prohibited by E.O. 13808. ...................................... 10

            1.    The Acceptance of a Payment Outside the Agreed-Upon
                  Payment Period Does Not Constitute a Change in the Length of
                  the Repayment Period Under FAQ 553. ................................. 12

            2.    OFAC's Guidance and the Objectives of OFAC Sanctions
                  Support D-R's Position That a Party Can Accept a Payment
                  Outside the Agreed-Upon Payment Period. ............................ 15

            3.    D-R Did Not Forego Placing PDVSA Into Default or Charging
                  Default Interest. ............................................................. 20

      C.    PDVSA's Expert is Not Independent or Objective in Light of His
            Personal, and His Firm's, Representation of PDVSA and Related
            Entities. ................................................................................. 24

IV.   THE EVIDENCE PROVES THAT BANK POLICIES DID NOT RENDER
      PDVSA'S PERFORMANCE OBJECTIVELY IMPRACTICABLE ...................... 26

      A.    Citibank and Deutsche Bank's Risk Appetite Policies Regarding The
            Venezuelan Sanctions at Issue Are Uniquely Restrictive and Not
            Representative of Other Banks' Policies. ....................................... 27

      B.    When it Became Clear that Citibank was No Longer an Option,
            Commerzbank and Novo Bank Were Identified as Viable Alternatives. ...... 30

            1.    PDVSA Concedes That It Ignored the Commerzbank and Novo
                  Bank Alternatives That D-R Provided. .................................. 31

            2.    Commerzbank and Novo Bank Would Have Processed
                  Payments From PDVSA to D-R. .......................................... 32

            3.    Commerzbank and Novo Bank Were Viable Alternatives. ........... 35

|   |   | i. | Utilizing Commerzbank or Novo Bank Would Not Have Created "New Debt." | 35 |
|   |   | ii. | Payment to an Account Other Than Citibank, or Payment in Euros, Was Permitted Under the Note Agreement. | 38 |
|   | C. | | At Least Three Other Banks Processed Payments by PDVSA Under the Note Agreement. | 40 |
|   | D. | | PDVSA Elected to Make Payments in Connection with U.S. Bonds. | 42 |
| V. | CONCLUSION | | | 43 |

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Beaufort Capital Partners, LLC v. Oxysure Sys.*,
  No. 16-CV-5176 (JPO), 2017 U.S. Dist. LEXIS 32335 (S.D.N.Y. Mar. 7,
  2017) ......................................................................................................................6

*Cacciola v. Selco Balers, Inc.*,
  127 F. Supp. 2d 175 (E.D.N.Y. 2001) ................................................................25

*CAMOFI Master LDC v. Col. P'ship*,
  452 F. Supp. 2d 462 (S.D.N.Y. 2006).................................................................6

*Clarex Ltd. v. Natixis Sec. Ams. LLC*,
  No. 1:12-cv-7908-GHW, 2014 U.S. Dist. LEXIS 121335 (S.D.N.Y. Aug. 29,
  2014) ..................................................................................................................8, 9

*Daubert v. Merrell Dow Pharms, Inc.*,
  509 U.S. 579 (1993)...........................................................................................24

*Ebert v. Holiday Inn*,
  No. 11-cv-4102, 2014 WL 349640 (S.D.N.Y. Jan. 31, 2014) ............................8

*Exp.-Import Bank of the United States v. Agricola del Mar BCS, S.A. de C.V.*,
  536 F. Supp. 2d 345 (S.D.N.Y. 2008).................................................................24

*Gen. Elec. Capital Fin. v. Bank Leumi Tr. Co.*,
  95 Civ. 9224 (AGS), 1999 U.S. Dist. LEXIS 485 (S.D.N.Y. Jan. 19, 1999) .........................13

*Health-Chem Corp. v. Baker*,
  915 F.2d 805 (2d Cir. 1990)...........................................................................1, 9

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l. Inc*.,
  241 F. Supp. 2d 246 (S.D.N.Y. 2002).................................................................22

*Inter-American Dev. Bank v. NextG Telecom Ltd.*,
  503 F. Supp. 2d 687 (S.D.N.Y. 2007).................................................................9

*Jacobs v. Citibank, N.A.*,
  Case No. 01-cv-8436 (JSR) (KNF), 2005 U.S. Dist. LEXIS 17495 (S.D.N.Y.
  Aug. 4, 2005) ......................................................................................................13

*Katt v. City of N.Y.*,
  151 F. Supp. 2d 313 (S.D.N.Y. 2001)..................................................................20

iii

*Kim Corp. v. Cent. Markets, Inc.*,
  70 N.Y.2d 900, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987)......................................................8

*Lantino v. Clay LLC*,
  No. 1:18-cv-12247, 2020 WL 2239957 (S.D.N.Y. May 8, 2020).............................................8

*Linde v. Arab Bank, PLC*,
  922 F. Supp. 2d 316 (E.D.N.Y. 2013) ...................................................................................20

*Lippe v. Bairnco Corp.*,
  288 B.R. 678 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004)..................................25

*Loc. 338, RWDSU v. Farmland Dairies, Inc.*,
  No. 02CIV.2705(LTS)(HBP), 2003 WL 1213422 (S.D.N.Y. Mar. 14, 2003),
  *aff'd*, 89 F. App'x 748 (2d Cir. 2003)......................................................................................9

*Local 338, RWDSU v. Farmland Dairies, Inc.*,
  2003 U.S. Dist. LEXIS 3676 (S.D.N.Y. Mar. 14, 2003) .......................................................27

*O'Connor v. Curcio*,
  281 A.D.2d 100 (2d Dep't 2001)............................................................................................22

*S. Fed. Sav. & Loan Ass'n v. 21-26 E. 105th St. Assoc.*,
  145 B.R. 375 (S.D.N.Y. 1991)................................................................................................24

*Transfield ER Cape Ltd. v. STX Pan Ocean Co.*,
  No. 09 CIV. 1250 (JGK), 2009 WL 691273 (S.D.N.Y. Mar. 16, 2009) ...........................26, 32

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*,
  205 F. Supp. 3d 454–55 (S.D.N.Y. 2016)..............................................................................19

*United States CFTC v. Byrnes*,
  53 F. Supp. 3d 319 (S.D.N.Y. 2014)......................................................................................15

*United States v. Ali Sadr Hashemi Nejad*,
  No. 18-cr-224 (AJN), 2019 U.S. Dist. LEXIS 211911 (S.D.N.Y. Dec. 6, 2019)...................15

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008)...................................................................................................18

*United States v. Sabir*,
  No. 05 Cr. 673 (LAP), 2007 U.S. Dist. LEXIS 34372 (S.D.N.Y. May 9, 2007) ...................18

*Wash. v. United States HUD*,
  No. 16-cv-3948 (SMG), 2019 U.S. Dist. LEXIS 127027 (E.D.N.Y. July 29,
  2019) .......................................................................................................................................13

*Wechsler v. Hunt Health Sys., Ltd.*,
    381 F. Supp. 2d 135 (S.D.N.Y. 2003) ..........................................................................19

**Rules**

Fed. R. Evid. 702(c) ..............................................................................................................24

Fed. R. Evid. 703 ..................................................................................................................18

**Other Authorities**

RESTATEMENT (SECOND) OF CONTRACTS § 261, Comment e (1981) .............................................8

RESTATEMENT (SECOND) CONTRACTS § 270 .................................................................................9

RESTATEMENT (SECOND) CONTRACTS § 270 cmt. b.....................................................................40

Pursuant to the Court's directive and the parties' agreement dated September 27, 2021, Plaintiff Dresser-Rand Company ("D-R") respectfully submits this Post-Trial Brief.

## PRELIMINARY STATEMENT

The ultimate question presented at trial in this case is whether the doctrine of impossibility should be significantly broadened beyond the limited and narrowly-defined circumstances within which it has always resided.  Under the theory proposed by Defendant Petróleos de Venezuela, S.A. ("PDVSA"), the doctrine would be extended into uncharted territory, where an obligor is "discharged" from its contractual obligations despite the obligor repeatedly refusing to avail itself of viable alternatives to satisfy its contractual obligations.  This must not be countenanced.

While this case concerns the validity of a January 2017 Note and Note Agreement between D-R and PDVSA and PDVSA's failure to pay thereunder, those questions have already been decided by way of a prior Order of this Court (ECF No. 59) and the parties' Agreed Findings of Fact:  the Note and Note Agreement are valid and enforceable; those agreements require PDVSA to pay D-R the principal sum of roughly $119.6 million plus interest; and PDVSA made only two of twelve required payments under the Note Agreement.  Thus, PDVSA concedes that D-R has satisfied its burden.  What burden remains is PDVSA's to carry, and it is a heavy one.

New York law is clear that the party pleading impossibility must show that it took "virtually every action within its powers to perform its duties under the contract." *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990).  PDVSA concedes this point, but cannot meet its burden to prove that it, in fact, did so.  While PDVSA unsuccessfully tried to make the third quarterly payment on three occasions, it also failed entirely to follow through on multiple alternatives presented to it to make payments, and now claims that had it done so, the Note would have become "new debt" and payment would not have been possible.  Of course, this is not supported by the record presented at trial or by existing case law, nor is there any logic to this position.  Indeed, the

1

purpose of sanctions imposed by the U.S. Government is to punish the sanctioned party, not the party (like D-R) that lent money to the sanctioned party in good faith before the sanctions. Moreover, to find as PDVSA urges would incentivize sanctioned debtors like PDVSA to simply default in paying, and then argue that any agreement by the creditor to accept dilatory payment renders the entire, valid debt prohibited by the sanctions.

PDVSA claims its performance under the Note Agreement was impossible on the basis of two events:  First, sanctions administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") made it impossible for PDVSA to pay D-R.  Second, regardless of whether sanctions prohibited PDVSA's payment, policies adopted by banks across the financial industry made PDVSA's performance objectively impracticable.  The evidence shows otherwise.

The primary sanction under which PDVSA claims impossibility is Executive Order ("E.O.") 13808, which prohibits transactions involving PDVSA to the extent they relate to "new debt," meaning debt issued after the effective date of E.O. 13808—August 25, 2017.  Since the Note and Note Agreement were executed in January 2017, E.O. 13808's prohibitions, by its plain terms, do not apply.  However, PDVSA argues that, under subsequent guidance from OFAC in the form of answers to "Frequently Asked Questions" (*i.e.*, "FAQ 553"), the Note and Note Agreement, were converted into new debt when the parties agreed that PDVSA could have thirty additional days to make **one already late** payment.  The problem with this is that FAQ 553 also explicitly states that U.S. persons "may collect and accept payment … regardless of whether … [PDVSA] pays during the agreed-upon period."

Although the language of FAQ 553 is straightforward on its face, the parties' expert witnesses disagree as to its interpretation.  At trial, D-R's expert witness, Stephanie Rice—a former OFAC sanctions enforcement investigator and head of sanctions compliance at several large,

international banks, who has had significant experience applying E.O. 13808 and its related FAQs—testified that the Note and Note Agreement were not converted into new debt by virtue of D-R's agreement to accept the third quarterly payment after it was originally due. Her conclusion rests on multiple bases, including, but not limited to, the text of E.O. 13808 itself and the FAQs; the guidance Ms. Rice received from OFAC while assessing transactions in the context of E.O. 13808 in her previous employment; and the policy objectives underlying OFAC sanctions—*i.e.*, to punish foreign targets, not innocent U.S. parties. As Ms. Rice explained, by way of FAQ 553, OFAC did not intend to give the debtor an option to simply decide not to make a timely payment on a valid, untouched-by-the-prohibition debt and then claim it was impossible to perform.

