**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DRESSER-RAND COMPANY,

                    *Plaintiff,*

    v.

PETRÓLEOS DE VENEZUELA, S.A. *et al.*,

                    *Defendants.*

**Case No. 19-cv-02689 (LLS)**


**PLAINTIFF'S REPLY TO DEFENDANT'S POST-TRIAL BRIEF**


REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
(212) 521-5400

*Attorneys for Plaintiff*
*Dresser-Rand Company*

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................. 3

I.      PDVSA IMPERMISSIBLY ATTEMPTS TO SHIFT ITS BURDEN TO D-R ................ 3

      A.      That No Other Third-Party Witnesses Were Called is Damaging to PDVSA's Case—Not D-R's. ................................................................. 3

      B.      Although PDVSA had the Burden to Take Virtually Every Action to Perform, the Evidence Shows that PDVSA did Virtually Nothing, While D-R Actually Acted ....................................................................... 6

            1.      The Record Reflects That PDVSA Barely Took Any Actions to Perform Under the Note, Despite Its Clear Obligation to Do So ............... 7

            2.      The Record Reflects That D-R Went to Great Lengths to Facilitate PDVSA's Payment, Even Though It Was Not Obligated to Do So ................................................................... 11

II.     PDVSA HAS NOT, AND CANNOT, MEET ITS BURDEN OF PROVING IMPOSSIBILITY ................................................................................................. 13

      A.      PDVSA Has Not and Cannot Establish That Sanctions Made Performance Impossible ...................................................................... 14

            1.      PDVSA's Interpretation of E.O. 13808 and FAQ 553 is Untenable. ...................................................................................... 14

            2.      PDVSA's Arguments as to How the Note Agreement was Changed Into New Debt are Contradicted by the Record ......................... 16

      B.      PDVSA has Not and Cannot Establish That Banks' Risk Appetites Made Performance Impossible. .......................................................... 19

CONCLUSION ....................................................................................................................... 21

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Chevron Phillips Chem. Co. v. Kingwood Crossroads, L.P.*,
   346 S.W.3d 37 (Tex. App. 2011) .......................................................................11

*Ebert v. Holiday Inn*,
   No. 11 CIV. 4102 ER, 2014 WL 349640 (S.D.N.Y. Jan. 31, 2014), *aff'd,* 628
   F. App'x 21 (2d Cir. 2015) ..............................................................................4

*Gap Inc. v. Ponte Gadea N.Y. LLC*,
   No. 20 CV 4541-LTS-KHP, 2021 U.S. Dist. LEXIS 42964 (S.D.N.Y. Mar. 8,
   2021) .............................................................................................................4

*Hammond v. Toy Indus. Ass'n*,
   8 F. Supp. 3d 484 (S.D.N.Y. 2014)..................................................................12

*Harriscom Svenska, A.B. v. Harris Corp.*,
   3 F.3d 576 (2d Cir.1993). (PDVSA Br. .).........................................................10

*Kascewicz v. Citibank, N.A.*,
   837 F. Supp. 1312 (S.D.N.Y. 1993)...................................................................8

*In re September 11 Property Damage*,
   481 F. Supp. 2d 253 (S.D.N.Y. 2007)................................................................4

*U.S. Fire Inc. Co. v. China Union Lines Ltd.*,
   496 F.2d 1198 (2d Cir. 1974)............................................................................4

*U. S. Fire Ins. Co. v. China Union Lines Ltd.*,
   375 F. Supp. 652 (S.D.N.Y. 1973)....................................................................4

*United States v. Bedford Assocs.*,
   548 F. Supp. 732 (S.D.N.Y. 1982)...................................................................12

**Rules**

Fed. R. Evid. 703 ....................................................................................................15

ii

Pursuant to the Court's directive and the parties' agreement dated September 27, 2021, Plaintiff D-R respectfully submits this Reply to Defendant PDVSA's Post-Trial Brief.[1]

## PRELIMINARY STATEMENT

PDVSA's Post-Trial Brief seemingly concedes a pivotal point:  PDVSA realizes it cannot carry its burden to prove its performance was excused on account of impossibility.  That burden was a heavy one to begin with, but now, given the added weight of the documentary and testimonial evidence adduced at trial, PDVSA simply cannot satisfy its burden.  Left with no alternative, PDVSA attempts to shift its burden to D-R—an exercise in futility that must be rejected by the Court.

Notably, PDVSA does not dispute that D-R established its prima facie case.  Yet, now that it is time for PDVSA to prove its affirmative defense of impossibility, PDVSA instead focuses much of its Post-Trial Brief on what D-R did not do.  This is all a distraction.  PDVSA owed the money; PDVSA had the obligation to pay; and PDVSA had the obligation to figure out a way to make that happen, not the other way around.  The critical issue here is what **_PDVSA did not do_** and whether **_PDVSA_** met its burden of proving impossibility.  The evidence shows that PDVSA did **_next to nothing_**, and as a result, PDVSA has not met its burden.

The entirety of evidence PDVSA points to as proof that it took "virtually every action within its powers" to pay D-R is "that it attempted on at least three occasions to make the third payment" to D-R and "proposed" alternative means of payment.  (PDVSA Br. at 1, 10.[2])  These three payment attempts were made to the same Citibank account after PDVSA knew that Citibank was not a viable option, and despite D-R providing PDVSA with the alternative options of

---

[1]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plaintiff's Post-Trial Brief (ECF No. 145) ("D-R Brief" or "D-R Br.").

[2]  "PDVSA Br." refers to PDVSA's Post-Trial Brief, dated October 15, 2021 (ECF No. 144).

Commerzbank and Novo Bank.  PDVSA ignored these options while D-R took the necessary steps to make the alternatives a reality.  Simply put, PDVSA did far from "virtually every action within its powers" to pay D-R.  To find otherwise flips the burden of proof on its head:  the party asserting impossibility could prevail by arguing, without any proof, that "we didn't take additional steps as we have unilaterally surmised they wouldn't have made any difference."  Neither the law nor common sense supports such a finding.