On the other hand, PDVSA's expert, John Barker—an attorney who has personally represented PDVSA in other, related matters, and whose law firm has represented the Government of Venezuela for 35 years—adopted a self-described "counterintuitive" interpretation that a party may accept a late payment only for pre-existing debt, but that in D-R's case, by agreeing to accept the late payment, the Note and Note Agreement became "new debt," which could not be accepted late. Mr. Barker also contends that the parties agreed to not place PDVSA in default and to not charge default interest, and that such actions "changed" the terms of the Note Agreement, thereby creating new debt. This purely advocated inference is based upon Mr. Barker's admitted supposition from extrapolated testimony at trial, not direct evidence. In fact, the record shows that PDVSA confirmed that it would "comply with ***all of its commitments*** under the Note Agreement," which necessarily includes its commitment to pay default interest. Mr. Barker simply contrived self-serving information that does not exist in the record. Moreover, none of PDVSA's attempted payments to D-R during the relevant time period were rejected by banks on the basis that the payment violated E.O. 13808, undermining Mr. Barker's newfound theory. Indeed, Mr. Barker

3

conceded—as he had to—that he saw no evidence that any bank rejected a payment from PDVSA to D-R based on OFAC sanctions, as opposed to a subjective determination by that bank to not process the payment. Thus, the choice here is an easy one—between D-R's interpretation, based upon a straightforward reading of the text and appreciation of the objectives of the sanctions regime, and PDVSA's interpretation, based upon circular logic and self-serving supposition.

With respect to PDVSA's speculative contention that the entire financial industry would have prohibited transfers from PDVSA to D-R, PDVSA's argument rests upon the policies of merely two banks—Citibank and Deutsche Bank—which resulted in the rejection of PDVSA's attempted payment to D-R. PDVSA ignores the fact that the Citibank and Deutsche Bank policies are themselves substantially different; that the record establishes that two other banks—Commerzbank and Novo Bank—would not have prohibited payment from PDVSA to D-R; and that three other banks—JPMorgan, China CITIC Bank, and Dinosaur Merchant Bank—actually did process *the specific payments at issue*. Instead, PDVSA would have the Court believe that, based upon Citibank and Deutsche Bank alone, every single bank in the world would reject PDVSA's payment because they were "very reluctant" to process PDVSA transactions.

PDVSA's impossibility defense also glosses over the fact that it blatantly ignored viable alternative options to make the required payments to D-R. PDVSA concedes that when D-R sent PDVSA Commerzbank account details, PDVSA ignored this information and never attempted payment to the Commerzbank account. PDVSA likewise concedes that there is no evidence that PDVSA responded to D-R's repeated outreaches (and the proffered draft amendment to the Note) regarding the use of Novo Bank—a bank that *PDVSA itself* suggested D-R use to facilitate payment. In an attempt to justify its inaction, PDVSA argues that Commerzbank and Novo Bank were not viable options because they did not comply with the account and currency provisions of

4

the Note Agreement. That is, the Commerzbank account was held by Siemens, D-R's parent company, and the Novo Bank account would require payment in Euros rather than U.S. dollars. These are red herrings. As D-R's representative, Erik Scherzer, testified at trial, the Note Agreement itself was a novation of numerous invoices held by various entities in the Siemens corporate family—not just D-R, but Siemens and other subsidiaries as well. It was manifest to the parties that D-R was acting as the managing agent for the debt owed to multiple Siemens entities; payment into a Siemens account would have been nothing more than a matter for internal accounting, and D-R would have accepted payment to such an account. Similarly, payment in Euros would have been readily accepted by D-R over no payment at all; indeed, the Note Agreement expressly contemplated payment in a currency other than dollars.

Moreover, although D-R went out of its way to provide PDVSA with alternative means of making payment, that should have been only the starting point of PDVSA's efforts to pay its debt, not the end. PDVSA's three attempted payments by the same exact method fall monumentally short of taking "virtually every action within its powers to perform its duties under the contract." Instead, PDVSA flipped the proverb on its head and apathetically took the first "no" as the indefinite answer. PDVSA did not attempt payment to Commerzbank or Novo Bank; it did not send representatives or white papers to Citibank to advocate for acceptance of the transaction; it did not even make a phone call to explain the purpose of the transaction. The law requires PDVSA to try "virtually everything"; if PDVSA had any intent to pay its debt to D-R, it would have tried at least *something*, but it did not try *anything* after it became clear that Citibank was not viable.

Finally, PDVSA's impossibility defense fails because PDVSA actually paid other creditors during the relevant time period. When PDVSA wanted to pay a debt, it could and did. The truth here is that paying D-R's debt was simply not a priority for PDVSA. For example, in 2019,

PDVSA arranged payment of interest on bonds that were secured by valuable shares in Citgo, which would have been seized if the interest was left unpaid. Because D-R's debt was unsecured, PDVSA apparently had limited inducement to make the required payments and simply chose not to do so. Such selective action and inaction does not satisfy the burden on PDVSA to prove that it did everything within its power to meet its contractual obligations. It patently did not. PDVSA's impossibility defense therefore fails, and judgment should be awarded to D-R for the full amount due on the Note, plus attorneys' fees and costs.[1]

## **ARGUMENT**

### I.   **THE COURT HAS DETERMINED, AND THE PARTIES HAVE STIPULATED TO FACTS, THAT ESTABLISH D-R'S CASE IN CHIEF**

"To make out a prima facie case for recovery" on a promissory note, "a plaintiff must simply show proof of a note and failure to make payment. When a note holder has established a prima facie claim, the burden then shifts to the defendant to prove . . . a bona fide defense against the note." *CAMOFI Master LDC v. Col. P'ship*, 452 F. Supp. 2d 462, 470 (S.D.N.Y. 2006); *see Beaufort Capital Partners, LLC v. Oxysure Sys.*, No. 16-CV-5176 (JPO), 2017 U.S. Dist. LEXIS 32335, at *5 (S.D.N.Y. Mar. 7, 2017) (same).

Here, the Court ruled in its February 11, 2020 Opinion & Order granting D-R's motion for summary judgment against PDVSA Petroleó, S.A., the Guarantor under the Note and Note Agreement, that D-R had "ma[d]e a prima facie case for recovery on the Note." (ECF No. 59 at 5.) As a result, PDVSA conceded in advance of trial and by way of the "Agreed Findings of Fact"

---

[1] Pursuant to Section 9.05 of the Note Agreement, PDVSA agreed to reimburse D-R for its attorneys' fees and costs related to this action. See JX 1 at 9.05 ("[PDVSA] agrees to pay all out-of-pocket expenses incurred by [D-R] …in connection with the enforcement or protection of its rights in connection with this Agreement and the other Finance Documents or in connection with the Notes issued hereunder, and, in connection with any such enforcement or protection, the fees, charges and disbursements of any counsel for [D-R]….")

in the Consent Pre-Trial Order[2] (ECF No. 121)—as it certainly had to—both the validity of the

Note Agreement and PDVSA's failure to pay D-R in accordance with the Note Agreement.

Specifically, PDVSA has acknowledged, and the record reflects, that:

1. "On or about January 20, 2017, [D-R], as Initial Note Holder and Administrative Agent, entered into a Note Agreement ('Note Agreement') with PDVSA Petróleo S.A. ('Petróleo'), as Guarantor, and [PDVSA], as Issuer, pursuant to which PDVSA agreed to pay certain amounts reflected in a Note, among the same parties, dated January 20, 2017 ('Note')." (Agreed Fact 1; *see also* JX-1; JX-2; Tr. 12:19–13:11.)

2. "Pursuant to the terms of the Note and the Note Agreement, PDVSA agreed to pay D-R (i) the principal sum of $119,646,069.70; (ii) with interest on the unpaid balance based on and computed on the basis of 365 days, at a rate per annum equal to 6.5%, payable quarterly on each day described on the payment schedule in the Note' and (iii) on any overdue payment of principal and any overdue payment of interest, payable on demand, based on and computed on the basis of 365 days, at a rate per annum equal to 8.5%." (Agreed Fact 2; *see also* JX-1 at 2.03, 2.04; JX-2 at 1; Tr. 13:12–14:12.)

3. "Based upon the payment schedule set forth in the Note, PDVSA was required to make quarterly interest payments for one year beginning on April 20, 2017 and continuing until January 20, 2018. Commencing on April 20, 2018, PDVSA was required to make quarterly principal and interest payments, with the last payment due on January 20, 2020." (Agreed Fact 3; *see also* JX-1 at A-1; JX-2 at 3; Tr. 14:6–12.)

4. "PDVSA made the first two quarterly interest payments due under the Note. PDVSA made the first payment on or about April 20, 2017 in the amount of $1,917,599.06 and the second payment on or about July 20, 2017 in the amount of $1,938,906.72." (Agreed Fact 4; Tr. 49:7–50:2.)

5. "Following the second quarterly interest payment on July 20, 2017, D-R did not receive another payment from PDVSA as required under the Note and the Note Agreement." (Agreed Fact 5; *see also id.* ¶¶ 6, 8–9; Tr. 14:13–16.)

Thus, all that is left for the Court to determine is whether PDVSA has met its burden on its

lone defense of impossibility: that PDVSA's duty to make payments under the Note was

discharged because its performance was rendered impossible.

---

[2] At trial, the Court acknowledged that it was "fully prepared to admit all of the agreed facts in the joint pretrial order and evidence." (Tr. 26:22–23.) Each "Agreed Findings of Fact" (ECF No. 121) is referred to herein as an "Agreed Fact."

## II.   PDVSA HAS FAILED TO SATISFY ITS HEAVY BURDEN OF PROVING IMPOSSIBILITY

PDVSA's defense rests on the theory that "[s]anctions imposed by the U.S. government on PDVSA and other Venezuelan government-related entities and the sanctions policies adopted by banks . . . made it impossible or objectively impracticable for PDVSA to make the requisite payments to [D-R]."  (PDVSA Pre-Trial Br. at 2.[3])

Under New York law, "impossibility . . . is treated synonymously with impracticability" as a defense to a breach of contract action.  *Lantino v. Clay LLC*, No. 1:18-cv-12247, 2020 WL 2239957, at *7 (S.D.N.Y. May 8, 2020) (internal citation omitted); *see Clarex Ltd. v. Natixis Sec. Ams. LLC,* No. 1:12-cv-7908-GHW, 2014 U.S. Dist. LEXIS 121335, at *31 (S.D.N.Y. Aug. 29, 2014) ("New York courts do not appear to recognize commercial impracticability as a separate defense to the doctrine of impossibility; rather, impracticability is treated as a type of impossibility and construed in the same restricted manner.").

New York law is "clear that impossibility excuses a party's performance 'under very limited and narrowly defined circumstances.'"  *Ebert v. Holiday Inn*, No. 11-cv-4102, 2014 WL 349640, at *21 (S.D.N.Y. Jan. 31, 2014); *see also Clarex*, 988 F. Supp. 2d at 393 ("New York courts have construed the impossibility defense very narrowly.").  That is, impossibility "excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance ***objectively impossible***."  *Id.* at 394 (quoting *Kim Corp. v. Cent. Markets, Inc.*, 70 N.Y.2d 900, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987) (alteration in original)).  The distinction between objective and subjective impossibility has been described as the difference between "the thing cannot be done" (objectively impossible) and "I cannot do it"

---

[3]  As used herein, the term "PDVSA Pre-Trial Br." refers to Defendant Petróleo de Venezuela, S.A.'s Trial Brief, dated March 29, 2021 (ECF No. 119).

(subjectively impossible).  *See* RESTATEMENT (SECOND) OF CONTRACTS § 261, Comment e (1981).