Moreover, PDVSA cannot now deflect from these fatal facts by relying on after-the-fact arguments that were never raised during the course of the parties' performance.  In its Post-Trial Brief, PDVSA takes the remarkable position that "D-R did not . . . present any credible evidence that would support a finding that any bank was willing to process PDVSA funds."  (PDVSA Br. at 1.)  Setting aside that, under New York law, it is not D-R's burden to prove payment was possible, D-R in fact did present such proof.  D-R presented documentary and testimonial evidence that **at least three other financial institutions** (JPMorgan, China CITIC, and DMBL) processed payment from PDVSA under the Note Agreement, and that **two other banks** (Commerzbank and Novo Bank) had no policy in place restricting payment from PDVSA.  Thus, PDVSA cannot credibly stand by its position that **every single bank in the world** would have rejected its payment for risk appetite reasons.

But, PDVSA's incredible positions do not stop there.  PDVSA argues that the parties agreed to change the payment date of the third interest payment such that it was no longer considered late at all, even though the record shows that PDVSA asked for a 30-day waiver to "**remedy the delay**" in its missed payments.  PDVSA also argues that D-R agreed not to put PDVSA in default and to waive default interest, even though PDVSA affirmed at the time that it would "comply with **all of its commitments**" under the Note Agreement, and never requested—

2

nor did D-R ever grant—a waiver of default interest.  PDVSA's assertion that D-R agreed to waive default interest is purely self-serving conjecture unsupported by a shred of evidence.

After assessing each of PDVSA's ill-fated arguments, it is clear why PDVSA has resorted to a thinly-veiled attempt to shift the burden to D-R:  PDVSA has no better option.  In sum, PDVSA has wholly failed to carry its burden of proving its impossibility defense; therefore, judgment should be awarded to D-R for the full amount due on the Note, plus attorneys' fees and costs.

## ARGUMENT

### I.      PDVSA IMPERMISSIBLY ATTEMPTS TO SHIFT ITS BURDEN TO D-R

PDVSA attempts to shift its burden to D-R in two material ways.  First, PDVSA argues that D-R had the burden to prove payment under the Note Agreement was possible, and D-R's decision not to call certain witnesses proves that such witnesses would have offered testimony favorable to PDVSA.  (*See* PDVSA Br. at 1–2.)  Second, PDVSA argues that D-R did not do enough to effectuate PDVSA's payment attempts.  (*Id.* at 9.)  PDVSA is wrong on both counts.

### A.      That No Other Third-Party Witnesses Were Called is Damaging to PDVSA's Case—Not D-R's.

Much of PDVSA's Brief is devoted to D-R's decisions at trial—criticizing D-R's choice not to present testimony from JPMorgan Chase ("JPMorgan") or Commerzbank A.G. ("Commerzbank").  From this, PDVSA argues that D-R's "failure to present any bank testimony (or even documents) can only mean one thing:  payment under the Note was impossible, and D-R knew that any evidence it unearthed from third-parties or elsewhere would only lend support to PDVSA's defense."  (PDVSA Br. at 2.)

As a matter of New York law, it is undisputed that PDVSA has the burden of proving impossibility and that it must demonstrate an event that "destroy[s] the means of performance and lead[s] to impossibility or impracticability."  (PDVSA Br. at 3.)  Because the burden lies with

PDVSA, this Court, as a threshold matter, cannot draw any inference from D-R not calling witnesses at trial.  *See U. S. Fire Ins. Co. v. China Union Lines Ltd.*, 375 F. Supp. 652, 654 (S.D.N.Y. 1973), *aff'd sub nom. U.S. Fire Inc. Co. v. China Union Lines Ltd.*, 496 F.2d 1198 (2d Cir. 1974) (explaining that to draw an inference from the failure of a party without the burden of proof to call a witness or produce evidence is improper, as it would allow the party with the burden of proof to "evad[e] his legitimate burden" (citations omitted)); *cf. In re September 11 Property Damage*, 481 F. Supp. 2d 253, 258 (S.D.N.Y. 2007) ("Defendants have the burden to plead the affirmative defense, by answer or by motion; the plaintiff is not required to allege facts to negate the affirmative defense.").

Moreover, because the impossibility defense is only applied in "extreme circumstances," the onus was on PDVSA to call the very witnesses that it now claims D-R should have called.  *Gap Inc. v. Ponte Gadea N.Y. LLC*, No. 20 CV 4541-LTS-KHP, 2021 U.S. Dist. LEXIS 42964, at *26 (S.D.N.Y. Mar. 8, 2021); *cf. Ebert v. Holiday Inn*, No. 11 CIV. 4102 ER, 2014 WL 349640, at *7 (S.D.N.Y. Jan. 31, 2014), *aff'd,* 628 F. App'x 21 (2d Cir. 2015) ("[I]mpossibility excuses a party's performance 'under very limited and narrowly defined circumstances.'" (citations omitted)). PDVSA's defense rests on the theory that "***[n]o bank*** . . . was willing to process the payments based on their [sic] internal risk appetites."  (PDVSA Br. at 1 (emphasis added).)  In other words, it was PDVSA's burden to prove at trial that ***every single bank in the world*** would have rejected PDVSA's payment to D-R.  Such a far-reaching position presents a tall order, requiring PDVSA to leave no stone unturned and call every bank possible to testify—or, at the very least, the seven banks relevant here.[3]

Instead, PDVSA chose to only call witnesses from two banks: Citibank and Deutsche Bank.

---

[3]  The seven banks involved in the transactions are: (1) Citibank, (2) China CITIC, (3) Deutsche Bank, (4) DMBL, (5) JPMorgan, (6) Commerzbank, and (7) Novo Bank.