Accordingly, as PDVSA concedes, to succeed on an impossibility defense, PDVSA must "demonstrate that it took ***virtually every action within its powers*** to perform its duties under the contract." *Baker*, 915 F.2d at 810 (emphasis added); *see also Loc. 338, RWDSU v. Farmland Dairies, Inc.*, No. 02CIV.2705(LTS)(HBP), 2003 WL 1213422, at *13 (S.D.N.Y. Mar. 14, 2003), *aff'd*, 89 F. App'x 748 (2d Cir. 2003).  To that end, "[w]here only part of an obligor's performance is impracticable, his duty to render the remaining part is unaffected if . . . it is still practicable for him to render performance that is substantial, taking account of any reasonable substitute performance that he is under a duty to render . . . ." RESTATEMENT (SECOND) CONTRACTS § 270.

PDVSA, as the party asserting the defense, bears the heavy burden of proving impossibility.  *See Inter-American Dev. Bank v. NextG Telecom Ltd.*, 503 F. Supp. 2d 687, 696 (S.D.N.Y. 2007) ("The burden of showing impossibility is on the party seeking to excuse performance."); *see also Clarex*, 988 F. Supp. 2d at 393 ("Under New York law, the defendant in a contract dispute has the burden to prove non-performance is excused by impossibility.").  As demonstrated below, PDVSA did not meet its burden at trial to establish that it was objectively impossible for PDVSA to make the payments to D-R under the Note Agreement, or that it took "virtually every action within its powers" to make the payment to D-R.  PDVSA, rather, applied lackluster effort and effectively said, "I cannot do it."

## III.    THE EVIDENCE ESTABLISHES THAT OFAC SANCTIONS DID NOT PROHIBIT PDVSA'S PAYMENTS UNDER THE NOTE AGREEMENT

### A.    PDVSA Has Conceded That Until At Least November 29, 2017, Payment Under the Note Agreement Was *Not* Prohibited By OFAC Sanctions.

Executive Order ("E.O.") 13808 prohibits "[a]ll transactions related to, provision of financing for, and other dealings … by a United States person or within the United States … [in] ***new debt*** with a maturity of greater than 90 days of [PDVSA]." (JX-41 (emphasis added); *see also*

Tr. 119:4–25.)  The parties do not dispute that the term "new debt" is not defined in E.O. 13808;

rather, one must refer to OFAC's answers to Frequently Asked Questions ("FAQ")—specifically,

FAQ 553—which state that the term "new debt" is any debt created **on or after August 25, 2017**,

the effective date of E.O. 13808.  (Tr. 120:4–14, 121:12–19, 337:2–18; *see also* JX-53.)  Thus, at

the time E.O. 13808 went into effect, the Note and Note Agreement—both entered into on January

20, 2017—were, by definition, not "new debt" within the scope of E.O. 13808's restrictions.  (*See*

*id.* 122:6–10.)  At trial, PDVSA's expert, John Barker, conceded as such:

> Q: "As of the date of 13808, its effectiveness, August 25, 2017, you and I agree that
> the Dresser note at issue here was existing debt, correct?"
> A: "Correct."
> Q: "It was not new debt at that point in time?"
> A: "Correct."

(*See* Tr. 366:9–14.)  In fact, Mr. Barker went so far as to explain that the earliest time in which the

Note Agreement could have theoretically been converted to "new debt" was when the "parties

agreed to change the terms of the [N]ote" on November 29, 2017.  (*See id.* 366:15–367:15.)  Thus,

according to Mr. Barker, there was "***no prohibition***" under E.O. 13808 to make payment under

the Note Agreement before November 29, 2017, at the earliest.  (*Id.* 367:7–15; *see also id.* 122:11–

16 (Rice explaining there is "no prohibition" under E.O. 13808 on PDVSA making payments

under the Note Agreement as of the date of E.O. 13808).)  Despite this, PDVSA did not make the

third quarterly payment by October 20, 2017, when it was due—or any time before November 29,

2017 for that matter.  (*See* Agreed Fact 9; Tr. 25:15–17.)

**B.     D-R's Agreement to Accept the Third Quarterly Payment on a Date After it
Was Due Did Not Convert the Note Agreement to "New Debt" That Would
Be Prohibited by E.O. 13808.**

Recognizing that the Note Agreement and Note do not constitute "new debt" under E.O.

13808, PDVSA has taken the position that the Note Agreement and Note were converted to "new

debt" because, following the issuance of E.O. 13808, the parties allegedly changed the terms of the Note Agreement. (PDVSA Pre-Trial Brief at 18.) PDVSA is wrong. On or about November 29, 2017, at a time when the third quarterly payment was already more than 30 days past due, PDVSA requested, and D-R agreed to, "a waiver of 30 additional days . . . in order to remedy the delay in the [third] payment of interest." (JX-13; *see also* Agreed Fact 8.) This was the entire substance of the "agreement."

PDVSA claimed it was unable to "timely satisfy" its payment obligations under the Note Agreement due to various reasons, "including, but not limited to, prevailing market prices of crude oil and the arbitrary and unilateral imposition of economic sanctions against PDVSA . . . by way of Executive Order 13808," but confirmed the payments from PDVSA to D-R under the Note Agreement "are legitimate and permissible under all applicable laws." (*Id.*) PDVSA "reiterate[d] its intention and ability to comply with all of its commitments under the Note Agreement and [that it] w[ould] remedy any delay in payment of the unpaid interest as soon as possible[.]" (*Id.*) Thus, at the time, D-R anticipated that PDVSA would in fact satisfy its payment obligations under the Note Agreement. (Tr. 26:4–8.) D-R viewed PDVSA's request and D-R's agreement as simply "giv[ing] [PDVSA] 30 days to pay" a payment already past due. (*Id.* 25:18–22.) D-R's agreement to accept the third quarterly payment after it was originally due did not warrant or result in any amendment to the Note Agreement; and, in fact, at no point were any amendments "signed and effective" as it relates to the Note Agreement. (*See* Tr. 30:18–23.)

Based upon the brief forbearance, requested *by PDVSA*, and an unduly selective reading of FAQ 553, PDVSA's expert, Mr. Barker, took the position—for the first time at trial—that OFAC would consider the Note Agreement to be "new debt"[4] (*Id.* 341:9–24) based on the following

---

[4]  Notably, when asked at his deposition whether an agreement to extend a payment deadline by 30-days for one payment only would constitute "new debt," Mr. Barker would not take an affirmative position. Instead, he responded

assumptions: (1) the parties' agreement that D-R would accept the third quarterly payment after it was originally due constitutes a change to the "length of the repayment period" contemplated by FAQ 553 (*see id.* 342:2–9); (2) the parties renegotiated the terms of the Note Agreement by agreeing not to place PDVSA in default (*id.* 342:10–20); and (3) the parties agreed to change the interest rate on the Note by agreeing not to place PDVSA in immediate default (*id.* 342:21–434:1). The record, however, reflects that Mr. Barker entirely misconstrues the terms of the Note Agreement, as well as the evidence at trial, and his interpretation of what constitutes "new debt" under E.O. 13808 does not comport with the plain language of FAQ 553, OFAC policy, and OFAC's guidance on the issue.

### 1. The Acceptance of a Payment Outside the Agreed-Upon Payment Period Does Not Constitute a Change in the Length of the Repayment Period Under FAQ 553.

FAQ 553 provides: "OFAC does not consider debt that was created prior to August 25, 2017 to be 'new debt' for purposes of E.O. 13808 so long as the terms of the debt instrument (including, for example, the length of the repayment period or any interest rate applied) agreed by the parties does not change on or after August 25, 2017." (JX-53; *see also* Tr. 122:21–123:1.) At trial, there was significant discussion regarding what OFAC intended with respect to the term "length of the repayment period" in FAQ 553. (*See, e.g.*, *id.* 123:19–124:8; 125:18–126:20; 342:2–9; 338:1–339:25.) PDVSA wants the Court to believe the term "length of the repayment period" can refer to any single payment deadline under the term of the debt instrument. (*Id.* 342:2–9.) Under PDVSA's interpretation, D-R's agreement to accept the third quarterly payment after it was originally due would constitute a change to the terms of the debt instrument and convert the

---

that he "can't say right now whether that would be permitted or prohibited [as new debt]" but only that it would "raise a kind of red flag that a financial institution would want to have due diligence on and get a comfort level before going forward." (PDVSA Ex. H at 108:24–109:25.)

Note Agreement to "new debt," even though the maturity date of the Note Agreement never changed. (Tr. 338:1–339:25.)

As explained by D-R's expert, Stephanie Rice, who has had significant practical experience with the application of E.O. 13808 to transactions involving PDVSA,[5] the term "length of the repayment period" as it is used in FAQ 553, and "as OFAC generally uses it in the context of similar programs to the Venezuela sanctions," refers to the "entirety of the repayment period of a debt instrument"—*i.e.*, the term of the Note—and not one payment deadline within the term of the Note. (Tr. 123:21–124:3.) Ms. Rice's interpretation is consistent with the interpretation of courts in the Second Circuit that the words "repayment period" mean the time between the first payment on a loan and the loan's maturity. *See, e.g.*, *Wash. v. United States HUD*, No. 16-cv-3948 (SMG), 2019 U.S. Dist. LEXIS 127027, at *14–15 (E.D.N.Y. July 29, 2019) (noting "total repayment period" of the note was 21 years, despite there being varying interest requirements throughout the 21 years); *Jacobs v. Citibank, N.A.*, Case No. 01-cv-8436 (JSR) (KNF), 2005 U.S. Dist. LEXIS 17495, at *3–4 (S.D.N.Y. Aug. 4, 2005) ("[d]uring the Repayment Period, [debtors] were required to make monthly payments to Citibank of principal and interest . . . The principal portion of the monthly payments made during the Repayment Period remained fixed"); *Gen. Elec. Capital Fin.*

---

[5] Ms. Rice testified at trial to her significant experience in the application of OFAC sanctions, both from her time as a Sanctions Enforcement Investigator at OFAC (Tr. 103:10–105:6), as well as in her role in the compliance departments of three global financial instructions:  JP Morgan Chase & Co. ("JPMorgan"), as one of two members of the global advisory team "responsible for advising all areas within the bank on sanctions compliance, including the sanctions compliance group itself, which had about 200 people across the globe" (*id.* 105:7–106:11); Commerzbank AG ("Commerzbank"), as head of sanctions compliance for the bank's U.S. office, where she oversaw all activities of the sanctions compliance team (*id.* 108:7–109:18); and Bank of Tokyo Mitsubishi UFJ, Ltd. ("Bank of Tokyo"), where she also served as head of sanctions for the U.S. and oversaw all aspects of the sanctions compliance teams functions.  (*Id.* 109:23–111:11; JX-67.)  Ms. Rice has personal experience writing policies to ensure sanctions compliance (*id.* 110:23–11:18) and, with respect to E.O. 13808, was "responsible for ensuring that [the Bank of Tokyo] immediately updated its controls, policies and procedures, and operations to ensure that they were in full compliance with [E.O.] 13808."  (*Id.* 112:7–20.)  In fact, Ms. Rice explained that she has experience with respect to assessing whether transactions constituted "new debt" under E.O. 13808.  (*See id.* 133:16–134:11.)  PDVSA's expert, Mr. Barker, on the other hand conceded that he has never "provided any advice as to the meaning of new debt as it pertains to PDVSA."  (*Id.* 332:1–3.)

*v. Bank Leumi Tr. Co.*, 95 Civ. 9224 (AGS), 1999 U.S. Dist. LEXIS 485, at *3–4 (S.D.N.Y. Jan. 19, 1999) ("After the Draw Period, [debtor] would have fifteen years in which to repay the loan through monthly payments of principal and interest ('Repayment Period') . . . .").