PDVSA claims that the evidence regarding these two banks "vividly illustrated the unwillingness" of every single bank in the world to process payments from PDVSA.[4]  (PDVSA Br. at 1.)  This is an incredible inference that PDVSA seeks from the Court, *i.e.*, to take the policies of merely two banks and, from that, draw a conclusion as to the state of the entire worldwide financial industry. Moreover, it begs the question of why ***PDVSA*** did not present testimony from JPMorgan or Commerzbank or any of the other banks involved, especially because PDVSA knew that acceptance of payment by JPMorgan and Commerzbank was at issue in the case.  (*See* ECF No. 119 at 15, 23–24.)  Tellingly, PDVSA included a Commerzbank witness on its trial witness list, and Commerzbank's witness, Jennifer Yang, was ready to testify at trial, but PDVSA then made the strategic decision at trial not to call Ms. Yang as a witness.[5]  But, PDVSA makes no effort to explain why it did not present testimony from these banks when it is apparently so confident that "any evidence  . . . unearthed from third-parties or elsewhere would only lend support to PDVSA's defense."  (PDVSA Br. at 2.)

The only inference to be drawn is that PDVSA knows that, far from lending support to PDVSA's defense, any additional evidence would have reinforced the documentary evidence already in the record—which is that a number of banks ***were*** processing payments from PDVSA under the Note Agreement and would have continued to do so but for PDVSA's failure to even try.  (*See* D-R Br. § IV.C.)  As D-R set forth extensively in its Post-Trial Brief, at least three banks processed payments from PDVSA to D-R, and at least two other banks did not have policies precluding payment from PDVSA to D-R.  (*See* D-R Br. § IV.)  PDVSA's arguments to the

---

[4]  As shown in the D-R Brief, Citibank and Deutsche Bank actually represent two disparate approaches to processing transactions involving PDVSA, and Deutsche Bank's policy was, in most respects, no more restrictive than the bare minimum required to comply with applicable sanctions.  (*See* D-R Br. at 28–29.)

[5]  PDVSA named Ms. Yang on its witness list on August 12, 2021, subpoenaed Ms. Yang to appear and testify at trial on August 27, 2021, and accounted for Ms. Yang in the parties' pre-trial discussions on the order of witnesses on September 10, 2021, only to then inform D-R on the second day of trial that it did not intend to call Ms. Yang.

contrary are borderline frivolous.  (*See infra* Section II.B.)  Thus, D-R, which undisputedly proved its *prima facie* case, did not need to introduce any additional testimony to establish that banks were processing payments from PDVSA in order to disprove PDVSA's unsupported affirmative defense.  PDVSA, on the other hand—***the party with the burden*** to show that its performance was impossible and, theoretically, the party with the most to gain from additional testimony—elected not to call any other banks.  In sum, that no additional third-party witnesses were called says far more about the weaknesses of PDVSA's position than it does about D-R's.[6]

### B.   Although PDVSA had the Burden to Take Virtually Every Action to Perform, the Evidence Shows that PDVSA did Virtually Nothing, While D-R Actually Acted.

Throughout its Brief, PDVSA pushes the false narrative that it was "significantly more proactive in trying to work with its banks to process the payments than was D-R."  (PDVSA Br. at 9.)  In doing so, PDVSA claims that D-R "hindered" PDVSA's performance, but this is yet another attempt by PDVSA to distract from its own inaction.  The reality is that D-R was under no obligation to take affirmative action, but nonetheless went above and beyond to facilitate payment from PDVSA.  PDVSA, on the other hand, did virtually nothing to effectuate payment before eventually ceasing all discussions with D-R.  All that said, whether PDVSA did "significantly more" (which the record belies) or D-R did significantly less (which the record belies), it ***does not matter***: PDVSA is the debtor; PDVSA owed the performance of payment; and PDVSA has the burden to prove its affirmative defense.

---

[6] PDVSA's claim that D-R failed to present documents in support of its position (*see* PDVSA Br. at 2) is easily dispensed with.  All of the joint exhibits were received into evidence at trial (Tr. 28:12), and Joint Exhibits 10, 30, 31 36 and 64, among others, make clear that China CITIC, DMBL, and JPMorgan processed the payments at issue, and Commerzbank and Novo Bank would have processed the payments.  (*See* D-R Br. § IV.B-C.)

1.    **The Record Reflects That PDVSA Barely Took Any Actions to Perform Under the Note, Despite Its Clear Obligation to Do So.**

PDVSA's claim that it was "proactive" is premised on two facts: first, after PDVSA tried and failed to pay D-R through D-R's Citibank account, PDVSA tried twice more via the exact same means, which also failed; and second, PDVSA merely ***proposed*** (but did not follow through on) two alternative means of payment—Commerzbank and Novo Bank.  Neither fact, however, either on its own or taken together, shows that PDVSA was "proactive," let alone that it "exhausted all reasonable options to pay under the Note," as PDVSA contends.  (PDVSA Br. at 13.)

*First*, PDVSA's three attempted payments do not amount to much.  This represents the bare minimum effort PDVSA could have taken, and, thus, falls an immense distance short of taking virtually every action.  In fact, PDVSA's decision to repeatedly attempt payment into the same non-viable Citibank account, without ever considering what it could do differently, actually undercuts PDVSA's position.  It is undisputed that PDVSA was aware that second and third payment attempts were likely to fail in January and February 2018:  PDVSA knew of the existence of E.O. 13808 by no later than November 29, 2017 (*see* JX-13 at 4 (letter from PDVSA to D-R referring to E.O. 13808)), and PDVSA knew that "Citibank rejects payments from PDVSA" by no later than December 18, 2017 (JX-15 at 2-3; *see* PDVSA Br. at 10).  But, after its first payment attempt into D-R's Citibank account failed on November 21, 2017, PDVSA did nothing differently.[7]  For example, as PDVSA concedes, "Citibank was never provided the details of the purpose of the transaction with PDVSA" (PDVSA Br. at 24); had PDVSA provided that information—or made any attempt to follow-up with Citibank about the rejected payment

---

[7]  PDVSA's point that it used "two different originating banks" (PDVSA Br. at 13) is irrelevant.  The originating banks were never the problem:  China CITIC, the first originating bank, processed the payment, as did DMBL, the second originating bank.  (D-R Br. at 40–41.)  Further, at least one intermediary bank, JPMorgan, also processed the payment.  (*See* D-R Br. at 41.)

attempts—PDVSA could have clarified that the payment related to a debt owed in connection with a January 2017 note, and was thus not "new debt."   Accordingly, PDVSA can hardly be credited for making second and third payment attempts when PDVSA was, by that time, aware of their likelihood to fail and ignored the alternative options available to it.  (*See* D-R Br. at 31.)