Moreover, both parties' experts agreed at trial that PDVSA's interpretation is, as Mr. Barker, described it, "counterintuitive[]." (Tr. 339:7–9.) If the acceptance of one late installment payment would constitute a change to the terms of the debt instrument that would convert the debt into "new debt," then the last sentence of FAQ 553 would serve no purpose. FAQ 553 makes clear: "Such pre-existing debt does not need to conform to the 30- or 90-day tenors imposed under E.O. 13808, and *U.S. persons may collect and accept payment* for such debt *regardless of whether* the relevant segment of the Government of Venezuela, include *PdVSA, pays under the agreed-upon payment period*." (JX-53 (emphasis added).) As Ms. Rice explained:

> . . . I think it is important to note that OFAC went to the trouble of clarifying this within the same FAQ in which it mentions that changes to the debt that constitute a change to the terms of the debt, such as a change to the repayment period, would render the debt to become new debt. It's very clear to me that OFAC made it a point to ensure that it was understood that accepting late payment was something different than changing the repayment period and the terms of the debt.

(Tr. 126:9–20.)

At trial, PDVSA's expert, Mr. Barker, attempted to avoid this reasonable conclusion by relying on the language "[s]uch pre-existing debt" and taking the position that that language refers to "debt created prior to August 25, 2017, that did not change – or the terms of the debt instrument agreed to by the parties did not change." (*See id.* 371:14–18, 372:3–9, 372:13–17.) According to Mr. Barker, only "pre-existing debt does not need to conform" to the 30-day or 90-day tenors imposed under Executive Order 13808 and can be paid outside the agreed-upon period. (*See id.* 338:1–339:9, 371:22–372:1.) But, under Mr. Barker's logic, a payment outside the agreed-upon period (*i.e.*, outside the monthly repayment schedule, for example), would constitute a change to

the "length of the repayment period," and thus would convert the pre-existing debt to "new debt." (*See id.* 338:1–339:25.)  At bottom, Mr. Barker's circular logic is that the last sentence of FAQ 553 refers to pre-existing debt whose terms have not been changed and, for such pre-existing debt, OFAC allows a payment outside the agreed-upon payment period, which payment would then convert the pre-existing debt to "new debt."  Respectfully, this Court should not accept such a nonsensical application of OFAC's FAQ 553.[6]  *See United States v. Ali Sadr Hashemi Nejad*, No. 18-cr-224 (AJN), 2019 U.S. Dist. LEXIS 211911, at *23–24 (S.D.N.Y. Dec. 6, 2019) ("In interpreting regulations, courts apply all the 'traditional tools' of construction. . . . [T]he Court must 'carefully consider' [the regulation's] 'text, structure, history and purpose'. . . guided by the maxim that 'the meaning of doubtful terms or phrases may be determined by reference to their relationship with other associated words of phrases (*noscitur a sociis*).'  Courts rely on this cannon of construction 'to avoid ascribing to one word [or phrase] a meaning so broad that it is inconsistent with its accompany words.'"); *United States CFTC v. Byrnes*, 53 F. Supp. 3d 319, 323–24 (S.D.N.Y. 2014) ("When interpreting a statute or regulation, we are required to read the statute or regulation as a whole, since the meaning of statutory language, plain or not, depends on context.").

## 2.  OFAC's Guidance and the Objectives of OFAC Sanctions Support D-R's Position That a Party Can Accept a Payment Outside the Agreed-Upon Payment Period.

Ultimately, Ms. Rice opined that the parties' agreement in November 2017 to make and accept the third payment approximately seventy days late did not transform the Note Agreement into "new debt."  (Tr. 125:9–11.)  At trial, Ms. Rice explained: "***It did not transform the preexisting debt into new debt*** because, as noted in [FAQ] 553, it is explicitly stated by OFAC

---

[6]  As Mr. Barker concedes, "OFAC knows how to be very specific, whether it's in the Executive Order or in the FAQs.  If there is a line, they are going to provide that because they have to provide guidance that everyone can rely on that can be replicated."  (Tr. 340:15–19.)  It follows that OFAC thus would not include language in FAQ 553 that it did not intend or that would result in an illogical application of E.O. 13808.

that *U.S. parties are permitted to accept late payment from PDVSA* or other government of

Venezuela entities *even if they pay after the agreed-upon time*." (Tr. 125:9–17 (emphasis added).)

As Ms. Rice made clear, D-R's agreement to accept the third quarterly payment after it was

originally due was

> *not a renegotiation of the overall payment period*, meaning the period between the
> date of issuance and the final date on which the debt is fulfilled, the debt repayments
> are fulfilled. Rather, *it is simply acknowledging that [D-R] will accept the
> payment late, which, again, under 553 is clearly noted as something that is
> permissible for U.S. parties to do*.

(*Id.* 125:18–126:3 (emphasis added).)

In forming her opinion, Ms. Rice relied not only on the plain language of E.O. 13808 and

FAQ 553, but also her discussions with OFAC regarding E.O. 13808 and similar sanctions

programs, as well as her knowledge of the objectives underlying OFAC's sanctions policies. (*See*

Tr. 136:5–7 ("Looking at how OFAC sanctions programs functions in general and their overall

policy and purposes for existence to me was also something that I considered in forming my

opinion."); 136:21–25 ("So taking that into consideration also informed my opinion, in this case,

the language in 13808 and 553, taken together, do not cause an impossibility for PDVSA to issue

payment to Dresser-Rand under the [N]ote and [N]ote [A]greement.").) Ms. Rice explained at

trial that, while at JPMorgan in 2014, she reached out to OFAC to better understand the parameters

of the Russia sanctions program, which she described as "quite similar" to the Venezuela sanctions

program. (*See id.* 131:4–12.) She sought guidance from OFAC regarding what, under the Russian

sanctions program, "would constitute a change to the terms of an existing contract that would

render that to fall within the scope of new debt." (*Id.*) OFAC advised, in Ms. Rice's words: "a

change that renegotiated the original terms of the contract or . . . the formal underlying terms of

the contract" would convert pre-existing debt to "new debt." (*Id.* 131:20–132:2.) Then, while at

Bank of Tokyo, Ms. Rice contacted OFAC with the same question—this time in the context of E.O. 13808 and the Venezuela sanctions program. (*Id.* 133:19–25.) OFAC gave the same response; in Ms. Rice's words: "a change to the terms of the debt, of a preexisting debt, has to be the underlying material formal terms of the contract [to constitute 'new debt']." (*Id.* 134:1–11.)

The advice OFAC provided and Ms. Rice's interpretation of E.O. 13808 and FAQ 553 are consistent with the objective of OFAC sanctions. As Ms. Rice explained, the "objective of OFAC sanctions in general . . . is to deprive the foreign target of resources and punish the foreign target while not punishing the U.S. parties." (Tr. 132:3–11; *see also id.* 117:5–21, 118:5–11 ("The purpose of OFAC sanctions, U.S. sanctions in general, is to punish the target of the sanctions, meaning the foreign entity who is targeted by the sanctions, and not to harm U.S. persons in any way.").) "The idea and objective," of sanctions, "is not for U.S. persons to lose out on all of their money." (*Id.* 136:16–20.) With respect to E.O. 13808, Mr. Barker conceded that "OFAC's policy here is, it didn't want to have the creditors negotiating away or providing a discount on the debt without the U.S. Government involvement in determining whether for foreign policy reasons it wished to permit that to go forward." (Tr. 339:25–340:4.) Consistently, Ms. Rice explained E.O. 13808 intended "to close a loophole whereby a party could utilize or could take advantage of preexisting debt to simply extend the period of that debt and the amount to allow it to continue indefinitely and thereby just continue to create new debt rather than having the original preexisting debt expire with the timeline that was originally set for it." (*Id.* 225:13–22.)

Against this backdrop, Ms. Rice's interpretation of E.O. 13808 and FAQ 553 is the more logical and reasonable interpretation. As Ms. Rice reasoned:

> [I]f all a foreign party had to do in order to not have to pay under a preexisting contract with a U.S. person was to not make payment on time and then all of a sudden, you know, there's a restriction that doesn't allow the U.S. party to accept that payment anymore, that just wouldn't make a great deal of sense in preventing

17

harm to U.S. persons.

> On the other hand, it does make a lot of sense when OFAC's guidance that was provided at the time and also reflected in 553, FAQ 553, is put in the context of a change to the payment terms that may allow for additional resources to be extended to the foreign party would be prohibited but for a U.S. person to continue to collect on preexisting debt even if a foreign person fails to pay them within the permissible time frame under the contract. That does make sense. So that's why, for me, it was not something that I took issue with, and I agreed with the guidance I was given.

(*Id.* 132:12–133:2.) In other words, the Court's observation at trial that Ms. Rice "perceives a difference between agreeing to accept a late payment instead of no payment at all, and changing the underlying operative terms of the agreement as a whole" was spot on. (Tr. 237:19–22.)

Recognizing that its position is only workable if one remains willfully blind to the policy objectives that sanctions like E.O. 13808 are meant to support, PDVSA has sought to exclude Ms. Rice's testimony about her discussions with OFAC as hearsay. (PDVSA Pre-Trial Brief at 21–22.) However, these discussions are precisely the type of testimony admissible under Federal Rules of Evidence 703 ("Rule 703"), which provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. ***If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.*** But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703 (emphasis added). The Second Circuit and other district courts in this Circuit have consistently applied this rule to hold that "[e]xpert witnesses may testify to opinions based on hearsay or other inadmissible evidence where experts in the field reasonably rely on such evidence in forming their opinions." *United States v. Sabir*, No. 05 Cr. 673 (LAP), 2007 U.S. Dist. LEXIS 34372, at *30 (S.D.N.Y. May 9, 2007); *see also, e.g.*, *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (holding testimony given by police officer based on interviews with gang members, statements by other law enforcement officers, statements from telephone calls between

gang members, and online materials could be admitted because the police officers "routinely and reasonably rely" on such hearsay statements in drawing their conclusions"); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 145 (S.D.N.Y. 2003) (finding expert testimony as to whether defendant's accounts receivable were non-reimbursable accounts was not hearsay because expert, a CPA, "reasonably relied on documents supplied by defendants to make a determination of how defendants accounted for their accounts receivable"). In fact, Rule 703 has been held to be even more applicable in the context of a non-jury trial: "When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying admissible information and will not rely on that information for any improper purpose." *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 454–55 (S.D.N.Y. 2016) ("Rule 703 contains no such limitation on a non-jury trial, and . . . the Supreme Court has stated that the Federal Rules place no restriction on the revelation of such information to the factfinder").

Here, PDVSA's own expert has conceded in agreement with Ms. Rice that it is common practice to directly contact OFAC to seek guidance with respect to compliance-specific questions, and practitioners routinely rely on OFAC's guidance in forming their opinions. (*See* Tr. 131:13–19, 134:2–4, 347:2–3.) In fact, at trial, Mr. Barker repeatedly deferred to OFAC's guidance, solidifying the notion that OFAC's guidance on these issues is critical and routinely is relied upon by practitioners in the field. (*See id.* 377:9–15, 383:18–20 ("I probably would take that to the regulator, yes."), 384:16–19 ("In advising a financial institution, or any of the parties here, I would take it to OFAC. And what we are trying to do is, we are now trying to think of, what would OFAC think if OFAC were to think about it?"), 384:23–25, 386:5–9 ("I'm not the one who makes the rules. OFAC makes the rules. . . . But that's something I would certainly take to OFAC to get.")) Accordingly, the Court should admit Ms. Rice's testimony about her discussions with OFAC,

especially because, based on her extensive academic and practical experience with OFAC sanctions, Ms. Rice agreed with the guidance she received from OFAC regarding "new debt" (*see id.* 130:17–131:3, 132:25–133:2), and, moreover, because Ms. Rice's discussions with OFAC were not the only basis for her opinion that D-R's acceptance of the third quarterly payment after it was originally due did not convert the Note Agreement to "new debt" (*see id.* 136:5–7; 136:21–25).  *See Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 323 (E.D.N.Y. 2013) (finding expert's testimony about whether individuals were members of a terrorist organization was not hearsay because expert's report "demonstrates that he has applied his expertise to analyze the underlying evidence. He pulls together information from discrete sources, including sources that may be independently admissible, and cross-references it against other supportive or contradictory information in reaching his conclusions. Moreover, the type of material [expert] relies upon reasonably forms the basis for the opinions of other experts in the field."); *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 371 n.36 (S.D.N.Y. 2001) (admitting expert testimony regarding NYPD "code of silence," which relied on conversations with officers, because "[t]he need to present that basis substantially outweighed any prejudicial unreliability that may inhere in the hearsay, particularly given the expert's academic and investigative training in conducting interviews and evaluating their reliability").