*Second*, while PDVSA proposed two alternative banks for sending its payment—again, further evidence that PDVSA knew, at the time, that Citibank was not likely to accept the payment—PDVSA did nothing more.  PDVSA concedes that it did not even respond to D-R after D-R provided PDVSA with account information for Commerzbank, nor is there any evidence that PDVSA attempted to make a payment into the Commerzbank account.  (*See* Agreed Facts 10–11; *see also* Tr. 31:21–23, 32:23–33:3, 44:23–45:16.)  PDVSA also concedes that it ignored D-R's repeated outreach regarding payment through Novo Bank.  (Agreed Fact 13; Tr. 36:21–24.) PDVSA now argues—again, based on nothing more than bald speculation—that neither Commerzbank nor Novo Bank were viable.  D-R refutes this in detail in its Post-Trial Brief (D-R Br. § IV.B) and *infra* Section II.B.  But, PDVSA never raised these concerns contemporaneously; they are manufactured, after-the-fact excuses.  In fact, PDVSA's current position that Novo Bank was not a viable alternative flies in the face of the record since ***PDVSA proposed Novo Bank***— where PDVSA itself had an account—to D-R as a suitable alternative.  Thus, PDVSA is simply wrong when it says that "[n]one of these efforts panned out because, after the imposition of E.O. 13808, payment under the Note was impossible."  (PDVSA Br. at 13.)  PDVSA's "efforts" did not "pan out" because there was no real effort at all.[8]

---

[8]  The fact that these concerns were not contemporaneously raised by PDVSA further supports D-R's position that PDVSA did not take "virtually every action within its powers to perform."   Not raising an allegedly legitimate concern relating to an alternative option at the time the option is processed and now relying on that concern as a scapegoat cannot amount to taking virtually every action to perform.  *Cf. Kascewicz v. Citibank, N.A.*, 837 F. Supp. 1312, 1320 (S.D.N.Y. 1993) (deposition testimony amounting to an "after-the-fact rationale[]" could not constitute material evidence of intent).

These are of course not the only examples of actions that PDVSA failed to take, and it would be impractical to list them all.  There are, however, two other omissions by PDVSA that are worth noting—namely, PDVSA's failure to attempt payment to D-R via check or to contact OFAC.  With respect to the former, PDVSA claims that payment through check was not possible because Citibank would have rejected the payment, and if D-R attempted to deposit the check at a different bank, "those banks would have applied their own risk appetite policies to the check and rejected it."  (*Id.* at 28.)  PDVSA tellingly offers no citation for the notion that any bank D-R tried to deposit or cash the check with would have rejected the check.

In fact, D-R could have deposited the check at any one of the other banks with which it maintained an account—including JPMorgan (which actually processed one of PDVSA's payment attempts (*see* D-R Br. at 41)), and Commerzbank (which the record shows would have processed the transfer (*see id.* at 33–34; *infra* § II.B.)—and found out for sure whether or not it would accept the check, but PDVSA prevented that from happening.  (*See* Tr. 70:3–71:17.)  D-R also maintained accounts at Deutsche Bank and Danske Bank, which also may have processed the check.  (*See id.* 70:3–71:17.)

Indeed, Deutsche Bank rejected PDVSA's November 21, 2017 payment attempt pursuant to its Venezuela Decision Matrix only because it was acting solely as an intermediary bank and did not know the purpose of the transaction (which, again, could have potentially been addressed if PDVSA had simply reached out to Deutsche Bank about the transaction).  (*See* D-R Br. at 28–29; JX-65.)  However, the Venezuela Decision Matrix provides that if a Deutsche Bank client is involved and Deutsche Bank is not acting as an intermediary bank, Deutsche Bank can "pass/release" the transaction after obtaining clarity from its client that the transaction does not involve new debt.  (JX-65.)  Thus, had PDVSA paid D-R through a check, D-R—a Deutsche Bank

client—could have explained to Deutsche Bank that the transaction did not involve new debt and, under the Venezuela Decision Matrix, the payment would have been processed.  PDVSA cannot excuse its failure to even try to make payment via check on the basis that it has now, years later, unilaterally concluded that that the check would not have been processed.  Regardless of PDVSA's current position on the viability of a bank accepting a check, PDVSA's failure to engage in the simple act of sending a check to D-R, as permitted under the Note Agreement, exemplifies PDVSA's failure to try all available means to fulfill its contractual obligations.

Regarding PDVSA's failure to seek guidance from OFAC, PDVSA brazenly argues that "D-R could have sought written guidance from OFAC on whether the payments on the Note were permitted under existing sanctions regulations, but apparently never did."[9]  (PDVSA Br. at 2.) PDVSA somehow fails to see the irony in this statement, considering that it simply highlights *yet another* action that PDVSA failed to take:  if any party should have contacted OFAC, it was the party whose burden it was to take virtually every action to perform—***PDVSA***.  That it did not, only to now cast aspersions on D-R for failing to do so, again exemplifies PDVSA's efforts to impermissibly shift its burden to D-R.

In sum, while it is PDVSA's burden to show that it took virtually every action to perform under the Note, there is scarce evidence of PDVSA taking any meaningful action to pay D-R.[10]

---

[9]  PDVSA gratuitously—and misleadingly—states that D-R refused "to turn over its communications with OFAC on the grounds that doing so would be 'unduly burdensome,' but then, in a complete about face, D-R admitted on the first day of trial that no such communications with OFAC existed." (PDVSA Br. at 2.)  To be clear, D-R objected to PDVSA's subpoena on various grounds, including that it would be unduly burdensome to require PDVSA "to undertake a comprehensive review of its emails and records dating back to 2017 in order to comply with the Subpoena," particularly in light of the fact that the trial was set to begin in mere days.  (ECF No. 137 at 2.)  That D-R's review ultimately revealed no communications does not mean that the review itself was not burdensome; it was, which, given the eleventh-hour nature of the subpoena, was likely what PDVSA was hoping for all along.