### 3. D-R Did Not Forego Placing PDVSA Into Default or Charging Default Interest.

Impermissibly expounding upon a passing reference at trial by D-R's Head of Credit and Collections, Erik Scherzer, PDVSA's expert (Mr. Barker) made a last-ditch attempt to argue the parties "changed" the terms of the Note Agreement based on a supposition that the parties reached an "agreement" not to place PDVSA "in default" when it missed the October 2017 payment, and, as a result, the parties "amended the agreement" by not increasing the interest rate to the default

rate of 8.5%.  (*Id.* 342:21–343:1, 372:18–373:1, 373:17–374:2, 381:15–21 ("So I am supposing

from the testimony of Mr. Scherzer."))  Mr. Barker's deduction finds no support in the record.

       As a threshold matter, for Mr. Barker's conclusion to have any merit, one would have to

assume, as Mr. Barker does, that agreeing to not place PDVSA in default results in a change of the

interest rate provided for in the Note Agreement.  That is not accurate.  Rather, as Ms. Rice

explained, even if D-R were to waive PDVSA's default—which, as established below, it did not—

the parties did not agree to "change[] the interest rate applied and agreed upon under the terms of

the contract."  (Tr. 223:20–224:11; *see also* JX-53.)  The two interest rates provided for under the

Note Agreement (6.5% and 8.5% upon default) did not change at any point throughout the course

of the parties' relationship.  In fact, as Mr. Scherzer explained, no amendments were "signed and

effective" as it relates to the Note Agreement.  (*See* Tr. 30:18–23.)

       What's more, Mr. Barker misstates Mr. Scherzer's testimony.  Mr. Scherzer made clear, as

of November 29, 2017, when PDVSA requested the waiver, ***PDVSA was already in default***:

> Q:  And is it true that as of the 30-day request for a waiver, PDVSA was already
> behind on payment, ***and they were already technically in default***?
>
> A:  ***Correct.  Right.***  I mean, look, we had a great relationship with PDVSA, I think,
> up until that point, and we were hoping that they would work with us and that we'd
> find a way to a satisfactory conclusion where payments would be made.  So we
> didn't want to say, oh, yeah, you're in default.  So, yes, we agreed to the 30-day
> waiver.

(Tr. 73:9–17 (emphasis added); *see also* Tr. 73:6–8 ("Q. What was your understanding of those 30

additional days? A. It was an opportunity for them to figure out how they were going to facilitate

the payment to us.").)  Mr. Scherzer, who is not a lawyer, was simply explaining that given the

"great relationship" between D-R and PDVSA, D-R chose not to respond to PDVSA's request

wherein PDVSA "reiterate[d] its intention and ability to comply with all of its commitments under

the Note Agreement and remedy any delay in the payment of the unpaid interest," (JX-13) by

actually calling an Event of Default under the Note Agreement.  But by not doing so, D-R did not waive the then-existing default or its concurrent right to default interest, which began to run immediately upon PDVSA's failure to make the third quarterly payment when due.  (JX-1 § 2.04.)

In fact, when making the request, PDVSA made clear it would "***remedy any delay in the payment of the unpaid interest*** as soon as possible."  (JX-13 (emphasis added).)  As Mr. Barker conceded, PDVSA did not indicate it would only pay the regular interest and not the default interest required.  (*See* Tr. 379:5–11 ("Q. Does that indicate that PDVSA was saying we will only pay the regular interest and not the default interest if that's required? A. There's no reference to default interest here.").  Rather, PDVSA confirmed it would "comply with ***all of its commitments*** under the Note Agreement," which includes its commitment to pay all unpaid interest, which at the time included default interest.  (JX-13 (emphasis added); *see also* Tr. 379:8–11 ("Q. And, in fact, PDVSA says it's going to comply with all of its commitments, including unpaid interest, right? A. That's right.").)  At bottom, PDVSA did not ask for and D-R did not grant relief from default interest at any point.  (*See* JX-13, JX-15; Tr. 380:3–13.)

With this in mind, the more reasonable conclusion is that D-R was simply agreeing to accept an already late payment without affecting its right to other remedies related to the late payment.[7]  As explained by Ms. Rice:

> Q. . . . ***So in your view, if PDVSA had paid on December 28, 2017, that it would – that would be considered a late payment?*** . . .
>
> A. ***Yes, that would have been a payment that was received by Dresser-Rand late.***  And I would differentiate that from, for example, if after receiving the letter from

---

[7]  Nor would the conclusion be any different if D-R's conduct was deemed to constitute a waiver of default.  Under New York law—which governs the Note Agreement (*see* JX-1 § 9.07)—a "waiver" is not synonymous with a "change," despite Mr. Barker's testimony to the contrary (*see* Tr. 374:3–6).  New York law treats "waivers" of a contractual right as distinct from a modification to the underlying agreement.  *See Hidden Brook Air, Inc. v. Thabet Aviation Int'l. Inc.*, 241 F. Supp. 2d 246, 269 (S.D.N.Y. 2002) ("The legal implications of a waiver differ from those of an enforceable modification."); *O'Connor v. Curcio*, 281 A.D.2d 100, 102 (2d Dep't 2001) ("There is a distinction between a modification agreement and a waiver.").  Thus, under New York law, D-R's alleged "waiver" of calling an Event of Default does not amount to a "change" in the terms of the Note Agreement.

PDVSA, the parties had gone back to the original contract and renegotiated the entire repayment terms so that the span of the term was in some way altered, for example, by pushing out the end of the repayment period.

(Tr. 222:8–23 (emphasis added).)

As noted above, PDVSA was in fact in default when its payment was late, independent of any action taken (or not taken) by PDVSA. As Mr. Barker conceded, the Note Agreement provides that PDVSA is in default, and the default interest rate is applied, "the minute payment is late." (Tr. 375:13–16, 376:2–5.) Section 2.04 of the Note Agreement provides, in relevant part:

> **Default Interest**. If (a) the Issuer shall *default in the payment of any principal of or interest on any Note* or other amount due hereunder or under any other Finance Document, by acceleration or otherwise (including automatic acceleration), *__or__* (b) if any Event of Default under Article VII (other than clause (a), (b) or (f) of Article VII) has occurred and is continuing and the Required Noteholders accelerate the Notes or direct the Administrative Agent to accelerate the Notes, then, . . . for so long as such Event of Default is continuing or until the Required Noteholders agree otherwise . . . all amounts outstanding under this Agreement and the other Finance Documents shall bear interest . . . payable on demand, based on and computed on the basis of actual number of days elapsed on a year of three hundred sixty five (365) days, at a rate per annum equal to eight and one-half percent (8.50%).

(JX-1 § 2.04 (emphasis added).) Subsections (a) and (b) of Section 2.04 are disjunctive. Subsection (a) does not require that the Noteholder or Administrative Agent accelerate the Note; upon default in the payment of "any" principal or interest, the default interest rate of 8.5% *automatically* applies. Mr. Barker conceded as much at trial:

> Q: So it is your view, sir, that when the payment was late on October 21, or really, October 20 at 12:01 pm, when that payment was late, that default interest automatically applied?
> A: For that one payment, yes, not for the whole.
> Q. Right, for the one payment because it hadn't been accelerated?
> A: Right.

(*See* Tr. 374:18–375:19; *id.* 381:9–10 ("So by operation of the note, my reading of the little "d" default is that it automatically triggered the 8.5 percent.")

In any event, even if D-R somehow failed to take some action PDVSA claims was required (a position, not surprisingly, which PDVSA did not take when seeking more time to make its payment in November 2017), its failure to do so in the context of the third payment does not constitute a waiver of D-R's rights under the Note Agreement. The Note Agreement provides:

> No failure or the delay of the Administrative Agent or any Noteholder in exercising any power or right hereunder or under any other Finance Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

(*Id.* § 9.08.) Courts in this Circuit consistently enforce such provisions and hold that language similar to that in Section 9.08 of the Note Agreement is sufficient to preclude the argument that PDVSA now makes. *See, e.g.*, *Exp.-Import Bank of the United States v. Agricola del Mar BCS, S.A. de C.V.*, 536 F. Supp. 2d 345, 351 (S.D.N.Y. 2008) (holding that stipulation in Notes "that no conduct by the Note holder or its successors shall constitute a waiver of any rights" is "sufficient to preclude" waiver argument); *S. Fed. Sav. & Loan Ass'n v. 21-26 E. 105th St. Assoc.*, 145 B.R. 375, 383 (S.D.N.Y. 1991) (enforcing provision in the contract that state "no failure on the party of the Bank to exercise, and delay in exercising, any right shall operate as a waiver thereof").

### C.    PDVSA's Expert is Not Independent or Objective in Light of His Personal, and His Firm's, Representation of PDVSA and Related Entities.

In addition to the substantive shortcomings discussed above, Mr. Barker's opinion that OFAC would view the Note Agreement as "new debt" is not credible due to Mr. Barker's apparent bias. While Mr. Barker is not counsel of record for PDVSA in this case, his role as PDVSA's counsel in other, related matters precludes any possibility of offering objective and reliable opinions to the Court. *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589 (1993) (explaining that to be admissible, expert testimony must be relevant and reliable); *see also* Fed. R. Evid. 702(c) (permitting expert testimony that is "the product of reliable principles and methods").

In particular, as Mr. Barker concedes, he is an equity partner at the law firm of Arnold & Porter, acts as counsel for the interim Government of Venezuela, including for the benefit of PDVSA, and has himself done work for the Government of Venezuela.  (*See* Tr. 332:9–18, 365:18–336:1.)  In fact, Mr. Barker's firm had at least $3 million worth of business in 2019 and 2020 from work performed for the interim Government of Venezuela, which represents a mere fraction of the fees collected by Arnold & Porter for nearly 40 years that the firm represented the Government of Venezuela.  (*See id.* 332:15–333:2, 365:1–13.)  Critically, Mr. Barker admitted to having "provided OFAC compliance advice" for "PDVSA under the direction of the ad hoc board appointed by President Guaidó and the Central Bank of Venezuela under the direction of the ad hoc board appointed by President Guaidó" as well as other "entities owned and controlled by the Bolivarian Republic of Venezuela."  (PDVSA Ex. F at 1–2.)  Thus, there is no disputing that, as an equity partner, Mr. Barker benefits from the work (including any continued work) that Arnold & Porter does for the Venezuelan government (*see id.* 333:9–12), both with respect to Mr. Barker's equity interest in the law firm, as well as his individual compensation, which is based on the number of hours that he works, including his work for the Venezuelan government.

Courts in the Second Circuit routinely disallow expert testimony in situations like this, where a party's expert also serves as that party's attorney.  The reason being, as this Court has recognized: there is a basic and unavoidable tension between a lawyer's role as an advocate, whose ethical "duty [is] . . . to represent his client zealously within bounds of the law," and the role of an expert, whose value depends on his "detachment and independence."  *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688–89 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *see also Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 184 (E.D.N.Y. 2001) ("When expert witnesses become partisan, objectivity is sacrificed to the need to win.").  While it is true that Mr. Barker was never

counsel of record in this action, his testimony can hardly be deemed independent or objective given his financial incentives attendant to his firm's representation of PDVSA and related entities, and his understandable desire to further that relationship, all of which calls into question his already suspect expert opinions.