[10]  PDVSA attempts to lessen its burden by arguing that it "need not show that it took every action that had only a remote chance of succeeding," citing *Harriscom Svenska, A.B. v. Harris Corp.*, 3 F.3d 576 (2d Cir.1993).  (PDVSA Br. at 4.)  But the issue in *Harriscom* was not that the action "had only a remote chance of succeeding," it was that the action itself was prohibited by the United States government, which "had undoubted power to compel compliance." *Id.* at 580.  Here, D-R does not argue that PDVSA should have acted in defiance of an applicable prohibition; D-R

2.     **The Record Reflects That D-R Went to Great Lengths to Facilitate PDVSA's Payment, Even Though It Was Not Obligated to Do So.**

PDVSA attempts to paint D-R as dilatory at best or obstructionist at worst by arguing that D-R (1) hindered PDVSA's performance by failing to complete Citibank's compliance documents, and (2) derailed the Commerzbank and Novo Bank alternatives.  PDVSA is wrong on both counts.

*First*, with respect to Citibank, the story spun by PDVSA is that D-R "dragged its feet," "ignore[d] Citibank's entreaties," and "after all of that negotiation and months of delay . . . never completed the paperwork."  (PDVSA Br. at 7.)  Contrary to PDVSA's alternative reality, the record is clear on what transpired.  D-R expressed interest in the preauthorization process by no later than November 8,[11] and told Citibank that it was reviewing Citibank's paperwork with "top priority" on November 10.  (*See* JX-16 at 7–11.)  On November 18, D-R's general counsel, Denise Hansen, emailed Citibank explaining that D-R had retained outside counsel to thoroughly consider Citibank's documents, and that the process was "very important" to D-R.  (*See id.* at 6.)  Indeed, that D-R took the matter seriously is evident in the many revisions D-R made to Citibank's paperwork, which D-R provided to Citibank on November 18, and most of which Citibank ultimately accepted.  (*See* JX-16 at 3; JX-19.)  Only after that extensive effort did Citibank "switch gears" and tell D-R that, even with the certification paperwork in place, "the payments would not be processed."  (*See* Tr. 91:6–20; *see also* JX-16 at 2.)  It was for this reason that D-R did not

---

argues that there were no applicable prohibition at all, and PDVSA has presented no evidence that payment was prohibited by the applicable sanctions.

   PDVSA also argues that "[h]ighly uncertain actions and actions which depend on the agreement of third parties are not required to establish an impossibility defense," citing a Texas state court opinion, *Chevron Phillips Chem. Co. v. Kingwood Crossroads, L.P.*, 346 S.W.3d 37, 60 (Tex. App. 2011).  (PDVSA Br. at 4.)  *Chevron* is easily distinguished.  First, it applies Texas law.  *Id.* at 52.  Second, the "actions" in *Chevron* were extraordinary—commencing litigation or entering into indemnity or settlement agreements with third parties.  *Id.* at 60.  Here, D-R is simply arguing that PDVSA should be held accountable for failing to take ordinary, reasonable actions that any debtor would take if it were intent on paying its debt—such as attempting payment into a different account.

[11] PDVSA states that "D-R finally indicated its interest in preauthorization on November 18."  (PDVSA Br. at 7.)  This is a mischaracterization.  The record shows that Dominique Lemonnier of Siemens spoke with Elvira Baican of Citibank by no later than November 8, not November 18.  (*See* JX-16 at 11 (Ms. Baican referring to a "previous call" with Ms. Lemonnier on November 8).)

submit the certification form.  (*See* Tr. 59:2–7.)

PDVSA now claims "D-R cannot know for sure whether or not Citibank would have processed PDVSA payments because D-R never submitted the paperwork," and that D-R's failure to do so hindered PDVSA's ability to perform.  (PDVSA Br. at 8.)  But, near certainty is what the record reflects.  D-R was told that "the payments would not be processed" by Citibank (*see* Tr. 91:6–20), and the contemporaneous email correspondence confirms a change in Citibank's messaging.  (*See* JX-16 at 2 (speaking to the need to "avoid . . . confus[ing] the client and creat[ing] unrealistic expectations").)  PDVSA is thus asking the Court to find that D-R devoted significant time and resources to the certification process yet abandoned it, thus increasing its risk of not being paid, even though it believed there was a possibility that Citibank might process the payment if the documentation was submitted.  Of course, this is illogical and not supported by the evidence.  (*See* Tr. 91:6–20; *see also* JX-16 at 2.)  The fact is that D-R did not hinder PDVSA's performance vis-à-vis Citibank;[12] D-R went out of its way to keep the Citibank option open, only for Citibank to change course at the last minute.  PDVSA's position as to Citibank also ignores the fundamental fact that D-R made other options available to PDVSA following the Citibank certification process.

*Second*, with respect to Commerzbank and Novo Bank, D-R went to great lengths to facilitate those alternatives.  After PDVSA requested that "D-R provide another account at another bank in order to reprocess the outstanding debt service payment to date" on December 18, 2017 (JX-15 at 2; *see also* Tr. 31:9–20), D-R promptly provided PDVSA with account information for

---

[12]  PDVSA cites to two cases for its proposition that "a party that hinders performance under a contract discharges the other party from its obligations to perform."  (*See* PDVSA Br. at 8.)  But, in both of those cases, the obligee took affirmative steps to prevent the obligations in dispute from being satisfied.  *See Hammond v. Toy Indus. Ass'n*, 8 F. Supp. 3d 484, 495 (S.D.N.Y. 2014) (indemnitee refused to allow the indemnitor's counsel to control the indemnitee's defense); *United States v. Bedford Assocs.*, 548 F. Supp. 732, 737 (S.D.N.Y. 1982) (party's delay in securing congressional approval of lease, which undeniably would have permitted renovations to take place, excused obligation to perform renovations).