## IV.    THE EVIDENCE PROVES THAT BANK POLICIES DID NOT RENDER PDVSA'S PERFORMANCE OBJECTIVELY IMPRACTICABLE

The second premise for PDVSA's impossibility defense is that, even if payment to D-R was not prohibited by OFAC sanctions, it would nonetheless be stopped by banks' "risk appetite" policies.  Relying on the policies of two banks—Citibank and Deutsche Bank—PDVSA claims that payment was objectively impracticable because **all banks** were unwilling to process PDVSA transactions given a perceived reputational risk in doing so.[8]  (*See* Tr. 355:10–18.)

The evidence proves otherwise.  While Citibank and Deutsche Bank may have had their own unique policies that effectively prevented payment from PDVSA to D-R when those banks were involved, **no less than five banks** did not:  the testimonial and documentary evidence shows that at least two other banks, Commerzbank and Novo Bank, would have processed the payments, and it is undisputed that JPMorgan, China CITIC Bank ("China CITIC"), and Dinosaur Merchant Bank – Zuma Bank ("DMBL") actually did process **the specific payments at issue**.

Moreover, when the parties identified Commerzbank and Novo Bank as avenues for PDVSA to make payment, PDVSA went silent.  PDVSA never attempted to make payment to Commerzbank or Novo Bank, even though these alternative were requested by PDVSA.  Having ignored these viable alternatives, PDVSA cannot meet its burden to prove that it took "virtually every action within its powers to perform its duties under the contract."  *Transfield ER Cape Ltd.*

---

[8]  PDVSA does not and cannot point to any evidence that any bank rejected a payment from PDVSA to D-R based on OFAC sanctions.  Mr. Barker conceded that he had not seen any evidence that "any bank flagged any payment from PDVSA that was supposedly header to Dresser-Rand as violative of OFAC sanctions."  (Tr. 388:21–23.)

*v. STX Pan Ocean Co.*, No. 09 CIV. 1250 (JGK), 2009 WL 691273, at *3 (S.D.N.Y. Mar. 16, 2009); *see also Local 338, RWDSU v. Farmland Dairies, Inc.*, 2003 U.S. Dist. LEXIS 3676, at *13-14 (S.D.N.Y. Mar. 14, 2003) ("The party pleading impossibility as a defense must demonstrate that it took virtually every action within its powers to perform its duties under the contract. Although [Defendant] took substantial steps to perform its duties under the Collective Bargaining Agreement, it cannot claim that it took virtually every action within its power to perform its duties."). For these reasons, discussed in full below, PDVSA's argument that bank policy made its performance objectively impractical fails.

### A.    Citibank and Deutsche Bank's Risk Appetite Policies Regarding The Venezuelan Sanctions at Issue Are Uniquely Restrictive and Not Representative of Other Banks' Policies.

PDVSA argues that the risk appetite policies employed by Citibank and Deutsche Bank with respect to transactions involving PDVSA, which resulted in the rejection of PDVSA's attempted payments by those banks, are reflective of the financial industry generally. (*See* Tr. 355:6–10.) The record, however, demonstrates that risk appetite is subjective and highly variable across banks. Indeed, the Citibank and Deutsche Bank policies differ far more than they concur, and there is no evidence that these policies are representative of the industry as a whole.

Risk appetite is an additional component of a bank's compliance program, alongside regulatory compliance. (*See* Tr. 172:3–14.) While regulatory requirements establish a minimum standard with which all banks must comply, a bank will also factor-in its own unique risk appetite or risk tolerance to determine if a transaction should be processed. (*See id*. 172:3–173:3; *see also id.* 144:8–12.) Unsurprisingly, some banks may be more risk-averse than others, which means that specific risk appetite policies "may vary from bank to bank, as well as from the sanctions themselves, perhaps being more restrictive than the sanctions in some cases." (*Id.* 172:3–14.) This variance is apparent even as between the Citibank and Deutsche Bank policies that PDVSA touts.

27

Citibank's risk appetite with respect to transfers from PDVSA is reflected in its policy to reject all transactions with PDVSA unless, in the case of specific Citibank clients, the client has been pre-approved following a manual certification process. (*See id.* 149:14–21 ("A program was implemented based on our risk appetite and our own risk assessment . . . ."), 180:11–181:3.) To obtain pre-authorization, Citibank required its clients to submit a sanctions compliance certification form and anticipated transaction profile. (*See id.* 149:14–21, 151:3–9; *see also* JX-18, JX-20.) This was a policy created in June or July 2017 out of Citibank's "own discretion," and, notably, within that discretion, Citibank could permit exceptions to the pre-clearance policy. (*See* Tr. 165:1–7, 166:12–23.) However, as Ms. Rice testified, by rejecting *any* transaction that was not pre-cleared, Citibank's policy is significantly more restrictive than E.O. 13808, which only prohibits transactions involving "new debt." (*See* Tr. 180:11–181:3.)

Deutsche Bank took a different approach. Beginning in September 2017, Deutsche Bank applied a "Venezuela Decision Matrix" to any transaction involving a Venezuela-related entity, like PDVSA. (Tr. 310:23–311:15; JX-59 ¶ 8; JX-65.) The matrix was developed entirely by Deutsche Bank based on Deutsche Bank's own interpretation of OFAC rules and regulations. (*See* JX-59 ¶ 13.) When applied, this matrix directs the "pass/release" or "delete/reject" of a particular transaction depending on the nature of the transaction—*e.g.*, whether a Deutsche Bank client was involved, whether Deutsche Bank was acting as an intermediary bank, and whether the purpose of the transaction was clear. (*See* JX-65; *see also* JX-59 ¶¶ 8, 19.) As Ms. Rice explained, "most of the guidelines that Deutsche Bank has set out [in the matrix] are, in fact, fully reflective or exactly matching what the regulatory requirements are under [E.O.] 13808."[9] (Tr. 191:8–11.) However,

---

[9] For instance, the matrix directs "pass/release" for any transaction involving new debt where there is no indication that the debt has a maturity of greater than 90 days, in the case of PDVSA, or 30 days, in the case of the Government of Venezuela other than PDVSA. (JX-65.) Similarly, the matrix says that if a Deutsche Bank client is involved and

in the narrow instance where Deutsche Bank is acting as an intermediary bank and Deutsche Bank does not know the purpose of the transaction, the policy is more restrictive than E.O. 13808 in that it calls for "delete/reject" actions in such a scenario even if, in fact, the transaction does not involve new debt. (*See* Tr. 191:11–21; *see also* JX-59 ¶ 19.)  That is exactly what happened in this case, which led to Deutsche Bank rejecting PDVSA's November 21, 2017 payment attempt. (*See* JX-59 ¶ 19; Tr. 311:16–314:11.)

What Citibank and Deutsche Bank's policies represent are two disparate approaches to processing transactions involving PDVSA—with Citibank's policy being significantly more restrictive than E.O. 13808, such that no transactions would be processed without its client completing a certification process (or, in the case of D-R, as discussed *infra* Section IV.B, even if the certification was completed), while Deutsche Bank's policy is largely consistent with E.O. 13808 except in one limited circumstance that happened to apply to PDVSA's attempted payment to D-R.  Thus, PDVSA's position that the policies employed by Citibank and Deutsche Bank are reflective of the financial industry's reluctance to process payments from PDVSA is not credible for two reasons:  *First*, given that Deutsche Bank's risk appetite is to a great degree perfectly consistent with E.O. 13808, it is untenable to claim, as PDVSA's expert (Mr. Barker) does, that Deutsche Bank's policy demonstrates that banks industry-wide were "very reluctant" to process PDVSA transactions even if permissible under Executive Order 13808.  (*See* Tr. 351:13–17, 355:6–18.) *Second*, the fact that Citibank's and Deutsche Bank's policies are meaningfully distinct makes it all the more evident that they are not reflective of an industry-wide trend; the only proposition that those policies do reflect is that risk appetite is highly variable bank-to-bank—a proposition that finds further support once the policies and practices of other banks are considered,

---

Deutsche Bank is able to clarify that the transaction does not involve new debt, the transaction qualifies for "pass/release." (*Id.*)  Both cases are fully consistent with E.O. 13808. (*Compare* JX-41 *with* JX-65.)

as the following sections show.  (*See also id.* 187:25–188:24, 206:15–20.)

**B.    When it Became Clear that Citibank was No Longer an Option, Commerzbank and Novo Bank Were Identified as Viable Alternatives.**

In an attempt to distract from its own inaction, PDVSA focuses on D-R's supposed failure to complete Citibank's manual certification process, claiming that this failure foreclosed the only option PDVSA had to make payment under the Note Agreement.  (PDVSA Pre-Trial Br. at 12.) This is wrong.

The evidence shows that D-R took the opportunity to obtain pre-clearance with Citibank very seriously, only to be rebuffed at the last minute.  D-R's general counsel, Denise Hansen, and Siemens' treasury team were involved in many discussions with Citibank throughout November and December 2017.  (*See* JX-16 at 6.)  Indeed, the D-R legal team deemed the matter a "top priority," even retaining outside counsel to thoroughly consider Citibank's compliance certification paperwork.  (*See id.*; *see also* Tr. 85:6–9, 87:3–4.)  D-R's general counsel went on to provide comments to Citibank's form documents to ensure that they were "in compliance with the sanctions orders"—all the while advising Citibank that the process is "***very important***" to D-R. (JX-16 at 6 (emphasis added).)  Yet, after weeks of time and effort, on December 19, 2017, Citibank suddenly "switch[ed] gears," and told D-R that even with the certification paperwork in place, the payments would still not be processed.  (*See* JX-16 at 2; *see also* Tr. 91:6–20.)  It was for this reason that D-R did not submit the certification form.  (*See* Tr. 59:2–7.)

The documentary evidence shows that Citibank was aware that this changed position could "bring[] negative origination to the relationship." (JX-16 at 2.)  This news followed an email from the Latin American relationship manager at Citibank, Carolina Juan (*see* Tr. 163:17–23), on December 17, 2017, wherein Ms. Juan noted that Citibank "[m]ost likely . . . will be unable to process" the payment and stressed the importance of "avoid[ing] to confuse the client and create

unrealistic expectations." (JX-16 at 2; *see also* Tr. 91–6–20.)  Understandably so; Guido Petruzelli, Siemens Capital Company LLC's Head of Global Liquidity and Interest Rate Risk Management, testified at trial that when Citibank communicated this development to him, he "felt like [Citibank] had wasted about a month's worth of time with various people" and left D-R "extremely disappoint[ed]." (Tr. 91:26–92:6, 92:17–93:3.)  Thus, this was not a case of D-R being unwilling to appease Citibank; to the contrary, D-R dedicated significant resources, only to be then be told that its efforts were for nothing.

More importantly, Citibank was not the only option available to PDVSA to make the payment required under the Note Agreement.  The parties discussed at least two viable alternatives—Commerzbank and Novo Bank.

### 1.    PDVSA Concedes That It Ignored the Commerzbank and Novo Bank Alternatives That D-R Provided.

On December 18, 2017, PDVSA asked D-R to "provide another account at another bank in order to reprocess the outstanding debt service payment to date." (JX-15 at 2; *see also* Tr. 31:9–20.)  On December 27, 2017, D-R provided PDVSA with the account information for a Commerzbank account held by Siemens AG through which D-R was able to accept payment. (JX-15 at 1; *see also* Tr. 30:4–12, 31:1–8.)  D-R followed up with PDVSA on January 16 and January 19, 2018. (*See* JX-23 at 1.)  But, as PDVSA now concedes, "PDVSA did not respond to D-R's outreach regarding the Commerzbank Account," nor is there any evidence that PDVSA attempted to make a payment into the Commerzbank account. (*See* Agreed Facts 10–11; *see also* Tr. 31:21–23, 32:23–33:3, 44:23–45:16.)  History would repeat itself a few weeks later.