Commerzbank on December 27, and followed up again on January 16 and January 19, 2018, only for PDVSA to go silent.  (*See* JX-23 at 1; Agreed Facts 10-11.)  There is not a single document or any testimony in the record that PDVSA engaged *in any way* with D-R on the Commerzbank alternative.  Then, after PDVSA proposed Novo Bank, D-R agreed to open an account at Novo Bank, and even went so far as to draft an amendment to reflect payment to D-R in euros as opposed to U.S. dollars.  (JX-33 at 1–3; *see also* Tr. 34:14–17, 35:1–5.)  D-R emailed PDVSA three times— on March 9, April 2, and April 4, 2018—to schedule a meeting to discuss PDVSA's overdue interest payments, but was flatly ignored.  (Agreed Fact 13; Tr. 36:21–24.)  Nevertheless, D-R went through a "labor intensive process" (Tr. 34:14–21) to open the Novo Bank account, which finally occurred in October 2018.  Now, PDVSA has the temerity to complain that D-R did not inform PDVSA once it opened the Novo Bank account (PDVSA Br. at 12), even though, by that time, D-R had not heard from PDVSA *for months*.  The fact is, with respect to both Commerzbank and Novo Bank, it was D-R that went above and beyond to make these alternatives a reality.

All told, given D-R's consistent efforts and readily-apparent determination to make the payment happen, contrasted with PDVSA's inaction and non-responsiveness, one might be excused for thinking that D-R has the burden of proof on the defense of impossibility—but it does not.  The burden remains solely PDVSA's, which makes all of PDVSA's statements about what D-R supposedly failed to do not only factually inaccurate but also legally irrelevant.

## II.   PDVSA HAS NOT, AND CANNOT, MEET ITS BURDEN OF PROVING IMPOSSIBILITY

PDVSA's impossibility defense hinges upon two events that it claims made its performance impossible:  (1) the issuance of E.O. 13808, and (2) risk appetite policies adopted by every single bank in the world.  PDVSA's brief confirms that these so-called "events" did not come close to rendering PDVSA's performance impossible.

A.   **PDVSA Has Not and Cannot Establish That Sanctions Made Performance Impossible.**

PDVSA asserts that the parties changed the terms of the Note—thereby converting the Note into prohibited "new debt" under E.O. 13808—in three respects:  (1) the deadline for the third interest payment was extended; (2) PDVSA went from being in default to not being in default; and (3) the default interest rate no longer applied to the third interest payment.  The only way one can reach this conclusion is by ignoring the plain language of the FAQ 553, the policy objectives underlying the sanctions, and the actual text of the parties' correspondence.

1.   **PDVSA's Interpretation of E.O. 13808 and FAQ 553 is Untenable.**

Before unraveling PDVSA's theories as to how the parties changed the terms of the Note, a threshold issue of interpretation of FAQ 553 must be addressed—specifically, whether or not the materiality, or lack thereof, of a "change" matters in determining whether new debt was created. As explained in D-R's Post-Trial Brief, D-R's position is that FAQ 553 was not meant to establish a rule that any change, no matter how trivial, was sufficient to transform pre-existing debt into new debt.  (D-R Br. at 16–20.)  Relying on the language of FAQ 553 (which provides examples of two changes that would unquestionably be material changes to the debt instruments) and Ms. Rice's opinion based on her interpretation of FAQ 553, the guidance she received from OFAC and her explanation of the policy objectives underlying sanctions, D-R asserts that a change that has no bearing on the key terms of the debt and in no way flouts the objectives of E.O 13808, which were to ensure that additional resources were not extended to the target of the sanctions, does not transform pre-existing debt into new debt.  (*See id.*)

PDVSA claims that Ms. Rice's testimony was inconsistent in that she originally testified at her deposition that OFAC advised her a "formal" amendment was required to trigger new debt, but then supposedly changed her story at trial to assert that only a material change could trigger

new debt.  (*See* PDVSA Br. at 18–19.)  Not so.  As Ms. Rice explained at trial, she believed that "when OFAC spoke of formal changes to the debt instrument," it was, "in essence, equating formal and material" and that, whatever word is used, the point was that OFAC was concerned with "the terms that characterized the debt instrument."  (Tr. 231:6–232:3.)  And, indeed, this is consistent with the express language of FAQ 553.  (*See* Tr. 230:25–231:15.)  If PDVSA wants to harp on the fact that "formal" and "material" are not perfect synonyms, it is free to do so.  But Ms. Rice was not proffered as an expert in linguistics; she was proffered as an expert on the subject of OFAC sanctions.  Ms. Rice relied on her expertise to extrapolate the essence of OFAC's guidance and in doing so equated a "formal" change to a "material" change, which was perfectly reasonable under the circumstances and in no way amounts to evolving or conflicting testimony.

PDVSA also continues to ask this Court to disregard Ms. Rice's testimony about guidance she received from OFAC because her conversations with OFAC are undocumented and "her memory of what was said during the calls is vague."  (PDVSA Br. at 19–20.)  Yet PDVSA's own expert, Mr. Barker, conceded that it is common practice to call OFAC for guidance (Tr. 131:13–19, 134:2–4, 347:2–3).  Mr. Barker even said that ***he*** would call OFAC for advice.  (*See* D-R Br. at 36–37; Tr. 383:7–20, 384:9–17, 385:1–386:20.).  Clearly, Ms. Rice's conversations with OFAC are ***precisely*** the type of facts or data contemplated by Federal Rule of Evidence 703 when it states that such information need not be admissible for the [expert's] opinion to be admitted "[i]f experts in the particular field would reasonably rely on [that information] in forming an opinion on the subject."  Fed. R. Evid. 703.  Moreover, contrary to PDVSA's contention (*see* PDVSA Br. at 20), Ms. Rice's testimony is all the more reliable because the guidance she received from OFAC was consistent with what OFAC later published in FAQ 553.  (*See* Tr. 231:4–15.)