On February 20, 2018, PDVSA asked D-R if it would accept payment in Euros, as opposed to U.S. Dollars, through PDVSA's bank, Novo Bank. (JX-33 at 2–3; Tr. 32:7–15, 33:8–34:13, 64:11–22.)  On March 2, 2018, D-R indicated that it could accept payment in Euros and would

even open its own account at Novo Bank "if PDVSA considers that this would expedite the Novation payments." (JX-33 at 2–3; *see also* Tr. 34:14–17, 35:1–5.) Yet, despite D-R again expressing its willingness to consider and utilize alternatives for PDVSA to make payment, PDVSA again went silent. D-R went so far as to prepare an amendment to the Note Agreement to reflect the payment in Euros. (Agreed Fact 13; Tr. 36:15–18.) PDVSA concedes that, although D-R followed up with PDVSA via email on March 9, April 2, and April 4, 2018, to attempt to schedule a meeting to discuss PDVSA's overdue interest payments—including outreach by the CEO of Siemens Venezuela, Herbert Stegemann—"there is no evidence in the record that PDVSA responded to D-R's outreaches." (Agreed Fact 13; Tr. 36:21–24.) Having been flatly ignored by PDVSA, D-R did not tell PDVSA that the Novo Bank account was ultimately opened in October 2018.[10] (*See* JX-37; *see also* Tr. 35:6–9 ("I'm not aware of that because I don't think that PDVSA was talking to us by then."), 65:3–13.) There is also no evidence of PDVSA following up with D-R regarding *its own request* to arrange payment through Novo Bank.

The record is clear that PDVSA ignored the option of utilizing Commerzbank and Novo Bank to make payment to D-R. This alone is fatal to PDVSA's impossibility defense, under which PDVSA must prove that it took "virtually every action within its powers to perform its duties under the contract." *Transfield ER Cape Ltd.*, 2009 WL 691273, at *3. Moreover, the record shows that both Commerzbank and PDVSA would have processed the payments—if PDVSA had only tried.

### 2. Commerzbank and Novo Bank Would Have Processed Payments From PDVSA to D-R.

Contrary to PDVSA's assertion that the financial industry "standard" was to reject

---

[10] PDVSA has implied that D-R was dilatory in its efforts to open a Novo Bank account. (*See* PDVSA Pre-Trial Br., ECF No. 119, at 16 ("[D-R] finally opened an account with Novobank on October 22, 2018 …"); Tr. at 65:3–4 ("When [D-R] finally did open up that account….").) The truth is that D-R promptly began the "labor-intensive process" (Tr. 34:14–21) of opening a new account in early April 2018—at the same time that it was trying, in vain, to arrange a meeting with PDVSA. (JX-36 at 17.)

transactions involving PDVSA (Tr. 355:6–18), the evidence demonstrates that Commerzbank and Novo Bank would have processed a payment from PDVSA to D-R during the relevant timeframe.

Commerzbank policy with respect to transfers involving Venezuelan persons—and, by extension, PDVSA—is reflected in a documented titled "Bolivarian Republic of Venezuela: Business Policy Restrictions" (the "<u>Commerzbank Policy</u>"). (*See* JX-64.) Notably, this document did not become valid until April 30, 2018; prior to that date, Commerzbank did not have any business policy restrictions applicable to PDVSA.[11] So, even if Commerzbank adopted a policy that would result in the rejection of transfers from PDVSA to D-R—which, as established below, was not the case—it did not do so until April 30, 2018, well after the third and fourth payments were due (by October 20, 2017 and January 20, 2018, respectively), and even after the fifth overall payment was due (by April 20, 2018). (*See* JX-2 at Ex. A.)

More importantly, the Commerzbank Policy, by its plain terms, does not prohibit payment from PDVSA to D-R. While PDVSA's expert was unwilling to state an opinion on the record at trial as to whether Commerzbank would have accepted a payment from PDVSA under the Note Agreement (*see* Tr. 10–13), Mr. Barker did form such a view in his expert report. (*See* PDVSA Ex. F at 14.[12]) Specifically, relying on Section 3.3 of the Commerzbank Policy, Mr. Barker is of the view that "transfers of funds from Venezuelan persons could only be processed if there were no 'indication for a connection to the financial system or jurisdiction of the United States' and the processing was not connected to the export of certain equipment and goods." (PDVSA Ex. G at

---

[11]  In discovery in this action, a subpoena was served upon Commerzbank directing Commerzbank to produce documents "sufficient to show Commerzbank's policies with respect to the receipt or transfer of funds of PDVSA." Aside from Commerzbank's Global Sanctions Policy and Global Sanctions Screening Policy, which set forth Commerzbank's sanctions screening policies generally, the only document identified by Commerzbank was the Commerzbank Policy, first made effective on April 30, 2018, and its subsequent versions.

[12]  As noted at trial and in D-R's Pre-Trial Brief, D-R objects to PDVSA's submission of an amended expert report three months after the close of expert discovery. (*See* Tr. 319:21–320:15; D-R Pre-Trial Brief at 18–19.)

14; *see also* Tr. 392:25–393:24.)

But, Section 3.3 of the Commerzbank Policy includes no such prohibition. The first paragraph of Section 3.3 of the Commerzbank Policy addresses and prohibits transfers of funds "***to*** Venezuelan persons . . . if there are indications for a connection to the financial system or jurisdiction of the United States." (JX-64 § 3.3 (emphasis added); *see* Tr. 204:7–205:23). As Mr. Barker concedes, this prohibition does not apply because the transfer here is a transfer ***to*** a non-Venezuelan person, D-R. (*See* Tr. 394:4–10 ("Q. . . . The first part of 3.3 has a prohibition of transfer to Venezuela persons, right? . . . So that wouldn't apply, correct, in this instance, right? . . . A. I'm sorry. Yes.").) The second paragraph of Section 3.3 contains a prohibition on transfers in connection with the export of certain goods, which is likewise inapplicable. (*See* JX-64 § 3.3.) The third paragraph then says that "transfers of funds . . . to a Venezuelan person . . . or for use in Venezuela or ***from a Venezuelan person*** … ***may be processed***, if there are no links to the above mentioned restrictions." (*Id.*) Because, as Mr. Barker acknowledges, none of the restrictions in paragraph one or two of Section 3.3 apply to a payment ***from*** PDVSA ***to*** D-R, such a payment is permitted under the third paragraph of section 3.3. (*See* Tr. 396:1–6.) As Ms. Rice explained, she "did not find anything within the policies produced by Commerzbank that indicates the bank would not have processed [the payment] base on [its] internal risk policies."[13] (Tr. 206:15–20.)

In the case of Novo Bank, there is no need for such analysis, as Novo Bank affirmatively represented that it did not have in effect any policy that would have prevented payment from PDVSA to D-R. On April 6, 2018, Siemens contacted a representative of Novo Bank, asking if the bank could "accept payments in EUR or USD from the Venezuelan state-owned company,

---

[13] Significantly, Ms. Rice worked as Director, Head of Sanctions Compliance for Commerzbank AG New York from 2015-2017, during which time she wrote the very policies that the Commerzbank sanctions compliance team—which she oversaw—implemented. (Tr. 108:11–109:18, 111:12–18.)

34

PDVSA." (JX-36 at 7–8.) Novo Bank responded that "[t]here are currently no embargoes or restrictive measures in place regarding commercial and financial transactions in Venezuela and, as such, there are no grounds for the rejection of transactions to and from Venezuela." (*Id.* at 7.) Thus, there can be no doubt that Novo Bank would have processed the payment.

The proposal to use Novo Bank—made by PDVSA—was attractive for the additional reason that PDVSA and D-R would have been using the same bank, making the transfer an "intrabank" transfer involving only one bank as opposed to two (originator and beneficiary banks) or three (originator, intermediary, and beneficiary banks). (*See* Tr. 208:4–20.) Thus, the fact that Novo Bank would have processed the payment effectively ensures that the payment would have been completed, since no other bank was involved that could have, in theory, rejected the payment based on its own risk appetite. (*Id.*) It is, therefore, apparent that Commerzbank and Novo Bank would have processed PDVSA's payment, if PDVSA had not ignored D-R's repeated outreaches or simply made the payments through these institutions. Further, PDVSA cannot meet its burden on the impossibility defense by ignoring the options presented and then claiming "no harm, no foul" since it now surmises that the options would not have worked.

### 3.    Commerzbank and Novo Bank Were Viable Alternatives.

PDVSA takes the position that neither Commerzbank nor Novo Bank was a viable alternative because either option would have created "new debt" prohibited by E.O. 13808 and/or was prohibited by the Note Agreement. This position, which was never communicated to D-R at the time these options were presented, finds no support in the record. (Tr. 36:15–24, 71:1–9.)

### i.    Utilizing Commerzbank or Novo Bank Would Not Have Created "New Debt."

Recognizing the objective of OFAC sanctions and the intent of E.O. 13808 discussed above (*see supra* section III.B.2), it is evident that changing the beneficiary bank from a Citibank account

held by D-R to a Commerzbank account held by D-R's parent company, Siemens, would not have created new debt. D-R would remain the ultimate beneficiary of the funds, and, thus, as Ms. Rice concluded, this would not "in any way chang[e] the underlying terms of the debt" to transform the Note Agreement from pre-existing debt into new debt. (Tr. 206:24–207:8.) The same logic would apply to a change from a Citibank account for payment in dollars to a Novo Bank account for payment in Euros; as Ms. Rice explained, "utilizing an alternative currency in this case would not in any way be an attempt to evade or avoid sanctions because the underlying payment itself was at all times permissible." (*Id.* 210:7–10.) Neither of these changes would have the effect of extending new credit to PDVSA, which of course was prohibited.

Not surprisingly, PDVSA and its expert, Mr. Barker, take a different view. Throughout his testimony, Mr. Barker took the position that FAQ 553 does not have a "materiality" qualifier and, thus, every change to the Note Agreement would convert the debt to "new debt." (*Id.* 339:21–25; 347:21–23, 363:2–8.) FAQ 553's non-exhaustive list of changes to the debt instrument that would convert pre-existing debt to "new debt" are, however, "things that are material to the underlying debt." (*See* Tr. 220:13–18 ("The examples that are given do suggest and show that the changes that OFAC is referring to here are things that are material to the underlying debt."), 232:15–23 ("something that would be – would characterize the debt and change to which could alter the key aspects of the debt, such as the overall length of the repayment period and/or the interest rate applied").)

Tellingly, when his theory was pressure-tested during trial, Mr. Barker was unwilling to take a position as to whether in fact any change to the Note Agreement—no matter how ministerial or inconsequential—would convert the debt to "new debt." (*See id.* 383:3–386:20.) At trial, Mr. Barker was given multiple hypotheticals regarding various changes to the Note Agreement, and

was asked whether those changes would convert the Note Agreement to "new debt." (*See id.* 383:7–386:20.) He was asked, for example, whether a change in the administrative agent's address in Section 2.08 of the Note Agreement would convert the debt to "new debt," and, in response, Mr. Barker took the position that he would have to consult OFAC: "I would probably take that to the regulator . . . ." (*Id.* 383:7–20; *see also id.* 384:9–25.) When asked whether a change to the notice recipient in Section 9.01(b) of the Note Agreement would convert the Note Agreement to "new debt," Mr. Barker stated that he would "certainly take [the issue] to OFAC," and that he was unwilling to state an opinion that it is new debt:

> THE COURT. The question, Mr. Barker is, are you willing, as you sit here, to state
>
> an opinion that it is new debt?
>
> THE WITNESS. No.