As for PDVSA, its position remains that "***any*** change" is sufficient to create new debt from

15

pre-existing debt.  (*See* PDVSA Br. at 15 (emphasis in original).)  PDVSA claims that its interpretation "makes a lot of sense" and is "entirely consistent with OFAC policy, which is to prevent creditors from "negotiating away or providing a discount on the debt without the U.S. Government['s] involvement . . . ." (*Id.*)  Yet PDVSA does not attempt to explain how a trivial change to a debt instrument could conceivably permit a creditor from "negotiating away or providing a discount on the debt."  Even more interesting, though, is that PDVSA never fully "buys-in" to its own theory.  At trial, Mr. Barker refused to affirmatively state that any change to the Note Agreement would convert it into "new debt."  Instead, he repeatedly testified that he would need to consult OFAC.  (*See* D-R Br. at 36–37; Tr. 383:7–20, 384:9–17, 385:1–386:20.) And now, in its Post-Trial Brief, PDVSA merely says that any change to the terms of pre-existing debt "must be viewed as *potentially* sufficient to create new debt."  (*See* PDVSA Br. at 15 (emphasis added).)  PDVSA's unwillingness to commit itself is understandable given the practical repercussions of its strict interpretation (*see* D-R Br. at 37–38), but it nonetheless undercuts the credibility of PDVSA's argument.  Thus, for these and all of the reasons set forth in D-R's Post-Trial Brief (*see id.* at 16–20), D-R's position is far more credible.[13]

### 2.    PDVSA's Arguments as to How the Note Agreement was Changed Into New Debt are Contradicted by the Record.

As for PDVSA's arguments about the supposed conversion of the Note into "new debt," none of them are supported by the record or, for that matter, by logic.  First, PDVSA claims that "[w]hile there is no dispute that the last sentence of FAQ 553 allows parties to accept late payment

---

[13]  For the same reasons that PDVSA's payment to D-R was permissible under E.O 13808, the payment was also not prohibited by Executive Order 13850 ("E.O. 13850").  Although E.O. 13850 blocked almost all payments from PDVSA beginning on January 28, 2019, absent a license from OFAC, General License 9, which was issued concurrently, permitted "all transactions and activities . . . ordinarily incident and necessary to dealings in any debt" issued by PDVSA prior to August 25, 2017.  (JX-44.)  Thus, the question under General License 9 is the same as under E.O 13808:  Was the debt at issue "new debt," either at creation or following a change in terms?  Because the Note and Note Agreement were issued prior to August 25, 2017, and were not changed within the meaning of FAQ 553 at any point, the answer here is "No."  Thus, General License 9 applies and permits PDVSA's payment to D-R.

on pre-existing debt . . . D-R did not agree to accept PDVSA's third-interest payment late; rather, it agreed to change the payment date such that payment was no longer considered late at all." (PDVSA Br. at 17.)   This position rests on a complete mischaracterization of the parties' communications.   PDVSA says in its Post-Trial Brief that on November 29, 2017, "PDVSA wrote a letter asking D-R to change the date of the third interest payment from October 20, 2017 to December 29, 2017."   (*Id.* at 13.)   This is false.   PDVSA did not ask D-R to "change the date of the third interest payment"; PDVSA requested a "*waiver* of 30 additional days" (JX-13 at 4)— similar to a request for a forbearance, not a request to make it as though the default never happened. If the parties had in fact changed the date of the third interest payment, then D-R would not be "waiving" anything.

Similarly, PDVSA's contention that "payment was no longer considered late at all" is belied by PDVSA's own words.   PDVSA requested its waiver "in order to *remedy* the delay in the aforesaid payment of interest" and reiterated its intention to "*remedy* any delay in the payment of the unpaid interest as soon as possible."   (*Id.* at 4 (emphasis added).)   If payment was "no longer considered late at all," then there would be no "delay" and nothing for PDVSA to "remedy."   It is clear that the parties' agreement was nothing more than an acknowledgement by PDVSA that payment was late, but that PDVSA still intended to make payment shortly, which of course D-R accepted in lieu of the alternative of receiving no payment at all.   This is precisely what the last sentence of FAQ 553 contemplates and permits.

PDVSA also argues that the parties' agreement resulted in PDVSA "not being in default" and that "the default interest rate no longer applied to the third interest payment."   (PDVSA Br. at 16.)   This is another position that is not supported—and is in fact rebutted—by the record. PDVSA's entire theory here rests on Mr. Scherzer's testimony that D-R did not want to "say [to

17

PDVSA], oh, yeah, you're in default." (PDVSA Br. at 16; Tr. 73:9–17.) Yet, all Mr. Scherzer conveyed was, given the "great relationship" between D-R and PDVSA, D-R did not want to call an "Event of Default" under Article VII of the Note Agreement and declare the Notes due and payable in full. (*See* JX-1 § 2.04, Art. VII.) But, as Mr. Barker acknowledged, PDVSA was automatically in "default" (although an "Event of Default" had not occurred) under Section 2.04 of the Note Agreement and 8.5% default automatically applied once PDVSA missed the third interest payment. (Tr. at 374:22–375:19 ("So under Section 2.04 . . . there's two defaults. There's a lower case default and an uppercase default, an [E]vent of [D]efault. . . . I haven't heard any testimony that says the formal [E]vent of [D]efault was triggered. So I think we're really talking about the first event of default, the lower case event of default.").) Thus, Mr. Scherzer's testimony that he did not want to "say" to PDVSA "you're in default" makes sense in the context of calling an "Event of Default"; D-R need not declare a "default," which was triggered automatically.