(*Id.* 385:1–386:20.) Thus, while Mr. Barker spoke with such conviction about FAQ 553 not having any qualifiers around the language "so long as the term of the debt instrument . . . agreed to by the parties do not change on or after August 25, 2017" (*see id.* 343:15–21, 347:18–348:2), Mr. Barker was ultimately unwilling to state an opinion on the record that every change to the Note Agreement, no matter how trivial, would convert the Note Agreement to "new debt."

Instead, Mr. Barker took the position that the regulator "would want to take a look … and determine whether the parties should proceed." (Tr. 340:24–341:6.) Boiled down, Mr. Barker's position is that OFAC would want to know about even the most trivial of changes to a debt instrument—such as a change to the address of the administrative agent or the addition of an additional notice party (Tr. 383:3–386:14)—even if those changes have no bearing whatsoever on the key terms of the debt. This is an exceedingly impractical position that would have the regulator bogged down in the minutiae of debt instruments, expending limited time and resources fielding

calls and processing licenses so that the most immaterial of changes could be authorized.[14]  This interpretation defies logic and reason, is not supported by the language of FAQ 553, and simply cannot be what OFAC intended.  The changes contemplated by the use of Commerzbank or Novo Bank did not alter the terms of the extension of credit, and thus would not have transformed the Note Agreement into "new debt."

**ii.    Payment to an Account Other Than Citibank, or Payment in Euros, Was Permitted Under the Note Agreement.**

PDVSA also argues that Commerzbank and Novo Bank were not viable alternatives because the terms of the Note Agreement precluded a payment into any account other than the Citibank account or payment in any currency other than U.S. dollars.  The record, however, establishes that neither was problematic.

With respect to a change in the recipient account, including a change from an account held by D-R to an account held by Siemens, Mr. Scherzer, was clear that if, for whatever reason, the designated Citibank account was unable to receive payment from PDVSA, D-R would have accepted payment through other means and other accounts.  (Tr. 18:12–17, 36:6–9.)  Indeed, as Mr. Scherzer explained, the Note Agreement itself was an agreement "to novate a number of unpaid invoices to various [D-R] and Siemens entities, to novate all of those invoices into a single agreement whereby PDVSA would pay us, over a period of three years, interest and principal." (*Id.* 12:22–13:6.)  Annex I to the Note Agreement sets forth all of the novated invoices held by various Siemens entities, including D-R, Dresser Rand de Venezuela, Siemens Energy, Inc.,

---

[14]  Mr. Barker also takes the bizarre position that OFAC would consider discussions about a particular change to be problematic, but that if the parties had simply implemented the change without discussion, there would be no issues. He testified that if the parties "just paid in euros and they didn't make any change to the agreement, I don't think that would have been a problem.  I mean, I think that would have been permitted…. But as soon as they talk about amending or changing that, I think that would be a problem."  (Tr. 359:5–15.)  This further highlights the absurdity of Mr. Barker's interpretation of the "new debt" language in E.O. 13808.

Siemens, S.A., and Siemens Industrial Turbomachinery, among others, that were captured by the Note Agreement. (*See* JX-1 at Annex I.) It is apparent that the Note Agreement was meant to streamline the collection of numerous invoices across numerous Siemens entities into one payment to D-R as the Administrative Agent; in short, to simplify things. (*See* Tr. 16:17–17:2 (Mr. Scherzer describing that, upon receipt of payment from PDVSA, it was D-R's "responsibility to distribute to the noteholders, which are the other Siemens entities that were participating in [the] novation").) Thus, for PDVSA to ultimately make the payment into the account of another Siemens-related debtor of PDVSA would not have been a material change to the terms of the Note Agreement.[15] (*See* Tr. 35:22–36:2 (". . . there would have been no functional reason why we wouldn't have taken the money into a Siemens account").

Similarly, payment in a currency other than dollars would have been entirely unremarkable and permissible under the Note Agreement. The various unpaid invoices novated by the Note Agreement consisted of debts in various currencies, including dollars, euros, pounds, and krona. (Tr. 13:7–11.) As in the case of the payment account, to now hold that the parties intended that payment would be made in U.S. dollars or not at all would be nonsensical. Moreover, the Note Agreement itself contemplates that payment could be made in a currency other than U.S. dollars. While Section 9.05 of the Note Agreement states that payments "shall be made solely and exclusively in Dollars," the Note Agreement also states that

> [i]f it becomes necessary to convert into Dollars any amount in any other currency, then that conversion shall be made at the rate of exchange quoted in the interbroker market by the Administrative Agent for the spot purchase of such original currency at the close of business on the Business Day immediately preceding the day such

---

[15] Tellingly, the Note Agreement also contemplated that PDVSA could make the payment directly to D-R as "Administrative Agent (at the offices at West 8 Tower, Suite 1000, 10205 Westheimer Road, Houston, TX 777042, Attention: Erik Scherzer and Martha Vance, *or* at the account set forth on Schedule 2.08)." (JX-1 § 2.08 (emphasis added); *see also* Tr. 18:3–11.) These alternative payment options confirm that the payment to D-R's Citibank account, as opposed to somewhere else, was not a material provision of the Note Agreement. Of course, PDVSA never attempted payment directly to D-R via check or other alternative options.

payment was made.

(JX-1 § 9.05(b).)  As Mr. Scherzer explained, U.S. dollars were specified as the preferred currency because "[i]t was just much easier for us to administer dollars," but D-R "would have happily accepted payments in other currencies."  (Tr. 14:20–15:7.)  And of course, if any amendment of the Note Agreement was required to pay into a different account, or in Euros, the Note Agreement provided for amendments in writing and signed by the parties.

PDVSA's objections that the Note Agreement prohibited payment to any account other than the specified Citibank account, or in any currencies other than dollars, is a transparent attempt to justify its complete failure to pursue the viable alternatives of Commerzbank and Novo Bank, particularly in light of the fact that PDVSA itself suggested the Novo Bank alternative.  Yet it is well-recognized that where "the part of the obligor's performance that is impracticable is so minor that it is still practicable for him to render substantial performance, his duty to do so is unaffected."  RESTATEMENT (SECOND) CONTRACTS § 270 cmt. b.  The fact is that the Note Agreement was put in place to ensure that PDVSA pays D-R; the Note Agreement's specification of an account to which that payment was to be made, and a currency in which it should be made, was simply a means to an end—not an end in itself.

### C.    At Least Three Other Banks Processed Payments by PDVSA Under the Note Agreement.

The record establishes that only two banks—Citibank and Deutsche Bank—had restrictive risk appetite policies, but that other banks—including Commerzbank and Novo Bank—could have and would have processed the payments.  This alone is sufficient to defeat PDVSA's defense.  Further, it is undisputed that *three banks*—China CITIC, DMBL, and JPMorgan—actually processed payments from PDVSA to D-R.

China CITIC was PDVSA's originating bank for the November 21, 2017 attempted

payment (*see* JX-10), and DMBL was the originating bank for the February 12, 2018 attempted payment (*see* JX-30 at column Q).  While both China CITIC and DMBL were foreign banks, because the transaction involved a U.S. beneficiary (D-R), both banks were subject to the same sanctions regulations as a domestic financial institution.  (Tr. 185:21–25, 194:25–195:4.)  Despite these regulations, both China CITIC and DMBL processed the payments from PDVSA earmarked for D-R.  This is evident by the simple fact that the next bank in the chain of each transaction— Deutsche Bank, in the case of China CITIC, and JPMorgan, in the case of DMBL—received the payment.  (*Id.* 186:5–11; 194:19–24.)  If either China CITIC or DMBL had rejected the payment, then Deutsche Bank or JPMorgan, respectively, would never have received it.  (*Id.*)

In the same vein, JPMorgan—the intermediary bank in the February 12, 2018 attempted payment (*see* JX-31 at 2)—processed the payment along to Citibank, which is clear from the fact that Citibank received the payment.  (Tr. 187:10–21.)  Mr. Barker concedes, in agreement with Ms. Rice, that JPMorgan was a "very reputable, very responsible" organization.  (*Id.* at 389:9–18.)  However, Ms. Rice, relying on her knowledge of JPMorgan's "very sophisticated sanctions compliance program," which is "generally on the more conservative side when it comes to accepting risk," was able to conclude that JPMorgan processed the payment because it was compliant with both OFAC regulations and JPMorgan's risk appetite. (*See* Tr. 241:5–242:4.)  Ms. Rice explained that because the screening process is an "automated platform" that "look[s] for any words that suggest a potential sanctions risk," and because "PDVSA was explicitly referenced on the face of the payment because it was the originating party . . . there is very little, if no, chance that an internal sanctions screening platform would have failed to pick up on the reference to PDVSA in the payment." (*Id.* 241:15–242:4.)  On the other hand, just as Mr. Barker would not state an opinion as to whether any particular change would create "new debt" (*see supra* section

IV.B.3.i), he would not opine as to which was more likely: JPMorgan's processing the payment was deliberate, or it was a mistake. (Tr. 390:6–391:14.)

The Court will of course decide which of those opinions is more credible, but the undisputed fact is that three banks actually processed payments from PDVSA to D-R, further undercutting PDVSA's impossibility defense.

### D.    PDVSA Elected to Make Payments in Connection with U.S. Bonds.

Finally, PDVSA's impossibility defense fails because the record establishes that PDVSA paid creditors other than D-R during the same time period that PDVSA contends it was "impossible" to pay D-R. Indeed, as testified to by PDVSA ad hoc board member Horacio Medina, in May 2019—over a year and a half after PDVSA's expert contends it first became impossible for PDVSA to pay D-R in November 2017 (Tr. 366:15–367:15)—PDVSA paid interest on bonds that matured in 2020. (Tr. 291:17–293:9.) And Mr. Medina conceded that the monies used to pay the interest came from a U.S. bank account in the name of the Central Bank of Venezuela, which was accessible to the Guaidó government—monies that would have been freely available to pay D-R as well. (Tr. 293:10–294:13.) Notably, there was no "impossibility" related to PDVSA paying the bond interest through a U.S. bank.

The only apparent distinction between PDVSA satisfying its payment obligation related to the bond interest and not doing the same for payments owed to D-R is the fact that the bond interest was a secured debt whereas D-R's debt was unsecured. (Tr. 299:15–301:8; ECF No. 19.) As Jose Ignacio Hernandez Gonzalez, the special prosecutor of the Republic of Venezuela, swore in a Declaration filed with this Court, PDVSA's ad hoc board of directors "authorized the payment of interest on PDVSA bonds secured by the shares of Citgo in order to preserve PDVSA assets for the Venezuelan people." (ECF No. 19 at ¶ 10.) Thus, it is evident that PDVSA was capable of paying creditors, like D-R, but it prioritized paying creditors that had the ability to seize shares in

Citgo.  Mr. Medina even testified during trial that PDVSA would not pay D-R unless and until there was a final judgment – conceding that PDVSA has the ability to pay D-R today if it were sufficiently induced into doing so.  (Tr. 301:22–302:3.)  This Court should not reward PDVSA for its selective approach to paying its debt, particularly where that selective approach, on its own, defeats its newfound claim of impossibility.

## V.     CONCLUSION

For all of the foregoing reasons, judgment should be entered in favor of D-R in the form of the Proposed Order attached hereto as Exhibit A.

Dated:    New York, New York
          October 15, 2021

REED SMITH LLP

By:    /s/ Jordan W. Siev
       Jordan W. Siev
       Geoffrey G. Young
       Nicole Lech
       599 Lexington Avenue
       New York, NY  10022
       Tel. (212) 521-5400
       Fax. (212) 521-5450

       *Attorneys for Plaintiff*