Furthermore, the Court need not mind D-R's internal thoughts about its relationship with PDVSA because there are written communications about what was or was not done to the Note Agreement to guide the Court on this point. In its November 29, 2017 letter, PDVSA affirmed that it would "remedy any delay ***in the payment of unpaid interest*** as soon as possible" and that it would "comply with ***all of its commitments*** under the Note Agreement," which includes its commitment to pay all unpaid interest. (JX-13 at 4 (emphasis added).) Thus, D-R can point to both the operation of Section 2.04 of the Note Agreement and the November 29, 2017 letter to show that PDVSA did not ask for, and D-R did not grant, relief from default interest at any point; PDVSA, on the other hand, cannot point to any documentary evidence to support its position, and instead must "suppos[e] from the testimony of Mr. Scherzer" that D-R agreed to not place PDVSA in default and to waive default interest. (Tr. 381:15–18.) The choice between the two is clear.

18

**B.**   **PDVSA has Not and Cannot Establish That Banks' Risk Appetites Made Performance Impossible.**

PDVSA claims that even if payment under the Note was not prohibited by OFAC sanctions, PDVSA's performance was still impossible because "no bank was willing to assume the risk of processing a payment from PDVSA under the circumstances here." (PDVSA Br. at 22.) Not so. As discussed in PDVSA's Post-Trial Brief (§ IV) and below, there is no evidence of a trend among banks to reject payments involving PDVSA based on risk appetite, let alone of a global consensus that ***all*** banks would have rejected the payment based on their respective risk appetites. The fact is that several banks processed the payment, and others would have done so, too.

PDVSA argues the extraordinary proposition that every single bank in the world would have rejected the payment due to its own risk appetite based upon the policies of only two banks—Citibank and Deutsche Bank. D-R has already explained how the Citibank and Deutsche policies differ and do not give rise to an inference as to how the entire global financial industry would have addressed the payments. (*See* D-R Br. § IV.A; *supra* § I.A.) Likewise, D-R has already explained that payment to an account other than Citibank or to an account held by Siemens, or payment in a currency other than U.S. dollars, would not have created "new debt" and was permitted under the Note Agreement. (*See* D-R Br. § IV.B.3.) D-R will not repeat either analysis here. But, D-R will correct PDVSA's gross mischaracterization of the Commerzbank and Novo Bank's policies.

In a troubled reading of the Commerzbank policy document, PDVSA interprets Commerzbank's internal "Business policy restrictions" to prohibit the processing of transfers from Venezuelan entities "if there are no links to the previously-mentioned transactions, which include payments in connection to the jurisdiction of the United States." (PDVSA Br. at 11.) This is incorrect. The Commerzbank policy states that "Transfers of funds . . . from a Venezuelan person

. . . may be processed, if there are no links to the above mentioned restrictions."[14]  (JX-64 at 9.)

There are only two "above mentioned restrictions."  One pertains to the exportation of certain

goods and is plainly irrelevant here.  (*See id.*)  The other restriction reads as follows:

> It is prohibited to process directly or indirectly transfers of funds or other transactions
> to Venezuelan persons, organisations [sic] or institutions, if there are indications for
> a connection to the financial system or jurisdiction of the United States.

(*Id.*)  In other words, a transfer involving a connection to the financial system or jurisdiction of the

United States is prohibited if such transfer involves the direct or indirect transfer or funds or other

transactions **to** Venezuelan persons.  PDVSA nevertheless claims that a connection to the

jurisdiction of the United States is **in and of itself** sufficient to trigger the restriction.  But if

PDVSA's interpretation were correct, why would Commerzbank not just say that it is prohibited

to process transactions **from** Venezuelan persons if there is a connection to the jurisdiction of the

United States?  Why instead use a cumbersome reference to "above mentioned restrictions"?  The

reason is that PDVSA's interpretation is nonsensical.  For PDVSA to claim that Commerzbank's

policy, as written, prohibits a payment from PDVSA to D-R is borderline frivolous, especially

faced with the fact that PDVSA elected not to call Commerzbank's representative at trial.

Finally, PDVSA's emphasis that "Scherzer admitted at trial that he is not aware of anyone

at D-R ever asking any of its euro-based banks if they would accept payment from PDVSA"

(PDVSA Br. at 13) is misplaced.  While this again is an impermissible attempt to shift the burden

of proof, and whether or not Mr. Scherzer could recall such a conversation, the record shows that

on April 6, 2018, Siemens contacted a representative of Novo Bank, asking if the bank could

"accept payments in EUR or USD from the Venezuelan state-owned company, PDVSA."  (JX-36

---

[14]  PDVSA uses the language "the previously-mentioned *transactions*."  (PDVSA Br. at 11 (emphasis added).)  This is not what the Commerzbank policy says.  The distinction is subtle, but the actual language—"above mentioned restrictions"—necessarily shows that PDVSA's interpretation is meritless.

at 7–8.)  Novo Bank responded that "[t]here are currently no embargoes or restrictive measures in place regarding commercial and financial transactions in Venezuela and, as such, there are no grounds for the rejection of transactions to and from Venezuela."  (*Id.* at 7.) Thus, according to Novo Bank itself, it would have processed the payment.

The notion that every single bank in the world would have rejected PDVSA's payment based on its risk appetite was dubious to begin with, but Commerzbank and Novo Bank's policies make it abundantly clear that this was not the case.  If more were needed, as discussed in D-R's Post-Trial Brief (§ IV.C), at least three other banks—JPMorgan, China CITIC, and DMBL— ***actually processed the payments at issue***.  In sum, the evidence establishes that banks' risk appetite policies did not make it impossible for PDVSA to perform under the Note Agreement.

## **CONCLUSION**

For all of the foregoing reasons, judgment should be entered in favor of D-R in the form of the Proposed Order attached to D-R's Post-Trial Brief as Exhibit A (ECF No. 145-1).

Dated:   New York, New York
        November 5, 2021

REED SMITH LLP

By:   */s/ Jordan W. Siev*
      Jordan W. Siev
      Geoffrey G. Young
      Nicole Lech
      599 Lexington Avenue
      New York, NY  10022
      Tel. (212) 521-5400
      Fax. (212) 521-5450

      *Attorneys for Plaintiff*